No. 26-1232

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

SHIRLEY WEBER, *et al.*,

Defendants-Appellees

NAACP; NAACP CALIFORNIA-HAWAII STATE CONFERENCE;
SERVICES, IMMIGRATION RIGHTS AND EDUCATION NETWORK;
LEAGUE OF WOMEN VOTERS OF CALIFORNIA,

Defendants-Intervenors-Appellees

ON APPEAL FROM THE ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

**APPELLANT'S EXCERPTS OF RECORD
(VOLUME 2 OF 3)**

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
CHRISTOPHER C. WANG
  Attorneys
  Department of Justice
  Civil Rights Division
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 532-3803

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cv-09149-DOC-ADSx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| SHIRLEY WEBER, ET AL, | ) | Thursday, December 4, 2025 |
| | ) | ( 7:38 a.m. to  9:09 a.m.) |
| Defendants. | ) | (12:01 p.m. to 12:58 p.m.) |
| | | ( 2:00 p.m. to  2:31 p.m.) |
| | | ( 2:31 p.m. to  2:33 p.m.) |


HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE


APPEARANCES:                SEE PAGE 2


Court Reporter:        Recorded; CourtSmart


Courtroom Deputy:      Karlen Dubon


Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

ER-36

2

**APPEARANCES**:


For Plaintiff:            ERIC V. NEFF, ESQ.
                          U.S. Department of Justice
                          150 M St. NE, Suite 8-139
                          Washington, DC 20002
                          202-532-3628

For Intervenors:          GRAYCE S.P. ZELPHIN, ESQ.
                          American Civil Liberties
                          Union of Northern California
                          39 Drumm Street
                          San Francisco, CA 94111
                          530-515-8978

                          CHRISTOPHER D. DODGE, ESQ.
                          Elias Law Group
                          250 Massachusetts Ave. NW
                          Suite 400
                          Washington, DC 20001
                          202-987-4928

For Robert Page:          SUZANNE E. SHOAI, ESQ.
                          Orange County Counsel
                          P.O. Box 1379
                          Santa Ana, CA 92702
                          714-834-3300

For Defendants:           MALCOLM A. BRUDIGAM, ESQ.
                          Office of the Attorney General
                          1300 I Street
                          Suite 125
                          Sacramento, CA 95814
                          916-210-7873

                          ROBERT W. SETRAKIAN, ESQ.
                          California Department of Justice
                          300 S. Spring Street
                          Suite 1702
                          Los Angeles, CA 90013
                          213-269-6668

ER-37

3

Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.

(Call to Order)

THE COURT:  -- Shirley Weber.

(Pause)

THE COURT:  And, counsel, as you're seated, let me take one more matter.  Just remain seated for a moment.

(Pause)

THE COURT:  All right.  Thank you then.  I think that resolves the rest of the morning calendar.  So first of all, good morning.

MR. NEFF:  Good morning, Your Honor.

THE COURT:  This is the matter of United States v. Shirley Weber.  It's case number 25-09149.  And, counsel, you can just remain seated.  You can pretend it's state court if you want to, but make your appearances.

MR. NEFF:  Eric Neff on behalf of the United States.  Good morning, Your Honor.

THE COURT:  Thank you.

MR. BRUDIGAM:  Deputy Attorney General Malcolm Brudigam on behalf of defendants Secretary of State Shirley Weber and the State of California.

THE COURT:  Okay, thank you very much.

MR. SETRAKIAN:  Deputy Attorney General Will Setrakian on behalf of defendants State of California and California Secretary of State Shirley Weber.

ER-38

4

THE COURT:  Thank you very much.  I appreciate it.

MR. DODGE:  Chris Dodge on behalf of Intervenors NAACP and Siren.

MS. ZELPHIN:  Grace Zelphin on behalf of Intervenors League of Women Voters of California.

THE COURT:  Is anybody here representing what I call the County case?

MS. SHOAI:  Good morning, Your Honor.

THE COURT:  Come on up.  What we're doing here may be of interest to you.  So we want your appearance.

MS. SHOAI:  Thank you, Your Honor.  Deputy County Counsel --

THE COURT:  No, no, wait, wait till we get a good recording of you.

MS. SHOAI:  Good morning, Your Honor.  Deputy County Counsel Suzanne Schoai on behalf of --

THE COURT:  I see.  Why don't you have a seat?  Do you have any other colleague with you today?

MS. SHOAI:  No, Your Honor.

THE COURT:  All right.  So first, I'd like to address plaintiff's motion for order to produce records pursuant to 52 U.S.C. 20701 that was filed on Monday, set for hearing today.  I appreciate the speed, but not at the expense of due process.  And although I've encouraged us to move forward as quickly as possible concerning the substantive issues, this is

5

not the due process because there needs to be at least 28 days' notice before a date for hearing under CD California Rule 6-1.

The plaintiff is seeking to reach the ultimate question in this case regarding the production of records and thousands of voters' lives will be impacted by this case. And the Court will not be setting the matter on any legal -- I don't want to say gamesmanship, but therefore, the motion for order to produce records pursuant to 52 U.S.C. 20701 is denied.

Now, you can once again follow the process and procedure in terms of due process. We'll have time potentially, but this doesn't supply the due process needed.

Second, I'd like to hear arguments if there are any on two motions regarding amicus briefs. First, there was a motion for leave to file an amicus brief brought by 16 states. Those states are Arizona, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

The second request was to file an amicus brief and it was filed by the former secretaries of state and the proposed amicus briefs are allegedly from a bipartisan group of state secretaries for the states of Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, and Washington.

Does any party have a statement to make regarding these amici briefs and any wisdom on your part that if I allow

6

these amici briefs, whether I should then extend for some period of time the opportunity for additional briefs from interested parties, because these are the parties that have directly contacted the Court, but there may be other parties that piecemeal choose to come in, and then I'm deciding that on an almost ex-parte basis, case by case as they come to me, unless you're flying out here for every single hearing for every requested amici brief.

So I was thinking if I was going to allow these, that I should throw this open for 7 days or 14 days for the amici briefs to come in during the period of argument and try to sort through whatever the Court's opinion would be and give you that courtesy and simply extend it.  But I'm looking for your wisdom on that because you can anticipate if I'm getting these amici requests now, I promise you, as soon as you leave the courtroom, there's going to be another request.  And I don't want to do that ex parte without your wisdom on both parties' parts.

So let's start with the first group.  This motion for leave to file an amici brief by 16 states, and one of my concerns was whether this would become a bipartisan effort, for instance, of Democrats and Republicans using the Court in a sense, in a political sense, not necessarily a substantive sense.  But I noticed there are what I consider some swing states, New Mexico certainly was during the last election,

7

Minnesota was, Michigan certainly was, Arizona was and has been what is popularly referred to as a swing state in a number of elections, and I don't know the voting history, for instance, of Illinois or Maryland, for instance.  I don't know how they've swung in different elections between the parties, and I don't know if that's even a consideration, but I was inclined to accept this amici brief, but only after discussing this with you folks.

So why don't you talk amongst each other or to yourself, and then state what your respective positions might be on this.

**(Pause)**

**(Recessed at 7:46 a.m.; reconvened at 7:48 a.m.)**

**THE COURT:**  Well, let me start with plaintiffs in this matter.  What are your thoughts?

**MR. NEFF:**  The United States' biggest concern is that this is resolved.  The United States' foremost and only concern is that this is resolved in a manner that, as the Court shares the concern, that it needs to be handled expeditiously.  As long as --

**THE COURT:**  Yeah, because it's got to get to the Ninth Circuit and probably the Supreme Court.

**MR. NEFF:**  And then there's, yes, and as long as amici don't get in the way of that, we have no objection.

**THE COURT:**  Okay.  And then I'll ask, if we do this,

8

what the time period is and how, but let me turn, and I've got my entities turned around, so please, once again, on behalf of?

MR. NEFF:  The State, Your Honor.

THE COURT:  The State.

MR. NEFF:  Yeah.  So we consent to the filing of these amici briefs, and we're happy to do a blanket consent.

THE COURT:  Okay.  That way you're not flying down or up in each occasion, because I'm a little hesitant to start parsing out which ones.  I just assumed to give a time period, and those that are relevant, et cetera, we can all focus on. Those that aren't, we'll read anyway.  Counsel?

MR. DODGE:  The NAACP intervenors joined the State's position and agreed to blanket consent.

THE COURT:  Okay, and Women, League of Voters?

MS. ZELPHIN:  Same.  We --

THE COURT:  And just a case for the County, we don't want to exclude them.  What would your position be?

MS. SHOAI:  We have the same position, we don't have any objection, although the Court knows that the case against the County is stayed, but for the record.

THE COURT:  Yeah, but no objection really.

MS. SHOAI:  Correct.

THE COURT:  All right.  What time period would I give these and how would -- I think I would simply docket this.  I'm going to put this case on a public website also, which we often

9

do in federal court, and that way the public has access to the transcripts, they have access with transparency when we have matters of this import.  How long?  Two weeks, three weeks?  In other words, we'll hear the arguments today, but it's going to take a while for the Court to write.

**MR. BRUDIGAM:**  I think two weeks would be fine, Your Honor.

**THE COURT:**  Two weeks?

**MR. BRUDIGAM:**  Yeah.

**THE COURT:**  Counsel, what's your wisdom?

**MR. DODGE:**  I would join in two weeks as I was explaining to co-counsel.  I think, you know, the Department of Justice has now brought something like 14 of these suits against various states, and so I think that has given the public good awareness of these proceedings, and so I think two weeks is sufficient to give any interested amici time to --

**THE COURT:**  Okay.  What's your wisdom on behalf of the Women, League of Voters and NAACP?

**MS. ZELPHIN:**  I agree with the --

**THE COURT:**  Two weeks?  What's your wisdom on behalf of plaintiff?

**MR. NEFF:**  As long as it doesn't delay this proceeding.

**THE COURT:**  Well, two weeks won't delay it.

**MR. NEFF:**  Yeah.  So that two weeks --

ER-44

10

THE COURT:  It's actually pretty quick for amici briefs.

MR. NEFF:  Two weeks sounds fine to the United States.

THE COURT:  Now, you just said something that this case is one now of 14 cases.  I didn't know that before.  Are we, in a sense, the lead case, or are cases more recently filed?

MR. NEFF:  This is, I think, the case moving at the fastest speed, Your Honor.  There were two cases filed before this one, but this one is out ahead of all of them.

THE COURT:  I see.  All right.  Would you reach a joint stipulation for me, then, and help the Court with the wording that amici briefs are requested by the Court.  Give that a two-week period of time.  Certainly that way we're before the holidays.  Well, just a moment.  We've got Thanksgiving coming up, don't we?

MR. NEFF:  We just had Thanksgiving, yeah.

THE COURT:  Yeah, we just passed it, so we're through that holiday, thank goodness.  No, I mean with goodness.  Thanksgiving, good.  You know, it's perfect.  Two weeks because we're not going to get caught on the Jewish/Christian holidays anyway, and if we do, it's a short period of time for the Jewish faith.  So, all right, then two weeks.

Could you fashion that for me today by agreement, and

11

I'll send out that docketed minute order today and get copies to you.

MR. NEFF:  We will.

THE COURT:  All right, this is the time for argument. You can take as long as you want, and there will be two rounds. I'm going to ask the intervenors to argue in this matter.  If the County wants to contribute in any way, you're welcome to, although in a sense you're not involved today.  But if you have something to say, I don't want to shortchange that.

And as intervenors, when I appointed two of you, that doesn't mean you necessarily agree.  I'm not looking for a concerted position on some issues.  There may be a variance. So you're not here as a uniform body.  When I appointed each of you, I think you're a broad and representative group, and therefore, in a sense, as intervenors, you're arguing your position either collectively, if you decide to, or individually.  And let's begin with who?

MR. NEFF:  I think it would be the people that brought -- the party that brought the motion, but submitted to the Court, Your Honor.

THE COURT:  Let's do it by procedure and start with them.  So, counsel, go to the lectern then and restate your name, because we're on Court Smart.  Otherwise, we don't have a very good record.

MR. BRUDIGAM:  Deputy Attorney General Malcolm

12

Brudigam, on behalf of Defendants Secretary of State Shirley Weber and the State of California.  And for the Court's awareness, Your Honor, I'm going to be handling the portion of the State's motion related to Title III of the Civil Rights Act of 1960, the National Voter Registration Act, and the Help America Vote Act, while my colleague, Will Setrakian, is going to handle the balance of the arguments concerning the federal privacy laws.

**THE COURT:**  Thank you.

**MR. BRUDIGAM:**  So, this case is before you today, Your Honor, because DOJ has insisted that California send it an unredacted electronic copy of its statewide voter registration list, which contains the personal information of over 23 million California voters.  Now, when DOJ approached California requesting this information, as federal law requires, California did make some records available for their inspection.  And as California law also requires, it only did so with appropriate redactions to voters' most sensitive personal information.  But DOJ, they didn't accept this offer, and they brought this lawsuit.

And so I want to be clear that this lawsuit is about DOJ wanting to get the social security numbers, the driver's license numbers, and the personal information of California voters, and it wants them all in an electronic format.  But federal law doesn't require this, and in fact, California law

13

prohibits it.

So, as you can tell, there's a, at the heart of this case, there is a question of whether federal law preempts state law. That's a key issue. But before we even get to that question, Your Honor, there's a series of initial legal and pleading hurdles that DOJ cannot even overcome. And so I'm going to address those initial legal hurdles claim by claim.

So first, with respect to Title III of the Civil Rights Act of 1960, that claim faces both a jurisdictional and a substantive defect. So to start, DOJ sued in the wrong court. The text of Title III is clear that the court that has jurisdiction to compel relief is the one where the records were demanded or where the records were located. And here, that's Sacramento. And so the proper district court to compel relief would be the Eastern District of California. And the only response that DOJ provides for this jurisdictional defect in their opposition is that it erroneously asserts that millions of these records are created and maintained in the Central District, but the fact of the matter is, is that the records are located and they can only be accessed in Sacramento. And also, their assertion isn't entirely true either, because a vast majority of the records within the statewide voter registration database, they flow in there through the DMV or the statewide online voter registration form.

And, you know, last year that accounted for almost 90

ER-48

14

percent of the records -- that 90 percent of the registrations or updates to registrations.  So on that ground, Your Honor, you should dismiss this Title III claim because the Court lacks jurisdiction to compel any relief under that statute.

So even if the Court does decide to take jurisdiction, DOJ encounters another statutory hurdle in Title III's text, which is that the demand doesn't contain a valid statement of the basis and the purpose for the records sought. So DOJ's demand lacks any basis at all.  None has been alleged in the complaint.  And the alleged purpose, evaluating -- a single sentence saying that they want all these records to evaluate compliance, to evaluate California's compliance with the NVRA, that's not a valid purpose under Title III.

A valid purpose would be one that relates to a civil rights investigation into discrimination in voting, and DOJ has admitted that that's not the purpose of their investigation here.  So we have two hurdles already that DOJ can't overcome.  But beyond that, even the relief that they seek in the complaint is inconsistent with the text of Title III.  The Title III only requires that the Secretary make records available at her principal office, and that's something that the Secretary already offered them.  And that's demonstrated through the letters that were exchanged between the Secretary and DOJ in advance of this litigation and which have been incorporated into the complaint and are properly before the

ER-49

15

Court on this motion to dismiss.

And so what those records show is that DOJ can't -- has not pled any plausible entitlement to relief based on what's already been offered.  And so again, there's another legal hurdle that DOJ cannot overcome.  And even assuming they could get past all three of those, Your Honor, then we're faced with the preemption question: whether this Title III law would even preempt California's voter information protections.  And there's no precedent involving Title III preempting a state law, but I would say that the analysis would be very similar to cases evaluating the NVRA and whether that law's disclosure provision would preempt a state law.

**THE COURT:**  What's the Court's standard in deciding that issue?

**MR. BRUDIGAM:**  I'm sorry, what was that?

**THE COURT:**  What's the Court's standard in deciding that issue.

**MR. BRUDIGAM:**  So yes, that standard is first, the Court would look at the text, of course, and see if there is a conflict between the text of the federal law and the state law.  And so here, Title III's text, it says nothing about prohibiting or redacting sensitive voter information.  And I would point Your Honor to a First Circuit case, Public Interest Law Foundation v. Bellows, where the same silence in the text on this question of redaction in the NVRA was found to be

ER-50

16

sufficient to find that the State could properly redact records that were being disclosed.  So that's the first question that the Court looks at.

The next thing that the Court should consider is whether the State law would, you know, get in the way of the objective of this federal law, you know, hinder whatever Title III is aimed to do.  And here, there's just no connection between protecting voters' personal information, on the one hand, and then an investigation into a civil rights violation or discrimination in voting.  There's just a disconnect between these two goals of these two laws.  And I think it's important to remember that states didn't begin collecting this sensitive information until 2002, when the Help America Vote Act was enacted.  That's over 40 years after Title III was enacted.  And so they weren't even contemplating social security numbers and driver's license numbers being turned over in those records.

And if you look at the Kennedy v. Lynd decision, a Fifth Circuit decision that DOJ basically -- their whole case relies on this decision, which is obviously nonbinding.  But if you go through that, you'll notice at the very end that they talk about the records that are being turned over were public records.  They didn't contain the type of sensitive information that we're dealing with here.  And so --

THE COURT:  What's the sensitive information in this

17

case?

            MR. BRUDIGAM:   What's the sensitive information?

            THE COURT:   Let's start with social security numbers.  The government certainly already has access to those.  Is it the linking of those social security numbers to the individual voter that causes a privacy concern or a Title III concern?

            MR. BRUDIGAM:   Yeah.  I mean, it's the linking of that social security number with not just the voter's name, but their address, their method of registering to vote, their voter participation history, their political party registration.

            THE COURT:   Just a moment.  So voter registration history?

            MR. BRUDIGAM:   Yeah.  And voter participation, which elections they voted in, which party they're registered with.  It's the connection of all of this information.

            THE COURT:   Would the government be able to ascertain how that person voted?

            MR. BRUDIGAM:   No.  No.  That's -- yeah, the secret ballot is protected, but --

            THE COURT:   So the privacy concerns so far that I'm hearing in your papers are the social security numbers, the addresses of the voter, the history -- I'm sorry, voter registration, the history of the turnout at the poll, in other words, the fact whether they voted or not, but not the way that

18

they voted.

MR. BRUDIGAM:  So to be clear, Your Honor, the specific information we're concerned about, which is protected by California law, is driver's license numbers and social security numbers.  That other information, they are entitled to inspect that information, and we've given them that opportunity already.

THE COURT:  All right.

MR. BRUDIGAM:  But the big problem is --

THE COURT:  Go through a list for me what you've given them.

MR. BRUDIGAM:  Well, we haven't given them anything. What we did is we offered them to come to the office and inspect all these records.

THE COURT:  What did you offer them?

MR. BRUDIGAM:  We offered them to inspect the entire statewide voter registration.

THE COURT:  No, I want you to list it for me now.  In other words, I want to parse out what you believe is worthy of protection and what you've already offered to disclose, and I want a clear record of that.

MR. BRUDIGAM:  Sure.

THE COURT:  So slow down and go through that, point by point.

MR. BRUDIGAM:  Of course, Your Honor.  So what we

**EXCEPTIONAL REPORTING SERVICES, INC**

ER-53

19

want to protect are the social security numbers and the driver's license numbers in voters' records, and there's other information protected by California law.

**THE COURT:** Other?  Not good enough for my record.

**MR. BRUDIGAM:** Which is the voter's signature.

**THE COURT:** Okay, signature.

**MR. BRUDIGAM:** Whether they made a choice of a language preference of how they want to receive their ballot.

**THE COURT:** All right.

**MR. BRUDIGAM:** And also related to driver's license number, if they have an ID number rather than a driver's license number.

**THE COURT:** All right.  Thank you.

**MR. BRUDIGAM:** And everything else we've made available.

**THE COURT:** And I want you to list everything else.

**MR. BRUDIGAM:** So everything else, I'm not sure if I have a comprehensive list, but it would be name.

**THE COURT:** If you don't, I don't.

**MR. BRUDIGAM:** So that comprehensive list is located in a regulation that we cited in our brief.

**THE COURT:** Then recite it to me.  We've got lots of attorneys here.  I've got lots of time.

**MR. BRUDIGAM:** Sure.  I believe I'd have to look up.

**THE COURT:** Would you step over?

ER-54

20

MR. BRUDIGAM:  Okay.

THE COURT:  This lumping together isn't going to get it for me.  All right.  So I want to know exactly what you're seeking to protect and what you're not.

(Pause)

THE COURT:  Thank you.

MR. BRUDIGAM:  Of course.  So the regulation that specifies exactly what they're permitted to inspect is Title II of the California Code of Regulations, Section 19-001 subdivision H.  That includes name, address, phone number, email, birth dates, voter participation history, registration method, their current registration status.  Are they active?  Are they inactive?  And I believe that's everything.  That is everything.

THE COURT:  And you're seeking to protect that?

MR. BRUDIGAM:  No.

THE COURT:  You're seeking to turn that over?

MR. BRUDIGAM:  Yes.  We've offered it.

THE COURT:  Go through that again very slowly. Names, addresses, voter participation.

MR. BRUDIGAM:  Yeah.

THE COURT:  Registration method.

MR. BRUDIGAM:  Right.

THE COURT:  What else?

MR. BRUDIGAM:  Registration status.

21

THE COURT:  Registration status.

MR. BRUDIGAM:  And contact information, phone number and email.

THE COURT:  Okay.

MR. BRUDIGAM:  Not every voter necessarily provides an email.

THE COURT:  Okay.  Thank you.

MR. BRUDIGAM:  Okay.  And so that's what we've made available.  And so I just want to, and again, the focus is just the --

THE COURT:  Once again, you have not made available social security numbers and driver's license.

MR. BRUDIGAM:  Correct, Your Honor.

THE COURT:  Okay.

MR. BRUDIGAM:  Okay.  So I want to just bring us back to the preemption question.  So we have no direct conflict between state law and federal law, and I think it's also important to look at the federal law that requires the State to collect social security numbers and driver's license numbers.  That statute is the Help America Vote Act.  And in requiring states to collect that information, they did not limit the state's ability to make that information confidential.  In fact, HAVA specifically stated that the choices on the methods of complying with this requirement shall be left to the discretion of the states.  That's 52 U.S.C. Section 21085.

ER-56

22

So California, in its discretion delegated under HAVA, chose to keep voters' social security numbers and driver's license numbers confidential.  And if you look at the state law making them confidential, this is Elections Code Section 2194(b)(1).  It says that information added to the voter registration records to comply with the requirements of the Federal Help America Vote Act of 2002 are confidential and shall not be disclosed to any person.

So the bottom line is that the best way to read Title III with California's state law protections and HAVA is a reading where there is no conflict.

**THE COURT:**  And what part of jurisprudence deals with this issue?  Is there any?

**MR. BRUDIGAM:**  So there is no jurisprudence specifically dealing with Title III preemption of state laws.  And that's why we think the case law evaluating NVRA preemption, which has a disclosure provision, is the most suitable vehicle for that analysis.

And so, Your Honor, what I just went through were three legal hurdles that the Government cannot overcome in their Title III claim.  And even if they were able to get past these three legal hurdles, the state law protecting this specific information is not preempted by Title III.  And so that's our argument on Title III of the Civil Rights Act.

I want to move on to the NVRA claim.  This is the

23

second count.

THE COURT:  Sure.  Let me ask you a question along the way, and we've got plenty of time.

MR. BRUDIGAM:  Sure.

THE COURT:  On one hand, you're arguing that this Court would use a procedural means and find that this Court didn't have jurisdiction and potentially the Eastern District did or Sacramento, as you've termed it.  That then would not resolve this case on the merits.

MR. BRUDIGAM:  It wouldn't resolve that claim on the merits.

THE COURT:  Well, resolve that claim.  But I thought each of you were looking for a broader resolution.  In other words, I don't what I'm going to do with the jurisdictional issue right now, but I do know that it's important to all of us to get this issue resolved in some form, get it to the circuit, get it to the Supreme Court, but that could take place in another state.  That could become your lead case.

So do you want this resolved on substantive grounds, or are you seeking to have this resolved on procedural grounds?  And if I accept your jurisdictional argument, you're not going to have a substantive ruling.  Maybe Michigan issues it, or New Jersey.  I mean, think about that for a while.  You don't have to respond right now, but make sure you don't, in a sense, win a battle and lose a war, okay?  Because I thought that you were

24

here for one reason, and that was to get this resolved as a precedent-setting case by both sides.  And then if there's a conflict in another jurisdiction, it goes up in another circuit, et cetera, or it goes up on appeal, however this Court decides these issues for the Ninth Circuit.

So think about whether you really want this resolved substantively or not.  Now, that doesn't mean you give up your argument, of course, but if I did rule in your favor, then you're going to have a substantial portion of this case that's not resolved here.  It'll be resolved in some other jurisdiction, like Arizona, maybe, okay?  Up to you.  So think about that.  All right.  Now, your next argument.

**MR. BRUDIGAM:**  Yeah, we will think about that.  Thank you, Your Honor.

**THE COURT:**  I want to hear from the Women League of Voters.  Do we want these issues resolved here, or do we want to potentially piecemeal these out, okay, and the NAACP as intervenors, okay?  I'll be asking those questions.

Counsel, thank you, but please continue.

**MR. BRUDIGAM:**  Of course.  So turning to the NVRA claim.  So DOJ just simply hasn't alleged a plausible violation under the NVRA.  So as I mentioned at the beginning, the alleged facts in this case, they show that the Secretary has complied with that law's public inspection provision.  As I've mentioned, the Secretary made the statewide voter registration

25

list available to DOJ for its inspection, and nothing more is required under that statute.  And so they haven't plausibly alleged a violation of the NVRA's public inspection provision. And here, we have a lot better case law on the question of redactions.  And courts have universally permitted that disclosures under the NVRA are that states can redact highly sensitive information like social security numbers and driver's license.  And DOJ doesn't cite any contrary authority.  And, in fact, until this case, it has repeatedly taken the position in legal briefs before court of appeals, federal court of appeals, that the NVRA does permit these kind of redactions.

THE COURT:  In those cases and the circuits that they're in.

MR. BRUDIGAM:  Sure.  So the most recent one would be the Public Interest Foundation v. Benson, which is a Sixth Circuit case that was decided earlier this year, and the brief that DOJ filed stated that position.

THE COURT:  And is that in the briefing that was submitted to the Court?

MR. BRUDIGAM:  That's cited.  It isn't.  It's not in our briefing, but it is in --

THE COURT:  Because I've missed that, so that's why I'm slowing you down.

MR. BRUDIGAM:  Sure, sure.

THE COURT:  I'd like to see that briefing.  I'd like

26

to see if DOJ has taken a contradictory position in the past and what their argument was on one hand if you're arguing today that they're changing their position.  So you've got time.

MR. BRUDIGAM:  Sure.

THE COURT:  As colleagues, you don't have to dig that out right now.  Just make a note of that.  I want to see if there's a constant, as I call it, in terms of DOJ's position or if it's contradictory.  I didn't see that reading the record or at least I didn't pick that up.

MR. BRUDIGAM:  So there's that case.  And I think the one that we do cite in our moving papers is the First Circuit case, Public Interest Law Foundation v. Bellows.  And in that case, DOJ, again, takes the same position.  That's a 2024 case.

THE COURT:  But at least then, if both cases were before the Court, the Court would see in both the First and the Sixth Circuit.  From your standpoint, Judge, this just isn't the First Circuit as a one-off.  This is a consistent position. Do you know of a contradictory position that the DOJ has taken prior to arguments today in another circuit?

MR. BRUDIGAM:  I do not.  And, in fact, I'll give you one more brief.  In the Fourth Circuit, this is a 2012 case, and I think their brief was submitted in 2011.  This is the Long case.

THE COURT:  Public Interest v. Long?

MR. BRUDIGAM:  No, it's -- it's Project Vote v.

27

Long.

THE COURT:  Is this in the briefing?

MR. BRUDIGAM:  That's -- it's in Intervenors NAACP Siren's briefing.

THE COURT:  All right.  When you argue that, please call that back to my attention because you've got briefing that's pretty scattered right now.  I'm going to want all of those, and I'm going to want any contradictory position or any synonymous position that DOJ has taken so I can see the reasoning before different courts across the country, and if they're filed in the Sixth, the First, and the Fourth, I'd be interested to see if these are like positions or varying positions and what the arguments are.

MR. BRUDIGAM:  Of course.  We'd be happy to provide those.  So, again, the courts have been unanimous.  DOJ has been unanimous in concluding that under the NVRA's disclosure provision, highly sensitive voter information can be redacted.

THE COURT:  Why is the social security number that the Government already has access to, highly sensitive information?  Is it what it leads to after you obtain that information, or is it the social security number in and of itself?

MR. BRUDIGAM:  I mean, I think it would be both, and I think it's a good question, Your Honor.  If they have these social security numbers, why are they coming and getting them

28

--

THE COURT:  Well, the argument's going to be we, the Government, already have this.  What's the sensitive information if we have access to it?  And therefore, I expect the argument, and the briefing argument seems to allude to the fact that it's not highly sensitive.  That's going to be DOJ's position.

MR. BRUDIGAM:  Well, whether or not they want to construe social security numbers as sensitive or not, the bottom line is that the claims that they're suing under do not require us to turn this over, period.

THE COURT:  Driver's license information, that's uniquely California.  That's not, in our case anyway, uniquely a California, what I view as a state.

MR. BRUDIGAM:  I think that's right.

THE COURT:  Information.

MR. BRUDIGAM:  Right.

THE COURT:  And in that case, much more information could be available, let's say, that you would have concerns about.  There, DOJ normally, I would think, doesn't have information to California information, which could be more extensive than just a social security number.  What are you concerned about concerning driver's license information?

MR. BRUDIGAM:  I mean, driver's license information is connected to many different, you know, state programs,

ER-63

29

participation in various programs, and so that's information that, you know, many voters wouldn't want to be --

THE COURT:  So name those programs.

MR. BRUDIGAM:  I don't --

THE COURT:  Well, go over and talk to your counsel. Slow down.  Go over and consult.

MR. BRUDIGAM:  Okay.

THE COURT:  Okay.  This is your opportunity.

MR. BRUDIGAM:  Sure.  Sure.

THE COURT:  And DOJ and the other parties will have the same courtesy.  Because there appears from the briefing that there's a much greater, let's say, if nothing else, privacy right and much more information that can be dispersed, and that seemed to be uniquely California oriented, not federally oriented.

**(Pause)**

MR. BRUDIGAM:  So I can't give you a list right now.

THE COURT:  Sure you can.  You've got lots of time.  Step over and talk to your colleague now.

MR. BRUDIGAM:  Well, so we don't have that information at the tip of our fingertips.  We, of course, can go and talk to our client and figure out exactly what that information is connected to, but I would just say that the key point here is less what it's connected to and the fact that California law protects it.  The legislature has made a

30

decision that this voter information is confidential, and the federal laws that are being invoked cannot overcome that protection.  And so --

**THE COURT:**  So no preemption.

**MR. BRUDIGAM:**  That's right.

**THE COURT:**  Just a moment.  Eventually, I'm going to ask each of you a very broad question that you should anticipate.  And that is, it may be that in some areas, such as the Social Security information, that there is a state and federal interest, and if I find that both have an interest, how does the Court balance that?  What factors would I use in making my decision to citing preemption or not?  In other words, in balancing the factors.  And what would be my standard preponderance, clear and convincing?  How do I make that decision?  What standard am I basing that on?  Or is it simply textual?  Now, don't answer that.  You've got lots of time.

The second is, in other areas, there may be a unique state right, or different states, whether it's Arizona or California, request information of voters.  And there, there may be a much greater right, and federal preemption may not take place, but I need to know what you're protecting, because the argument from DOJ will and should be, Judge, we also should have access to this information, and I'll wait for their argument.

Uniquely, it seems, historically, that the states

31

have controlled the process and procedure in terms of a voter. The federal government has rarely moved into this area, except in the civil rights era in the South.  And those were extraordinary circumstances.  But normally, each individual state not only enforces these rights through their local district attorneys or their local law enforcement agencies, but historically, these rights have seemed to be state rights.

When I get to DOJ, I'm going to be asking you, why are you requesting driver's license in particular?  And what's the federal, you know, nexus to this?  Okay, so be forewarned about that question.  So, counsel, please continue.

**MR. BRUDIGAM:**  Sure, and I just want to make a comment in response to that, Your Honor.  I think that that's really a great point.  And if you look at the amicus brief submitted by the group of bipartisan former Secretaries of State, they make this point very strongly in their brief that states are the default --

**THE COURT:**  Can I present to you something?  I haven't read those carefully for one reason.

**MR. BRUDIGAM:**  Sure.

**THE COURT:**  I want to read all the amicus briefs if I'm going to allow them at one time.  I don't want to start forming opinions in a piecemeal fashion as I get one amicus brief from one party, which is why I've delayed having this discussion with you and gotten your position if I can get these

32

amicus briefs at one time.  I think it's dangerous for a court to piecemeal that, in a sense.  So I want to, now that we know we're going to get amicus briefs in two weeks, I've glanced at them in terms of trying to make a determination whether I would allow them or not, but I was waiting for your input.

So I represent to you, it's been a quick, quick read and brief discussion with my law clerks, and that's about the extent of it.

MR. BRUDIGAM:  Got it.

THE COURT:  Okay?  So when you refer me to that, I'll go back now and read, but --

MR. BRUDIGAM:  Yes, bookmark it.

THE COURT:  Yeah, okay.

MR. BRUDIGAM:  Yeah, yeah.

THE COURT:  I will.

MR. BRUDIGAM:  Okay.  So I just want to finish on this disclosure provision under the NVRA.  So the last thing you said is, okay, so this doesn't preempt California law, but I want to actually just back up one step, which is that even irrespective of state law, courts that have looked at this question have allowed redactions of this highly sensitive material, whether or not there was necessarily a state law involved.

THE COURT:  Which courts?

MR. BRUDIGAM:  So I think the main one would be the

33

First Circuit, the Public Interest Legal Foundation

v. Bellows.  And that is really the lead case on this question,

and it cites a number of authorities reaching the same

conclusion.  So I think that would be the best --

**THE COURT:**  Behind this is your concern that there's

voter suppression that would take place?  In other words, as we

argue the different Title III, et cetera, there's always some

politics behind almost every case that the Court gets.  In some

way, is this, from your view, not only the protection of this

information under the statutes, but also a concern that there's

any voter suppression?

**MR. BRUDIGAM:**  Well, I think that's a good question,

Your Honor.  And part of the problem here, first thing is we

want to protect this information, but we're getting no

explanation, no rationale whatsoever for all of these records,

why the DOJ wants these records.  So we don't even have an idea

exactly what they want to do with them.  But I think voter

suppression is certainly something we're concerned about and a

possibility, but --

**THE COURT:**  I expect DOJ to argue that they want to

stop illegal voting.

**MR. BRUDIGAM:**  And I would say that they would need

to allege some sort of facts, a statement or basis in support

of their demand, a statement of the basis and the purpose, if

that is their true purpose and basis, because what they've said

34

so far is not that.  They've said very specifically, the purpose of these records is to evaluate compliance with the NVRA's list maintenance provisions.

And what those provisions require, just so you understand, is that states conduct a general program that makes a reasonable effort at removing ineligible voters from the voter list by reason of death and those who move.  And so -- and that really brings me to the next point about the NVRA, is that aside from not alleging a violation of the disclosure provision, they also have not alleged any violation of the NVRA's list maintenance provision that I just listed out there.  There's just no facts whatsoever.

And they actually suggest that they can't even allege anything in support of a violation, because they're saying that these records are -- you know, not having these records prevents them from assessing compliance, which is -- which doesn't make sense under the legal standard for that claim.

And so that's our argument regarding the NVRA count.  So I'm going to move on to the last count.  This is the Help America Vote Act claim.  And so again, DOJ really runs into the same problems.  They haven't alleged a violation of that law in their complaint, and it should be dismissed.

So the first violation of HAVA that they say, or that they that they allege, is that California not turning over these records in response to their demand violates HAVA.  Well,

ER-69

35

that's just not true.  If you read the statute, there is no disclosure provision in that law.  And DOJ admits this in their opposition, and that admission is dispositive on this claim, because the Ninth Circuit has held that a government investigative demand is created solely by statute.  And here, there's nothing in the statute requiring we disclose these records or turn them over.  And so when we consider whether HAVA could preempt state laws, or California state law, there's just no conflict whatsoever, and so there is no preemption there.

And then beyond the nondisclosure of records, they also kind of -- they attempt to allege other violations of HAVA, which don't really make any sense.  They just assert legal conclusions about certain provisions in HAVA, but they don't allege any facts in support of them.  You know, they allege that we're violating the provision, which requires us to collect social security numbers and driver's license numbers, which doesn't make any sense, because that's why we're here today, because we have that information and we're protecting it.

And so I would just say, if you look at that claim, it falls far below the Twombly-Iqbal plausibility standard.  And, you know, beyond not actually alleging a violation, like with the NVRA, they also suggest that they can't allege any violation, because they need -- supposedly need these records

36

to evaluate compliance.

I would just -- the one point they make on HAVA is that it lacks a private enforcement mechanism.  It can only be enforced by the federal government.  And this is, and they're basic, and they're saying that because they have the right to enforce HAVA, they have the right to demand these records from us, but there is no authority supporting that proposition, and it's directly contrary to Ninth Circuit authority.  And so there's no violation here for us not turning records over in advance of litigation, simply because they can bring an enforcement action and get records in discovery.  You know, we have to get past the pleading stage first.

And so with that, Your Honor, I would say that all three of DOJ's counts should be dismissed.  And at this point, I want to turn it over to my colleague.

**THE COURT:**  All right.  Step over with your colleagues, though, as a colleague, and just see how did they do, okay?  Just walk over there for a moment, and I'll pay the same courtesy to DOJ.  Step over with whoever, when you argue, but step over and have a conversation with them.  And just, if there's anything you missed, you'll have a second round, okay?

**MR. BRUDIGAM:**  I appreciate it, Your Honor.

**THE COURT:**  It'll be a little bit more brief.  Now, let me ask just a couple of questions along the way.  Am I going to get more requests, and you folks know, because this is

37

going to be the lead case in the country, obviously, with the other 14 cases.  So far, we have the states of Arizona, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington. And when I was considering this amicus, I was wondering if I was going to have a political show of two different parties on these voter rights cases.

Here, you have a number of what I call border states, Arizona, Michigan, Minnesota, arguably New Mexico.  So at least your acquiescence today to have this come before the Court is well received.  Do you know, though, of other state attorney generals who are going to be voting just by rumor or hearsay, and are we giving them enough time in two weeks to get these amicus briefs in?  And if so, inform us, because if we need three weeks, we can take it, okay?  But counsel your argument, please.

**MR. SETRAKIAN:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MR. SETRAKIAN:**  Will Setrakian for Defendants, Secretary of State Shirley Weber and the State of California.

To start, to your most recent point, I have no special insight into whether or not future amicus briefs may be incoming from the organizations and individuals that you just identified.

38

My colleague has explained why DOJ fails to state a claim under the Civil Rights Act, the NVRA, and the Help America Vote Act.  But even if the Court disagrees with everything that my colleague said, it still should grant the State's motion to dismiss, because three federal privacy laws serve as affirmative defenses to the complaint.

Now, I'll begin with the Privacy Act.  Two Privacy Act violations appear on the face of DOJ's complaint.  First, DOJ improperly seeks information on how California's registered voters exercise First Amendment protected rights, something the Privacy Act directly protects.  DOJ does not dispute that the choice to register to vote constitutes protected expression. Now, DOJ thus cannot collect this information unless it falls into one of this subsection's statutory exceptions.  Now, DOJ pins its hope on the exception for records collected, quote, within the scope of an authorized law enforcement activity, close quote, but the Ninth Circuit gives that exception a narrow reading.  That's from the McPherson case.

To meet this exception, DOJ must show a good reason to believe that the records are pertinent and relevant to its claimed law enforcement basis.  That comes from the Garris case, also cited in our briefing.  Those two are the only Ninth Circuit cases to construe the law enforcement exception to Privacy Act Subdivision E-7.

DOJ cannot meet this test.  DOJ claims it needs these

ER-73

39

records to enforce the NVRA and the Help America Vote Act.  But personalized, unredacted voter records are not pertinent or relevant to this wide ranging, amorphous investigation. Instead, this is the sort of overbroad data gathering disallowed when First Amendment protected rights are at stake. The Privacy Act thus bars this collection.

And the Privacy Act bars the collection for another reason.  DOJ has not followed the Act's protocols for collecting sensitive information.  The Privacy Act requires the Government to publish or identify something called a System of Records Notice, or SORN, before collecting data.

Now, a SORN tells Americans how their sensitive data will be collected, used, and shared.  DOJ identifies no SORN in its complaint.  It thus is out of compliance with the Privacy Act.  Now, in its opposition, DOJ raises three SORNs, but none justify this collection.  The first SORN identified concerns Civil Rights Division records, quote, indicating a violation or potential violation of law, and it covers information on investigations' subjects, victims, and potential witnesses.

Now, this SORN does not apply here for several reasons.  First, California's voters are not the subjects, victims, or witnesses of DOJ's claimed investigation.  That targets California, not its voters.  But even overlooking this issue, this SORN fairly read allows for collection of information regarding discrete legal violations.  Say, I like

**EXCEPTIONAL REPORTING SERVICES, INC**

ER-74

40

to think of maybe the statements of witnesses interviewed while investigating a hate crime.  It does not let DOJ claim an investigation covering all voters in a state, and indeed, maybe more than just one state, then collect, store, and possibly share that information based on only that representation.

And precedent supports this, I think, common sense instinct.  In the related field of federal administrative subpoenas, this circuit restricts the Government's ability to overread text to engage in bulk information gathering.  That's the Peters case cited in our briefing.  There's also an ejusdem generis issue with DOJ's reading of this SORN.

As the court knows, observing other items in the statutory list can help interpret disputed text.  This SORN covers two groups, subjects of investigations, as we've been discussing, and, quote, individuals of Japanese ancestry who were eligible for restitution benefits as a result of their internment during World War II, close quote.

I think that narrow pool of covered persons strongly suggests that the subjects of investigations language cannot sweep to cover all state residents.  And for all those reasons, this SORN does not apply here, and the other two don't apply either.  The other two cited by DOJ.  First, they're not even SORNs of their own.  Instead, they just revise the SORN we have been discussing.  But second, those revisions target situations far afield from this one, a publicization of data after an

41

investigation ends and after a data leak.

The Privacy Act accordingly bars this collection.  I want to address while I'm talking about this something that the Court wondered about during my friend's argument, which was whether or not the federal government just already has social security numbers.  The way I view it, the federal privacy laws require data hygiene.  Even if some agencies of Government may already possess a social security number, the law still restricts the Government's ability to share and use data between agencies without notice.

The Government is composed of many different bodies. And the mere fact that one agency, probably the Social Security Administration, is in possession of a log of, I assume, social security numbers, that does not mean that DOJ, a separate agency, can access that information.  Indeed, that's what the Privacy Act was designed to slow down, to block, exactly that sort of exchange without any oversight process or publicization.

THE COURT:  Okay.

MR. SETRAKIAN:  I'll turn to the E-Government Act. DOJ, straightforwardly, has not complied with this law.  The Act mandates that an agency take certain actions before it collects, quote, any information in an identifiable form permitting the physical or online contacting of, close quote, a person if more than 10 persons are implicated.  If those

ER-76

42

conditions are met, the agency must conduct something called a privacy impact assessment, have that assessment reviewed by agency staff, and publish it.  Now, the assessment, in turn, must address --

THE COURT:  Now, is that an administrative process decided by the executive branch, or is that statutory?

MR. SETRAKIAN:  This is by statute.  The E-Government Act is a statute.  It leaves some elements to the executive.

THE COURT:  What elements are you referring to?

MR. SETRAKIAN:  Certainly.  So the contents of a --

THE COURT:  I'm sorry, what elements are you referring to in the Privacy Act?

MR. SETRAKIAN:  Yes, the contents of a privacy impact assessment.

THE COURT:  Read that to me.

MR. SETRAKIAN:  Read the entire -- I have the regulation.  It's 16 pages long.

THE COURT:  No, you don't have to do that, counsel.  But you're relying --

MR. SETRAKIAN:  Yeah.

THE COURT:  In other words, I want to be able to look back and find that section.

MR. SETRAKIAN:  So yeah, so --

THE COURT:  Mr. Mitchell, in the meantime, would you be kind enough to gather all the parties?  I don't know what

43

Mr. Szabo's schedule is today, but this argument is going to take longer on the Voter Rights Act than I anticipated.  So if he's only available a certain period of time.  So if you could gather the parties, have them all come into court, and I'll get a time estimate.  I'm sorry, counsel.

**MR. SETRAKIAN:**  Not at all.  So this is from Section 208, cited in our briefing, subdivision (b)(2)(A).  So the director shall issue guidance to a --

**THE COURT:**  I'm sorry.  2-B-A?

**MR. SETRAKIAN:**  No, (b)(2)(A).

**THE COURT:**  (b)(2)(A), thank you.

**MR. SETRAKIAN:**  And Section 2 is called Contents of a Privacy Impact Assessment.  And Section A says the director shall issue guidance to agencies, specifying the required contents of a privacy impact assessment.  Now, subdivision B explains what that guidance must contain.  I'll give a couple of examples.  The guidance shall require that a privacy impact assessment address what information is to be collected, why the information is being collected, with whom the information is to be shared.  I could go on.

The specific OMB guidance is titled M-03-22 OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002.  We cite this in our briefing.

**THE COURT:**  Okay.

**MR. SETRAKIAN:**  DOJ simply has not followed this law.

44

It seeks information that triggers the statute, but it has not pleaded that it completed a privacy impact assessment.  And DOJ claims it need not comply with this law, but that misses the mark.

DOJ argues it's not collecting data from individuals themselves, but from California, but the law asks only whether the federal government is collecting individuals' personal information.  It says nothing about the information's source. And to the contrary, the OMB guidance we were just discussing clarified that the E-Government Act applies when collecting information, quote, from or about members of the public.  So not just from, but also, as here, about.

Perhaps recognizing this weakness, DOJ pivots to policy, but its arguments fail.  They argue that the E-Government Act would require DOJ to conduct many privacy impact assessments before collecting this data, but the purpose of federal privacy laws is to restrict the Government from unrestrained access to individuals' records.  DOJ cannot paint the intended operation of this law as running against policy. The E-Government Act thus mandates the complaints dismissal.

I'll briefly conclude with the Drivers Privacy Protection Act, just a couple of points on that statute.  The Act prohibits the disclosure of driver's license numbers obtained by a state DMV in connection with a motor vehicle record.  Now, it covers California's Secretary of State because

45

she receives these numbers from DMV when voters register there through Motor Voter.

Now, recognizing the law's application, DOJ argues that it fits into a statutory exception.  The law exempts data collected, quote, for use by any government agency in carrying out its functions.  But as precedent explains, we cite a Seventh Circuit en banc opinion that goes deeply into this, the phrase "for use" plays a key role in that analysis.  The Government falls into this exception only if it plans to use the specific information collected for an identified purpose.  Now weighed against that standard, DOJ's argument collapses.

As the Seventh Circuit recognizes, the act's purpose is to prevent all but a limited range of disclosures.  Here though --

THE COURT:  What was the Seventh Circuit dealing with in that case?

MR. SETRAKIAN:  Yeah, it's called Senne v. City of Palatine or village of Palatine.  Yes, Senne v. Village of Palatine.  The cite is 695 F3rd 597.  As I mentioned, that's an en banc opinion from the Seventh Circuit cited in our papers.

THE COURT:  Okay.

MR. SETRAKIAN:  Here, DOJ has not pleaded that it will use the specifically requested material, these unredacted driver's license numbers, to conduct its NVRA and Help America

46

Vote Act investigations.  This exception thus does not apply.  I'm happy to answer any further questions the Court has.  Otherwise --

**THE COURT:**  Not now.  There'll be a second round, but step over with your colleagues.  Make certain that there's something that you might have missed.  Just take a moment as a courtesy and consult with them.

**MR. SETRAKIAN:**  Absolutely.

**(Pause)**

**MR. SETRAKIAN:**  Nothing further at this time, Your Honor.

**THE COURT:**  Okay.  LA Alliance and the City, I'll be right with you.  I'm going to ask about the time constraints and the availability of witnesses in just a moment, but I want to hear one other segment.

For the intervenors, who would like to go first, the NAACP or the League of Women Voters?

**MR. DODGE:**  I'll be going first on behalf of the NAACP, Your Honor.

**THE COURT:**  All right, please.  And, counsel, once again, I'm going to continually ask, if you know of any other states joining us, Arizona, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, or Washington, tell me immediately, in case I need to extend this briefing

47

schedule or their input.

Number two, with the amici that are requested so far from the Secretaries of States of Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, Washington, once again, if we get that kind of hearsay out there, you have a contact, let's get together very quickly so we can get that briefing and the amici briefs before the Court as quickly as possible, in case we're making a mistake in terms of two weeks.

I've allowed you to intervene.  You do not have to take the same position as the Women League of Voters.  You're arguing potentially collectively, but you're arguing also individually.  And I'll say to both counsel, once again, when you're asking the Court to reflect upon jurisdiction, make sure that that's what you want, because I could decide this procedurally and refer this to another district.  Therefore, this may not be the lead case in the country.  Arizona may decide this, New Jersey, Washington.  So be careful.

Number two, I have the Obama birth certificate case. I could have decided that in one paragraph on standing.  We took 30 some pages to anticipate that this issue would arise again under the 25th Amendment.  And sure enough, in the election, it was right back to us.  So just if you want this resolved on the merits, fine.  If you want it, if your argument holds water with the court, then you're maybe in some other

ER-82

48

jurisdictions.  So decide how quickly you want this decided, because I know about 40 million voters, minimally or depending upon this, just in this case submitted to us.  So counsel, please.

**MR. DODGE:**  Good morning, Your Honor.  Chris Dodge of the Elias Law Group on behalf of Intervenor NAACP.

**THE COURT:**  Nice meeting you.

**MR. DODGE:**  I wanted to start by getting immediately to Your Honor's concerns about what this case is really about. This case is about voter registration, and voter registration is a canonical area of state government and state domain.  The elector's clause in the Constitution assigns, in the first instance, responsibility for voter registration and all that it entails to the 50 states.

Now, the federal government, as Your Honor has alluded to, has limited tools that permit it to supervise that process when there's a breakdown, when there's not adequate list maintenance, when there's racial discrimination, when there's suppression of the right to vote.  But DOJ's tools to do that are extremely limited.  They can only exercise the power that Congress has given them to intrude upon this historical state domain.  And that is what this case is really about, because what's going on here is completely unprecedented.

To give some context to the Court, which I think gets

49

to this amici issue, this issue starts with the Department of Justice demanding the full unredacted state voter registration lists of over 40 states.  It has now sued 16 of those states in three tranches.  It started with Maine and Oregon.  California was in the second tranche.  And just two days ago, it sued another six states.  I can give you those 14 states if you would like.  It overlaps somewhat with the states that have submitted an amici brief.  But that's sort of what's going on.  This is a national issue.  And this Court is out front right now in terms of the briefing and the scheduling, but those cases will be following in short order.

There are two others in the Ninth Circuit in Washington and Oregon that are also underway.  So that's the context here.

So what really this case is about is, is the Department of Justice using its limited tools given to it by Congress properly to intrude upon California's state voter registration system by demanding that it turn over a full unredacted voter list?  And, you know, there's extensive briefing on the three tools that they point to.  They claim three tools here: the Civil Rights Act, the NVRA, and HAVA.  And my colleagues from the states have sort of gone through those.  You know, we've raised similar arguments in our briefing, and I don't want to, you know, waste the Court's time repeating them because they are in the papers.  I want to focus

50

on some of the more discreet arguments we raise in our brief.

And I guess one more piece of context for the Court that I think the Court will find interesting. In its most recent tranche of cases, the six cases they filed just a couple days ago, the Department of Justice is only pursuing a single claim. They abandon their NVRA and HAVA claims in these six most recent cases against, I believe, Vermont, Rhode Island, Delaware, Maryland, New Mexico, and Washington. They only, in those most recent cases, are pursuing their Title III <u>Civil Rights Act</u> claim, which I think tells you something about the degree of confidence they have in their NVRA and HAVA claims. And I think the briefing very adequately explains why they do not have any plausible claim for using those two tools, HAVA and the NVRA, for the purpose they're seeking here.

HAVA has no disclosure provision. Period. Full stop. It is not there. There will be -- you can find nothing in the Department of Justice's briefing about how HAVA entitles them to demand documents from a state. Non-existent.

The NVRA, it has a limited public inspection provision that applies to everyone, but it gives no special access to the Department of Justice. It means anyone in this courtroom could make a demand of a state and say, hey, I would like to see certain documents about how you maintain your voter rolls. But that's a limited public inspection right, and it does not get them the information they're seeking here. It

51

gives them documents about sort of the mechanics of voter registration, and it gives them certain information like names and addresses that the state has offered to give here, but it doesn't give them social security numbers.  It doesn't give them driver's licenses.  That's not in the statute.  And there is a boatload of precedent on the NVRA, the Bellows case from the First Circuit that my friend alluded to, extensive, you know, cases cited in the briefing, throughout the briefing, that uniformly say states are allowed to enforce their own privacy laws to redact information that is requested under the NVRA.

THE COURT:  You're referring to the Bellows case out of the First Circuit?

MR. DODGE:  That would be the best one, Your Honor.  And I think, and to Your Honor's earlier point, that is the paradigmatic instance of the DOJ just flip flopping its position here.  There are numerous briefs from the Department of Justice in these NVRA cases.  There are a lot of NVRA cases out there.

THE COURT:  Okay.  Just a moment.

MR. DODGE:  The Bellows case is one --

THE COURT:  Counsel, slow down.  We've got lots of time.  So far you've cited Benson out of the Sixth Circuit.  You've cited Bellows out of the First, and the Long case out of the Fourth.  My question to all of you is going to be if DOJ

52

has taken a consistent position as you're arguing, I also want to know if they've taken a contra position, and I want that briefing in front of the Court so I can see what the arguments were in this different circuits.  Are you relying on the Bellows case?

            MR. DODGE:  Yes, Your Honor.

            THE COURT:  All right.  Thank you.

            MR. DODGE:  And to that point, Your Honor, what I would say is in those three cases, which are the three I'm familiar with, in each of them, DOJ took the position that the NVRA permits states to redact certain voter registration information, in every single one across administrations, that was DOJ's position.  I am not aware of the DOJ ever arguing until this case or, you know, this collection of cases that the NVRA permits the federal government to demand all of this.

            THE COURT:  Were the redaction the same areas that this Court's dealing with?  Because here, slowing all of you down, the willingness of the State and potentially the County, when I hear from the County, are the names, addresses, voter registration, registration method, status, contact information is permissible, but you have strong arguments concerning Title III Privacy Act and privacy rights, from your viewpoint, concerning social security numbers and certainly the state driver's license information, which has a larger breadth of information.

ER-87

53

Are you concerned -- as your briefing seems to allude to in some of the amicus so far, concerning voter registration, in other words, as you argue statutory language behind that, there's some motivation.  And you -- I think we can all note that the federal government on occasion has moved in the civil rights issues, especially in the south, but rarely in terms of states.  So for DOJ, you know that that question is coming.  Why the state of California?  Why these different jurisdictions?  What's behind this?  What is your real concern?

**MR. DODGE:**  It's a great question, Your Honor.  And you know, I do not have a direct link to AG Bondi's mind on this issue, but there is some --

**THE COURT:**  We'll call her.  I'm just joking.

**MR. DODGE:**  That there is -- you know, their stated purpose, the Department of Justice's stated purpose is to supervise each individual state's list maintenance, how they maintain their voter rolls?  We think that's not -- you know, that's not really suitable for the various tools they're trying to use here.

There is public reporting out there that is cited in the briefing that I think the Court can take notice of that says that what the Department of Justice is trying to do through these requests is in essence to compile a national voter registration list, which is something that has simply never existed in American history before because it's a

54

state responsibility, by design, so that there is not an over centralization of the electoral process in this country to sort of, you know, avoid one person controlling the voter rolls?

THE COURT:  What do I do if I find that both the state and the federal government have a substantial interest? How do I balance that?  What standard do I use because there's no jurisprudence in this area?

MR. DODGE:  It's governed by the statutory text, Your Honor, because DOJ, of course, the federal government is a government of limited powers.  The Department of Justice does have tools in its belt.  Congress has given them the tools we're discussing here today, the Civil Rights Act, the NVRA, HAVA.  The problem is they are trying to expand those tools beyond what the statutory text will permit to get more than what Congress has chosen to allow them to acquire.  That's the nub of the issue here.

You know, I think everyone would agree that the federal government has a limited role to play in supervising the voter registration process, but it is limited.  It is limited by design.  And what is going on here is unprecedented and they are exceeding their authorization in trying to compile these full lists from essentially every state and that's sort of the nub of the issue.  So it's not a balancing inquiry.  It's a -- the question is is DOJ acting within the scope of their limited authority to intrude upon the state

55

voter registration process.

THE COURT:  So you're relying upon statutory?

MR. DODGE:  Yes, that's exactly right, Your Honor. So, you know, I've sort of briefly alluded to HAVA and the NVRA, which have -- you know, HAVA has no inspection power for DOJ, the NVRA has a universal public inspection that gives no special power to DOJ, and there's uniform case law saying that states are allowed to enforce their own privacy laws. California has a very robust state privacy law that protects voter information even when there's an VVRA request from the public.

So that leaves their last tool, which is the Civil Rights Act.  The public documents request provision of the Civil Rights Act has collected dust over the years.  It really hasn't been used much since the '60s.  It was passed in 1960 during the Civil Rights era to bolster DOJ's ability to collect certain kinds of records for civil rights investigations.  That's what the legislative history says, that's what the case law says.

And I want to raise one specific statutory argument that I think the NAACP alone has raised which is that when you look at the text of that document production requirement in the Civil Rights Act, what it says is that states are required to retain and preserve all records and papers which come into their possession relating to any application, registration, or

ER-90

56

payment of a poll tax back when poll taxes existed before they were eliminated by the Civil Rights Act of 1964.

And the key language that I want to bring to the Court's attention there is come into possession.  The only kinds of documents, states are required to preserve and turn over to the federal government are those that come into their possession and that obviously might refer to something like a voter registration application that someone submits to their local registrar, that comes into their possession.  When you receive a letter in the mail that comes into your possession, when you write a letter yourself, it doesn't come into your possession.  You don't receive it.  You don't acquire it.  That's what that language means.  Come into possession means to acquire or to receive.  That's what Black's Law Dictionary says.  That's what a litany of decisions from the Supreme Court in the Ninth Circuit say.  Huddleston is the Supreme Court case, I'll give you, but it's in the briefing.

So the question is the records they're seeking here under the Civil Rights Act, the full statewide voter registration list, is that a document that came into the possession of California election officials?  No, of course not.  It's one they created.  It's something they created in the first instance.  They didn't receive it from voters the way they might a registration application.

And I understand Your Honor hasn't fully read the

ER-91

57

amici briefs, but I think the Maryland brief --

**THE COURT:**  I won't until they're all before me at one time, so I don't read them piecemeal.

**MR. DODGE:**  One point raised in that is that the animating concern behind this document preservation and production requirement in the Civil Rights Act was that southern registrars, when a black person came in to register to vote in the '60s, they'd oftentimes just destroy it.  They wouldn't preserve it and they were -- so the Act is specifically concerned with making sure that election officials preserve documents they receive from voters so that there is documentary evidence for a subsequent civil rights investigation.

The Department of Justice has no explanation in its briefing.  They're welcome to try and explain it here today how the state registration list is --

**THE COURT:**  Does the executive branch have to give a reason?  In other words from your perspective, they have to have, for want of a better word, some noble reason behind seeking to obtain this information.  With the separation of the branches, why do they have to have and why do they have to explain that right?

**MR. DODGE:**  Because the operative constitutional provision underlying all of this is the elections clause, and the elections clause says that in the first instance, the time,

ER-92

58

manner, and place of elections for Congress is determined by the states.  That is the default rule.  Congress and never mind the executive branch, do not get the first say on that.

What it does say then is that Congress may supplant state laws, specifically as to the manner of holding elections, and that's so that states don't frustrate federal elections with suppressive rules or obstruction or what-have-you.  So to Your Honor's question, the issue is has Congress here chosen to supplant state prerogative to give the executive branch a tool to intrude upon the states.  That's the question and, you know, as has been discussed here, they point to three purported tools from Congress: Civil Rights Act, HAVA, NVRA, but they can't really explain how any of those tools actually gives them -- how the text of any of those laws authorizes them to make these demands of California or any other state.  That's the essence of my argument, Your Honor.

**THE COURT:**  Okay.  Then step over just a moment and talk to your colleagues.

**MR. DODGE:**  Sure.

**THE COURT:**  Whether you have the same or different arguments.  Take a moment.

**(Pause)**

**(Discussion regarding another case)**

**THE COURT:**  This would be the League of Women Voters.  And if you'd make your appearance, please.

59

**MS. ZELPHIN:**  Thank you, Your Honor.  Grace Zelphin on behalf of the League of Women Voters of California.  And I'll attempt to keep it short, given the Court's calendar today.

**THE COURT:**  We've got plenty of time, trust me.

**MS. ZELPHIN:**  What the Department of Justice is doing here is putting the cart before the horse.  It wants the sensitive personal information of 23 million Californians, but it simply does not have any legal authority by which to obtain this.  And when I say that sensitive personal information, yes, it's the driver's license, it's the social security numbers, but it also includes the tranche of data, right?  And these personal sensitive pieces of information in a larger context, in the whole set of 23 million Californians.

And as, you know, a lot of argument has already been taken here, the cases and the law cited by the Department of Justice simply do not give them any authority to obtain that information, which is housed rightly in the state of California.

I won't belabor the point as to preemption, but the NVRA public disclosure provision, upon which the Department of Justice originally relied heavily upon, requires disclosure of public voter rolls, but it does not require that information to include that sensitive information as prohibited by California and federal law.  HAVA has no disclosure.  And in its

60

opposition, the Department of Justice appears to have waived that argument, not addressing it at all in opposing the intervenor's motion to dismiss.

THE COURT:  I'm sorry, you dropped your voice.  State that again.

MS. ZELPHIN:  Which the Department of Justice did not raise at all or argue on at all in their opposition.

THE COURT:  Okay.  Thank you.

MS. ZELPHIN:  So that brings us to Title III of the Civil Rights Act, which also allows the Attorney General to demand records.  But again, it still cannot require the sensitive data of 23 million Californians.

First of all, they failed to comply with the statutory regulations to request records under that statute.  They have failed specifically to make a demand that contains a basis of the purpose, therefore.  So they simply have not provided that.  They have not said, what is the information, what is it based, what is it going to be used for?  They attempt to cobble together some arguments based on their response -- the California's responses to EACS, but it just does not coincide with their request.

And even if they were able to put together a demand that includes a purpose and basis, that must be read in conjunction with state and federal privacy laws.  And in doing that, again, there is absolutely no --

61

**THE COURT:** And let me slow you down. What's your concern about privacy? What areas are you specifically concerned about if the Government's argument is we already have access to social security numbers, the State is already willing to turn over names, addresses, voter registration, voter method, registration status, and contact information, or at least that's the representation made by your colleague. What's your concern?

**MS. ZELPHIN:** The League of Women Voters has used the NVRA public disclosure provision, which also provides this information, allows for public disclosure of those records, which are necessary to review to ensure that folks are not --

**THE COURT:** And what are those records? What are those records?

**MS. ZELPHIN:** That includes the state voter roll, which is what the federal government is seeking here. What it does not include in that voter roll -- right, so the voter roll is, I think, a set of data. But in that set of data, that cannot include specific information tied to each of those voters, which includes their driver's license number and their social security number, right?

So it's not just that the federal government doesn't have access to social security numbers anywhere, but in this tranche of data, as a voter, as someone who has registered to vote, complete information cannot be completing that data set

62

with sensitive information like driver's license.  And that is exactly how it should be applied in the NVRA context, and that would also apply in the CRA context, where -- and similarly, there are instances, there have been historically, where folks are disenfranchised, and the League of Women Voters wouldn't say that that cannot be investigated, but what cannot happen is using the CRA as an unfettered discovery tool to gather tranches of information, including sensitive data, without any restriction.

THE COURT:  And that's a privacy concern?

MS. ZELPHIN:  Yes.

THE COURT:  Okay.

MS. ZELPHIN:  And to two of your other questions -- or one of your other questions, the League of Women Voters is very concerned about voter suppression and the use of this data, as it could be done directly to counter the actual purpose of these statutes, which is to franchise the citizen.

THE COURT:  Okay.  Check with your colleagues for just a moment, if you care to.  And there'll be a second round, eventually, after I hear from DOJ.  You okay?

MS. ZELPHIN:  Okay.

THE COURT:  Okay, when we come back, you can anticipate -- the question I've got for the Government will be, while the federal government has been active in the South, especially during the Civil Rights Movement in the 1960s, what

63

are you relying upon for intervention in your request of the states for this information?  And the case started with the Orange County filing, and there were either 13 or 17, I believe, subject to the county's correction of the court --

**MS. SHOAI:**  Seventeen.

**THE COURT:**  -- instances of what was a concern of some kind of voter manipulation or fraud.

**MS. SHOAI:**  Your Honor, just to clarify, the request was for voter registration data related to individuals who were no longer able to vote because they didn't meet the citizenship requirements?

**THE COURT:**  That's correct.  But there were 13 or 17, I forget.

**MS. SHOAI:**  Correct.  It was 17.

**THE COURT:**  Seventeen, thank you.  But what caught the notoriety was the dog who voted twice.

**MS. SHOAI:**  Which is not the subject of the complaint, by the way.

**THE COURT:**  I understand.  But your former colleague argued that in the court.

When the states set up our voting apparatus, whether it's Arizona, California, or whatever, uniquely, the states have been in charge of just how we voted a polling place. Historically, they've been in charge with the local district attorneys, at least in this state, of any kind of voter fraud,

**EXCEPTIONAL REPORTING SERVICES, INC**

64

and therefore, the states have had a strong interest in the past, except with those exceptional circumstances in the South, of a state's rights, if you will, not only in terms of procedure, but enforcement.

Eventually, during your argument, I want to hear what interest the federal government has that is unique that causes the request of this information, and if the executive branch can request this information without a purpose, because you hear the other side arguing, in a sense, that this is a fishing expedition, and behind the scenes is voter suppression, of course.  You have unlimited time, but for LA Alliance and the City, how long is Mr. Szabo available today?

**UNIDENTIFIED SPEAKER:**  Until 2:00 p.m., Your Honor.

**THE COURT:**  Can you bear with me?  You have no choice, but could you take a recess for a moment, and one of you sit in the audience so you see our time frame.  We could be done in five minutes or by 2:00 p.m., okay?  But we'll come back to you.  We'll try to resolve this today.

You're from D.C. or you're from Sacramento?

**MR. BRUDIGAM:**  I'm from Sacramento, Your Honor.

**THE COURT:**  Okay.

**MR. SETRAKIAN:**  I'm here in Los Angeles.

**MR. DODGE:**  I'm from D.C., Your Honor.  In theory, I'm flying to San Francisco later this afternoon for another matter.

65

THE COURT: No, you won't. You'll be here. Okay. Where are you from?

MS. ZELPHIN: Sacramento.

THE COURT: Sacramento.

MR. NEFF: Washington, D.C., but I'm at the Court's discretion.

THE COURT: I can hold a nice session. I can go from 6:00 to 10:00, okay? That's not a threat. I'm just telling you I have unending hours, okay? So if you need it to get resolved tonight, I can reconvene in another court. This court closes at 6:00, but I can stay open until minimally 10 o'clock if you need to. So tell me -- we'll complete it today for you, okay? I promise you.

You have unlimited time, so when DOJ comes back, (indisc.). Don't worry about the time, okay? And if you need to make a call, I'm joking with you. They want you to call Bondi. You don't have to do that. But if you need to make a call, you're entitled to make that, all right? And then there'll be a second round. Fair enough? Okay.

So one of you sit out in the audience, and let's see how long this will take LA Alliance, all right?

**(Recessed at 9:09 a.m.; reconvened at 12:01 p.m.)**

THE COURT: If you'd come forward. If you folks come forward on the voting rights case, I'm going to make this a public case because of the nationwide interest in it. So I'm

ER-100

66

going to create for you folks a public website, publish the transcripts and those will be done at court expense.  They won't be a cost to either party.  This has too much significance across the United States, not only California but I think nationwide.  So I'll create that website for you, we'll get those transcripts up for you in a period of time and that way other districts, other courts considering this matter can see what's occurring here.  Fair enough?  And guess what?  It's not going to cost you.  Okay?

MR. NEFF:  Thank you, Your Honor.

THE COURT:  All right.  Yeah.  Thank you.

All right.  Then, counsel, we're back on the record in the matter of the Weber case and I'm going to turn to the Department of Justice.  And once again, you have as little or as much time as you want.  If you need to stop at any time, consult with somebody, make a phone call, I don't find that any affront.  Okay.

So once again, would you just identify yourself for the record and you can remain seated if you'd like to if you're more comfortable like state court or you can go to the lectern.

MR. NEFF:  I do have a state court history, Your Honor, but for a change I'll go to the lectern.

THE COURT:  It's entirely different than state court so go to the lectern then and just identify yourself for the record.

ER-101

67

And counsel, all of you've hopefully had an early lunch.  And with your permission, after DOJ argues, if we have the time, one of you have some engagement some place.  Let that person, whether they're a party or an intervenor, argue first in terms of rebuttal and then if they want to stay but please, in the future, please don't tell me you've got something in the afternoon because I'm giving you unlimited time, okay?  So okay.

So Counsel, on behalf of the Department of Justice.

**MR. NEFF:**  Thank you, Your Honor.

Your Honor got straight to an issue that is overhanging this entire hearing today which is the procedural posture of it.  What is truly the procedural posture?  And I want to get to that because it's important here.

This is not just some other complaint that was filed.  This was filed under the Civil Rights Act of 1960 which is a very particular unique law.  That law has been interpreted when it's used as an equivalent of an OSC.  There really is an OSC pending before this court.

The counsel opposed to this are really trying to bootstrap in a merits argument in a motion to dismiss.  It's inappropriate.

However -- and I appreciated the Court's discussion, both of the People's motion to compel as well as questioning opposing counsel about where they stand as far as their

68

jurisdictional argument because the parties should be serious about what's going on here.  The People, or the United States, while we believe that the motion to dismiss brought by various counsel is inappropriately bootstrapping in merits arguments, we also do believe that this deserves a resolution and that arguing it on the merits on the papers, regardless of what we call it, is an important matter for this country but we should be honest about what we're doing here.

The United States is asking for this court to issue, in accordance with the Civil Rights Act of 1960 and caselaw interpreting that, a prompt order that California produce records that we are clearly entitled to.  That's what this motion really -- that's what this litigation really boils down to and we shouldn't lose sight of that.

The various issues brought up by Defense either fall into trying to avoid the text of that statute of the Civil Rights Act of 1960 or pure speculation or both.  We can take each one in turn -- I'm happy to address the ones the Court would particularly like me to address more than we have in the briefing -- but if -- we want to start with the Civil Rights Act.  The language just couldn't be clearer.

The records that the Civil Rights Act refers to under 52 USC 20701 through 6 is that every officer of election shall retain and preserve all records and papers related to any act requisite to voting.  The scope is quite clear.

69

Then we go down from Section 301 to Section 303.  It becomes very clear.  Any 301 record shall, upon attorney general demand, be made available to us.  We provide a statement of basis and purpose.

And Your Honor, it's the United States' position that that is the only thing that could even conceivably be litigated in a motion to dismiss if we're really calling it that.  The United States believes that's not really what counsel is trying to do but let's take it -- let's stay in the motion to dismiss basket for right now.

The would have to challenge the complaint on its face.  A <u>Civil Rights Act</u> (inaudible) complaint challenged on its face could really, I guess, only be argued that, (a), it wasn't the attorney general bringing the case; (b), it's not election records or, (c), that there's no statement of basis or purpose.  And they spent a lot of time talking about basis or purpose.

But basis and purpose under this statute is not something that is reviewable and the courts have found that and it's clear from the text of the statute.  Your Honor, it's equivalent of a requirement that the Court enter its meaning on the minutes.  It can then be reviewed as to whether the Court put in a reason on the minutes but the reason itself is not reviewable for a -- for whatever action the Court took.

We only need to state a purpose.  We have done that.

ER-104

70

We actually went far beyond that.  The counsel has to ignore many, many concerns with California that we cited in our complaint as to why we want these records.  However, we are not required to do so.  There is no burden.  There is just simply a requirement that we state our purpose.

Now, our purpose is free and fair elections.  Our purpose is to seek to make sure that voter rolls are clean and that every vote is represented and our purpose was clearly stated.  And to understand our purpose the Court is going to need to read the three election statues at play here in their entirely and in totality.

The three statutes, the Civil Rights Act of 1960, the NVRA and HAVA all work together.  It is a statutory framework for having free and fair elections in the country.

Counsel for the intervenors and for the State of California would like you to look at each of them individually.  Piecemeal it out and not see them in totality, much the way you would instruct a jury that they should read all the instructions in totality and not get overfocused on one.  In fact, they all are clear on their face what they say but in the big picture what it provides is a framework of how voters are protected under the NVRA for their registrations and then under HAVA what minimum requirements the state has as to what they have to do to maintain those voter rolls to be accurate.  And then the Civil Rights Act provides the mode by which we can get

**EXCEPTIONAL REPORTING SERVICES, INC**

71

those records to make sure we are doing our duty as the federal government to make sure that these federal elections remain free and fair.

And counsel simply has to rely on both misrepresentations of the law and our position, stating our -- for example, that our whole case relies on Lynd.  No.  This action relies on the Civil Rights Act of 1960 and its very clear text, which is the one thing they don't want to talk about because it's very clear.

Privacy concerns are first not a proper concern for this motion to dismiss but even if they were, they're unfounded.  Privacy -- the United States is going to comply with all federal laws.  That includes the Federal Privacy Act. The DOJ Civil Rights Division itself has a stated policy available on a website as to how we will comply with the Federal Privacy Act and have before.

THE COURT:  Explain that to me.

MR. NEFF:  Yes, sure.

So we publish a series of regulations.  They're called the SORNs that show how we tend to the data and make sure everything is properly protected under, not just Federal Privacy Act, but other obvious concerns when you're dealing with large databases.

THE COURT:  Is that part of my record?

MR. NEFF:  Yes.

72

THE COURT:  And what would I look at that?  What exhibit?

MR. NEFF:  At our -- in our response to our motion to dismiss and the supporting data for that, the attachments for that.

However, I would state, that to any extent, especially the state privacy-type acts would contradict the Civil Rights Act, that the Civil Rights Act would rule.

The United States does this on a regular basis.  We have multiple states that don't even see this as a dispute, that simply just -- in fact, on their own do this on a regular basis, share the information with the federal government so that we can run crosschecks to make sure that people are properly on voter rolls.

THE COURT:  What states are those that have shared either their DMV registrations or the social security numbers of voters?

MR. NEFF:  Offhand, right now, off of memory I believe the states are Kansas, Indiana -- there are four.

THE COURT:  That's okay.

MR. NEFF:  I'll also state the biggest one is -- so we also have an MOU that we produce at the state request.  Some states request it, some don't.  Some say, yes, you're entitled to this data, here you go.  And we have a whole data-sharing setup ready.  It's essentially the Box program, plus some

73

federal proprietary encryption technology to make sure that this is as secure as it needs to be.  And we -- so Texas just told us today they're going to enter in the MOU and share us the data in the next few days.  We believe many more states are going to follow just in the next few days but so we have four states that have already sent us the data.  No questions asked.  Probably another dozen or so states in the next week or so that are just going to sign the MOU and share with us.  This really shouldn't be controversial.  It's clearly stated as part of our duty under HAVA and the Civil Rights Act is clear that this is the mechanism in which we do it.

**THE COURT:**  Do you think that those states with attorney generals complying with your request would be interested in filing an amicus just as other states who may be opposed to your request are filing amicus?  In other words, what I want to do is make certain if we have states coming late to the table but in compliance that we're looking at the reasoning by all of the atty generals in the respective states.

And what I was worried about before, frankly, is if I had red and blue states lining up when I started to look at the amicus, I was particularly interested in the states bringing that to me.

Now, I don't know how you define what I call -- well those states that have voted for different -- in different elections in different ways.  Arizona, New Mexico, Michigan,

74

Minnesota, seem to be what I call those states that traditionally doesn't go Democrat or Republican.

And then I looked down at the state secretaries for the states and if you notice, there are three states out of there on the amicus.  Connecticut is in for the first time.  They are not part of the amicus for the 16 states that we initially named but these are the state secretaries for the states of and Connecticut is an addition, Nebraska is an addition, Pennsylvania -- which has certainly been a swing state.

So I was a little worried and that's why I sought your wisdom about whether you all were going to stipulate to me accepting this because I didn't know the weight if I was just dealing with a party disagreement.  And I'm not saying that these swing states necessarily carry greater or less weight but I want to be alert that if this is a partisan effort.  And certainly the country is divided so ...

**MR. NEFF:**  I would be --

**THE COURT:**  ... so I've got a stipulation that I'm accepting all of these amicus briefs.  I just want to pay you the courtesy if other states are coming onboard, like Texas, et cetera, that we give them a chance for those attorney generals to get this to us but by the same token, I'm going to be writing over the next couple weeks.

Is two weeks enough time for you?

75

MR. NEFF:  We can inform the states that --

THE COURT:  Okay.

MR. NEFF:  -- a judge has invited them to file amicus but --

THE COURT:  Will you do so?  In other words, for both parties.  Get it out to all the states that you can and I'll docket this, et cetera.  And there may even be disagreements between different courts examining this matter and different circuits.

MR. NEFF:  I think the bigger picture is that the states that are complying are likely not going to see this as something that they need to delve issue.

THE COURT:  But I just want to pay you the courtesy in terms of due process.  Okay.

MR. NEFF:  Yes.  And I would say that's because this really shouldn't be a political issue.  One side can make it a political issue if they want to just simply in a single position declare it that but it doesn't change the fact that the Civil Rights Act of 1960, the text is quite clear and that no one is in favor of faulty voter rolls.

THE COURT:  We've also had for both parties we've had a series of state rights issues in the federal court for years. And different states have taken a perspective on what the states' rights issues are.  Some are much more state-right oriented, others aren't.  That's why I was interested in the

76

division.  But since you've all stipulated, I'm accepting this amicus at the present time.  I just want to make sure you've got the courtesy on both sides of any other parties coming onboard so if we need an extra week we can take it, okay?

Okay.  Won't you continue.  I'm sorry.

**MR. NEFF:**  Thank you, Your Honor.

The -- would emphasize that this data is necessary for the United States to conduct its HAVA operation -- its HAVA enforcement compliance and that is why that data is specifically cited in the statute.  It simply couldn't be clearer that it needs to be the last four digits of a social security number or the driver's license; otherwise, we are not able to make a verified finding as to the various voter roll registrations that might have problems.  In fact, we sometimes even have to follow up after that data is run.  It's rare but there's a reason that was put in the statute because it's something like we can verify it from what I've talked to our database analysts something like 99.999 percent of the time. That's enough for us to be able to know if it's an actual person that lives in that location and is who the voter registration role says it is.

**(Pause)**

Again, with the caveat that we do not need to ever -- that we do not need to get to this.  This is essentially an OSC where we only need to state our purpose and then we are

77

entitled to the records.  Also under a prompt order, according to caselaw, a prompt order that this is essentially an OSC hearing.

The facts of California itself are particularly worrisome.  Maybe the most worrisome state in the union.

The state is required to provide various data to the Election Assistance Commission which is a nonpartisan commission.  The state -- the agency created by HAVA in order to try and keep this as neutral as possible and California doesn't provide the complete data.  Their data doesn't have Los Angeles County in it.  It's one-fourth the state's population.  That on its own should cause concern countrywide that they've not submitted that data.  It would be irresponsible of the United States to not come in at this point and say we need to see your data to ensure fair and free elections.

All of the harms that opposing counsel have pointed to are based on speculation, logical leaps and there is no concrete evidence they can point to.

That being said, with the overarching point that this is before the Court right now as essentially an order for an order to show cause, dressed up as a complaint, and that you have a dismissal that is essentially fighting that order to show cause, dressed up as a motion to dismiss, I believe the Court should act within what would be its lawful authority to issue a prompt order that California needs to turn those

78

records over to us that we are entitled to.

THE COURT:  How do you deal with the state provisions concerning the DMV?  In other words, the state is arguing to the Court that that has a -- for want of a better word -- a special category that is not subject to the Voting Rights Act of 1960 or HAVA, and that they have a privacy interest in a sense as well.  What does the Court do with that?

MR. NEFF:  Any state privacy interest would be trumped by federal law.  It would be trumped by both the Federal Privacy Act, which we're complying with.  It would be trumped by HAVA, which is a -- I repeat -- a federal minimum standards law for state compliance that specifically mentions driver's license number or last four digits of social.

The state is required to produce and provide this data under the statute.  If they have some issue with the driver's license; hypothetically, if a state just said we have some real concerns about our driver's license, they comply with the statute if they provide the last four of the social security number.

Does the Court have other questions or concerns?

THE COURT:  Just one moment.  Let me look at a note that I made.

(Pause)

The state represents that they have offered -- and I think both in the Orange County case with the registrar -- and

ER-113

79

it's represented today in the statewide case -- the names and addresses.  Has that offer in fact been made?

MR. NEFF:  Has that offer --

THE COURT:  Yes.  To you.

MR. NEFF:  Oh --

THE COURT:  Not to you but to the government, the DOJ.

MR. NEFF:  California has taken the unique in the nation position that they are -- that they -- we are permitted to come and inspect it in their offices, that data; which, (a), is not sufficient; (b), we argue is not an appropriate way of providing it in today's day and age where it's actually more secure to share this data electronically through our shared file-sharing --

THE COURT:  Kind of slow-walking you.  Kind of slow walking.

MR. NEFF:  I think --

THE COURT:  For want of a better term.

MR. NEFF:  That is the United States' interpretation of it but --

THE COURT:  How about the voter participation and the registration methods?  Have those been offered to you?  In other words, that's been argued to me but behind the scenes I don't have that record right now.  Has that been offered to you?

80

MR. NEFF:  It is in the back-and-forth is in the letters attached as exhibits in the filings, Your Honor; however, the United States' position is that the responses have been woefully inadequate.

THE COURT:  Okay.  So we've never gotten down to really how that information would be exchanged.  It's flowing back and forth in terms of representations but as a practical matter there's a big difference between a representation and conveying the information to you.

MR. NEFF:  Well actually in our letters we did lay out to opposing counsel our file-sharing program, how it works, that it is secure and we invite them to -- assuming they have a change of heart, to use it.

THE COURT:  About the registration status and the contact information, has that been offered to you?

MR. NEFF:  That, I'm not sure about.  I'm not sure what the scope of their offer is.

THE COURT:  Okay.

MR. NEFF:  I just know that it does not include the -- for sure, does not include the driver's license number or the last four of the social as required by the HAVA statute.  And in other states as well, that has always been the crux of the dispute.

THE COURT:  In their opening arguments they'd argued that in the Benson case out of the Sixth Circuit, Bellows out

ER-115

81

of the First and Long case out of the Fourth, that there's an inconsistent and uniformed position taken by the government. How do you respond to that?

MR. NEFF:  That the -- there is no inconsistency in position.

THE COURT:  Explain that to me.

MR. NEFF:  What there is is difference in posture of those cases.  It is a true statement to say that the United States, as an agency, has yet to go to states to enforce the minimum standards of the HAVA statute.  One can argue whether that was a wise or unwise decision but here we are 23 years later and the federal government has yet to do it.  It is still, for certain, good law.  The United States believes it is a law that should be enforced and complied with.  Therefore, because of that history where this hasn't been done before, all of those cases relate to private parties trying to in some way get in.

The DOJ's position is that private parties do not have a right of action under HAVA and therefore they should not be allowed to go to states and say, I would like your driver's license or social security number.  However, there are states around the country, including ones that are fighting us, that interestingly, have been willing to turn over that data to a private organization without the same protections as the United States.  That's been cited in our briefing, the ERIC

ER-116

82

Organization.

So what I would say is all those cases are inapplicable.  It often requires selectively quoting them to make it sound like in some way the United States government is not entitled to it.  No, the United States government is uniquely mentioned in both the CRA and HAVA.  And therefore just because this is the first time the United States is coming in and doing it, doesn't mean that it's not clearly what the statute states.

THE COURT:  For both parties, you mentioned that California is one of the main outliers, for want of a better word, from the DOJ and the executive branch's position.  Is it the position of the executive branch that there need not be any stated purpose that there's an absolute right to obtain this information per statute?

MR. NEFF:  Statute requires we state a purpose.  A purpose.

THE COURT:  And what is the purpose here?

MR. NEFF:  The purpose is for, as stated in our letters to them, for voter roll maintenance enforcement and compliance.

THE COURT:  And we stated in Orange County with a limited county case involving Page.  There, there were -- and I keep 13 or 17 but 17, I believe, allegations.  The most notorious became the dog that voted twice.

ER-117

83

Is that, out of 1.2 million voters, what's the basis, for instance, of that kind of request because of course we're always going to have error, including people who legitimately die.  So what's the threshold that this stated purpose has?  How should I interpret that?

**MR. NEFF:**  Under the CRA there is no threshold.

**THE COURT:**  Okay.  Now, do you need to -- and thank you.  Do you need to make any calls?  You're all by yourself, you're doing -- there's nobody to consult with but do you need to make any calls?  Are you satisfied with your argument?

**MR. NEFF:**  I appreciate the offer, Your Honor, but no, we're satisfied.

**THE COURT:**  Okay.  There'll be a second round.

**MR. NEFF:**  Yes.

**THE COURT:**  So counsel, however you'd like to proceed then.  One of you has another obligation, I don't care which order.  You can take the intervenors first or the parties.

**(Pause)**

**MR. BRUDIGAM:**  So there was a lot going on there, Your Honor, and so I'm going to try to be thorough in making sure I cover all of those points.

So I think the first thing I want to talk about is this notion that the complaint is just an order to show cause.  And essentially what the federal government wants to do is take the Court and sideline them in this dispute and say that the

ER-118

84

Court has no room for any judicial review here.  And that's just not supported by the text of the statute.

There's nothing in the Civil Rights Act that creates a special statutory procedure.  The words "order to show cause" are not in the statute at all and I'll just read you the text right here.

It says that:

"The appropriate district court shall have jurisdiction by appropriate process to compel the production of such record or paper."

That's what it says, "By appropriate process."  And so that's up to the Court to decide what the appropriate process is here.

And I'd also just point Your Honor to the fact that the Federal Rules of Civil Procedure contemplate what rules apply when you have a government investigative demand.  I mean Federal Rule of Civil Procedure 81(a)(5) specifically says:

"The Federal Rules of Civil Procedure apply to proceedings governing demands for records by the U.S. government."

And so this idea that some other procedure applies, it's not supported by the text, it's not supported by the Federal Rules of Civil Procedure.  The only thing that supports this purported procedure are these early 1960s' cases and like we've said, the federal government, they pin their hopes on

85

this one Kennedy v. Lynd, Fifth Circuit case from 1962.  That's the one they're referring to which says that the Court shouldn't have any role here.

But that case is obviously nonbinding on Your Honor and it's really been overruled.  I would point you to the United States v. Powell case.

THE COURT:  I'm sorry, what -- just a moment.

MR. BRUDIGAM:  Sure.

THE COURT:  All right.  Please continue.  I've got my note.

MR. BRUDIGAM:  So the Supreme Court in United States v. Powell found that the Federal Rules of Civil Procedure, they apply to a proceeding like this.  And in that case it involved an IRS document request statute which used the very same language that we have here which is that the Court shall, by appropriate process, compel relief under that statute.  So even if Your Honor found Kennedy v. Lynd persuasive, it's obviously unbinding, that's been overruled.  So just to be clear, the Federal Rules of Civil Procedure govern this action.

THE COURT:  Well, you've cited on both parties' parts, different enactments by council, statutory provisions. I think we can all agree that we want qualified voters to vote without any chilling effect.

MR. BRUDIGAM:  I agree.

THE COURT:  Is there -- well I think we can all

ER-120

86

stipulate to that.

        **MR. BRUDIGAM:** We can.

        **THE COURT:** And I'll use the word "qualified voters".

        Is there a chilling effect in the request by the government and if so, what is that chilling effect? How would there allegedly be persons who may believe that the government has no business in the sense of getting more information.

        **MR. BRUDIGAM:** Sure I mean I think --

        **THE COURT:** And behind this the concern of this court eventually, besides the statutory following the law, is going to be the impact of what we write and do. And this case will probably be the first case that comes out that other circuits look at. So with that noble goal in mind of having voter participation, is there a chilling effect or not?

        **MR. BRUDIGAM:** I think there's absolutely a chilling effect here because --

        **THE COURT:** And I need you to define that for me.

        **MR. BRUDIGAM:** Sure.

        **THE COURT:** And it may not be relevant to the opinion but behind all of this, we need voters who are qualified to be able to vote.

        **MR. BRUDIGAM:** Right.

        **THE COURT:** Now the ease of that could be differences between different administrations and whether you have different methodologies. And I know there's a huge controversy

ER-121

87

about mail-in ballots and voter registration and drive-in, et cetera, but when we're finally done with this, we want qualified voters to vote.  And if there's a chilling effect, or this privacy right that we've somewhat skipped over, I want to hear how you define that.

MR. BRUDIGAM:  Sure.  Your Honor, I think this action should make the stomach of every American turn, knowing that this executive branch is going in, state by state, collecting and vacuuming up everybody's voter registration information. It is on a scale that we have never seen before.  Okay.

And what this is going to do --

THE COURT:  It is their disparity argument.  In other words, remember when I started this conversation early on, and I discussed the amicus briefs, I was particularly interested if I was getting just red and blue states.  That's why I was looking to see if there were these swing states.

MR. BRUDIGAM:  I mean I point Your Honor to --

THE COURT:  Or is this a argument also that a particular group of states are being examined versus other states?  Because here, the government has represented while California from their perception might be an outlier, they've also made inquiries of the let's say more, from their standpoint, compliant states like Kansas and -- I forget which one -- just a moment -- Indiana, and that Texas was coming onboard.

ER-122

88

MR. BRUDIGAM:  Yeah.  Well, what I would say is I mean those aren't states that are complying, they're voluntarily giving that information to the federal government.

THE COURT:  But regardless, the government has made an inquiry so if there's an argument that the government is reaching out and being selective, if the state is voluntarily complying that doesn't seem to me to be singling out progressive states.  And if you think that, then I need to hear that and hear your reasoning behind that.

MR. BRUDIGAM:  I'm not saying they're singling out states.

THE COURT:  Okay.  Then we can pass that.

MR. BRUDIGAM:  They're going after every state and California is by no means --

THE COURT:  So I'm not going to have a disparity argument.

MR. BRUDIGAM:  Right, right.  I just mean in terms of the position the secretary has taken, I mean the reason they had to sue 14 different states is because nobody wants to turn this data over.  The representations that Counsel just gave today, that's the first that I've heard of any state turning over that information.  So we are by no means an outlier in taking this position.

THE COURT:  Wait just a moment.  For the government or DOJ, how do we validate Kansas and Indiana?  What validation

89

do I have about that?

MR. NEFF:  I was actually looking that up right now, Your Honor, because --

THE COURT:  Well go ahead and look it up.  You've got lots of time.

MR. NEFF:  And I --

THE COURT:  By the way, I'm not holding you to it.  I know it's in good faith but I'd like to hear what states that we have validation for turning this document over.  And there may be numerous states.

MR. NEFF:  It's a good-faith representation here.  I am kind of a point --

THE COURT:  Okay.  Well now take away the good faith. I accept that.  Okay, I'm asking for proof now.

MR. NEFF:  Okay.  Wyoming, Kansas, Indiana and Arkansas all complied voluntarily.

THE COURT:  Okay.  Just a moment.

MR. NEFF:  Texas --

THE COURT:  Kansas, Indiana, Wyoming and Arkansas ...

MR. NEFF:  ... have already complied ...

THE COURT:  ... voluntarily.

MR. NEFF:  ... voluntarily.

THE COURT:  Okay.  Texas?

MR. NEFF:  Texas, Virginia, Utah, Tennessee, South Dakota --

90

THE COURT:  Just a moment.

MR. NEFF:  Oh it's gonna go long, yeah.  South Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama, all fall into the list of they have expressed with us a willingness to comply based on the represented MOU that we have sent them.  And so we expect full --

THE COURT:  Now apparently Nebraska can't make up its mind because of the proposed amici briefed to the Court, they have the former state secretaries of state for Colorado, Connecticut, Minnesota and guess what?  Nebraska.

MR. NEFF:  Well those are former.  And furthermore, just because some states are representing certain things in court, there are still discussions going on now that this MOU we have is fully blessed.  There are the -- I don't think it's safe at this point to go beyond those states but --

THE COURT:  Then that's fine.

MR. NEFF:  -- that's a fair representation of the state of discussions as of today.

THE COURT:  And Counsel, back to you.

MR. BRUDIGAM:  Sure.  And yeah, so all I heard there was we've heard a willingness.  It doesn't sound like those states have actually turned over any data, just to be clear.

So I want to talk a little bit about --

THE COURT:  No, I think he said that four states have actually.  Kansas --

EXCEPTIONAL REPORTING SERVICES, INC

ER-125

91

MR. BRUDIGAM:  Four states have actually turned over but the broader list --

THE COURT:  -- Indiana, Wyoming and Arkansas.

MR. BRUDIGAM:  Right.

THE COURT:  The others were a purported willingness.

MR. BRUDIGAM:  Right.

So Your Honor, the federal government is really leaning hard into the text of these statutes and they say that we don't want to talk about the text but that's just absolutely not true.  And I want to just start with the Civil Rights Act of 1960.

There is a very clear statutory limitation in that provision and it's in Section 20703.  And it says that the attorney general's demand shall contain a statement of the basis and the purpose therefore.  DOJ has not satisfied this requirement and so their demand is invalid plainly under the statutory text.

THE COURT:  So the plain representation by the government is too broad; and that is, they want to stop voter fraud.

MR. BRUDIGAM:  Well, so they've mentioned a couple of things.  It keeps changing so I want to unpack this a little bit.

So they said that the purpose is free and fair elections, clean voter rolls.  Then he said up here that it's

ER-126

92

for enforcing HAVA.  So these are multiple different bases. And also it's different than the -- or than the purpose that was originally articulated in the letters to the secretary.

The original request said that it was -- they were seeking it for NVRA voter list -- list maintenance compliance. So the reason and rationale keeps shifting and changing.  And that's a problem, not just because it's suspicious, it's a problem because, again, the text says, "The demand shall contain a statement of the basis and the purpose therefore. The text use of the article."  'The,' twice, in front of the basis and the purpose indicates that there is only one basis and one purpose.

And the federal government has explicitly rejected this plain text reading.  They said it up here that they just need to give you any old basis and then the demand is good.

**THE COURT:**  That's my question also to both of you; and that is, does the executive branch need to state a purpose? Your argument is that they do.

**MR. BRUDIGAM:**  They do.

**THE COURT:**  Counsel for DOJ puts that in broad terms.

**MR. BRUDIGAM:**  Right.  Well but again, it's not just a purpose, it's -- or not just the purpose, it's also the basis.

**THE COURT:**  Okay.

**MR. BRUDIGAM:**  And they have not alleged any basis

ER-127

93

anywhere in their action.

Now, I also want to talk about -- and just -- you know this -- I'm sorry. I want to talk a little bit more about HAVA, which is the law that apparently now that's the main method of enforcement we're now learning today, that that's what they want to enforce and they specifically reference the requirement under HAVA that states collect social security numbers and driver's license numbers. Well let's look to the text of HAVA. What does it say?

"The state shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph in accordance with state law."

And that is -- when it says "this subparagraph," it's referring directly to the requirement that states collect that information when processing voter registration applications. So there is nothing for the federal government to enforce here. This is solely the state's domain.

And as I said in my original motion, another provision of HAVA explicitly delegates discretion of implementation of HAVA to the states. So again, we're not afraid of the text in this case, we think it strongly supports our position. And so I also want to talk about what this data could be used for.

So we've heard a lot of different reasons. I just

**EXCEPTIONAL REPORTING SERVICES, INC**

ER-128

94

explained why it's not relevant for HAVA.  I want to also talk about why it's not relevant for List Maintenance under the NVRA.

So the legal standard under the NVRA requires states to conduct a general program that makes a reasonable effort.  So the Sixth Circuit held this year in that Benson case that this just means a serious attempt, a rational, sensible approach.  It need not be perfect or optimal.  And so under this standard, getting line-by-line voter information of their social security numbers and driver's license numbers, that's entirely unrelated to whether a general program exists or whether the state is making a reasonable effort.  And so, again, at every turn, the supposed reason why they need this information, it just doesn't add up.

And then finally, I want to talk about they claimed, as they did in their brief, that California has, quote, "the most worrisome voter registration data in the nation."  That's just absolutely wrong, okay?  That's an assertion in a brief without any support.

And they also incorrectly say that in submitting data to the Election Administration Commission in response to the EACs survey, this is an election administration survey, they said the LA County didn't submit any data.  That's not true.  That's simply not true.  You can go to the survey and look at the data that LA submitted and you can look at our explanation

95

to DOJ in our letters in advance (inaudible) litigation explaining the questions they had about that survey.  So to the extent that they want to rely on EACs as some after-the-fact rationalization for this demand, it just doesn't make sense. It doesn't add up.

So those are the main --

THE COURT:  Were there inconsistent or consistent offers if you're aware of the Page case, as well as this case. In other words, when this started in Orange County, originally counsel was here, there's a representation about the registrar there making the same or similar representations about what they were willing to share with DOJ but I've never compared the two.  And I don't know what the state's position is because DOJ's argument might be, we're getting inconsistent data.  In other words, even when we're sharing, with the different entities promising that they'll share some amount of this data, the different counties are supplying this in different ways.

MR. BRUDIGAM:  Sure.  So I won't speak too much about that case but I would say that case is different and there isn't a problem of inconsistent data sharing because in the state case, they're saying, give us the whole list.  We want every voter.

In Orange County, they said, we want a list of just the individuals that have been removed from your list because of non-citizenship, people who renounced or for whatever

96

reason.

THE COURT:  So this is much broader from your perspective in terms of protection, privacy, HAVA.

MR. BRUDIGAM:  Yeah.  It's not an issue of can they be reconciled.

So I do want to just back up again and just zoom out on the big picture here in this case.

You know, as we talked about -- my colleague talked about, in his motion, that the states really have the primary role in administering elections and the voter registration process.  The Constitution makes that quite clear in the elections clause.  And it makes sense to prioritize the state in this process because they're the ones that are closer to the voters, more accountable to the voters.  And so this is an arrangement that it depends on the principle of subsidiarity where a decision should be made at the local level.  And here, we don't -- there's no place for the federal government to come in and start demanding these records under that constitutional framework.

And not only are the states the default entity running elections but it's only Congress that can make or alter those rules.  Here, we have the executive branch in court trying to get this information.  The Constitution says nothing about the executive branch having any role in federal elections.

ER-131

97

And I would just say that this is not a unique position by this administration.  The president has been meddling in state election law since he came into office.  And I would point Your Honor to a case in the District of Massachusetts, California v. Trump, where the executive was doing something sort of similar where they were going in under the guise of federal law and trying the change the way states administer and conduct elections and that was pursuant to an executive order the president issued.  And so here, we're having another situation where the federal government is coming in under the guise of inapplicable federal laws and trying to interfere with the state's role in elections.  And so I'd just say against that backdrop, it's important to keep that in mind; but even if, you know, considering all that, if you'd just go back to the text of these statutes, the federal government is not entitled to this information under those laws.

And so at this point I want to turn it over to my colleague, Will Setrakian, to just provide some rebuttal on the federal privacy laws issue.

**THE COURT:**  Thank you.  And once again, would you state your name because we're on CourtSmart.

**MR. SETRAKIAN:**  Good afternoon, Your Honor.  Will Setrakian for defendants, The State of California and California Secretary of State Shirley Weber.  Just four quick points on the federal privacy statute.

98

First, I want the Court to recognize between the briefing and the argument, we have given the Court law on these three statutes.  Statutory law, regulatory law and decisional law.  And my friends on the other side have not.

Now, turning to my friend on the other side's reference to DOJ's Civil Rights Privacy Policy -- this is cited in their opposition to the motion to dismiss -- ECF 63 on Page 23 and Footnote 11.  That privacy policy clearly does not apply here.  The policy concerns some sort of form.  It says to the reader, quote:

"The information you provide through this form will be used in some way or another."

And among other things, it says:

"All the information you give via this form is voluntary."

Now that, of course, is miles from this case where individuals are not providing data via some form to the government and they are not doing so voluntarily.

Third, my friend on the other side said the Civil Rights Act prevails over the Privacy Act.  Now they, of course, offer no citation, no opinion for that proposition.  And it's true that the question has not been litigated as between the Civil Rights Act and the Privacy Act but in the NVRA context, which also contains a disclosure provision, every court to read the two laws together, the NVRA and the Privacy Act.  Every one

ER-133

99

of them.

THE COURT:  Let me stop both of you and just ask a naïve question.

Your argument is that the states not only set up the process and procedure for voting but they also have the enforcement applications.

(To Clerk):  Oh, you want to check CourtSmart and just make sure it's operating?  Still going?  Let's make sure, Counsel, because we sent the staff to lunch, okay?

MR. SETRAKIAN:  Yes.

THE COURT:  And if it's not, guess what?  We get to argue again on this record, okay?  (laughs)

MR. SETRAKIAN:  This would be everything since we began at noon.

THE COURT:  Yeah, well it's like the Rocky horror picture show.

MR. SETRAKIAN:  That's okay, Your Honor.

THE COURT:  Or Ground Hog day.

Is it operating?  Counsel --

MR. SETRAKIAN:  Thumbs up.

THE COURT:  -- magic electronics, it's still operating.

MR. SETRAKIAN:  Excellent.

THE COURT:  So let me come back to the question.

It sounds to me like this court's going to eventually

100

be in the position of deciding, at least in the privacy area, a unique issue of first precedence in the country and that is trying to decide what those states' rights are in terms of your unique position in terms of policy and practice.  And I'm not referring to HAVA now or I'm not referring to statute but also if we get into privacy and also one that's legitimate for the federal government to intervene as they did in the civil rights cases in the South.  How am I going to balance that so it's not a personal opinion or predilection by a court?  Because I don't think there's any jurisprudence and I guarantee you you've got a good chance of whatever happens here going to the Supreme Court.  In fact, I wouldn't be surprised if they took this case on cert.

**MR. SETRAKIAN:**  Well, as to the privacy laws, I would submit this is not essentially a question of first impression, that several courts have already been working through, trying to read together --

**THE COURT:**  Which courts?

**MR. SETRAKIAN:**  Sure.  We have six opinions that we cite in our briefing.  A case called Public Interest Law Foundation v. Dahlstrom; case called True the Vote v. Hosemann; Public Interest Law Foundation v. Bellows; Public Interest Law Foundation v. North Carolina State Board of Elections; Project Vote v. Long, and a case called Greater Birmingham Ministries.

**THE COURT:**  Now, you cited them.

101

MR. SETRAKIAN:  Yes.

THE COURT:  And are they all consistent?

MR. SETRAKIAN:  They are.

THE COURT:  Because I have to go back and do my homework now after argument?

MR. SETRAKIAN:  Yes.  They all are consistent in concluding that the Privacy Act still compels some redaction of voter information.

And the reasoning tends --

THE COURT:  Do they deal specifically with what those redactions are?  Are they the social security numbers?  Yes or no?

MR. SETRAKIAN:  I believe they all concern redactions of social security --

THE COURT:  No, no, "I believe".  That's the way police officers talk to me.  "I believe".

MR. SETRAKIAN:  No, yes, I believe they all concern redactions of social security numbers and they all --

THE COURT:  Okay.  Do they all involve redactions concerning state DMV or do they deal with that?

MR. SETRAKIAN:  I don't think they all involve the DMV.  They all involve voter records.

THE COURT:  Do any of them involve DMV?

MR. SETRAKIAN:  I am not sure where the source was of the data in all of them.  I think Project Vote involves DMV

EXCEPTIONAL REPORTING SERVICES, INC

102

sourced data but in any event, this data is coming from state election offices and they all use similar reasoning.  They all say that one of the purposes of the NVRA was to increase voter participation.

And there would be, as Your Honor recognized earlier, a chilling effect if individuals knew that by registering to vote, they were putting their entire packet of information, including social security numbers and driver's license numbers, available for exposure.  The NVRA's case for members of the public but also from the federal government if it passed.  And that's the reasoning these courts take and the reasoning I submit the Court should adopt here which is that we have to read these statutes together and that is a way that they can sort of play nicely with one another.

And I will just conclude with one comment on the history of privacy laws.

You'll recall the Privacy Act was enacted in the wake of Watergate and COINTELPRO.  Scandals that shook Americans' faith that their data would be responsibly collected, used and stored.  And this is not just attorney argument.  The Ninth Circuit recognized this in the Garris case that we cite at Page 1295.  They talked about a, quote, "Rightful and broad condemnation of government surveillance programs," close/quote.  Applying the Privacy Act in these related laws here vindicates those ends.

103

I'm happy to answer any further questions the Court has.

THE COURT:  I'm just going to joke with both of you but wait till we get from Watergate to AI.

MR. SETRAKIAN:  Yeah.

THE COURT:  And your refrigerator spying on you.

MR. SETRAKIAN:  I do think there's something to that insight where these statutes came about as electronic surveillance was becoming more sophisticated.  And so as it only continues to grow more sophisticated, the importance of these statutes looms even larger.

THE COURT:  Is there any jurisprudence concerning data dumps that would be of value to the Court or any reasoning?  There's been quite a controversy concerning government gathering information through massive data dumps involving private citizens.  Is there any jurisprudence there?

MR. SETRAKIAN:  Data dumps?

THE COURT:  Because you're dealing basically data dumps.

MR. SETRAKIAN:  Not that I'm aware of.

THE COURT:  Okay.

MR. SETRAKIAN:  But maybe.

THE COURT:  Okay.  All right then thank you very much.

And you're satisfied with your argument?

104

**MR. SETRAKIAN:**  Yes.

**THE COURT:**  Now, in three minutes -- it's up to you but in three minutes I'm going to take the other case because I only have an hour with the gentleman here from the County.  So if you have three minutes, fine; if you don't, I'll see you about 2:00 o'clock.

**UNIDENTIFIED SPEAKER:**  We're going to have rebuttal, right?

**THE COURT:**  Oh, there's going to be rebuttal.  In other words, we're not leaving, okay?

**UNIDENTIFIED SPEAKER:**  I think Your Honor --

**THE COURT:**  Why don't we just resume.  I'm giving you the courtesy.  If you wanted to catch the plane, you could have.  I've let you go out of order but otherwise, why don't I see you folks at 2:00 o'clock.  I'll take a recess -- well they'll take a recess then before the next witness and we'll try to finish off your arguments, okay?

**UNIDENTIFIED SPEAKER:**  Okay.

**THE COURT:**  Okay.  Have a good recess and we'll see you at 2:00 o'clock.

   **(Recess taken at 12:58 p.m.; reconvened at 2:00 p.m.)**

**THE COURT:**  Call the matter of *United States v. Shirley Weber*.

You're not -- you don't have a 45-minute time constraint but come on up for a moment and let's see if we can

105

get you on your way.

**(Laughter; Pause)**

And then, Counsel, would you just restate your name for the record so we have -- we have it on CourtSmart, please.

Someone with Department of Justice?

**MR. NEFF:**  Eric Neff for the United States.

**THE COURT:**  Thank you.

**MR. BRUDIGAM:**  Malcolm Brudigam for the State.

**THE COURT:**  Thank you.

**MR. SETRAKIAN:**  Will Setrakian for the States Defendants.

**THE COURT:**  Thank you.

**MR. DODGE:**  Chris Dodge for Intervenors NAACP and SIREN.

**MS. ZELPHIN:**  Grayce Zelphin for Intervenor League of Women Voters of California.

**MS. SHOAI:**  Deputy County Counsel Suzanne Shoai for Orange County Register of Voters Bob Page.

**THE COURT:**  And I'll come back to you, in case you have any comments that you'd like to make.  I somewhat skipped over you the first time.  I'll come back.

**MS. SHOAI:**  Thank you, Your Honor.

**THE COURT:**  So Counsel, once again identify yourself by name and who you represent.

**MR. DODGE:**  The gentleman who preceded me is quite

106

tall.

Good afternoon, Your Honor.  Chris Dodge on behalf of the NAACP and SIREN Intervenors.  I sort of want to address two things, I think, some nuts and bolts issues and then sort of the bigger picture, which Your Honor keeps coming back to here.

On the nuts and bolts, you know, as I said on the top half, this issue, this case really boils down to whether or not Congress has given the Executive Branch the tools necessary to make the demand that it has placed upon California.  My friend on the other side during his argument said that me and my colleagues were trying to avoid the statutory text.  That is completely backwards.  There is one side here that is avoiding the relevant statutory.  It is the Federal Government; it is not the Defendants and Intervenors.  And I'll give you an example.

So in the top half of my argument I talked about Title III of the Civil Rights Act and one of the statutory arguments that the NAACP raised in its briefing.  My friend on the other side got up, and I will assume this was an oversight on his part, but he purported to quote the statute to Your Honor, it will be in the transcript, and he left out the very portion of the statute that I quoted to Your Honor that decides this issue and he did not address the argument raised in our briefs.  So I will read the actual text of the statute that my friend on the other side neglected.

**EXCEPTIONAL REPORTING SERVICES, INC**

107

This is 53 U.S.C. 20701 and in relevant part it says every officer of election shall retain and preserve all records and papers which come into his possession relating to any application, registration, and payment of a poll tax.  My friend on the other side did not quote that part about come into possession.

And the same thing was true in their Complaint.  They conspicuously left that portion of the statutory text out of their Complaint.  And I think the reason why is quite clear.  It's because as a statutory matter it forecloses what they are seeking in this case.

As I explained in the top half, that phrase come into possession carries a particular meaning.  Congress oftentimes will use the term possession in a statute.  As Your Honor surely knows, there are a litany of federal statutes that say possession.  Come into possession is not the same.  Come into possession means to acquire or receive something.  I came into possession of my grandmother's antique china.  I came into possession of a letter a friend from Fresno sent me.  If I write a letter and place it on my desk I don't come into possession of that letter.  I come into possession of a letter when it is sent to me and I receive it.

So that operative text in the Civil Rights Act means that the records subject to this inspection requirement they rely upon are only those that come into the possession of

108

election officials.  Period.  Full stop.  If a California election official compiles a list in their office in Sacramento, that didn't come into their possession, they created it.  In contrast, when a voter goes down to their local registrar and submits an application, that application comes into the possession of the registrar.  That's the difference.

My friend on the other side has not addressed this statutory point in their briefing.  They have not addressed it here in oral argument.  And I think it's because there is no good answer to it.  Simply put, if it does not come into their possession, if it is not a record that comes into the possession of state election officials it is not subject to mandatory disclosure under this Act.  And, you know, I think my friend on the other side has to account for the statutory text at some point and he has not.

So that's sort of point number one on the text on the nuts and bolts, which, you know, again I think highlights who here is actually evading the statutory text.

The next, let's go to HAVA.  My friend from the State I think addressed this very ably.  DOJ counsel got up and said, well, HAVA requires a compilation of Social Security numbers and driver's license numbers.  Well, that's true, but there's a very important omission that my friend from the State pointed out.  HAVA says the states have to do that, subject to their own state voter registration laws.  It is a -- and if you read

109

the legislative history of HAVA, and I know this is quoted in our brief, the NAACP brief, in the legislative history of HAVA Congress specifically says it praises the historical decentralization of election management in this country and it says very plainly that the rationale for that that the Founders had in the elections clause was that it would avoid the over-centralization of power when it comes to administering elections.

And that is precisely what the Department of Justice is trying to do here.  They are trying to take unprecedented steps to centralize the management of federal elections, which the Constitution in the first instance assigns to the states.  And I think, as my friend said, that should give everyone a great deal of pause.  There should be a great deal of pause at the idea that federal elections are going to be run from Washington, D.C. rather than state capitals' county registrar offices.

And then with respect to the NVRA, the last of the three tools they invoke, you know, I think there's been a lot of discussion about that here today, the one point I would like to emphasize is that statute does have a inspection provision but it is one common to all people.  It is not a special provision for the Government.  And my friend from DOJ in trying to explain DOJ's past position in the *Long* case, the *Bellows* case, the *Benson* case said, oh, well, those cases were

110

different because they involved requests from private parties. There's absolutely no statutory basis to draw that distinction whatsoever.  There's one public inspection provision in the NVRA, it applies -- you know, if you construe that provision, Your Honor, that construction will apply as much to the Department of Justice as it will to your law clerk, as it will to the Marshal downstairs who wants to put in a request to the state to say give me these documents.  There's no special solicitation to the Government under the NVRA when it comes to what they are allowed to review as far as documents go.  And I think my friend on the other side has played a little fast and loose with that fact.

And I think because there's only that one common public inspection provision, that's why you have, again, uniform case law.  The *Bellows* case is, you know, I think a really good distinction of -- articulation of it.  It collects all the other relevant case law, saying because this is a public inspection requirement we can't just have Joe Smith requesting every little bit of data about a voter.  Of course you have to redact certain sensitive information.  And the courts are uniform on that.

So that NVRA public inspection provision is not broad enough in scope to get the Government what they seek here.  It is limited.  For that reason, because anyone on the street can walk in and use it.  And certainly it would be very troubling

ER-145

111

if any person on the street could get the same kind of data the federal government is requesting here.  And that's how they're asking you to construe the NVRA.

So that's sort of the nuts and bolts.  Unless Your Honor has questions on them, I sort of want to, you know, again, zoom out, like why are we here, what's the big deal.  The big deal is, again, this unprecedented effort on behalf of the Department of Justice to create a nationwide centralized voter database.

**THE COURT:**  And by Department of Justice, that would be the Executive Branch?

**MR. DODGE:**  Correct, Your Honor.  Correct.  And, you know, there was some discussion about, you know, are they targeting certain states, are certain states complying.  You know, let's sort of look at the facts that are before the Court.

Four states have willfully complied with their demands.  I suppose that's their prerogative.  They might have unique state laws as far as what information is protected.  But that's certainly not any sort of indication that these tools they rely on actually grant them that power.  That just means the leaders in these states said you know what, we're okay with this or we don't have state laws that protect this information.  Which is not the case in California.  California has very robust state laws passed by the legislature that protect this

112

information.  And so it doesn't really speak to California what these four states did.

My friend alluded to some dozen or so states that, you know, maybe kind of in the coming days are going to do something.  I mean I don't know anything about that.  I think we should -- I think it will be curious to see what that actually looks like in reality.  You know, he's talked about this memorandum of understanding the Department of Justice has offered them.  I don't know what that says.  I don't know what sort of, you know, terms and conditions are in it.  I think that would be, you know, sort of interesting to learn more about.  And I don't think the Court should take on faith that these 12 states are just up and turning over their entire voters lists because someone sent them a letter in the mail from Washington, D.C. asking for it.

The facts, as I understand them, is that at this point in time the Department of Justice has made this demand of almost every state in the country.  Blue, red, swing, purple, whatever you want to call it.  States of all colors have resisted it.  Lots of Republican led states.  You know, my friend has quoted, if you add his numbers up that's 16 states.  There are more than 16 states in this country that have a Republican government.  The states they have sued so far I think do skew quite blue.  Fifteen of them are led by Democratic governors.  One is led by Republican, New Hampshire.

ER-147

113

Whether that is an indication of something, I don't know.  But I think in aggregate most states are pushing back on this.

And so my friend got up and said this shouldn't be a big deal, you know, this shouldn't be political.  You know, in the abstract, of course, he's right.  I think if this were a run-of-the-mill application of the NVRA it wouldn't necessarily be very political.  But there's no precedent of the Department of Justice of the Executive Branch going around with this scope and breadth to the states.  And Your Honor asked, you know, does that have any chilling effect on people.  Of course it does.

You know, my friend on the other side has given very ephemeral reasons to the Court for why they need this information.  Oh, we want to help people vote.  We want good voter lists.  Voter fraud.  Freedom.  You know, whatever.  Like these very high level explanations of what they intend to use the data for.  You know, I don't think those satisfy the text of the statute but I also think, you know, there's public reporting out there that is cited in the papers that casts a fair bit of shadow over what the Department of Justice purports to want this information for.

It is I think basically confirmed by public reporting that the Department of Justice will share this information with the Department of Homeland Security, an agency that is typically tasked with, you know, terrorism issues, national

114

security issues.  And I think if you are someone who's represented by one of my clients, SIREN, which represents working class immigrants in California, and you hear that the Department of Justice is coming to your state and says turn over all this voter information and there's reports out there that it's going to be turned over to the Department of Homeland Security, they might start thinking, gosh, you know, I don't want -- I don't need this kind of trouble, I don't need this -- why should I bother registering to vote if my information is going to be on the fast lane from my local registrar's office to Washington, D.C. and the Department of Homeland Security. That absolutely chills people.  And I don't think we have anywhere near the kind of assurances from the federal government that would give those groups of people comfort in knowing that their data was going to be compiled in a national database.

I think Your Honor's alluded sort of like to the question of they're all Social Security numbers, the federal government has them, what's the consequence of that?  To me the consequence is voter lists are maintained at the state level by design.  By constitutional design, by statutory design.  The NVRA and HAVA, you know, actual enactments of Congress, assign these responsibilities to the states.  They don't assign it to the Civil Rights Division of the Department of Justice.

And so I think the precedent of having a nationwide

115

voter registration database at the fingertips of the Executive Branch, it is precisely the centralization of election management authority that the Constitution is meant to avoid, the federal statutes are meant to avoid.  But I think -- you know, my fried used the term subsidiarity, which, you know, is a very impressive term.  I mean it really just boils down to the fact that you go to vote at your local registrar's office. You know your neighbors when you go to vote at the polls.  The person who checks you in is somebody who lives down the street. There's a lot of trust that comes from voting at the local level, from registering at the local level.  And elevating that to some focal point in our nation's capital, that remove from just going down to your town hall to vote, it's of huge consequence to people, especially those who, I think with good justification, are very hesitant to know that their information is going to the Executive Branch.

So I think that's -- I think those are the stakes and I think that on the nuts and bolts it really boils down to these three statutes they have invoked.  You know, there are affirmative defenses, of course the Privacy Act, I think, you know, those things need to be considered as well.  But, you know, in the first instance the most immediate legal question before the Court is do these three statutory tools they point to actually grant them the authority to compile these statewide voter registration lists.  And the answer is no.

ER-150

116

So if Your Honor has additional questions, I'm glad to address them.  Otherwise, I know you have a busy day.

**THE COURT:**  Counsel, thank you very much.

Counsel of behalf of the League of Women Voters?

**MS. ZELPHIN:**  Thank you, Your Honor.  Grace Zelphin on behalf of the League of Women Voters.  I'll keep this brief because I think a lot of the points that we would like to raise are similar to our colleagues.

Just big picture here, the NVRA, HAVA, and the CRA were each passed for the purpose to ensure that eligible Americans can participate in free, fair, and secure elections, which I think are a cornerstone in America's democracy, the right of every citizen to vote.  Each of these statutes was passed in the context to open up the ability for folks to register to vote, making new pathways for folks to get their registration organized, making sure that their registrations were not unfairly deleted, and that folks when they step to the polls to vote they're able to do so.

The Department of Justice's attempt to conflate and import pieces of these statutes now to authorize its line-by-line evaluations of voter data simply must fail for all the reasons my colleagues have spoken to earlier today.  The statutes that were passed and thoroughly considered to help voters access the polls do not permit the federal government to use them to go line-by-line and try to find folks and any

117

imperfection in a state's data registry to disenfranchise voters.

And the harm is great.  Having folks know that their data that they have entrusted with their local registrar is going to a massive database in the federal government discourages folks of all walks of life, of any walk of life that just does not want that kind of vulnerability in their personal data.  It risks suppressing registration, it risks suppressing voting in, you know, a franchise that we're already less than 60 percent of eligible voters vote.

We should be doing everything we can to encourage voting and use these statutes for the purposes for which they were intended and for that reason, and for the reason that the statutes clearly do not permit the Department of Justice to use them in the way they are intending to, the Motion to Dismiss should be granted.

With that, I'll rest on our papers and thank the Court for their time.

**THE COURT:**  Thank you very much, Counsel.

Let me turn to the County for a moment.  In a sense you don't have to make a comment, you're here on the Page matter, but if you have anything that you'd like to share I want to make sure you have that opportunity.

**MS. SHOAI:**  No, Your Honor.  I really do appreciate the opportunity, but I have nothing to add at this time.

118

**THE COURT:** Let me turn to the Department of Justice.

**MR. NEFF:** Thank you, Your Honor.

**THE COURT:** I want you to just state your name.

**MR. NEFF:** Eric Neff for the Department of Justice --

**THE COURT:** Thank you.

**MR. NEFF:** -- Your Honor, the United States. The Civil Rights Act is so clear on its terms that we are ending up with absurd arguments here and dealing with opposing counsel's reference to language of come into possession. We have not been trying to hide from that language. It's simply for economy of briefing to not include that descriptive phrase, which is referring to just the any record that is coming into a state election official's possession, they then need to turn that over to us if they want. It doesn't provide any qualifier that applies to this case.

Is counsel arguing that if a state was discriminating against a whole class of voters based off of race that then the federal government would not be able to request their voter registration list because it was compiled by the state? It runs afoul of the very purpose of the statute.

It's simply saying that that is just a descriptive phrase that says any record that comes into the state election official's possession, if we deem it as something we need for our purposes we can request it.

HAVA. The language of HAVA does support subsidiarity

119

when one understands the purpose under which it was passed and the legislative context in which it was passed.  Up to that point there had been no law passed that provided any minimum standards for the state that the federal government could enforce.  Therefore, HAVA is clearly stating, while we are not undermining subsidiarity, while we still have respect for subsidiarity, we here are stating in very specific circumstances these minimum standards for the first time are ones that the federal government has statutory authority to enforce.

Big picture in this argument, I think you can put kind of the three arguments that have been made by opposing counsel kind of into three buckets.  First, jurisdiction, whether it's proper here in Sacramento.  We stated in our papers that we believe in an electronic era any office where the records are available is a principal office under the statute.  The request for these rolls are made on a regular basis at Secretary of States and registrars all around the state.

Going in reverse order, I think, of depth of discussion and importance.

The privacy issue seemingly getting lost here is that we're dealing with the United States, the federal government, the agency that issues this number, that has more protections than any other agency to preserve private information, is

ER-154

120

dealing with national security matters on a day-to-day basis. And within that context, this can't be clearer. Election integrity and privacy laws do not conflict. I repeat they do not conflict. Privacy laws are about protecting the public as the government goes about its lawful business.

With all respect, I would push back on Your Honor that this is a unique issue posed before the Court. I would say it's not. It's a non-issue. No one thinks that privacy laws preempt the government from going about its lawful business. No one thinks the government is restricted in its ability to enforce federal laws, either civilly or criminally, because of privacy laws, much less getting the last four digits of a Social Security number where there's a specific federal statute saying that we get it. We are pursuing clean voter rolls and free and fair elections and we will protect all citizens' privacy, as it is our obligation to do and as we have laid out in our papers how we will do it.

Furthermore, the request is not something extraordinary. For example, the SAVE database has been in operation in the Department of Homeland Security for at least two decades that I'm aware of. And just in the past six, I believe it was instituted in May, they began running voter rolls for voluntary states with this data, with driver's license and last four of Social. Twenty-one states gave it to them. Twenty-one at last count. The states are interested in

ER-155

121

having their own clean voter rolls.  The federal government is interested if states are not maintaining clean voter rolls.

Now the final bucket I would say is falling under or at least getting to the statute here of the Civil Rights Act, the purpose, the requirement that we state a purpose.  Opposing counsel is trying to make just a mountain out of a molehill on this.  As I've said to Your Honor, I would analogize it to a requirement that putting a reason on the minutes.  Because that precludes their various claims and defenses here they want to say things like, and I'm quoting, we need to unpack that, this is -- they are giving ephemeral reasons, also that we need to allege some sort of facts.  Those are all quotes.  And none of those are in the statute.  The Civil Rights Act does not allow for that.  The Civil Rights Act is about getting election records in short order and whether the purpose is combatting discrimination, voter roll list maintenance, it does not matter.

The *Coleman v. Kennedy* (phonetic) case made it clear.  Quote, no prima facie case is required.  Quote, we do not need to identify in a general way the reasons.  Quote, it's comparable to an order to show cause.  Your Honor should just -- given the proper complaint, quote, it entitles AG to a prompt order requiring compliance.  A prompt order is important here because we do have concerns about this -- all states are -- it's an interest in the federal government in ensuring

122

free and fair elections and clean voter rolls.

In California we have particular concerns. It's the largest, as we've alleged in our papers, it's the largest state in the Union. Just on their own publicly available data there were 2.1 million duplicate registrations. That is 15.6 percent of the voter rolls were duplicates. That doesn't even -- that number doesn't even include the largest county in the state because the data was not provided to them. There are other counties that weren't provided as well. They provided no data on duplicate registration removals. Their removal -- their death removal rate, removing someone from the voter rolls because they have died, was half, about half the national average. These are all concerning data points.

There could be many more. We're not required to allege any of them. I myself could get up here under oath. I used to be the election -- prosecutor of election crimes here in Los Angeles. I could describe my cases, go down the list. It's not required. All we have to do is allege a purpose. And the records need to be turned over to us in short order.

This isn't about the Privacy Act or California privacy laws and their conflict with HAVA going to the Supreme Court, this is just about the most populous state in the nation failing in their list obligations and then, frankly, obstructing federal oversight efforts.

Thank you.

ER-157

123

THE COURT:  All right.  Long, long ago when I was practicing I knew that when I got to the elevator door if I just would have told that judge one more thing that I had forgotten I would have persuaded that judge.  So this is a shotgun one round, anything you have missed, anything that you want to say but now it's brief.  It's that one succinct statement that says, I really want the judge to hear this.

MR. BRUDIGAM:  Your Honor, at the very beginning of today you asked whether we wanted a decision based on jurisdiction or the merits and I just want to be clear that we, even though we raised that jurisdictional argument, we invite a decision on all of the merits in this case.

THE COURT:  Okay.  I feel more comfortable -- I'll follow the law, but I think we all need a decision subjectively on this.

MR. SETRAKIAN:  Nothing further from me, Your Honor.

THE COURT:  Counsel?

MR. DODGE:  One thing I'll briefly add, Your Honor, on whether motions to dismiss are a proper vehicle, and they absolutely are.  Pure questions of law are resolved on motions to dismiss all the time.  That's what this presents, whether the statutes actually supply the authority the Government is claiming.  And, you know, it's already been discussed a little bit but nothing in any of these laws creates a special proceeding where the Government doesn't have to prove its case

ER-158

124

under the Federal Rules of Civil Procedure.  They filed a civil action.  Literally the first rule of the Rules of Civil Procedure says all civil actions shall be governed by the Federal Rules.

So, you know, I know they're in a hurry.  I don't think they want to tarry in this court long.  They want to take it up.  But they have to follow the Federal Rules and the Federal Rules, including Rule 12(b)(6) and, if necessary, Rule 56, are the proper mechanisms for resolving this case.

**THE COURT:**  Counsel on behalf of the League of Women Voters?

**MS. ZELPHIN:**  Thank you, Your Honor.  Along similar lines I just wanted to reiterate that the Civil Rights Act Title III does not have any special judicial process that oversets the proper judicial oversight -- appropriate process that this Court may exercise.  And even though the Department of Justice seems to want to assert that in a CRA proceeding they're above the law, that's certainly not the case and the cases that they cite do not support that.

**THE COURT:**  County?

**MS. SHOAI:**  No, thank you, Your Honor.

**THE COURT:**  DOJ?

**MR. NEFF:**  Submitted, Your Honor.

**THE COURT:**  All right, I want to thank you for your courtesy.  Obviously, I'll wait for the amicus briefing.  But

125

before you leave, I want to know that the wording meets with your approval concerning the amicus briefs and it meets with the time that we've tried to reflect upon.  Do we have a draft of that by any chance?

**MR. SETRAKIAN:**  Yes, Your Honor.  In fact, we all agreed on a draft that matched --

**THE COURT:**  Could you just read it?

**MR. SETRAKIAN:**  Well, we just -- sure.  One of my colleagues is having it be submitted to the Court now.  Yeah, sure, let me read it --

**THE COURT:**  Why don't you just read it.  Why don't we all hear it and see if we can stipulate to it.

**MR. SETRAKIAN:**  Sounds good.  Quote:

"On December 4th, 2025, the parties appeared and stipulated to the following briefing schedule.  All potential amici have 14 days from entry of this order to submit proposed amicus briefs.  Potential amici need not seek leave to file proposed amicus briefs."

**THE COURT:**  Acceptable to all parties?

**MR. NEFF:**  Acceptable.  Eric Neff for the United States.

**THE COURT:**  Now, is that 14 working days or is that excluding weekends or not?  In other words, you've got the holiday season upon you.

**MR. SETRAKIAN:**  I imagine that --

ER-160

126

THE COURT:  You want to make sure you get the briefing, depending upon where it comes from.  Working days or -- for my days it's seven days a week so it doesn't matter, but, you know, other people might have a different view.  So do you want that court days or working days or just seven calendar days?

MR. SETRAKIAN:  I viewed it as 14 calendar days.

THE COURT:  Okay.  Counsel?

MR. NEFF:  The United States as well.

THE COURT:  Okay.  So it will be calendar.  That will be calendar days.  I'll put it out tomorrow, not out today, just so we have enough time.  Okay?  Because people are going to get this on a Friday, you've already gone through three days by Monday.

I want to really thank you.  Just excellent briefing and excellent argument.  I want to pay that compliment to you.  It's been very helpful.  Obviously, you're not going to get a decision before two weeks.  I want to get that amicus briefing and look at that also.  But obviously I'll be thinking and reflecting upon it in the meantime.  Okay?

Thank you very much.  Have a good day now.

(Counsel thank the Court)

(Proceeding adjourned at 2:31:40 p.m. and then resumed at 2:31:51 p.m.)

THE COURT:  …and those questions to you with a page

127

limit and a time limit.  Okay?

**MR. BRUDIGAM:**  Your Honor, I do think --

**THE COURT:**  And also I think that there was some briefing due concerning the position of DOJ and the juxtaposition of DOJ in a number of cases that you cited to me. I'll need that as quickly as possible as well.

**MR. BRUDIGAM:**  Yeah, we can provide a supplemental notice attached --

**THE COURT:**  Provide that to the other parties.  They should have a chance to respond.

**MR. BRUDIGAM:**  Of course.  Just attaching those three DOJ amicus briefs that were referenced in argument --

**THE COURT:**  Okay.

**MR. BRUDIGAM:**  -- that's what we're talking about.

**MR. NEFF:**  Your Honor, I do think there's one more issue we should deal with.

**THE COURT:**  Okay.

**MR. NEFF:**  The United States's Motion to Compel.  We understand Your Honor's concern with that.  However, we would submit that it is still procedurally proper for us to set out a date in accordance with the Rules of Civil Procedure on that, which would, being as generous as possible accounting for them, would be 28 days from today I believe.

**THE COURT:**  Now, I didn't preclude you, just for due process grounds it was filed yesterday.

ER-162

128

MR. NEFF:  Yes.

THE COURT:  The Rules say 28 days, so you're not -- I tried to (inaudible) you're not curtailed from filing that.

MR. NEFF:  Okay.

THE COURT:  Okay?

MR. NEFF:  Thank you.

THE COURT:  Have a good day then.  Thank you very much.

**(This proceeding was adjourned at 2:33 p.m.)**

**EXCEPTIONAL REPORTING SERVICES, INC**

### CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **December 8, 2025**

**Signed**                                              **Dated**

*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

ER-164

GRAYCE ZELPHIN (SBN 279112)
gzelphin@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

JULIA A. GOMEZ (SBN 316270)
jgomez@aclusocal.org
PETER ELIASBERG (SBN 89110)
peliasberg@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232

Counsel for Intervenor-Defendant
League of Women Voters of California

*Additional counsel listed below*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| UNITED STATES OF AMERICA, | Case No.: 2:25-cv-09149-DOC-ADS |
|---|---|
| Plaintiff, | **INTERVENOR-DEFENDANT LEAGUE OF WOMEN VOTERS OF CALIFORNIA'S NOTICE OF MOTION AND MOTION TO DISMISS** |
| vs. | |
| SHIRLEY N. WEBER, in her official capacity as Secretary of State of California, and the STATE OF CALIFORNIA | |
| Defendants. | DATE: December 4, 2025<br>TIME: 7:30 A.M.<br>COURTROOM: To be set by the Court<br>JUDGE: David O. Carter |

i
LWVC's Motion to Dismiss | Case No. 2:25-cv-09149-DOC-ADS

ER-165

THERESA J. LEE (NY 5022769)*
tlee@aclu.org
SOPHIA LIN LAKIN (NY 5182076)*
slakin@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

PATRICIA J. YAN (NY 5499173)*
pyan@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800

*Application for admission pro hac vice forthcoming

ER-166

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

Intervenor-Defendant League of Women Voters of California (the "League") respectfully moves for this Court to dismiss the United States's Complaint because it fails to state a claim for which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of their Motion, the League submits and incorporates the below Memorandum of Points and Authorities.

On November 19, 2025, the Parties appeared and stipulated to a briefing and hearing schedule for Defendants' motions to dismiss that contemplates the League filing this present Motion to Dismiss by November 20, 2025. Dkt. No. 65.

ER-167

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS.......................................... iii

TABLE OF CONTENTS...................................................................... iv

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................2

LEGAL STANDARD.........................................................................2

ARGUMENT .................................................................................3

I.    Plaintiff Is Not Entitled to California's Full Unredacted Voter List Under the NVRA. ...............................................................................3

    A.   The Constitution requires redaction under the NVRA. ...............................4

    B.   The NVRA does not preempt California privacy law. ................................6

II.   Plaintiff Fails to State a Cognizable Claim Under Title III of the CRA.........7

    A.   Plaintiff's demand for records fails to meet the statutory requirements of Title III of the CRA............................................................................8

    B.   Any records disclosed under the CRA should be redacted to protect the constitutional rights of voters. .....................................................12

III.  HAVA Does Not Provide for Data Disclosure. ....................................12

CONCLUSION................................................................................13

CERTIFICATE OF COMPLIANCE.......................................................15

ER-168

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) ..................................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................2, 3

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
  824 F.3d 1156 (9th Cir. 2016)................................................................3

*Dinkens v. Att'y Gen. of U.S.*,
  285 F.2d 430 (5th Cir. 1961)..................................................................9

*FDIC v. Wentz*,
  55 F.3d 905 (3d Cir. 1995) .....................................................................9

*Gonzalez v. Herrera*,
  151 F.4th 1076 (9th Cir. 2025)..............................................................13

*Greidinger v. Davis*,
  988 F.2d 1344 (4th Cir. 1993)................................................................4

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962)...................................................8, 11

*In re Gordon*,
  218 F.Supp. 826 (S.D. Miss. 1963)......................................................11

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962)..............................................................8, 10

*Kim Ho Ma v. Ashcroft*,
  257 F.3d 1095 (9th Cir. 2001)................................................................4

*Lynn v. Biderman*,
  536 F.2d 820 (9th Cir. 1976)..................................................................9

*No Labels Party of Arizona v. Fontes*,
  142 F.4th 1226 (9th Cir. 2025)...............................................................1

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) ...............................................................................6

ER-169

*Peters v. United States*,
   853 F.2d 692 (9th Cir. 1988) ............................................................................9

*Project Vote, Inc. v. Kemp*,
   208 F. Supp. 3d 1320 (N.D. Ga. 2016) .........................................................5, 6

*Project Vote/Voting for Am., Inc. v. Long*,
   682 F.3d 331 (4th Cir. 2012) ..................................................................*passim*

*Pub. Int. Legal Found. v. Benson*,
   136 F.4th 613 (6th Cir. 2025) .........................................................................10

*Pub. Int. Legal Found. v. Boockvar*,
   431 F. Supp. 3d 553 (M.D. Pa. 2019) ...............................................................5

*Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*,
   136 F.4th 456 (3d Cir. 2025) ............................................................................5

*Pub. Int. Legal Found., Inc. v. Bellows*,
   92 F.4th 36 (1st Cir. 2024) ..................................................... 4, 5, 6, 12

*Pub. Int. Legal Found., Inc. v. Dahlstrom*,
   673 F. Supp. 3d 1004 (D. Alaska 2023) .............................................................5

*Pub. Int. Legal Found., Inc. v. Matthews*,
   589 F. Supp. 3d 932 (C.D. Ill. 2022) ..............................................................5, 6

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
   996 F.3d 257 (4th Cir. 2021) ...........................................................................4, 5

*Sheetz v. Cnty. of El Dorado*,
   601 U.S. 267 (2024) ........................................................................................12

*State of Alabama ex rel. Gallion v. Rogers*,
   187 F. Supp. 848 (M.D. Ala. 1960).................................................................1, 8

*Trim v. Reward Zone USA LLC*,
   76 F.4th 1157 (9th Cir. 2023)............................................................................8

*United States v. Powell*,
   379 U.S. 48 (1964) ............................................................................................9

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ..........................................................................................1

ER-170

**Statutes**

U.S. Const. art. I, § 4, cl. 1....................................................................................3

52 U.S.C. § 20501.................................................................................................1

52 U.S.C. § 20507(a) .........................................................................................10

52 U.S.C. § 20507(c) .........................................................................................10

52 U.S.C. § 20507(i) ................................................................................ 3, 4, 12

52 U.S.C. § 20701.................................................................................................1

52 U.S.C. § 20703 .................................................................... 7, 9, 10, 12

52 U.S.C. § 20901.............................................................................................1, 12

52 U.S.C. § 21111...............................................................................................13

Cal. Elec. Code § 2194(b)....................................................................................6

Cal. Gov't Code § 7924.000(b)-(c)......................................................................6

**Rules**

Fed. R. Civ. P. 12(b) ................................................................... iii, 2, 14

**Other Authorities**

C.R. Div., U.S. DOJ, F*ederal Law Constraints on Post-Election "Audits"* 2 (Jul. 28, 2021), https://perma.cc/B6Q4-TR6J. ..........................................................1

H.R. Rep. No. 86-956 ..........................................................................7

Jonathan Shorman, *DOJ Plans to Ask All States for Detailed Voting Info*, Stateline, Aug. 1, 2025, https://perma.cc/526V-97C3. ....................................11

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr.r for Just. (Nov. 17, 2025), https://perma.cc/3Q77-SNAN (last updated Nov. 17, 2025)..................11

ER-171

# INTRODUCTION

The right to vote is "of the most fundamental significance under our constitutional structure." *No Labels Party of Arizona v. Fontes*, 142 F.4th 1226, 1231 (9th Cir. 2025) (citation omitted). It is "preservative of all [other] rights" because it guards against tyranny and ensures the competition of ideas amongst our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

It is in this context that Congress has repeatedly legislated to protect the franchise, including through the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*, and the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq.* These statutes were all passed for the express purpose of ensuring that eligible Americans—especially racial minorities and voters with disabilities—can participate in free, fair, and secure elections. Congress designed the NVRA to limit "discriminatory and unfair registration laws and procedures" that restrict voter participation, particularly among racial minorities. 52 U.S.C. § 20501(a)(3). Similarly, Congress designed HAVA to help Americans vote by investing in election administration that would improve "accessibility and quantity of polling places" for those with disabilities and limited English proficiency. 52 U.S.C. § 20901(b)(1)(G). And the Department of Justice ("DOJ") itself explains that Title III of the CRA, its election records provision, was designed to "secure a more effective protection of the right to vote." C.R. Div., U.S. DOJ, *Federal Law Constraints on Post-Election "Audits"* 2 (Jul. 28, 2021), https://perma.cc/B6Q4-TR6J (quoting *State of Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960)).

The United States's demand for California's *unredacted* voter file—which contains sensitive personal information including a driver's license number, a state identification number, or a Social Security number from every voter in the state— runs afoul of the core purposes of these statutes and is contrary to law. To be sure,

1

the public disclosure of state voting records is a critical transparency measure that helps maintain the accuracy of the voter rolls and, of utmost importance, ensures that citizens are not erroneously removed from the voter records. Yet releasing the State's voter records *without redaction* of sensitive personal information would deter voter participation and undermine the right to vote. It would also violate state law meant to prevent the erosion of that right. Indeed, and as many courts have held, redacting sensitive personal information when releasing state voting records is essential to strike a balance between guaranteeing transparency in elections and ensuring voters' sensitive information is kept confidential so they can exercise their fundamental right to vote.

The United States cannot point to any authority that supports its demand for unredacted voter data: the NVRA only requires disclosure of *redacted* data, the United States has not and cannot state a basis and purpose for its request for data under the CRA (and even documents properly requested should be redacted), and HAVA contains no data disclosure provisions at all. Because the United States has failed to state a legally cognizable claim, the Court should dismiss the Complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

We incorporate by reference the factual background provided in Defendants' Motions to Dismiss (Dkt. 37-1 and Dkt. 62-1) to avoid restating facts already before the Court.

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements." *Id.* at 678–79. A complaint must be dismissed if it "fails to state a cognizable legal theory or fails to allege sufficient factual support for its legal theories." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

## ARGUMENT

**I.      Plaintiff Is Not Entitled to California's Full Unredacted Voter List Under the NVRA.**

The United States invokes the NVRA to demand California's unredacted voter list, Compl. ¶¶ 12–21, 34, 50–56, but the statute does not authorize such disclosure. Section 8(i)(1) of the NVRA requires states to provide "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" upon request. 52 U.S.C. § 20507(i)(1). Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to records under the NVRA. Voting rights advocates have consistently relied on the NVRA to investigate infringements on the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating improper rejection of voter registrations submitted by students at a historically Black university).

However, the information required to be disclosed under the NVRA is not without limits. As federal courts have consistently found, providing for the redaction of sensitive personal information strikes the necessary balance that the Constitution demands: protecting both the fundamental right to vote and transparency in our elections. This is necessary to safeguard voters' constitutional right to participate in elections, consistent with each state's authority to prescribe the time, place, and manner of elections. *See* U.S. Const. art. I, § 4, cl. 1.

3

LWVC's Motion to Dismiss | Case No. 2:25-cv-09149-DOC-ADS

ER-174

## A.     The Constitution requires redaction under the NVRA.

Since the NVRA is silent as to how sensitive personal information should be treated during disclosure, *see* 52 U.S.C. § 20507(i)(1), the Court must interpret the statute in a manner that does not unconstitutionally burden the right to vote. *See Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1111 (9th Cir. 2001) (recognizing "a statute should be construed to avoid constitutional problems so long as the saving construction is not 'plainly contrary to the intent of Congress'" (citation omitted)). Federal courts throughout the country have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i)(1) to permit— and even in some cases require—redaction and the protection of sensitive materials. Indeed, as the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and as such, "the proper redaction of certain personal information in the Voter File can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality of records).

Indeed, the Fourth Circuit has held that redaction may be affirmatively required to the extent the disclosure of such sensitive material would "create[] an intolerable burden on [the constitutional] . . . right [to vote] as protected by the First and Fourteenth Amendments." *Project Vote*, 682 F.3d at 339 (quoting *Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993)). The Court in *Project Vote*, even while granting access to a state's voter registration applications for inspection and photocopying, ensured the redaction of Social Security numbers, which it found are "uniquely sensitive and vulnerable to abuse." *Id.* (citation omitted). In coming

to this conclusion, the Court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339 (citations omitted). If disclosure is compelled here contrary to existing legal protections, California voters "may become less engaged and reluctant to register to vote or otherwise participate in the political process," Dkt. 24-1, ¶ 23, the exact risk warned of in *Project Vote*. 682 F.3d at 339. The public disclosure provisions of the NVRA must be interpreted to avoid this unconstitutional burden. *See id.*; *Bellows*, 92 F.4th at 56. And courts have consistently recognized that the NVRA disclosure provisions do not compel the release of sensitive information that is otherwise protected by federal or state laws, such as California's privacy law that is applicable here. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344–45 (N.D. Ga. 2016); *see also Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of recons.*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022).

The United States has itself admitted—on multiple occasions, and as recently as last year—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Brief for the United States as Amicus Curiae, *Bellows*, 92 F.4th 56 (No. 23-1361), 2023 WL 4882397 ("United States *PILF* Amicus Brief"), at *27–28; Brief for the United States as Amicus Curiae at 28–29, *Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2025), (Nos. 23-1590 and 23-1591), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records.").

ER-176

As with any requester of records under the NVRA, the United States should be afforded access to the voting records contemplated under Section 8(i) of the NVRA. But federal court precedent is clear that this access is not unfettered and instead must always be balanced against privacy protections that are vital to ensuring that citizens' fundamental right to vote is not burdened.

### B. The NVRA does not preempt California privacy law.

Contrary to the United States' about-face on this issue, there is no conflict between the NVRA and California's privacy law.[1] Federal laws like the NVRA preempt state election laws only when there is an actual conflict, such that the two sets of law cannot be read consistently with one another. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (holding that the NVRA preempts state election law only insofar as the two are inconsistent); *see also Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("The Supremacy Clause cannot 'be deployed' 'to elevate abstract and unenacted legislative desires above state law'") (citation omitted).

California's voter privacy law, Cal. Elec. Code § 2194(b)(1); Cal. Gov't Code §§ 7924.000(b)-(c), is on all fours with the governing federal case law. Courts have consistently held both that redactions are appropriate to accommodate and harmonize state privacy laws while ordering the disclosure of documents as mandated by the NVRA, *see, e.g.*, *Matthews*, 589 F. Supp. 3d at 942 ; *Kemp*, 208 F. Supp. 3d at 1344–45, and that redactions and preserving confidential information may even be required to protect the constitutional right to vote, *see, e.g.*, *Project Vote*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56.  If Plaintiff is permitted to engineer a false conflict between the NVRA and California's privacy laws, it will force the Secretary of State to violate California law and potentially the federal Constitution, stripping millions of Californians of their privacy and stifling Californian voter

---

[1] Def. State of California Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss ("State MTD"), Dkt. 37-1 at 14–16 provides additional authority on this point.

ER-177

registration, all while exceeding both the purpose of and statutory authority provided by the NVRA. *See* United States *PILF* Amicus Brief, 2023 WL 4882397 at *27–28 (arguing Section 8(i) does not compel production of unredacted social security numbers and driver's license numbers as state limits on voter information are not preempted when they impact uses that "would not further the NVRA's purposes").

**II.    Plaintiff Fails to State a Cognizable Claim Under Title III of the CRA.**

Congress enacted the public records provisions in Title III of the CRA to facilitate investigations of civil rights violations preventing eligible citizens from voting due to discrimination. *See* H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). Title III requires that records requested by the Attorney General be made "available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. § 20703.

The Attorney General's request here is contrary to the CRA for at least two reasons. *First*, Plaintiff failed to provide "a statement of the basis and the purpose" supporting its records requests as required by the statute. *Id*. The Complaint provides no basis to conclude that unredacted records will aid an assessment of California's compliance with the list maintenance provisions of the NVRA or HAVA. *Second*, to the extent Plaintiff is or becomes entitled to any records under the CRA, those records must be redacted—as they must be for the requests under the NVRA—to uphold the privacy and constitutional rights of California voters.

**A.    Plaintiff's demand for records fails to meet the statutory requirements of Title III of the CRA.**

Plaintiff's request to California fails to provide "a statement of the basis and the purpose," *id.*, sufficient to support disclosure of the unredacted voter file.[2] Indeed, neither the Complaint nor the DOJ letter that invoked Title III identify a sufficient purpose or basis supporting the records request.

"Basis" and "purpose" under Title III have consistently been treated as distinct concepts. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962) (showing that basis was the underlying information providing the grounds for the complaint); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) (same), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). The United States' failure to articulate both a sufficient basis and purpose underlying its request for the unredacted voter file is enough to invalidate the CRA claim.

While that statute does not define basis or purpose, courts look to the "ordinary meaning" of undefined statutory terms. *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023). Contemporaneous case law immediately following the enactment of Title III shows that "basis" is the statement for why the Attorney General believes there is a violation of federal civil rights law, and the "purpose" explains how the requested records would help determine if there is a violation of the law. *See Lynd*, 306 F.2d at 229 n.6. The basis and purpose requirements under the CRA are critical safeguards, so that the statute cannot be used as a fishing expedition to obtain records for either speculative or unrelated reasons. For example, the Attorney General could not use the CRA to obtain voting records because it wanted to verify taxpayer addresses. *See State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("Title III provides—

---

[2] *See also* State MTD at 7–8; NAACP; NAACP California-Hawaii State Conference; and SIREN Proposed Notice of Mot. and Mot. to Dismiss ("NAACP/SIREN MTD"), Dkt. 62-1 at 17–19.

8
LWVC's Motion to Dismiss | Case No. 2:25-cv-09149-DOC-ADS

ER-179

if properly applied and enforced—an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles."), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). The statutory basis and purpose requirements are not perfunctory but require a specific statement detailing the reason(s) for requesting the information and how that information will aid in the investigatory analysis.

In the context of administrative subpoenas, an analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Lynn v. Biderman*, 536 F.2d 820, 824 (9th Cir. 1976) (citing *United States v. Powell*, 379 U.S. 48, 57–58 (1964)), and that such subpoenas "may not be so broad so as to be in the nature of a 'fishing expedition,'" *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988). Indeed, courts have explained that such a purpose requirement ensures that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *FDIC v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation pursuant to an administrative subpoena).

Here, the Complaint does not plausibly allege that the Attorney General has provided an adequate statement of the basis and purpose supporting the demand for California's unredacted voter file. It contains a handful of paragraphs describing the explanation it provided to California in support of its CRA records request. Compl. ¶¶ 38–40. This includes a partial quote of the statutory language of 52 U.S.C. § 20703, but notably fails to include the law's relevant text: "This demand shall contain a statement of the basis and the purpose therefor." *See* Compl. ¶ 39. Nowhere in the Complaint does the United States make any allegation as to the specific basis for, or purpose of, its CRA request, including within the entirety of the CRA count. *See* Compl. ¶¶ 46–49.

Plaintiff has provided no basis for why it believes California's list maintenance procedures violate the NVRA or HAVA. But even assuming that enforcement of the NVRA and HAVA could be a proper "basis" for the demand, nowhere in the Complaint does the United States explain the "purpose" of seeking the unredacted information here. It does not attempt to explain why unredacted voter files are necessary to determine whether California has undertaken a "reasonable effort to remove the names of ineligible voters," 52 U.S.C. § 20507(a)(4), likely because those files are not in fact necessary. A single snapshot of a state's voter list does not provide information from which one could determine if the state has made a "reasonable effort" to remove ineligible voters. Further, the NVRA and HAVA both leave the mechanisms for conducting list maintenance within the discretion of the State. *See id.* § 20507(a)(4); (c)(1); § 21083(a)(2)(A). The procedures carried out by a state or locality establish its compliance; the unredacted voter file does not. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025).

Moreover, any post hoc efforts of Plaintiff to contort its requests to meet the requirements of the CRA fail when compared to the standards set in past cases, where, for example, the demand explained that the Attorney General had information indicating that there was a racial disparity in voter registration and that he could determine whether that was in fact the case by examining the requested records. *See Lynd*, 306 F.2d at 229 n.6 ("This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."). As such, Plaintiff's statement invoking Title III does not provide a "statement of the basis and the purpose therefor," and thus does not comply with the CRA. 52 U.S.C. § 20703.

The United States' failure to identify its basis and purpose is unsurprising, because it has made clear elsewhere that its purpose is *not* to evaluate compliance

ER-181

with the list maintenance provisions of the NVRA or HAVA, but to sweep up sensitive data of tens of millions of voters that can be used for any number of reasons.[3] Federal courts have confirmed that the Attorney General's authority to examine election records is not unlimited and can be inhibited by courts if the purposes are "speculative, . . . from idle curiosity," or for improper purposes. *Coleman*, 208 F. Supp. at 201. In stark contrast to previous *targeted* demands under the CRA, here DOJ has requested sensitive voter data from at least 40 states,[4] and sued eight states and one county that failed to immediately comply with its full demands.[5] This undermines any purported basis and purpose that Plaintiff may now seek to advance. *Cf. Coleman*, 208 F. Supp. at 201 ("[The Attorney General] is presumed to be acting in good faith and in the proper pursuit of his official duties unless otherwise shown."). Plaintiff has provided no basis for arguing that 40 states are violating the list maintenance provisions of the NVRA or HAVA, and arguing as much would be implausible. DOJ cannot use the CRA as a limitless tool to compile and consolidate voter data, rather it is a limited device to protect the right to vote. *See In re Gordon*, 218 F.Supp. 826, 827 (S.D. Miss. 1963) ("It is like wise a mistaken view to assume that such investigation of such records is an unlimited discovery device which may be employed and used without restraint and in the

---

[3] Jonathan Shorman, *DOJ Plans to Ask All States for Detailed Voting Info*, Stateline, Aug. 1, 2025, https://perma.cc/526V-97C3.

[4] Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Dkt. 37-2 at 148–237; Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information,* Brennan Ctr.r for Just. (Nov. 17, 2025), https://perma.cc/3Q77-SNAN (last updated Nov. 17, 2025).

[5] *United States v. Bellows*, No. 1:25-cv-00468 (D. Me. filed Sept. 16, 2025); *United States v. Oregon*, No. 6:25-cv-01666 (D. Or. filed Sept. 16, 2025); *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. filed Sept. 25, 2025); *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. filed Sept. 25, 2025); *United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y. filed Sept. 25, 2025); *U.S. v. Scanlan*, No. 1:25-cv-00371 (D.N.H. filed Sept. 25, 2025); *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. filed Sept. 25, 2025); *United States v. Page*, No. 8:25-cv-01370 (C.D. Cal. filed June 25, 2025).

place and stead of a Rule 34 motion with its less restrained facilities for a complete discovery of any relevant irregularities and improprieties in the administration of the registration and voting laws of the state.").

**B.    Any records disclosed under the CRA should be redacted to protect the constitutional rights of voters.**

Even had Plaintiff provided a valid basis and purpose to support its demands—which it did not—any sensitive personal voter information would be subject to redaction. Just like the NVRA, the text of Title III does not prohibit redactions to ensure compliance with both state law and the Constitution. *See supra* Part I.A; *Project Vote*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56. The same privacy and constitutional concerns that federal courts have found warrant redactions in response to NVRA records requests apply equally to requests for the same records under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). Thus, even were Plaintiff entitled to records under Title III, the sensitive personal information protected by California law still must be redacted. No matter the statutory mechanism, conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right . . . ." *Project Vote*, 682 F.3d at 339 (citation omitted).

**III.    HAVA Does Not Provide for Data Disclosure.**

Unlike the NVRA and CRA, HAVA does not have a disclosure provision. *Compare* 52 U.S.C. § 20507(i)(1) (NVRA requiring states to make certain voting records available for public inspection) *and* 52 U.S.C. § 20703 (CRA authorizing the Attorney General to inspect, reproduce, or copy election records), *with* 52 U.S.C. § 20901 *et seq.* (HAVA containing no comparable provision). This alone ends the inquiry: California cannot be legally required to disclose records pursuant

ER-183

to a statute that does not authorize the disclosure of any records, let alone the specific and expansive ones that Plaintiff demands.[6]

Plaintiff apparently contends that the mere existence of HAVA's civil enforcement mechanism allows for unredacted access to all of California's voting records. Compl. ¶¶ 30, 60; *see* 52 U.S.C. § 21111 (permitting the Attorney General to enforce "the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083 [Section 303], and 21083a."). Not so. HAVA does not provide authority to access state records. Rather, 52 U.S.C. § 21111 merely provides the Attorney General with the authority to bring a civil action to enforce compliance with the four sections of HAVA establishing the "uniform and nondiscriminatory election technology and administration requirements . . . ." And none of the personal identifiers that Plaintiff seeks are necessary to ensure that California's system complies with these HAVA sections. Indeed, the fact that other voting-related statutes that also include civil enforcement mechanisms, such as the NVRA and the CRA, contain records provisions when HAVA does not compel the conclusion that HAVA contains no such authority. *See, e.g.*, *Gonzalez v. Herrera*, 151 F.4th 1076, 1084 (9th Cir. 2025) (courts "must assume 'that Congress acts intentionally when it omits language included elsewhere'" (citation omitted)). Because HAVA contains no provision entitling the United States to state records, this cause of action must also fail as a matter of law.

## CONCLUSION

In exercising its legislative authority in enacting elections laws, Congress has struck a careful balance between transparency and protecting individuals' fundamental, constitutional right to vote. Never has Congress concluded that the privacy of sensitive personal information must give way in order for individuals to

---

[6] *See also*, State MTD at 16-20; NAACP/SIREN MTD at 10-11.

13
LWVC's Motion to Dismiss | Case No. 2:25-cv-09149-DOC-ADS

access voter registration. And indeed, it would not have done so as conditioning the right to vote on the release of private information "creates an intolerable burden on that right." *Project Vote*, 682 F.3d at 339 (citation omitted). For these reasons, Plaintiff's request for California's full and unredacted electronic voter file should be denied, and Plaintiff's complaint should be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: November 20, 2025                    Respectfully submitted,

                                            /s/ *Grayce Zelphin*
                                            Grayce Zelphin

                                            *Counsel for Intervenor-Defendant League*
                                            *of Women Voters of California*

**<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned counsel of record for Defendant-Intervenor the League of Women Voters of California, certifies that this brief contains 4386 words, which complies with the page limit set by Section 6 under "Judge's Procedures" on Judge Carter's courtroom website, https://apps.cacd.uscourts.gov/Jps/honorable-david-o-carter, and with L.R. 11-6.1.

Dated: November 20, 2025                    Respectfully submitted,

<u>/s/ *Grayce Zelphin*</u>

Grayce Zelphin
ACLU Foundation of Northern California

*Counsel for Defendant-Intervenor League of Women Voters of California*

ER-186

GRAYCE ZELPHIN (SBN 279112)
gzelphin@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

JULIA A. GOMEZ (SBN 316270)
jgomez@aclusocal.org
PETER ELIASBERG (SBN 89110)
peliasberg@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232

Counsel for Intervenor-Defendant
League of Women Voters of California

*Additional counsel listed below*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHIRLEY N. WEBER, in her official capacity as Secretary of State of California, and the STATE OF CALIFORNIA<br><br>Defendants. | Case No.: 2:25-cv-09149-DOC-ADS<br><br>**[PROPOSED] ORDER GRANTING INTERVENOR-DEFENDANT LEAGUE OF WOMEN VOTERS OF CALIFORNIA'S MOTION TO DISMISS**<br><br>DATE: December 4, 2025<br>TIME: 7:30 A.M.<br>COURTROOM: To be set by the Court<br>JUDGE: Hon. David O. Carter |

1

[PROPOSED] Order Granting LWVC's Mot. to Dismiss | Case No. 2:25-cv-09149-DOC-ADS

THERESA J. LEE (NY 5022769)*
tlee@aclu.org
SOPHIA LIN LAKIN (NY 5182076)*
slakin@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

PATRICIA J. YAN (NY 5499173)*
pyan@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800

*Application for admission pro hac vice forthcoming

[PROPOSED] Order Granting LWVC's Mot. to Dismiss | Case No. 2:25-cv-09149-DOC-ADS

ER-188

Intervenor League of Women Voters of California (the "League") moved to dismiss the Complaint on the grounds that it fails to state a claim as to all three causes of action. The Court, having considered the Motion, the papers submitted in connection with said Motion, and all other relevant matters of record, and good cause appearing, HEREBY GRANTS the Motion and ORDERS that the Complaint be DISMISSED without leave to amend.

IT IS SO ORDERED on this _____ day of _____, 2025.

 

_____
United States District Court Judge

[PROPOSED] Order Granting LWVC's Mot. to Dismiss | Case No. 2:25-cv-09149-DOC-ADS

ER-189

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

MAUREEN RIORDAN
Senior Counsel, Voting Section
Civil Rights Division
BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division
        U.S. Department of Justice
        4 Constitution Square, Room 8.141
        150 M Street NE
        Washington, D.C. 20002
        Telephone: (202) 704-5430
        Email: Brittany.Bennett@usdoj.gov

Attorneys for Plaintiff, UNITED STATES OF AMERICA

1

ER-190

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

UNITED STATES OF AMERICA

        Plaintiff,

        v.

SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the State of California,

        Defendants.

CASE NO: 2:25-cv-09149-DOC-ADS

HON. DAVID O. CARTER

NOTICE OF ERRATA RE: OPPOSITION TO MOTION TO DISMISS

Date:    Monday, Dec. 8, 2025
Time:    8:30 a.m. Courtroom: 10A
Trial Date:    None set.
Action Filed: Sept. 25, 2025

**<u>NOTICE OF ERRATA RE: OPPOSITION TO MOTION TO DISMISS</u>**

2

ER-191

Plaintiff United States of America gives notice that the document filed on November 18, 2025 (Dkt. 63) inadvertently omitted the Certificate of Compliance required by L.R. 11-6.1, and signature of counsel. The document is refiled herewith to resolve the omission.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

3

ER-192

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

4

ER-193

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

MAUREEN RIORDAN
Senior Counsel, Voting Section
Civil Rights Division
BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division
     U.S. Department of Justice
     4 Constitution Square, Room 8.141
     150 M Street NE
     Washington, D.C. 20002
     Telephone: (202) 704-5430
     Email: Brittany.Bennett@usdoj.gov

Attorneys for Plaintiff, UNITED STATES OF AMERICA

1

ER-194

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the State of California,<br><br>Defendants. | CASE NO: 2:25-cv-09149-DOC-ADS<br><br>HON. DAVID O. CARTER<br><br>OPPOSITION TO MOTION TO DISMISS |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

2

ER-195

## TABLE OF CONTENTS

BACKGROUND ....................................................................................................7

LEGAL STANDARDS .........................................................................................8

ARGUMENT.........................................................................................................8

  I.    The United States Has a Valid Legal Claim Under the Civil Rights Act of 1960. ...................................................................................................................9

    A.    The language of the Civil Rights Act of 1960 unambiguously permits the requests. .......................................................................................................9

    B.    The United States has sufficiently pled a claim for relief under Title III of the Civil Rights Act. .................................................................................11

    C.    The United States is entitled to unredacted "copying" and "production" of Defendants' Federal election records. ..................................................14

    D.    The Central District of California has jurisdiction to compel relief for the CRA claim brought by the United States. ........................................17

II. The United States Has a Valid Legal Claim Under HAVA.............................18

    A.    Defendants have failed to engage in reasonable list maintenance practices resulting in an inaccurate voter roll. .................................................18

    B.    HAVA does not have a public disclosure requirement because unlike the NVRA, there is no private right of action under the Act. ..................................20

III.    The United States Has a Valid Legal Claim Under THE NVRA................21

IV. THE UNITED STATES IS COMPLYING WITH THE APPLICABLE PRIVACY LAWS. ...........................................................................................22

    A.    The United States is Complying with the Privacy Act. .............................23

    B.    The First Amendment does not prohibit access to data the United States needs for its HAVA and NVRA enforcement......................................24

C.    The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA enforcement............................................26

D.    The Driver's Privacy Protection Act does not allow Defendants to deny the United States list maintenance data. ...................................................................28

CONCLUSION................................................................................................................29

4

ER-197

## TABLE OF AUTHORITIES

**Cases**

*Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960).................10

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) .................23, 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................8, 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................8

*Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008) .................................21

*Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937
  (D.N.H. May 27, 2025)...........................................................16

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)..........................10, 14, 16

*Colón-Marrero v. Vélez*, 813 F.3d 1 (1st Cir. 2016).....................................19

*Connell v. Lima Corp.*, 988 F.3d 1089 (9th Cir. 2021) .................................11

*Ebert v. Poston*, 266 U.S. 548 (1925)..............................................10, 11

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878
  F.3d 37 (D.C. Cir. 2017) .......................................................28

*Electronic Privacy Information Center v. Presidential Advisory Commission on
  Election Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017)...........................27

*Ernst & Haas Mgmt. Co. v. Hiscox, Inc.*, 23 F.4th 1195, (9th Cir. 2022) .................8

*Goal Zero, LLC v. Cargo Freight Servs., Ltd.*, No. 16-CV-04055-LB, 2016 WL
  7406796, (N.D. Cal. Dec. 22, 2016) ............................................18

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012)....................................23

*In re Dumont*, 581 F.3d 1104 (9th Cir. 2009) ........................................10

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)......................................13

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ..................................passim

*Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, (9th Cir. 2014)........................8

*Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008)............................8

*Mi Familia Vota v. Fontes,* 129 F.4th 691 (9th Cir. 2025) .............................25

ER-198

*Reno v. Condon*, 528 U.S. 141 (2000)..........................................................................28

*Sanders v. Kennedy*, 794 F.2d 478 (9th Cir. 1986) .................................................8, 20

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960) .........................................................................................................................21

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929)....................................10, 11

*Voting Rts. Coal. v. Wilson,* 60 F.3d 1411 (9th Cir. 1995) .......................................25

**Statutes**

18 U.S.C. §§ 2721, 2725..............................................................................................28

28 U.S.C. § 84..............................................................................................................17

44 U.S.C. § 3101..........................................................................................................24

5 U.S.C. § 552a......................................................................................................24, 25

52 U.S.C. § 20507...........................................................................................16, 22, 26

52 U.S.C. § 20701.....................................................................................................9, 15

52 U.S.C. § 20703.................................................................................................passim

52 U.S.C. § 20705....................................................................................................17, 18

52 U.S.C. § 20706..........................................................................................................18

52 U.S.C. § 21083...........................................................................................16, 19, 25

52 U.S.C. § 21111..........................................................................................................20

52 U.S.C. §§ 20701-20706 ...........................................................................................10

Pub. L. No. 107–347......................................................................................................27

Pub. L. No. 86-449, 74 Stat. 86 (1960) .........................................................................9

Pub. L. No. 93–579, 88 Stat. 1896 (1974)...................................................................25

**Legislative Materials**

106 Cong. Rec. 7767 .....................................................................................................11

148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002)......................................................21

H.R. Rep. 107-329(I) (2001) ........................................................................................20

6

## **BACKGROUND**

The Attorney General of the United States brought this straightforward case to enforce the requirements of three complimentary Federal statutes. Those laws, the Civil Rights Act of 1960 ("CRA"), the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"), govern voter registration and voting records pertaining to Federal elections.[1] California reported voter registration data to the U.S. Election Assistance Commission in the Commission's 2024 Election Administration and Voting Survey ("EAVS"), released in late June 2025. *See* Pl.'s Opp. Br., ECF 27 at 8-9. Much of California's data was missing, including from Los Angeles County, which encompasses a quarter of the state's population. *Id.* at 9. What data California did report to the Commission is among the worst in the nation on several metrics and is inconsistent with reasonable list maintenance efforts under Federal law. *See id.* The United States engaged in repeated correspondence with Defendants, requesting Defendants' cooperation to address its data requests in a manner consistent with Federal privacy law. Those efforts were met by delay, obfuscation, and a refusal by Defendants to produce records mandated by Federal law and necessary to assess California's compliance with Federal election laws. *See id.* at 9-10. This litigation followed.

Defendants now move to dismiss the United States' Complaint on several grounds, none of which has merit. *See* Defs.' Mot. to Dismiss & Mem. Law in Supp., ECF 37. Defendants begin with a thread-bare recitation of what they describe as the "legal standard," without acknowledging that the Court must accept all material allegations in the Complaint as true. Instead, Defendants ask the Court to decide this case on the merits at the pleading stage after rewriting the statute to encompass requirements omitted by Congress. This Court should decline Defendants' invitation

---

[1] The United States has set out a detailed background of this litigation previously. *See* Mem. of Law in Opp. to Mot. To Intervene by NAACP et al. and League of Women Voters of Cal. ("Pl.'s Opp. Br."), ECF 27 at 7-11.

ER-200

and deny their motion to dismiss.

## LEGAL STANDARDS

When considering a motion to dismiss, a court must read the complaint in the light most favorable to the non-moving party and accept all material allegations in the complaint as true. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). The court's inquiry is confined to the allegations in the complaint. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). A motion to dismiss must be denied if the plaintiff's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In other words, dismissal under Rule 12(b)(6) is proper only when the complaint either: (1) lacks a cognizable legal theory; or (2) fails to allege sufficient facts to support a cognizable legal theory. *Id.* In evaluating whether a complaint states a plausible claim for relief, a court relies on its "judicial experience and common sense." *Landers v. Quality Commc'ns., Inc.*, 771 F.3d 638, 641 (9th Cir. 2014). A motion to dismiss is viewed with disfavor and is rarely granted. *Ernst & Haas Mgmt. Co. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022).

## ARGUMENT

The three claims brought by the United States each offer overlapping, and complimentary, statutory authority for obtaining records from the Defendants to enforce Federal voter list maintenance requirements. Defendants seek dismissal of those claims, ostensibly because they maintain that none of them has a plausible basis. To arrive at that conclusion, Defendants ask the Court to: (1) disregard the plain language of the statutes by injecting ambiguities that do not exist and thereby allow the Court to legislate from the bench to rewrite the provisions in a manner that

suits them; (2) selectively ignore relief specified in the statutes that foreclose their defenses; and (3) make merit findings that are not only inappropriate at a motion to dismiss stage, but are barred altogether by one of the statutes. The clear text of the CRA, HAVA, and NVRA, and interpretative case law require that accepting all the allegations in the Complaint as true, the United States asserts both a cognizable legal theory and has pled sufficient facts to support that theory. Finally, the privacy arguments are also not grounds on which to dismiss the Complaint.  Accordingly, Defendants' Motion to Dismiss should be denied.

## I.      THE UNITED STATES HAS A VALID LEGAL CLAIM UNDER THE CIVIL RIGHTS ACT OF 1960.

### A.      The language of the Civil Rights Act of 1960 unambiguously permits the requests.

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). It imposes a "sweeping" obligation on election officials to preserve and on request to produce registration records pertaining to Federal elections. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). Section 301 provides, in pertinent part, "Every officer of election shall retain and preserve, for a period of twenty-two months from the date of [a Federal election] *all* records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…" 52 U.S.C. § 20701 (emphasis added). Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying… by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Defendants argue that the Court must go outside the text of the statute to the legislative history and find that Title III is limited "to investigations of civil rights violations, namely, efforts to prevent

9

ER-202

*eligible* voters from voting or registering to vote for illegal reasons like racial discrimination." Defs.' Mot. to Dismiss, ECF 37-1 at 8 (emphasis in original). No such language appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706. Moreover, in a decision cited by Defendants, Defs.' Mot. to Dismiss, ECF 37-1 at 6, 9, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous.*" *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960) (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767).

Requiring more than that by engrafting a requirement of racial discrimination that does not exist in the statute would violate the clear congressional mandate. Where, like here, "the language of an enactment is clear… the words employed are to be taken as the final expression of the meaning intended." *In re Dumont*, 581 F.3d 1104, 1111 (9th Cir. 2009) (quoting *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929)). Well-established principles of statutory construction foreclose Federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "The judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W[here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278-79 (citations omitted). In that manner, the "'judicial function [is] to apply statutes on

10

the basis of what Congress has written, not what Congress might have written.'" *Connell v. Lima Corp.*, 988 F.3d 1089, 1108 (9th Cir. 2021) (quoting *Ebert*, 266 U.S. at 554).

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the statute to add a requirement of racial discrimination. *See id.*[2]

**B.    The United States has sufficiently pled a claim for relief under Title III of the Civil Rights Act.**

The filing of a request for Federal election records under Title III by the Attorney General "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Lynd*, 306 F.2d at 225. Instead, "it is… comparable to the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Id.* The Fifth Circuit has described in detail what the Attorney General must allege to satisfy the statute:

> Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure. All that is required is a simple statement by the Attorney General that after a [Section 303] written demand for inspection of records and papers covered in [Section 301], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers 'available for inspection, reproduction, and copying…'

*Id.* at 225-26 (quoting 52 U.S.C. § 20703). Under the plain language of the statute, "[t]here is no place for any other procedural device or maneuver – either before or during any hearing of the application – to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* at 226. Likewise, there is no basis

---

[2] Defendants' recitation of what they describe as legislative history for which they seek judicial notice, therefore is immaterial and not helpful to the Court in its consideration of their Motion to Dismiss.

11

ER-204

in the proceedings to challenge "the reasons why the Attorney General considers the records essential…" *Id.* Rather, if the Attorney General has stated in writing the basis and the purpose of the demand, Title III is satisfied, and the records must be produced. 52 U.S.C. § 20703.

The United States has met those requirements. On July 10, 2025, the Attorney General requested that California, through its Secretary of State, fill in the wide gaps of data that the state had not disclosed to the EAC, and to produce its complete voter registration list to include the HAVA identifying numbers. Compl. ¶ 34, ECF 1. In a letter dated August 8, 2025, the Secretary refused to cooperate and declined to produce the requested voter records. *Id.* ¶ 37.  On August 13, 2025, the Attorney General made a written demand pursuant to Title III for a current copy of California's computerized Statewide Voter Registration List ("SVRL"), including each registrant's full name, date of birth, residential address, and the HAVA identifying numbers. The demand explained that the purpose was to evaluate the state's compliance with its list-maintenance requirements under Federal law and described how the privacy of data would be protected and could be transmitted securely. *Id.* ¶¶ 38-42. Defendants tacitly acknowledge that amounts to the "statement of its purpose" required by Section 303. Defs.' Mot. to Dismiss, ECF 37-1 at 7.

Conversely, Defendants argue that the United States failed to describe the basis for its request. *Id.* To arrive at that conclusion, Defendants erroneously employ a hyper-technical reading of Section 303. In doing so, they deliberately ignore the detailed basis the United States provided in writing to them in its July 10, 2025 letter. That basis will be restated briefly again here.

As the United States explained to Defendants in that letter, the 2024 EAVS Report revealed several anomalies in California's voter registration data inconsistent with reasonable list maintenance efforts. The letter described how California reported 2,178,551 duplicate registrations comprising 15.6 percent of the total

ER-205

registered voters. The actual number is significantly higher because it did not include data from seven California counties, including the most populous one, Los Angeles County (which has one-quarter of the state's population). Compl. ¶ 34(B), ECF 1 (summarizing California's responses in the EAVS report). Furthermore, California failed to provide any data in response to Question A12h on the EAVS survey regarding duplicate registrations removed from the statewide voter registration database. *Id.* ¶ 34(C). California's percentage of voters removed from the voter registration list because of death was just 11.9 percent, which was a little more than half the national average. *Id.* ¶ 34(D). California did not provide confirmation notice data for several counties and had wide swings in the number of inactive registered voters. *Id.* ¶ 34(E). Taken together, the data that California reported to the EAC raised several red flags that necessitated further investigation. Therefore, the Attorney General requested that California, through its Secretary of State, fill in the wide gaps of data that the state had not disclosed to the EAC, and to produce its complete voter registration list to include the HAVA identifying numbers. *Id.* ¶ 34.

Defendants deride the serious gaps and red flags in their own voter registration data as being somehow insufficient to "fall within Title III's scope." Defs.' Mot. to Dismiss, ECF 37-1 at 10. As support for their contention, they take out of context a quote from a Fifth Circuit decision that statistical evidence "was 'a matter which does not bear any particular importance to the present inquiry.'" *Id.* (quoting *Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962)). What Defendants leave out is the reason why evidence bearing on the Attorney General's purpose and basis is immaterial. In *Lynd,* the Fifth Circuit explained, "On the filing of this simple statement by the Attorney General, the Court is required to treat it as a summary proceeding." 306 F.2d at 226. By doing so, the statistics included in the Department's July 10, 2025, letter became immaterial beyond satisfying Section 303's requirement for a basis for the request. Under the language of the statute, "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the

13

ER-206

purpose' contained in the written demand, [Section 303], *is not open to judicial review or ascertainment*." *Id.* (emphasis added).

To summarize, the United States identified the basis for its request for Federal election records by identifying in its July 10, 2025, letter to Defendants voter registration metrics reported by California that are among the worst in the nation. When Defendants failed to produce those records, the United States followed up with a written statement of its purpose, to evaluate California's compliance with list-maintenance requirements under Federal law in its August 13, 2025 letter. That correspondence satisfies the plain language in Section 303 of the CRA for a "demand in writing by the Attorney General or [her] representative" including "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. *See generally Coleman*, 313 F.2d at 868 (a written demand "made for the purpose of investigating possible violations of a Federal statute," such as HAVA and the NVRA, is sufficient to comply with Section 303).

### C. The United States is entitled to unredacted "copying" and "production" of Defendants' Federal election records.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, *reproduction, and copying*…" 52 U.S.C. § 20703 (emphasis added). Records that must be produced to the United States pursuant to this demand cannot be contested as long as the records fall within Section 301's broad definition: "all records and papers which come into [the officer of election's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in a Federal election "for a period of twenty-two months from the date of any general, special, or primary election" for Federal office. 52 U.S.C. § 20701. As the Fifth Circuit explained in *Lynd*, "the scope of the order to produce" is "not open to judicial review or ascertainment." 306 F.2d at 226. "This is so because the papers

14

ER-207

and records subject to inspection and demand have been specifically identified by Congress," as set out in Section 301. *Id.* "The incorporated standard of [Section 301] is *sweeping*." *Id.* (emphasis added). The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers… relating to any… act requisite to voting'…" *Id.*

Defendants do not contest that the request by the United States for California's SVRL for the statutory 22-month period comes within Section 301's "sweeping" scope. *Id.* Apparently acknowledging the futility of their position, Defendants again ask the Court to legislate two limitations that are conspicuously absent from Title III: that the Attorney General be restricted to "inspection" that is reduced to "a redacted version of California's voter registration list…" Defs.' Mot. to Dismiss, ECF 37-1 at 11. They then proceed to argue that notwithstanding the Supremacy Clause of the Constitution, which they concede "gives Congress preemptive power over certain state election law," that California law prevails. *See id.* To reach that strained conclusion, they maintain that they may redact the Federal election records that have been properly demanded because "Title III's text does not prohibit the redaction of sensitive voter information." *Id.* at 12. The weakness of Defendants' position is so transparent that they are not even troubled to explain how the Court can limit the United States to "inspection" in the face of Section 303's references to "reproduction" and "copying." *See id.*

Furthermore, if the Defendants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce the list maintenance requirements of HAVA and the NVRA by having access to the voter identification numbers required by Federal law. For each voter, that includes their driver's license number, last four digits of their social security number, or other identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). That information is necessary to identify duplicate registration records, registrants who have moved, and

15

ER-208

registrants who have died or otherwise are no longer eligible to vote in Federal elections.[3] There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868.

Indeed, the data the United States has requested under the CRA is the same that twenty-five states and the District of Columbia (which does not include California) routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with Federal list-maintenance requirements.[4] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce Federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal docketed*, No. 25-1585 (1st Cir. June 17, 2025).

---

[3] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters…").

[4] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Nov. 17, 2025).

16

ER-209

Consequently, the United States is entitled to copying and production of California's unredacted SVRL under the plain language of Section 303 of the CRA. *See* 52 U.S.C. § 20703.

### D. The Central District of California has jurisdiction to compel relief for the CRA claim brought by the United States.

Section 305 of the CRA provides that the "United States district court for the district in which a demand is made pursuant to [section 303], or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. The Central District of California encompasses seven of California's 58 counties: Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, and Ventura. 28 U.S.C. § 84(c). Together, those counties account for nearly half of California's total population; according to the 2020 Census, roughly nineteen million people out of the state's 39.5 million people.[5] As the California Secretary of State's NVRA Manual makes clear, county election officials maintain voter registration records and have list-maintenance responsibilities.[6]

Defendants adopt a narrow reading of Section 305, asserting that the United States only can file its CRA suit in the Eastern District of California because the "demand was made to the Secretary at her Sacramento address, and her response stated that the records demanded are in her Sacramento office." Defs.' Mot. to Dismiss, ECF 37-1 at 6. The Secretary's office address is of no consequence to this action. Section 305 does not limit jurisdiction to the district in which the demand is

---

[5] *See* U.S. Census Bureau, 2020 Census total population by county for the State of California, *available at* https://www.census.gov/data/tables/time-series/demo/popest/2020s-counties-total.html (last visited Nov. 17, 2025).

[6] *See* California Sec'y of State, California National Voter Registration Act Manual ch. 4 (2025), *available at* https://elections.cdn.sos.ca.gov/nvra/nvra-manual/chap-4.pdf (last visited Nov. 17, 2025).

17

made. It also provides that jurisdiction is proper in a district "in which a record or paper so demanded" is located. 52 U.S.C. § 20705.

In this instance, millions of the records demanded by the United States – about half of all of California's SVRL – are created and maintained by "officers of election," namely county election officials, in the Central District. Like the other provisions of Title III, that term is defined broadly to include "any person who… performs or is authorized to perform any function, duty, or task in connection" with Federal election records, such as those records originating in the seven counties in the Central District. 52 U.S.C. § 20706. Moreover, if California continues to maintain and use the computerized SVRL as required by HAVA and its 2005 agreement with the Attorney General,[7] then those electronic records may be securely accessed and produced anywhere in the State of California, including in the Central District. Accordingly, Defendants' effort to seek dismissal for lack of jurisdiction fails.[8]

## II. THE UNITED STATES HAS A VALID LEGAL CLAIM UNDER HAVA.

### A. Defendants have failed to engage in reasonable list maintenance practices resulting in an inaccurate voter roll.

Congress enacted HAVA "to improve our country's election system." H.R. Rep. 107-329(I) at 31 (2001). The Act recognizes that "the federal government can

---

[7] *See* Mem. of Agt. between the United States and California (Nov. 2, 2005), *available at* https://www.justice.gov/crt/case-document/file/1081196/dl?inline (last visited Nov. 17, 2025).

[8] Defendants maintain that the Court "should dismiss DOJ's Title III claim without leave to amend" for lack of jurisdiction. Defs.' Mot. to Dismiss, ECF 37-1 at 6. The Court need not reach the question for the reasons discussed above. If it did, typically, "'if there is another district or division in which the action could have been brought, transfer is preferred to the harsh remedy of dismissal.'" *Goal Zero, LLC v. Cargo Freight Servs., Ltd.*, No. 16-CV-04055-LB, 2016 WL 7406796, at *4 (N.D. Cal. Dec. 22, 2016) (citation omitted).

18

ER-211

play a valuable [role]" in assisting states in modernizing their elections systems. *Id.* at 31-32. HAVA requires states to implement a computerized SVRL that is coordinated with other state agency databases. *See* 52 U.S.C. § 21083(a)(1)(A). It also establishes "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Under HAVA Section 303, a state's "election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* HAVA's list maintenance requirements apply to all states, including California. *See Colón-Marrero v. Vélez*, 813 F.3d 1, 14 (1st Cir. 2016) (collecting citations).

Defendants acknowledge HAVA includes list maintenance requirements that apply to California. *See* Defs.' Mot. to Dismiss, ECF 37-1 at 16-17. Nevertheless, they assert that the United States "fails to allege any facts supporting a specific violation of HAVA's list maintenance requirements." *Id.* at 18. Instead, Defendants maintain that the principal HAVA violation that the United States alleges, that California has provided insufficient information and voter registration data in response to its requests, prevents evaluation of the state's HAVA efforts. *Id.* The balance of their arguments asks the Court to determine at the pleading stage – without the benefit of any discovery – that Defendants comply with HAVA on the face of the incomplete and self-serving responses they provided in their correspondence with the United States. *See id.* at 17-19.

The United States has identified numerous anomalies from voter registration data that California reported in the 2024 EAVS Report, which show Defendants' list maintenance program is inconsistent with the reasonable efforts required by HAVA. *See supra* Part I(B). The Court must read these allegations in the Complaint in the light most favorable to the United States and accept all those material allegations as

19

ER-212

true. *Sanders*, 794 F.2d at 481. At this early juncture, the Court can reasonably conclude that the incomplete data provided by California to the EAC, which omitted over one-quarter of all voter files statewide and still resulted in some of the worst voter registration metrics in the country, makes the HAVA claim "plausible on its face." *Iqbal*, 556 U.S. at 678. The United States plainly has stated a cognizable legal theory under HAVA and pled sufficient facts to support that theory. As a result, dismissal is inappropriate. *Id.* Defendants' motion to dismiss the HAVA claim therefore must be denied.

### B. HAVA does not have a public disclosure requirement because unlike the NVRA, there is no private right of action under the Act.

Defendants further argue that the HAVA claim must be dismissed because "[u]nlike the NVRA, HAVA has no disclosure provisions." Defs.' Mot. to Dismiss, ECF 37-1 at 17. That is true, and it explains why the United States is entitled to the Federal election records it has demanded through its HAVA claim. The only enforcement provision in HAVA authorizing a cause of action in Federal court is found at Section 401, which provides that enforcement of the Act is vested solely in the Attorney General. *See* 52 U.S.C. § 21111. Senator Dodd of Connecticut, a HAVA conferee and sponsor, recognized that the Act did not have a private right of action. *See* 148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002). As a result, the Supreme Court has held that private parties may not enforce Section 303, including requests for records under that provision. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (per curiam) ("Respondents, however, are not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 in an action brought by a private litigant to justify the issuance of a TRO."). Congress unsurprisingly did not include a public disclosure requirement, such as the one included in Section 8(i) of the NVRA, because unlike the NVRA, private parties cannot enforce HAVA.

At the same time, however, that does not leave the United States without

20

ER-213

recourse to seek list maintenance records under HAVA. Rather, it may do so through the ordinary discovery process necessary to prosecute its Section 303 claim. Here, the CRA cases are instructive. Under the CRA, election officials are required to preserve and produce Federal election records "to facilitate the investigation… before suit is filed." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam). By comparison, the demand for records that the United States has made under HAVA falls into the conventional realm of discovery: "The chief purpose of [Federal] Rule [of Civil Procedure] 34… is to give a party litigant the right to have records produced after suit has been filed." *Id.* That is all the United States is doing in this case. It seeks records necessary to establish its claim under HAVA that Defendants are violating the list maintenance requirements in Section 303(a)(4) of the Act.

Accordingly, Defendants' motion to dismiss the HAVA claim should be denied.[9]

### III.    THE UNITED STATES HAS A VALID LEGAL CLAIM UNDER THE NVRA.

For similar reasons, Defendants' motion to dismiss the NVRA claim must be denied. The plain text of Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1). That includes the voter registration list, which necessarily must be used to ensure the accuracy of the official list of eligible voters,

---

[9] Defendants' citation of a Third Circuit decision addressing the narrow issue of the removal of convicted felons from the voter rolls is not controlling and has no bearing on this action. *See* Defs.' Mot. to Dismiss, ECF 37-1 at 19-20.

21

and is the some of the best evidence of a state's voter list maintenance efforts. The United States has properly alleged in its Complaint that Defendants have failed to engage in reasonable list maintenance efforts and have refused to produce records associated with those efforts. For the same reasons described in the preceding discussion, all the well-pled allegations in the Complaint must be accepted as true. As stated repeatedly throughout this brief, California's voter registration metrics are among the worst in the nation and are strongly suggestive of its list maintenance violations. It is wholly improper to determine based upon the pleadings alone that Defendants have "complied with the NVRA." Defs.' Mot. to Dismiss, ECF 37-1 at 13.

Finally, it is unnecessary to address in any detail the string cite of authorities that Defendants can deny the United States what they describe as "highly sensitive personal information of voters." *Id.* at 14. All the decisions that Defendants summarize, as well as the selected excerpt from an amicus brief filed by the United States, involved efforts by *private organizations* to obtain that data and accordingly are distinguishable from this action. Here, the United States is seeking certain data in the SVRL in its efforts to enforce the NVRA in California. As discussed in the final part, Federal privacy laws that apply to the Attorney General and the Department of Justice ensure that no sensitive voter data or information will be used, disseminated, or disclosed. Consequently, Defendants' motion to dismiss the NVRA claim should be denied.[10]

**IV. THE UNITED STATES IS COMPLYING WITH THE APPLICABLE**

---

[10] Contrary to what Defendants argue on pages 14-16 of their brief, to the extent California law purports to bar the United States from obtaining Federal election data necessary to enforce the NVRA, that conflicting law is preempted. *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).

22

ER-215

**PRIVACY LAWS.**

California fails to raise legitimate privacy issues to mandate a dismissal. The United States does not dispute that the Privacy Act applies here, and the United States is complying with those requirements. The First Amendment does not prohibit the Department's collection of voter information to assess compliance with the NVRA and HAVA.  The requirement for a Privacy Impact Assessment under E-Government Act does not apply to the list maintenance activities being conducted by the United States under the NVRA and HAVA. Similarly, the Driver's Privacy Protection Act does not limit the United States' ability to conduct list maintenance activities.

**A.     The United States is Complying with the Privacy Act.**

Defendants argue that the United States must comply with the Privacy Act, and the United States is doing that. However, there is no requirement that the United States needs to plead its compliance with the Privacy Act in every complaint that may contain personally identifiable information.

The voter information that the Department is collecting is maintained consistent with Privacy Act protections as explained in the Civil Rights Division's Privacy Policy.[11] The full list of routine uses for this collection of information can be found in the systems of records notices ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). The statutes cited in the SORNs for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960, and the United States made its requests pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling

---

[11] *See* https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

23

the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Similarly, to the extent that Defendants are concerned about the transport of such data to the United States, the Department uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs. [12]

Moreover, the Privacy Act does not bar the disclosure of California's SVRL to the United States. The Privacy Act regulates Federal agencies' collection, maintenance, and disclosure of information within their own systems of records – it does not restrict the ability of state actors to share information with Federal agencies. The statute's plain language confirms that it applies only to Federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of Federal agency record systems. There is no basis for California to fail to disclose information to a Federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

**B.    The First Amendment does not prohibit access to data the United**

---

[12] *See* JUSTICE/DOJ-014, Department of Justice Employee Directory Systems, last published in full at 74 Fed. Reg. 57194 (Nov. 4, 2009), and modified at 82 Fed. Reg. 24151, 24153 (May 25, 2017); JUSTICE/DOJ-002, Department of Justice Computer Systems Activity and Access Records, last published in full at 64 Fed. Reg. 73585-02 (Dec. 30, 1999), and modified at 66 Fed. Reg. 8425-02 (Jan. 31, 2001) and 82 Fed. Reg. 24147-01 (May 25, 2017).

24

**States needs for its HAVA and NVRA enforcement.**

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting California's SVRL. Defendants contend that the United States violates the First Amendment because the request for the SVRL is not "pertinent to and within the scope of an authorized law enforcement activity" under 5 U.S.C. § 552a(e)(7). Defs.' Mot. to Dismiss, ECF 37-1 at 20-22.

Initially, the United States made it clear that it seeks the SVRL to enforce Section 8 of the NVRA and Section 303 of HAVA regarding list maintenance. Both of those statutes are enacted pursuant to the Elections Clause and have broad mandates. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 7-9 & n1 (2013) (discussing the breadth of the Elections Clause). As the Ninth Circuit explained in rejecting a constitutional challenge to the NVRA in *Mi Familia Vota v. Fontes,* "the Supreme Court has read the grant of power to Congress in Article I, section 4 [of the U.S. Constitution] as quite broad." 129 F.4th 691, 712 (9th Cir. 2025) (citing *Voting Rts. Coal. v. Wilson,* 60 F.3d 1411, 1413-14 (9th Cir. 1995)).

Defendants' argument that the United States' request for the SVRL is not pertinent to California's list maintenance program is baffling. Defs.' Mot. to Dismiss, ECF 37-1 at 22. HAVA requires the driver's license number or the last four digits of the Social Security Number in Section 303(a)(5)(A), and the Attorney General is enforcing California's compliance with that provision. *See* 52 U.S.C. § 21083(a)(5)(A). Section 8(a)(4) of the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of… the death of the registrant," or "a change in the residence of the registrant…" 52 U.S.C. § 20507(a)(4). A registered voter list that includes all fields will allow for more accurate matching when determining whether a person on the voter registration list is deceased or in finding duplicate registrations.

The work of the ERIC supports this proposition. ERIC is a private

organization whose mission includes, among other things, the means "to assist states in improving the accuracy of America's voter rolls," although California is not a member of ERIC.[13] According to ERIC's website, "Members submit dates of birth, driver's license/ID card numbers, and Social Security numbers to ERIC…" *Id.* "At least every 60 days, each member submits their voter registration data and licensing and identification data from their Moter Vehicle Department ("MVD") to ERIC. ERIC refers to these data as Member Data. Data fields related to name, address, driver's license or state ID number, last four digits of social security number, date of birth, and activity date are required, if present. Members also submit information on current record status (e.g., is the record 'active' or 'cancelled'), phone number, and email address when available. These fields improve the quality of the data matching process." *Id.* List maintenance is an authorized enforcement activity, and California's voter registration list is integral to that effort.

### C. The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA enforcement.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to California to

---

[13] ERIC, FAQS, *available at* https://ericstates.org/faq/ (last visited Nov. 17, 2025); *see also* ERIC, "Which States Are Members of ERIC?," *available at* https://ericstates.org/about/ (last visited Nov. 17, 2025).

26

provide a voter registration list they already maintain pursuant to Federal law to analyze their federally required list maintenance.[14]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result whereby the Department of Justice would need to do thousands of Privacy Impact Assessments whenever the Section gathered any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act (UOCAVA). Nor does the purpose of the privacy provision in the E-Government Act suggest it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208 (a).

Even if the Court found the E-Government Act applied here—and it should not—Defendants' reliance on *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) does not support dismissal of a complaint based on an alleged failure to conduct a PIA. The plaintiff sought to enjoin a Federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds, finding that "As we read it, the provision is intended to protect *individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind." *Elec. Privacy Info. Ctr.*

---

[14] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited Nov. 17, 2025).

ER-220

*v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017).

### D. The Driver's Privacy Protection Act does not allow Defendants to deny the United States list maintenance data.

The Driver's Privacy Protection Act (DPPA) generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). The statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The Supreme Court in *Reno v. Condon*, 528 U.S. 141 (2000), confirmed this principle. In that case, the court upheld the DPPA against a Tenth Amendment challenge, emphasizing that the statute regulates the use of DMV information rather than the state itself. The court explicitly recognized that the DPPA does not restrict a state agency's use of personal information for its own functions, including enforcement and other official governmental activities. As the court stated, "The DPPA *permits* DMVs to disclose personal information from motor vehicle records for a number of purposes." *Id*. at 145 (emphasis in original).

The DPPA's prohibition is clearly not implicated in the present case. The DOJ is a government agency performing a statutorily mandated function —verifying voter registration records maintained by state and local entities. Under the governmental-function exemption in § 2721(b)(1), the DOJ's use of DMV-provided information is permissible, even though the information originates from a motor vehicle record.  Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with

ER-221

the DPPA and fall squarely within the statute's exceptions.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Motion to Dismiss by Defendants.

DATED: November 17, 2025    Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division


*/s/ Brittany E. Bennett*
MAUREEN RIORDAN
Senior Counsel, Voting Section
BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

29

ER-222

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

30

ER-223

# <u>CERTIFICATE OF COMPLIANCE</u>

*The undersigned, counsel of record for Plaintiff, certifies that this brief contains 6,690 words, and complies with the word limit of L.R. 11-6.1.*

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

31

ER-224

Lalitha D. Madduri (CA Bar No. 301236)
lmadduri@elias.law
Jacob D. Shelly* (DC Bar No. 90010127)
jshelly@elias.law
Christopher D. Dodge* (DC Bar No. 90011587)
cdodge@elias.law
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498

Tyler L. Bishop (CA Bar No. 337546)
tbishop@elias.law
Walker McKusick* (WA Bar No. 63205)
wmckusick@elias.law
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180

Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
F: (213) 277-8989

*Counsel for Proposed Intervenor-Defendants
NAACP; NAACP California-Hawaii State
Conference; and Services, Immigrant Rights and
Education Network*

*\* Admitted pro hac vice*

i

ER-225

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>SHIRLEY N. WEBER, in her official capacity as Secretary of State of California, et al.,<br><br>        Defendants. | Case No:  2:25-cv-09149-DOC-ADS<br><br>**NAACP; NAACP CALIFORNIA-HAWAII STATE CONFERENCE; AND SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK PROPOSED NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>Hearing Date: December 8, 2025<br><br>Time: 8:30 a.m.<br><br>Courtroom: 5A, 5th Floor |

ii

ER-226

### **PROPOSED NOTICE OF MOTION AND MOTION TO DISMISS**

The National Association for the Advancement of Colored People ("NAACP"), the NAACP California-Hawaii State Conference ("NAACP-CA/HI"), and Services, Immigrant Rights and Education Network ("SIREN") (together, "NAACP-SIREN Proposed Intervenors") move to dismiss Plaintiff's Complaint because it fails to state a claim for which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] In support of their Motion, NAACP-SIREN Proposed Intervenors submit and incorporate the below Memorandum of Points and Authorities.

Pursuant to Local Rule 7-3, counsel for NAACP-SIREN Proposed Intervenors e-mailed counsel for Plaintiff and Defendants on November 17, 2025. *See* Ex. C, Decl. of Lalitha D. Madduri ¶¶ 4–5. Counsel for Plaintiffs stated they oppose leave to file this motion as well as the motion itself. *Id.* ¶ 5. Counsel for Defendants stated they do not oppose the motion. *Id.* ¶ 4.

Dated: November 17, 2025

Respectfully submitted,

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri (CA Bar No. 301236)
Jacob D. Shelly* (DC Bar No. 90010127)
Christopher D. Dodge* (DC Bar No. 90011587)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498
lmadduri@elias.law
jshelly@elias.law
cdodge@elias.law

---

[1] NAACP-SIREN Proposed Intervenors request that the Court accept this Proposed Motion to Dismiss in the event the Court grants their Motion to Intervene, ECF No. 14. *See, e.g.*, *Twitch Interactive, Inc. v. Fishwoodco GmbH*, No. 5:22-CV-03218, 2023 WL 7458374, at *5 (N.D. Cal. Nov. 9, 2023) (granting motion to intervene and accepting proposed motion to dismiss "as filed"); *Donald Trump for President, Inc. v. Benson*, No. 1:20-cv-01083-JTN-PJG, 2020 WL 8573863 at *3 (W.D. Mich. Nov. 17, 2020) (similar).

iii

ER-227

Tyler L. Bishop (CA Bar No. 337546)
Walker McKusick* (WA Bar No. 63205)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law
wmckusick@elias.law

Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
omar@qureshi.law
max@qureshi.law

*Counsel for Proposed Intervenor-
Defendants NAACP; NAACP California-
Hawaii State Conference; and Services,
Immigrant Rights and Education Network*

*\* Admitted pro hac vice*

iv

ER-228

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... vi

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers. ........................... 2

    II.    DOJ launched a nationwide campaign to collect voter data held by states. 4

    III.    DOJ sued California as part of its effort to create a national voter list. ...... 6

LEGAL STANDARD ............................................................................................... 7

ARGUMENT ........................................................................................................... 7

    I.    DOJ has not stated any claim entitling it to California's statewide voter registration list. ........................................................................................... 7

        A.    The NVRA does not entitle DOJ to California's full unredacted voter list. .......................................................................................... 7

        B.    HAVA does not entitle DOJ to California's full unredacted voter registration list. .............................................................................. 10

        C.    The Civil Rights Act of 1960 does not entitle DOJ to California's voter registration list. ...................................................................... 12

            1.    Title III was designed to combat the denial of voting rights based on race. ................................................................... 12

            2.    By its plain text, Title III does not cover California's internally created statewide voter registration list ................ 13

            3.    DOJ lacks a proper basis and purpose to demand records under Title III. ...................................................................... 17

            4.    Title III does not prohibit redacting sensitive voter information. ...................................................................... 19

    II.    DOJ has not stated any other claim for relief. ......................................... 20

CONCLUSION ....................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. ex rel. Gallion v. Rogers*,
    187 F. Supp. 848 (M.D. Ala. 1960) ...................................................................12

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013) .................................................................................................2

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................7

*Bobreski v. EPA*,
    284 F. Supp. 2d 67 (D.D.C. 2003) ...................................................................11

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
    854 F.3d 683 (D.C. Cir. 2017) .........................................................................17

*CFPB v. Source for Pub. Data, L.P.*,
    903 F.3d 456 (5th Cir. 2018) ...........................................................................17

*Dinkens v. Att'y Gen. of U.S.*,
    285 F.2d 430 (5th Cir. 1961) ...........................................................................12

*Fischer v. United States*,
    603 U.S. 480 (2024) ...........................................................................................16

*Foster v. Love*,
    522 U.S. 67 (1997) ...............................................................................................2

*Grand Canyon Univ. v. Cardona*,
    121 F.4th 717 (9th Cir. 2024) .........................................................................14

*Harkless v. Brunner*,
    545 F.3d 445 (6th Cir. 2008) ...........................................................................20

*Honeycutt v. United States*,
    581 U.S. 443 (2017) ...........................................................................................15

*Huddleston v. United States*,
    415 U.S. 814 (1974) ...........................................................................................15

*Husted v. A. Philip Randolph Inst.*,
    584 U.S. 756 (2018)..................................................................................3

*In re Admin. Subpoena* ,
    No. 1:25-MC-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025)........19

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) .............................................................17, 18, 19

*Loughrin v. United States*,
    573 U.S. 351 (2014)................................................................................14

*McCloskey v. Mueller*,
    446 F.3d 262 (1st Cir. 2006).................................................................11, 21

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
    526 U.S. 344 (1999)................................................................................16

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ....................................................................7

*Peters v. United States*,
    853 F.2d 692 (9th Cir. 1988) ..................................................................11

*Project Vote, Inc. v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016).......................................................9

*Project Vote/Voting For Am., Inc. v. Long*,
    752 F. Supp. 2d 697 (E.D. Va. 2010) .......................................................10

*Project Vote/Voting for Am., Inc., v. Long*,
    682 F.3d 331 (4th Cir. 2012) .....................................................................9

*Pub. In. Legal Found., Inc. N.C. State Bd. of Elections*,
    996 F.3d 268 (4th Cir. 2021) .....................................................................9

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024).................................................................1, 8, 9

*Pub. Int. Legal Found., Inc. v. Dahlstrom*,
    673 F. Supp. 3d 1004 (D. Alaska 2023) ......................................................9

*Pub. Int. Legal Found., Inc. v. Matthews*,
    589 F. Supp. 3d 932 (C.D. Ill. 2022) ..........................................................9

ER-231

*Rainero v. Archon Corp.*,
844 F.3d 832 (9th Cir. 2016)...........................................................................13

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*,
351 F.3d 1229 (D.C. Cir. 2003) .......................................................................16

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ...........................................................................3

*True the Vote v. Hosemann*,
43 F. Supp. 3d 693 (S.D. Miss. 2014)................................................................9

*Union Pac. R.R. Co. v. United States*,
865 F.3d 1045 (8th Cir. 2017) ........................................................................14

*United States v. Mohrbacher*,
182 F.3d 1041 (9th Cir. 1999) ........................................................................15

*United States v. Prasad*,
18 F.4th 313 (9th Cir. 2021) ...........................................................................15

*Van Buskirk v. Cable News Network, Inc.*,
284 F.3d 977 (9th Cir. 2002)............................................................................6

*Webb v. Trader Joe's Co.*,
999 F.3d 1196 (9th Cir. 2021) ...................................................................11, 21

**Constitutional Provisions Statutes And Rules**

U.S. Const. art. I, § 4, cl. 1................................................................................2

5 U.S.C. § 552a................................................................................................19

6 U.S.C. § 1502(a) ...........................................................................................14

7 U.S.C. § 12(e) ...............................................................................................14

13 U.S.C. § 214.................................................................................................14

18 U.S.C. § 1703(a) .........................................................................................14

18 U.S.C. § 1709..............................................................................................14

18 U.S.C. § 1968(f)..........................................................................................14

18 U.S.C. § 2721..............................................................................................19

18 U.S.C. § 3500(a) ............................................................................14

30 U.S.C. § 1732(b) ...........................................................................14

49 U.S.C. § 47124a(b) ........................................................................14

50 U.S.C. § 217 ..................................................................................14

52 U.S.C. § 20501(b) ...........................................................................3

52 U.S.C. § 20507 ..............................................................................10

52 U.S.C. § 20507(a) .................................................................3, 18, 20

52 U.S.C. § 20507(g) ............................................................................3

52 U.S.C. § 20507(i) .............................................................................8

52 U.S.C. § 20701 .......................................................................1, 12, 13, 15

52 U.S.C. § 20703 .........................................................................17, 18

52 U.S.C. § 21083(a) ...................................................................*passim*

52 U.S.C. § 21111 ..............................................................................11

Cal. Elec. Code § 2194(b).............................................................1, 8, 19

11 C.F.R. § 9428.7 ...............................................................................4

Fed. R. Civ. P. 12(b)(6) ...............................................................1, 2, 21

**Other Authorities**

Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee, *Project Vote/Voting for Am. v. Long*, 682 F.3d 331 (No. 11-1809), 2011 WL 4947283 ....................................................................................9

Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (No. 23-1361), 2023 WL 4882397 ....................................................................................8

*Come into possession*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/thesaurus/come-into-possession-of (visited Nov. 17, 2025) ..........................13

ix

ER-233

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/8VP4-WRXD ................................................................................................................. 4

H.R. Rep. No. 86-956 (1959) ............................................................................ 12

H.R. Rep. No. 107-329 (2001) ................................................................. 2, 3, 11

Jonathan Shorman, *Some Republican States Resist DOJ Demand for Private Voter Data*, Stateline (Sept. 18, 2025), https://stateline.org/2025/09/18/some- ......... 4

Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings*, 2025 ............................ 4

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 28, 2025), https://perma.cc/CZ8S-JRRK ............................................................ 4

Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://perma.cc/K63M-TZKV ............................................................ 19

*Receive, Black's Law Dictionary* (12th ed. 2024) .................................................. 13

ER-234

# INTRODUCTION

The United States Department of Justice ("DOJ") seeks to amass a nationwide voter registration list, a scheme not authorized by Congress and contrary to federal laws assigning states the responsibility for maintaining voter registration. To build this unauthorized and unprecedented federal list, DOJ has demanded that dozens of states turn over their full, unredacted voter lists, even though state laws often shield voter information on those lists—most notably driver's license numbers, social security numbers, and full dates of birth—from disclosure. California law is no exception: it dictates that such sensitive voter information "shall not be disclosed to any person." Cal. Elec. Code § 2194(b)(1).

California—like nearly every other state contacted by DOJ—has so far largely refused to comply with its demands. Now, DOJ has amplified its pressure campaign by filing suit to forcibly obtain California's voter registration list and its citizens sensitive and confidential information. Far from granting such relief, this Court should dismiss this action under Rule 12(b)(6) because DOJ has failed to state a claim. DOJ cites three authorities in support of its demand—the National Voter Registration Act ("NVRA"), the Help America Vote Act ("HAVA"), and Title III of the Civil Rights Act of 1960 ("CRA")—but none provides DOJ with authority to access California's unredacted voter registration list. Courts have broadly (and recently) recognized that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024). HAVA does not contain *any* disclosure provision. And the text of Title III of the CRA plainly does not apply here: that long-dormant statute extends only to "records and papers *which come into [election officials'] possession*," 52 U.S.C. § 20701 (emphasis added), not internally generated databases *created by* election officials. Finally, even if Title III did reach California's state-created voter registration list, DOJ's demand here is not supported by an adequate basis or purpose. In short, nothing in these

1

federal provisions prevents states from redacting the sensitive voter information DOJ seeks.

Tellingly, DOJ's Complaint nowhere identifies past instances where any of the statutes upon which it purports to rely have been used to obtain the sort of sensitive voter information that DOJ now demands. The reasons why are clear: this unprecedented effort runs contrary to the decentralized structure of our federal electoral system, which is state-focused *by design*. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1 (giving the States principal authority over congressional elections). When enacting HAVA after the contested 2000 election, Congress stressed that the "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, at 31–32 (2001). DOJ asserts sweeping federal authority and control over the management of federal elections that is not only unsupported by the statutes that DOJ cites, but is antithetical to the carefully designed system of American elections as reflected by the Constitution, federal law, and the state's rightful administration of elections. The Court should dismiss the Complaint with prejudice under Rule 12(b)(6) for failure to state a claim.

## **BACKGROUND**

**I.**   **Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.**

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. Accordingly, as a default matter, the Constitution assigns the States the responsibility for determining voter eligibility and maintaining lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

While Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that states are

ER-236

the custodians of voter registration data. Congress in 1993 enacted the NVRA to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). Tellingly, that law charges *states*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists (subject to strict procedural safeguards), *id.* § 20507(c)–(g). It similarly makes *states* the custodians of voter lists. *See Husted*, 584 U.S. at 761.

In the wake of the 2000 elections, Congress enacted HAVA "to improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Like the NVRA, HAVA regulates how *states* maintain voter registration lists, requiring that they create a "computerized statewide voter registration list" and "perform list maintenance." 52 U.S.C. § 21083(a)(1), (2)(A). HAVA is abundantly clear that this list is "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). And more generally, HAVA commands that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085. Indeed, HAVA's drafters stressed the importance of maintaining our decentralized electoral system to preserve free and fair elections:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, at 31–32. And while HAVA requires states to create their own centralized statewide voter registration lists, nothing in the law obligates them to disclose records in any manner, including to the federal government.

3

ER-237

**II.    DOJ launched a nationwide campaign to collect voter data held by states.**

This spring, DOJ initiated an unprecedented campaign, demanding unfettered access to state voter files, which include sensitive and personal information about each registered voter. To date, DOJ has sent demands to at least forty states, with plans to make similar demands on all fifty.[2] It seeks to use the data to create a national voter database that will, in turn, be used to attempt to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections.[3] The vast majority of states that have received such demands—including those led by Republican officeholders—have refused to comply, declining to turn over sensitive information that is typically protected by state law.[4]

DOJ sent California a letter on July 10, 2025, demanding, among other things, California's "statewide voter registration list" within 14 days. Compl. ¶ 34, ECF No. 1; Brudigam Decl. Supporting Defs.' Mot. Dismiss, Ex. 1, at 6, ECF No. 37-2. DOJ demanded that California produce "*all fields*" from its voter registration list. Brudigam Decl. Ex. 1, at 6. DOJ also posed several questions regarding California's responses to Election Administration and Voting Survey ("EAVS") prompts. Brudigam Decl. Ex. 1, at 7.[5] The Secretary responded on July 22, requesting additional time to respond. Compl.

---

[2] *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/8VP4-WRXD; Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 28, 2025), https://perma.cc/CZ8S-JRRK.

[3] *See* Barrett & Corasaniti, *supra* n. 2.

[4] Jonathan Shorman, *Some Republican States Resist DOJ Demand for Private Voter Data*, Stateline (Sept. 18, 2025), https://stateline.org/2025/09/18/some-republican-states-resist-doj-demand-for-private-voter-data/ (reporting only Indiana has so far given DOJ everything it sought).

[5] EAVS is a biennial survey of state and local election officials administered by the U.S. Election Assistance Commission ("EAC"). *See* 11 C.F.R. § 9428.7. EAVS asks state and local election officials to answer questions concerning the administration of federal

4

ER-238

¶ 35; Brudigam Decl. Ex. 2, at 10. On July 29, DOJ sent another letter, this time demanding immediate responses to some of its questions as well as a full and unredacted copy of the statewide voter registration list by August 8. Compl. ¶ 36; Brudigam Decl. Ex. 3, at 12. On August 8, the Secretary responded with a letter offering to make a copy of California's voter registration list available for inspection at the Secretary's office in Sacramento. Compl. ¶ 37; Brudigam Decl. Ex. 4, at 16. Consistent with California and federal law, the Secretary indicated that sensitive information—including voters' drivers license numbers and social security numbers—would be redacted. Brudigam Decl. Ex. 4, at 16. DOJ rejected the Secretary's offer on August 13 and reiterated its demand for the statewide voter list, including "each registrant's full name, date of birth, residential address, their state driver's license number, and or the last four digits of the registrant's social security number." Compl. ¶ 38; Brudigam Decl. Ex. 5, at 21. DOJ stated that the purpose of the request is to "assess" California's compliance with the list maintenance requirements of the NVRA, HAVA, and CRA. Brudigam Decl. Ex. 5, at 20.

The Secretary responded the following week on August 21, again inviting DOJ to inspect the voter list at her office and explaining that HAVA, the CRA, and the NVRA did not authorize DOJ's request. *See* Compl. ¶ 43; Brudigam Decl. Ex. 6, at 24–27. The letter also pointed out that DOJ's efforts to obtain similar data from every state undermined its claim that the data was necessary to investigate California's NVRA compliance. *See* Brudigam Decl. Ex. 6, at 25. The Secretary sent another letter to DOJ on August 29 to provide a list of election officials responsible for voter list maintenance in the state, as DOJ requested in its initial letter. Compl. ¶ 44; Brudigam Decl. Ex. 7, at 29–48. The Secretary then sent a final letter on September 12, responding to each

elections, including those involving the voter registration process, military and overseas voting, mail voting, in-person polling operations, provisional voting, and election-related technologies. *Id.* at § 9428.7(b)(6)(i)−(vii). Subsequently, EAC reports its findings to Congress and the public after each regular federal election cycle. *See* Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings*, 2025.

ER-239

question posed in DOJ's initial letter but again declining to provide detailed voter data. Brudigam Decl. Ex. 8, at 50–57. The Secretary's letter raised concerns that DOJ was not in compliance with federal privacy laws that appear to be implicated by DOJ's collection of voter information. Brudigam Decl. Ex. 8, at 57. DOJ did not respond to the Secretary's August 21, August 29, or September 12 letters, and never sought to inspect California's voter registration list. Instead, DOJ sued on September 25, asserting that California has "refuse[d] to fully comply with Plaintiff's requests for information." Compl. ¶ 43.[6]

## III.   DOJ sued California as part of its effort to create a national voter list.

DOJ filed this suit on September 25, 2025, primarily seeking to compel California, in violation of state and federal law, to produce its full and unredacted statewide voter registration list. *See* Compl. at 16, Prayer for Relief, ¶ 5. DOJ claims that it is entitled to this relief under the NVRA, HAVA, and CRA. DOJ also alleges that California failed to "provide sufficient responses to the United States's specific inquiries regarding its maintenance procedures," *id.* ¶ 53—seemingly referencing its written questions regarding California's EAVS responses, not its request for California's statewide voter registration list, but the Complaint does not request relief on the EAVS issue, *id.* at 16, Prayer for Relief, ¶ 1–5.

On the same day that DOJ sued California, it filed largely identical suits against New York, Minnesota, New Hampshire, Pennsylvania, and Michigan. Compl., *United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-cv-1338 (N.D.N.Y. Sept. 25, 2025); Compl., *United States v. Simon*, No. 0:25-cv-3761 (D. Minn. Sept. 25, 2025); Compl., *United States v. Scanlan*, No. 1:25-cv-371 (D.N.H. Sept. 25, 2025); Compl., *United States v. Commonwealth of Pennsylvania.*, No. 2:25-cv-1481 (W.D. Pa. Nov. 25, 2025); Compl., *United States v. Benson*, No. 1:25-cv-1148 (W.D. Mich. Sept. 25, 2025). And just a few days earlier, DOJ sued Maine and Oregon, asserting the same claims

---

[6] The Court may properly consider the correspondence between the Secretary and DOJ at the motion-to-dismiss stage because it was referenced throughout the Complaint. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).

under the NVRA, HAVA, and CRA. Compl., *United States v. Bellows*, No. 1:25-cv-468 (D. Me. Sept. 16, 2025); Compl., *United States v. Oregon*, No. 6:25-cv-1666 (D. Or. Sept. 16, 2025).

NAACP-SIREN Proposed Intervenors are three civic organizations that collectively represent nearly 12,000 voters in California. To assert and protect their interests, they moved to intervene as defendants on October 7, 2025. *See* ECF No. 14. That motion remains pending. They file this proposed motion to dismiss following the Court's November 17 hearing. *See generally* NAACP-SIREN Mot. for Leave.

## LEGAL STANDARD

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion-to-dismiss stage, the Court "must accept as true all of the allegations contained in a complaint" but need not accept the complaint's "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Dismissal is required when a complaint fails to allege "sufficient facts" "to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

## ARGUMENT

**I.    DOJ has not stated any claim entitling it to California's statewide voter registration list.**

DOJ cites three statutes to justify its unprecedented demand for the disclosure of California's entire, unredacted statewide voter list—the NVRA, HAVA, and CRA—none of which supplies any "cognizable legal theory" for the relief DOJ seeks. *Navarro*, 250 F.3d at 732.

**A.    The NVRA does not entitle DOJ to California's full unredacted voter list.**

DOJ points to the NVRA to support its demand for California's unredacted voter list, Compl. ¶¶ 50–56, but that law cannot sustain the weight DOJ puts on it. What the

7

ER-241

NVRA requires is that each state "maintain for at least 2 years and . . . make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). This "public inspection" requirement is the sole disclosure provision in the NVRA, and by its terms, it does not grant the federal government special inspection rights beyond those available to the public. Moreover, courts across the country have squarely rejected the notion that the public inspection provision obligates states to provide *every* piece of information contained in covered records—up to and including highly sensitive personal information contained within those files. Instead, courts have recognized that nothing in the NVRA's text prohibits states from redacting sensitive voter information before disclosure and that doing so does not violate that federal law.

For instance, in *PILF*, the First Circuit held that while Maine's voter registration list was a "record" covered by Section 20507(i) and therefore subject to public inspection, *see* 92 F.4th at 45–49, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" such voter files. *Id.* at 56; *see also id.* (citing with approval decisions recognizing that states could redact information such as birthdates and social security numbers). Accordingly, the First Circuit concluded that the "proper redaction of certain personal information" in statewide voter registration lists could "assuage the potential privacy risks implicated by the public release of the [v]oter [list]." *Id.* In so holding, the First Circuit effectively recognized that the NVRA's public inspection provisions did not preempt or circumvent the Maine legislature's lawfully enacted privacy requirements, which largely parallel California's state law protection for sensitive voter information and prohibit disclosure of the highly sensitive personal information DOJ seeks. *See* Cal. Elec. Code § 2194(b)(1).

That conclusion should come as no surprise to DOJ—it filed an amicus brief in *PILF* urging the First Circuit to reach that result. *See* Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee at 27–30, *PILF*, 92 F.4th 36 (No. 23-1361), 2023

8

ER-242

WL 4882397, at *27–30. While DOJ opposed Maine's argument that it could place limitations on a requester's ability to use and publish the voter registration list, it recognized that the state's "privacy concerns" were "substantial." *Id.* at *27. To that end, its brief "emphasize[d] the limits on [section 20507(i)'s] preemptive scope." *Id.* Most notably, it conceded that "*the NVRA does not prohibit States from redacting 'uniquely sensitive information' like voters' Social Security Numbers before disclosing records*." *Id.* (emphasis added) (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)). And it further conceded that the NVRA does not "prohibit [states from] redacting an even broader set of personal information in certain sensitive circumstances." *Id.* (citing *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021)). DOJ made similar arguments previously. *See* Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee at 11, 25–26, *Project Vote/Voting for Am.*, 682 F.3d 331 (No. 11-1809), 2011 WL 4947283, at *11, 25–26. Its current demand that California produce an entirely unredacted voter registration list reflects an unexplained reversal of its longstanding (and correct) view of federal law.

The First Circuit's holding in *PILF* is no outlier—many other courts have reached the same conclusion. *See Project Vote/Voting for Am., Inc.*, 682 F.3d at 339 (affirming district court order to redact social security numbers before disclosure under NVRA); *N.C. State Bd. of Elections*, 996 F.3d at 268 (recognizing that the NVRA permits redactions to "protect sensitive information"); *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1016 (D. Alaska 2023) (holding the NVRA permits "the exclusion of sensitive personal information" from disclosure); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344–45 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birth dates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (holding

9

ER-243

the NVRA "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting social security numbers). Indeed, DOJ cannot point to a single case interpreting the NVRA to override similar state privacy laws at the behest of the federal government or anyone else. Although the Ninth Circuit has yet to address the question, this broad and uniform precedent from multiple courts across the country reaffirms that the NVRA does not grant the invasive authority that DOJ claims here. This Court should follow suit.

To hold otherwise would have striking privacy implications. As noted, the NVRA's public inspection provision provides no special inspection privilege to the federal government. 52 U.S.C. § 20507. Thus, any right that DOJ may have to request inspection of records under section 20507(i) is a right that is equally shared by the general public. Consequently, if it were the case (as DOJ implies) that it has the right under section 20507(i) to demand the complete, unredacted voter registration list, then any member of the public can do the same. Not only would that conclusion be contrary to the many decisions holding precisely the opposite, it also would work a radical and unexpected harm to voter privacy, allowing any person to demand the driver's license numbers, dates of birth, and partial social security numbers of every registered voter, in every state. That radical outcome could not have been Congress's intent when enacting the NVRA. DOJ's suit here provides no reason for the Court to depart from the judicial consensus about the scope of the NVRA and jeopardize the privacy rights of tens of millions of registered voters in California alone.

**B.    HAVA does not entitle DOJ to California's full unredacted voter registration list.**

DOJ points to HAVA as another basis for relief, but that statute also does not support its demand. Compl. ¶¶ 57–63. In fact, HAVA contains no disclosure requirements *at all*. DOJ's Complaint and correspondence cite no authority to the contrary, relying instead upon a provision permitting the Attorney General to file suit "as

10

ER-244

may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" of HAVA. 52 U.S.C. § 21111. But the underlying statutory provisions DOJ may enforce through section 21111 say nothing about permitting DOJ to demand state voter registration lists at will. To the contrary, the sole underlying provision concerning voter registration affirms that voter registration lists must be "maintained" and "administered at the State level"—not by the federal government. 52 U.S.C. § 21083(a)(1)(A); *see also* H.R. Rep. No. 107-329, at 32, 36 (emphasizing that "local control must be preserved" under HAVA and voter registration databases should be "administered at the state level"). Nothing in HAVA provides any basis for DOJ to compel the disclosure of information that the Constitution and federal law both instruct to be administered at the state level.

Further, it would defy logic to conclude that HAVA implicitly authorizes, let alone *requires*, states to disclose all voter registration information, including sensitive and personal information protected by state law. Since the NVRA—which has an actual public disclosure provision—permits states to redact sensitive and personal voter information, HAVA—which does not contain *any* disclosure requirement—cannot somehow be read to have broader preemptive effect on state privacy laws than the NVRA. And the mere fact that HAVA grants the Attorney General a cause of action to enforce HAVA's substantive requirements changes nothing because those substantive requirements impose no obligation on states to disclose records to the federal government. *Cf. Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988) (explaining authority to issue document requests "is created solely by statute"); *Bobreski v. EPA*, 284 F. Supp. 2d 67, 76 (D.D.C. 2003) (rejecting argument that statutes created "implied subpoena authority").

Meanwhile, DOJ does not allege that California has violated HAVA's substantive requirements. The federal government, as much as any litigant, cannot use litigation as a "fishing expedition" with "no basis other than gross speculation." *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1204 (9th Cir. 2021); *see also McCloskey v. Mueller*, 446 F.3d 262,

11

ER-245

271 (1st Cir. 2006) (holding litigants may not "conduct fishing expeditions in hopes of discovering claims that they do not know they have").

**C.      The Civil Rights Act of 1960 does not entitle DOJ to California's voter registration list.**

In its final effort to justify its disclosure demand, DOJ dusts off Title III of the CRA, a long dormant law passed in the civil rights era to combat racial discrimination in voting in Jim Crow states. *See* 52 U.S.C. § 20701, *et seq*. As with the NVRA and HAVA, Title III does not support DOJ's demands.

**1.      Title III was designed to combat the denial of voting rights based on race.**

Congress enacted Title III to buttress protections against racial discrimination in voting contained in the Civil Rights Act of 1957. *See* H.R. Rep. No. 86-956, at 3 (1959) (finding that while "some progress" has been made since the Civil Rights Act of 1957 toward the "elimination of discrimination because of race," there was a "need for additional legislation to implement the enforcement of civil rights"); *Ala. ex rel. Gallion v. Rogers,* 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("The legislative history leaves no doubt but that [Title III] is designed to secure a more effective protection of the right to vote"), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). In the Civil Rights Act of 1957, Congress tasked DOJ with protecting the "right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7. Despite this charge, DOJ's efforts were stymied by "the refusal of some state and local authority to permit" inspection of voter registration records. *Id.* DOJ had "no existing power in civil proceedings to require the production of [voter registration] records during any investigation" concerning "complaints of a denial to vote because of race." *Id.* Congress found that without granting DOJ a "suitable provision for access to voting records during the course of an investigation," its ability to combat racial discrimination in voting was "rendered relatively ineffective." *Id.* Congress thus enacted Title III to assist DOJ "*during any investigation it may conduct on complaints of a denial to vote*

12

ER-246

*because of race*." *Id.* (emphasis added); *see also id*. (explaining Title III is "an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion, or national origin" (quoting *In re Wallace*, 170 F. Supp. 63, 67 (M.D. Ala. 1959))).

> **2.    By its plain text, Title III does not cover California's internally created statewide voter registration list.**

DOJ's effort to invoke Title III of the CRA fails from the start because, by its plain terms, it does not require the production of California's voter registration list—or any internal records created by election officials. *See Rainero v. Archon Corp*., 844 F.3d 832, 837 (9th Cir. 2016) ("If the statutory language is plain, we must enforce the statute according to its terms." (citing *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009)). Title III permits DOJ to access only those records that "come into [the] possession" of election officials relating to a voter's "application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. To "come into possession" of something means to receive or acquire it from someone else. *See, e.g.*, *Receive*, *Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"); *Come into possession*, *Cambridge Dictionary*, https://dictionary .cambridge.org/us/thesaurus/come-into-possession-of (visited Nov. 17, 2025) (listing synonyms of "come into possession" as "obtain," "acquire," and "receive"). Title III's coverage thus extends only to records that election officials *receive* or *acquire* from voters—not those that election officials *generate* or *create* themselves. Here, DOJ seeks California's "computerized statewide voter registration list," Compl. at 16, Prayer for Relief ¶ 5—an internal database *created* by California election officials. Simply put, DOJ does not seek a record—like a voter registration application—that "c[a]me into [the] possession" of California's election officials. 52 U.S.C. § 20701. It is therefore not a record "required by section 20701 . . . to be retained and preserved," *id.* § 20703, and thus not within the scope of the Attorney General's demand authority under Title III.

The Court should reject DOJ's effort to recast Title III in a broader fashion than its text can support. The "cardinal principle" of statutory interpretation is "that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Accordingly, Congress's choice to draft Title III to specifically reach only records and papers that "come into [the] possession" of election officials must be accorded respect and given its plain meaning. That is particularly so because Congress had "obvious alternative" language at its disposal, *Union Pac. R.R. Co. v. United States*, 865 F.3d 1045, 1050 (8th Cir. 2017), namely papers and records "in the possession" of election officials, rather than those that "come into" possession of such officials.

Indeed, Congress frequently employs the phrase "in the possession of" when it means to do so. *See, e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a); 18 U.S.C. §§ 3500(a)–(b), 1968(f)(3)–(4); 7 U.S.C. § 12(e); 49 U.S.C. § 47124a(b)(1). By contrast, in the comparatively few instances where Congress has employed the phrase "come into his possession," it has done so in contexts where, as here, it was referring to materials that an individual or entity received from an outside source. *See, e.g.*, 18 U.S.C. §§ 1703(a), 1709 (prohibiting a postal employee from stealing or destroying postal material that "comes into his possession"); 50 U.S.C. § 217 (requiring a soldier to turn over captured or abandoned property that "comes into his possession"); 13 U.S.C. § 214 (prohibiting a census worker from publishing or disclosing material that "comes into his possession"). As the Ninth Circuit has noted: "Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different meanings." *Grand Canyon Univ. v. Cardona*, 121 F.4th 717, 725 (9th Cir. 2024) (alteration in original) (quoting *Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014)). Congress's meticulous choice to adopt the comparatively rare statutory formulation of "come into [the] possession of" in Title III rather than the broader phrase "in the possession of" carries "the natural implication . . . that it did not intend the alternative." *Union Pac. R.R. Co.*, 865 F.3d at 1050 (citing *Advoc. Health Care Network*

14

ER-248

*v. Stapleton*, 581 U.S. 468, 477 (2017)). Put simply, if Congress had wanted Title III to be read as DOJ requests, Congress would have written Title III that way. To interpret such phrases identically—which is what DOJ seeks—would strip the CRA's text of its intended meaning.

Once the statute is properly construed, DOJ's claim collapses. A legion of federal courts—many relying on dictionaries published contemporaneously with the enactment of Title III of the CRA—have held that to "come into possession" of something means to receive, acquire, or obtain it from some other source. *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting *Webster's New International Dictionary* (3d ed., 1966, unabridged))); *United States v. Prasad*, 18 F.4th 313, 319 (9th Cir. 2021) ("The plain meaning of the term 'obtain' is 'to come into possession of" (quoting *Obtain*, *Oxford English Dictionary* (2d ed. 1989)); *United States v. Mohrbacher*, 182 F.3d 1041, 1048 n.5 (9th Cir. 1999) (defining "receive" as "to come into possession of" or to take "into one's possession (something held out or offered by another)" (first quoting *Webster's New International Dictionary* (3d ed., 1986, unabridged), and then quoting *Oxford English Dictionary* (2d ed. 1989))). DOJ has no plausible argument that the Defendants received, obtained, or acquired—*i.e.*, that they "c[a]me into [the] possession of"—the statewide voter registration list. Instead, those officials *created* that voter list themselves.

Further, in striving to give effect to every word and phrase in a statute, a court must consider the "specific context" of the phrase being interpreted and the "broader context of the statute as a whole." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). The specific context of "come into [the] possession" in Title III is that it covers a voter's "application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701.

15

ER-249

These qualifiers are important—each describes discrete documents *submitted by a voter* and other things done *by a voter*. Those actions by voters stand in stark contrast to a *state election official's conduct of creating* a computerized statewide voter list by compiling data from many underlying documents submitted to it *by voters*. *See Fischer*, 603 U.S. at 487 ("[A] word is given more precise content by the neighboring words with which it is associated." (citation modified)).

The broader context of the CRA also supports excluding statewide voter registration lists from the reach of Title III in the circumstances specifically at issue here—where DOJ has never alleged that it is in fact investigating a Civil Rights Act violation, but instead has claimed to be enforcing NVRA or HAVA. Congress created Title III as a tool to detect voting-related racial discrimination—*not to ascertain compliance with the NVRA or HAVA*. *See supra* Argument § I.C.1. In fact, it was not until 2002—decades after Title III's enactment—when Congress enacted HAVA that states were first tasked with creating and maintaining "a single, uniform, official, centralized, interactive computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1)(A), yet this is exactly what DOJ now seeks from California under Title III. And even then, Congress made it clear that the list was to be maintained "at the State level." *Id.* Congress simply could not have foreseen in 1960 the modern explosion in computing technology—and all the privacy and data security problems brought with it— and so could not have crafted Title III with the intent to grant DOJ unfettered access to the vast amount of sensitive voter data now contained on states' secure computer databases, which themselves would not even come to exist until decades after Title III was enacted. *Cf. Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 353 n.5 (1999) (supporting statutory interpretation with observation that "Congress could not have foreseen" technological changes in drafting legislation in the 1940s); *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1238 (D.C. Cir. 2003) (narrowly reading statutory subpoena power with observation that the technology at issue was "not even a glimmer in anyone's eye" when Congress drafted the statute).

16

### 3. DOJ lacks a proper basis and purpose to demand records under Title III.

Because its statutory text does not reach California's statewide voter registration list as a covered record or paper, the Court need go no further to deny DOJ's assertion that Title III authorizes its demand for the statewide list. But DOJ's Title III argument fails for an additional and independent reason: the statute requires DOJ to articulate a "basis *and* the purpose" for demanding records. 52 U.S.C. § 20703 (emphasis added). DOJ's demand fails on both counts.

*First*, DOJ has not even bothered to try to articulate any basis to believe that California has denied the right to vote or otherwise violated federal law. The lack of any stated basis for investigating California is further highlighted by the fact that DOJ has made what appear to be near carbon copy demands to over forty other states and has sued eight states with complaints that contain nearly identical boilerplate claims and allegations. *See supra* Background § II. This nationwide effort to collect state voter registration lists undermines any notion that DOJ has a cognizable "basis" for investigating California specifically that would be recognized as valid under the Civil Rights Act. "Simply put, [DOJ's demand] does not identify what conduct, it believes, constitutes an alleged violation." *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018).

*Second*, DOJ's stated purpose for issuing the demand to California—"to assist in our determination of whether California's list maintenance program complies with the NVRA," ECF No. 37-2 at 21—is not sufficient under Title III, which is meant to permit DOJ to review voting records for "question[s] concerning infringement or denial of [a person's] constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see also CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690–91 (D.C. Cir. 2017) (rejecting "perfunctory" statement of purpose in issuing civil investigative demand, reasoning agencies are "not afforded unfettered authority to cast about for potential wrongdoing") (citation modified). That is, Title III's "purpose is to

17

ER-251

enable the Attorney General to determine whether" a suit to enforce the CRA is appropriate, *Lynd*, 306 F.2d at 228—not to ascertain compliance with distinct laws with their own enforcement mechanisms including—in the NVRA's case—disclosure provisions.[7] Throughout its correspondence and Complaint, DOJ has yet to cite a single instance in the 65 years of Title III's existence in which the agency issued a demand for records under Title III that did not relate to investigating the "infringement or denial of their constitutional voting rights." *Id*. NAACP-SIREN Proposed Intervenors are aware of no such example.[8]

Further, even if ascertaining California's compliance with the NVRA and HAVA were a proper purpose for invoking Title III, California's full unredacted voter list is unnecessary for DOJ to evaluate California's list maintenance efforts under the NVRA and HAVA. Both statutes grant states wide discretion: State efforts under the NVRA must only be "reasonable," 52 U.S.C. § 20507(a)(4), and HAVA explicitly commits "specific choices . . . to the discretion of the State." *Id.* § 21085. Secretary Weber has already offered to permit DOJ to inspect a copy of California's voter file without the sensitive personal information protected by California law and exempt from disclosure under the NVRA. *See supra* Background § II. Rather than take her up on the offer, DOJ filed this lawsuit. In doing so, DOJ never bothered to explain why it specifically requires California voters' driver's license numbers, full dates of birth, or social security numbers—*in addition* to all the other information on the voter list that California already

---

[7] Indeed, in its initial letter to California, DOJ never even mentioned the Civil Rights Act of 1960. *See generally* Brudigam Decl. Ex. 1, at 6–8

[8] While some of the 1960s-era cases that interpreted Title III included language indicating broad deference to the Attorney General's statement of a "basis and . . . purpose" for requesting records, *see Lynd*, 306 F.2d at 226 (quoting 42 U.S.C. § 1974b, recodified at 52 U.S.C. § 20703), those cases involved circumstances where Title III was being used for its intended purpose: investigations into the potential denial of voting rights on account of race. Those prior cases are thus fundamentally different than the circumstances here, where DOJ has offered no justifiable basis to support the need for records to evaluate compliance with two *other* statutes.

18

ER-252

offered to disclose—to ascertain California's compliance with the NVRA and HAVA. Considering all the circumstances of DOJ's demand, the only conclusion that can be drawn is that DOJ can articulate no reasonable basis to justify a fishing expedition regarding California's compliance with the NVRA and HAVA. *See In re Admin. Subpoena No. 25-1431-019*, No. 1:25-MC-91324-MJJ, 2025 WL 2607784, at \*5 (D. Mass. Sept. 9, 2025) (quashing subpoena when DOJ "failed to show proper purpose" under the statutory scheme, rejecting notion that "the Government's self-proclaimed say-so" is sufficient to "preclude any form of judicial review").[9]

### 4. Title III does not prohibit redacting sensitive voter information.

Aside from whether DOJ can validly invoke Title III to demand California's unredacted voter list, Title III does not require the production of sensitive and personal voter information. As the Fifth Circuit has explained, Title III is intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," but not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. The information that DOJ seeks here is not material typically "open to legitimate reasonable inspection." *Id.* To the contrary, it seeks highly sensitive information that is typically safeguarded from prying eyes under both federal and state law. *See, e.g.*, 5 U.S.C. § 552a; 18 U.S.C. § 2721; Cal. Elec. Code § 2194(b)(1)–(2). And since driver's license numbers and partial social security numbers were not required on voter registration forms until HAVA was enacted in 2002, *see* 52 U.S.C. § 21083(a)(5)(A)(i), the Congress that enacted Title III four decades prior would not have intended the statute's reach to extend to disclosure of such information. That reinforces the fact that, as with the NVRA, states are free to

---

[9] Indeed, an attorney in DOJ's voting rights section told *The New York Times* that DOJ was "dishonest" in describing the purpose for its requests for state voter data. Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://perma.cc/K63M-TZKV.

adhere to their own state laws requiring that they redact sensitive, personal information when producing documents under Title III.

## II.     DOJ has not stated any other claim for relief.

The only clear request for relief in the Complaint is DOJ's demand for California's statewide voter registration list. Compl. at 16, Prayer for Relief, ¶ 5. But the Complaint also alleges that California refused to "provide sufficient responses to the United States's specific inquiries regarding its maintenance procedures." Compl. ¶ 53. This apparently refers to DOJ's questions to California regarding the state's EAVS responses and list maintenance practices. *See* Compl. ¶ 53. To the extent that these vaguely alleged deficiencies are meant to constitute a claim for relief under the NVRA or HAVA, they fail.

California has no statutory obligation to answer DOJ's questions *at all*. Through the NVRA and HAVA, Congress charged states with making "reasonable effort[s]" to perform list maintenance, 52 U.S.C. § 20507(a)(4); *id.* § 21083(a)(1)(A), but Congress never required states to report the results of that maintenance to DOJ or submit to DOJ's inquiries about their list maintenance activities. Regulations instead require states to provide certain information *to the EAC*, not DOJ, *see supra* note 5 (citing 11 C.F.R. 9428.7), and DOJ's NVRA claim does not allege that the information that California provided the EAC was insufficient or otherwise violated this regulation. In fact, DOJ does not cite the regulation, nor claim any authority to enforce it. It certainly does not point to any instance in which it compelled a state to answer its questions about the state's EAVS survey responses. Accordingly, Secretary Read's decision not to answer DOJ's questions does not constitute a violation of the NVRA or HAVA or form a basis for relief.

DOJ attempts to fall back on its general enforcement authority under the NVRA and HAVA, Compl. ¶¶ 1, 3, 51 (citing 52 U.S.C. §§ 20510(a), 21111), but that authority simply permits DOJ to bring suits to address plausibly alleged *violations* of those statutes. *See Harkless v. Brunner*, 545 F.3d 445, 450 (6th Cir. 2008) ("The NVRA authorizes judicial intervention if a state fails to comply with its terms."). Here, DOJ does not allege

20

that California has *violated* any of its obligations under the NVRA or HAVA in connection with its EAVS survey responses; instead, it claims to seek information to prospectively determine Defendants' compliance with the list maintenance requirements of the NVRA and HAVA, Compl. ¶¶ 56, 63, as it has done with dozens of other states, *see supra* Background § II. DOJ's argument gets things backwards—DOJ cannot sue California (or any other state) as part of a roaming inquiry for noncompliance with federal law; rather, the Attorney General can file suit when she can plausibly allege that the substantive terms of the NVRA or HAVA have been violated. *See Webb*, 999 F.3d at 1204; *McCloskey*, 446 F.3d at 271. She has plainly not done so here.

## CONCLUSION

For the reasons above, NAACP-SIREN Proposed Intervenors respectfully request that the Court dismiss the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Dated: November 17, 2025              Respectfully submitted,

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri (CA Bar No. 301236)
Jacob D. Shelly* (DC Bar No. 90010127)
Christopher D. Dodge* (DC Bar No. 90011587)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498
lmadduri@elias.law
jshelly@elias.law
cdodge@elias.law

Tyler L. Bishop (CA Bar No. 337546)
Walter McKusick* (WA Bar No. 63205)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100

21

ER-255

Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law
wmckusick@elias.law

Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
omar@qureshi.law
max@qureshi.law

*Counsel for Proposed Intervenor-Defendants NAACP, NAACP California-Hawaii State Conference, and California Alliance for Retired Americans*

* *Admitted pro hac vice*

Case 2:25-cv-09149-DOC-ADS   Document 37-2   Filed 11/07/25   Page 23 of 237   Page ID #:355

# EXHIBIT 6

ER-257



**SHIRLEY N. WEBER, Ph.D.** | SECRETARY OF STATE | STATE OF CALIFORNIA

LEGAL AFFAIRS OFFICE

1500 11th Street | Sacramento, CA 95814 | 916.695-1242 | www.sos.ca.gov

August 21, 2025

<u>Via Mail and Email</u>

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW-4CON
Washington, DC 20530
Michael.Gates2@usdoj.gov
Maureen.Riordan2@usdoj.gov

Dear Ms. Dhillon:

I write in response to your August 13, 2025 letter regarding the U.S. Department of Justice's (DOJ) request for a copy of California's voter registration list and associated voter registration records.

DOJ's July 10 and July 29 letters both invoked the National Voter Registration Act's (NVRA) public inspection provision, 52 U.S.C. § 20507(i), in requesting that California provide a copy of its voter registration list. On August 8, I informed your office that we have made available for public inspection a copy of California's voter registration list at my office in Sacramento, with appropriate redactions of social security numbers, driver's license numbers, and similar protected personal identifying information as required under California law and allowed under the NVRA. Despite our invitation, you have not yet made an appointment for the inspection.

My office remains willing and available to facilitate your inspection of the redacted voter file; however, your letter fails to establish a sound legal basis to demand anything more.

> **1. DOJ Has Not Established Legal Authority to Request the Unredacted Voter File Containing Sensitive Personal Identifying Information of Millions of Californians.**

Your August 13 letter—for the first time—references the Help America Vote Act (HAVA) and the Civil Rights Act of 1960 (CRA). But neither statute supports your office's sweeping request. HAVA gives the Attorney General authority to enforce the "uniform and nondiscriminatory election technology and administration requirements" set out in that Act. 52 U.S.C. § 21111. California carefully complies with every HAVA requirement and stands ready to demonstrate

ER-258

this compliance through its documented policies and practices, should your office so request. Notably, your letter gives no basis for suspecting any shortcoming or failure in California's HAVA compliance, nor suggests that DOJ is actually investigating any alleged HAVA violation.

The CRA also does not authorize your office's sweeping request for all California voters' sensitive, personal identifying information linked to their voter registration. As you note, to validly request election records under the CRA, your office must provide "a statement of the basis and the purpose" of the request. 52 U.S.C. § 20703. Your August 13 letter asserts that the purpose of DOJ's request for the unredacted voter file is "to assist in [DOJ's] determination of whether California's list maintenance program complies with the NVRA." But demonstrating compliance with the NVRA's list maintenance requirements does not require production of sensitive and confidential records of millions of Californians. And your communications with my office articulate no basis for even suspecting a violation of the NVRA, much less a reason why DOJ needs access to confidential voter data to evaluate our list maintenance program.

As you know, the NVRA does not give DOJ general supervisory power over the accuracy of each record in the voter file. Rather, Congress deliberately left the primary responsibility to manage voter lists in the hands of the States, subject to protections against unjustified voter purges and the requirement that States "conduct a general program" to remove voters who become ineligible due to death or change in residence. 52 U.S.C. § 20507(a)(4). To satisfy the NVRA's list maintenance obligations, a State must simply "establish a program that makes a rational and sensible attempt to remove" registrants who have died or moved. *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025) (rejecting the argument that the adequacy of a list maintenance program should be judged by statistical indicia).

Because the protected, sensitive data of millions of California voters is not facially germane to an investigation of the State's list maintenance practices, and your office has not provided any other basis or purpose for requesting this confidential data, the CRA does not require its production. *See* 52 U.S.C. § 20703.

DOJ's request to California also does not come in a vacuum. Our sister States have informed us, along with reporting by media outlets, that DOJ is seeking voter registration lists from all 50 States. I understand that many States received letters nearly identical to the August 13 letter sent to my office, each demanding substantially identical data. This nationwide effort undermines DOJ's claim that its data request is necessary for an investigation of *California's* NVRA compliance. Thus, it appears that your requests are not part of any good faith investigation into California's—or any State's—compliance with the NVRA, but rather some undisclosed purpose.

2. **California Law Protecting Voters' Sensitive Identifying Information is Not Preempted in these Circumstances.**

As I informed your office in my August 8, 2025 letter, the Secretary of State is required under California law to redact certain information from the copy of the voter registration list which has

ER-259

been made available for inspection, including social security numbers, driver's license numbers, and contact information of confidential voters like victims of domestic violence.  Cal. Elec. Code § 2194; Cal. Gov. Code § 7924.000(b); Cal. Elec. Code §§ 2166, 2166.5, 2166.7, 2166.8; *see also* Cal. Const. art. I, § 1.

These legal protections are not preempted by the NVRA, which does not require the disclosure of sensitive personal identifying information. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases).  Nor are they preempted by HAVA, which does not contain any inspection provision and thus does not obligate California to make any records available to DOJ.  *See* 52 U.S.C. § 21111.  Finally, these legal protections are not displaced by DOJ's mere citation to the CRA, particularly when DOJ has not stated a valid purpose and basis for accessing this sensitive and confidential personal data.  *See* 52 U.S.C. § 20703.

### 3.  DOJ Has Not Demonstrated that Its Data Request Complies with the Privacy Act.

Finally, from DOJ's correspondence, we understand that DOJ is creating a system of records of California voters (and, apparently, all voters nationwide), which is subject to the Privacy Act of 1974.  As I requested in my August 8 letter—but so far have received no response—please explain in detail how DOJ's request complies with the Privacy Act.  Specifically, please explain:

1) DOJ's purpose for creating this system of records, including a citation to the notice published in the Federal Register, as required under 5 U.S.C. § 552a(e)(4);
2) Any currently planned or foreseen transfer of the records outside of DOJ's Voting Rights Section and your basis for believing that such a transfer complies with the Privacy Act;
3) How California's voter registration list is necessary and relevant to the reason DOJ is compiling this system of records;
4) How the system of records DOJ is establishing complies with the prohibition in 5 U.S.C. § 552a(e)(7) on maintaining records "describing how any individual exercises rights guaranteed by the First Amendment," considering that voter registration lists include party affiliation and voter participation history, *see id.*; and
5) What, if any, measures DOJ is taking to ensure the new system of records will be maintained with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination."  5 U.S.C. § 552a(e)(5).

Before my office allows DOJ to make a copy of any part of the voter registration list, we must confirm that DOJ's collection of this data is permitted under the Privacy Act.  Additionally, as I informed your office in my August 8 letter, prior to DOJ making copies of any voter file records, we require that DOJ enter into a Memorandum of Understanding with my office to ensure that

the handling of the data meets the standards of California law, the Privacy Act, and any other applicable protections.[1]

Please do not hesitate to contact my office regarding when you plan to visit Sacramento to review the voter registration information.

Respectfully,

/s/ Shirley N. Weber

Shirley N. Weber, Ph.D.
California Secretary of State

---

[1] There is no legal basis for your claim that DOJ is entitled to receive the records in electronic form.  The NVRA and the CRA require States to allow inspection and copying of the records, but no more than that.  52 U.S.C. § 20507(i)(1) (requiring States to make covered records "available for public inspection and, where available, photocopying at a reasonable cost"); *id.* § 20703 (requiring the records custodian to make covered records "available for inspection, reproduction, and copying at the principal office of such custodian").  Permitting your inspection satisfies our legal obligations under these statutes and ensures that my office complies with legal protections for voter registration data under California and federal law.

ER-261

Case 2:25-cv-09149-DOC-ADS    Document 37-2    Filed 11/07/25    Page 19 of 237   Page ID #:351

# EXHIBIT 5

ER-262



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**August 13, 2025**

<u>Via Mail and Email</u>

The Honorable Shirley N. Weber
c/o Legal Affairs Office
Office of the Secretary of State
State of California
1500 11th Street
Sacramento, CA 95814
Secretary.weber@sos.ca.gov
legalsupport@sos.ca.gov

Re:    **California Voter Registration List and Other Disclosures**

Secretary Weber:

This letter responds to your letter of August 8, 2025.  This communication is limited to our request for the State of California's voter registration list ("VRL") and associated voter registration records and does not include the Justice Department's response to your partial answers to the inquiries about California's VRL maintenance processes.  That response will come later.

Our July 10, 2025, letter requested California's VRL to assess the State's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*.  Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq*., also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements.  *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C.

ER-263

§ 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

As the plain language of the statute makes clear, California cannot limit the Justice Department's access to mere inspection of the requested voter registration records; the Justice Department is entitled to a full and complete copy of those records in the form in which California maintains them, including in electronic form pursuant to HAVA.

As required by Section 303 of the CRA, our letter dated July 10, 2025, provided you with "a statement of the basis and the purpose therefore," *id.*, namely, to assist in our determination of whether California's list maintenance program complies with the NVRA. At your request, we have reaffirmed that statement in this correspondence.

When providing the electronic copy of the statewide VRL, California must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

In addition to the full electronic VRL, we also request by this letter a copy of all original and completed voter registration applications submitted to the State of California from December 1, 2023, through July 1, 2025. To be clear, that means copies of all voter registration applications completed and submitted by prospective voters during that time period. When providing a copy of the requested completed registration applications, California must ensure that they are provided in unredacted format.

Your letter dated August 8, 2025, also indicated concern regarding federal privacy protections of the VRL and other requested information by the Justice Department. Section 304 of the CRA provides the answer:

Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

ER-264

General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. As you noted, other federal laws may be applicable, including the Privacy Act. California's privacy laws, to the extent they are inconsistent with federal law, are preempted.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522(a) note); 52 U.S.C. § 21083(c)).  In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing.

To that end, provide the requested electronic Voter Registration List[2] to the Justice Department within seven days or by August 21, 2025, and provide all original and completed voter registration applications submitted to the State of California from December 1, 2023, through July 1, 2025, to the Justice Department by September 12, 2025.

California's VRL and the requested original and completed voter registration applications may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS").  Please be advised that failure by California to provide its statewide VRL may result in legal action. Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Jana Lean
       Chief of Elections
       1500 11th Street, 5th Floor
       Sacramento, CA 95814
       jana.lean@sos.ca.gov

---

[2] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Case 2:25-cv-09149-DOC-ADS    Document 37-2    Filed 11/07/25    Page 5 of 237   Page
ID #:337

# EXHIBIT 1

ER-266

**U.S. Department of Justice**

Civil Rights Division

---

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 10, 2025

<u>Via Mail and Email</u>

The Honorable Shirley Weber
Secretary of State
1500 11th Street
Sacramento, CA 95814
secretary.weber@sos.ca.gov

Dear Secretary of State Weber:

We write to you as the chief election official for the State of California to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing California's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by California officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

The current electronic copy of California's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

ER-267

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In the EAVS data for Question A3d, California had 2,178,551 voters (15.6 percent) with duplicate registrations. However, seven counties failed to provide data regarding duplicate registrations. Please provide a list of all duplicate registration records in Imperial, Los Angeles, Napa, Nevada, San Bernardino, Siskiyou, and Stanislaus counties.

2. No data was listed in the EAVS survey for Question A12h for California regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list including the date(s) of removal. If they were merged or linked with another record, please provide that information. Please explain California's process for determining duplicates and what happens to the duplicate registrations.

3. In the EAVS data for Question QA12c, California had 378,349 voters (11.9 percent) removed because of death, which was well below the national average. Please provide a list of all registrations that were cancelled because of death. Please explain California's process for determining who is deceased and removing them from the voter roll and when that occurs.

4. Confirmation Notice data was missing in the EAVS survey for Questions A10a through A10f for several counties in California. Please provide the data for each county in California for Questions A10a through A10f.

5. The 2022 EAVS report contained 4,984,314 inactive voters, while the 2024 report contained 2,883,995. Please explain the reason for the change in the number of inactive registrations for these years.

6. A list of all registrations, including date of birth, driver's license number, and last four digits of Social Security Number, that were cancelled due to non-citizenship of the registrant.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

2

ER-268

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Cc:    Jana Lean
       Chief of Elections
       1500 11th Street, 5th Floor
       Sacramento, CA 95814
       jana.lean@sos.ca.gov

3

ER-269

ROB BONTA
Attorney General of California
R. MATTHEW WISE
SETH E. GOLDSTEIN
Supervising Deputy Attorneys General
ROBERT WILLIAM SETRAKIAN (SBN 335045)
ANNE P. BELLOWS (SBN 293722)
LISA C. EHRLICH (SBN 270842)
MICHAEL S. COHEN (SBN 339846)
KEVIN L. QUADE (SBN 285197)
WILLIAM BELLAMY (SBN 347029)
MALCOLM A. BRUDIGAM (SBN 323707)
Deputy Attorneys General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone: (916) 210-7873
 Fax: (916) 454-8171
 E-mail: Malcolm.Brudigam@doj.ca.gov
*Attorneys for Defendants Shirley Weber, in her*
*official capacity as the California Secretary of*
*State, and the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the STATE OF CALIFORNIA,**<br><br>Defendants. | Case No. 2:25-cv-09149-DOC-ADS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date: Monday, Dec. 8, 2025<br>Time: 8:30 a.m.<br>Courtroom: 10A<br>Judge: Hon. David O. Carter<br>Trial Date: None set.<br>Action Filed: Sept. 25, 2025 |

ER-270

**TABLE OF CONTENTS**

                                                                              **Page**

Introduction ......................................................................................... 1

Factual Background ............................................................................. 3

Legal Standard ................................................................................... 5

Argument ........................................................................................... 5

    I.    DOJ Has Failed to Assert Cognizable Legal Claims ................... 5

        A.    DOJ's CRA Claim Fails on Both Jurisdictional and Substantive Grounds ................................................... 5

            1.    Title III of the CRA ............................................ 5

            2.    This court lacks jurisdiction to compel relief .................. 6

            3.    DOJ's demand for records fails to satisfy an essential statutory requirement ......................................... 7

            4.    DOJ cannot invoke Title III to investigate issues unrelated to civil rights ......................................... 8

            5.    DOJ is only entitled to in-person, redacted inspection of records covered by Title III ..................... 11

        B.    DOJ Has Not Asserted a Cognizable Claim Under the NVRA .............................................................. 13

            1.    The Secretary has complied with the NVRA .................. 13

            2.    The NVRA does not preempt California law .................. 14

        C.    DOJ Has Not Asserted a Cognizable Claim Under HAVA ..... 16

            1.    HAVA has no disclosure provisions at all ..................... 17

            2.    DOJ fails to allege any other violation of HAVA .......... 18

            3.    HAVA does not preempt California law ........................ 19

    II.    DOJ Has Not Alleged Compliance with Federal Privacy Laws ......... 20

        A.    DOJ's Hunt for Data Violates the Privacy Act ....................... 20

        B.    DOJ's Data Demand Violates the E-Government Act ............. 23

        C.    DOJ's Demand Violates the Driver's Privacy Protection Act ................................................................ 24

Conclusion ........................................................................................ 25

ER-271

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*
   778 F. Supp. 3d 685 (D. Md. 2025) ....................................................23

*American Civil Rights Union v. Philadelphia City Commissioners*
   872 F.3d 175 (3d Cir. 2017) ............................................................20

*Arizona v. Inter Tribal Council of Arizona, Inc.*
   570 U.S. 1 (2013) ...........................................................................12

*Atlas Data Priv. Corp. v. We Inform, LLC*
   2025 WL 2444153 (D.N.J. Aug. 25, 2025) ........................................15

*Avila v. Spokane Sch. Dist. 81*
   852 F.3d 936 (9th Cir. 2017) ..............................................................9

*Bellitto v. Snipes*
   935 F.3d 1192 (11th Cir. 2019) ....................................................16, 17

*Brusseau v. Dep't of Homeland Sec.*
   2021 WL 3174248 (E.D. Va. July 27, 2021) ......................................23

*Buckley v. Am. Const. L. Found., Inc.*
   525 U.S. 182 (1999) .........................................................................22

*Bufkin v. Collins*
   604 U.S. 369 (2025) ...........................................................................8

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*
   824 F.3d 1156 (9th Cir. 2016) .............................................................5

*Colón-Marrero v. Vélez*
   813 F.3d 1 (1st Cir. 2016) .................................................................19

*Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*
   963 F.3d 982 (9th Cir. 2020) ..............................................................7

*Crowley v. Nev. ex rel. Nev. Sec'y of State*
   678 F.3d 730 (9th Cir. 2012) .............................................................17

ER-272

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Dittman v. California*
191 F.3d 1020 (1999) ...............................................................................23

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.*
470 F.3d 827 (9th Cir. 2006) ..................................................................... 9

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election
Integrity*
266 F. Supp. 3d 297 (D.D.C. 2017) .......................................................24

*Fla. State Conf. of N.A.A.C.P. v. Browning*
522 F.3d 1153 (11th Cir. 2008)...............................................................17

*Garris v. Fed. Bureau of Investigation*
937 F.3d 1284 (9th Cir. 2019)..................................................................22

*Gonzalez v. Arizona*
677 F.3d 383 (9th Cir. 2012).............................................................12, 15

*Greater Birmingham Ministries v. Sec'y of State for Ala.*
105 F.4th 1324 (11th Cir. 2024)..............................................................14

*Husted v. A. Philip Randolph Inst.*
584 U.S. 756 (2018) .................................................................................13

*In re Coleman*
208 F. Supp. 199 (S.D. Miss. 1962)....................................................7, 10

*In re Saldana*
122 F.4th 333 (9th Cir. 2024)................................................................... 8

*Kennedy v. Bruce*
298 F.2d 860 (5th Cir. 1962).................................................................10

*Kennedy v. Lynd*
306 F.2d 222 (5th Cir. 1962).............................................................7, 10

*Khoja v. Orexigen Therapeutics, Inc.*
899 F.3d 988 (9th Cir. 2018)................................................................. 3

ER-273

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Oklahoma v. Castro-Huerta*
    597 U.S. 629 (2022) ................................................................... 18

*Pac. Coast Fed'n of Fishermen's Assocs., Inc. v. Nickels*
    150 F.4th 1260 (9th Cir. 2025) ................................................... 8

*Peters v. United States*
    853 F.2d 692 (9th Cir. 1988) ..................................................... 18

*Project Vote/Voting for Am., Inc. v. Long*
    752 F. Supp. 2d 697 (E.D. Va. 2010) ......................................... 14

*Pub. Int. Legal Found., Inc. v. Bellows*
    92 F.4th 36 (1st Cir. 2024) ........................................... 12, 14, 15

*Pub. Int. Legal Found, Inc. v. Benson*
    136 F.4th 613 (6th Cir. 2025) ............................................ 16, 17

*Pub. Int. Legal Found., Inc. v. Dahlstrom*
    673 F. Supp. 3d 1004 (D. Alaska 2023) ..................................... 21

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*
    996 F.3d 257 (4th Cir. 2021) ........................................ 14, 15, 21

*Reno v. Condon*
    528 U.S. 141 (2000) ................................................................... 24

*Ritter v. United States*
    177 Fed. Cl. 84 (2025) ............................................................... 21

*Rivera v. Peri & Sons Farms, Inc.*
    735 F.3d 892 (9th Cir. 2013) ..................................................... 23

*Rutan v. Republican Party of Illinois*
    497 U.S. 62 (1990) ..................................................................... 22

*Safe Air for Everyone v. Meyer*
    373 F.3d 1035 (9th Cir. 2004) ..................................................... 5

*Sams v. Yahoo! Inc.*
    713 F.3d 1175 (9th Cir. 2013) ................................................... 20

# TABLE OF AUTHORITIES
## (continued)

Page

*Senne v. Vill. of Palatine, Ill.*
  695 F.3d 597 (7th Cir. 2012) (en banc) ............................................................... 25

*State of Ala. ex rel. Gallion v. Rogers*
  187 F. Supp. 848 (M.D. Ala. 1960) .................................................................. 6, 9

*True the Vote v. Hosemann*
  43 F. Supp. 3d 693 (S.D. Miss. 2014) ............................................................ 14, 21

*U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*
  931 F.3d 966 (9th Cir. 2019) ............................................................................. 20

*United States v. Brumbaugh*
  139 F.4th 1077 (9th Cir. 2025) ............................................................................ 6

*United States v. Lynd*
  301 F.2d 818 (5th Cir. 1962) ............................................................................. 10

*United States v. Ritchie*
  342 F.3d 903 (9th Cir. 2003) ............................................................................... 3

*United Steelworkers of Am., AFL-CIO-CLC v. Weber*
  443 U.S. 193 (1979) ............................................................................................ 8

*Voting Rights Coal. v. Wilson*
  60 F.3d 1411 (9th Cir. 1995) ............................................................................. 12

*Yim v. City of Seattle*
  63 F.4th 783 (9th Cir. 2023) ............................................................................. 15

STATUTES

5 U.S.C.
  § 552a(a)(3) ......................................................................................................... 21
  § 552a(a)(4) ......................................................................................................... 21
  § 552a(a)(5) ......................................................................................................... 21
  § 552a(e)(4) .............................................................................................. 21, 23, 24
  § 552a(e)(4)(D) .................................................................................................... 23
  § 552a(e)(7) .............................................................................................. 21, 22, 23
  § 552a(f) .............................................................................................................. 21

ER-275

# TABLE OF AUTHORITIES
## (continued)

Page

18 U.S.C.
§ 2721(a) .................................................................................................... 24
§ 2721(b)(1) ............................................................................................... 25
§ 2721(c) .................................................................................................... 25
§ 2725 ........................................................................................................ 24

52 U.S.C.
§ 20504 ...................................................................................................... 25
§ 20507(i) ........................................................................................... 3, 13, 15
§ 20507(i)(1) .............................................................................................. 13
§ 20507(a)(4) ..................................................................................... *passim*
§ 20701 .................................................................................................. 6, 12
§ 20703 .............................................................................................. *passim*
§ 20705 ................................................................................................... 6, 7
§ 20901 ...................................................................................................... 17
§ 21081 ...................................................................................................... 17
§ 21083 ...................................................................................................... 17
§ 21083(a)(2) ............................................................................................. 22
§ 21083(a)(2)(A)(ii) ................................................................................... 20
§ 21083(a)(2)(B)(ii)-(iii) ............................................................................ 19
§ 21083(a)(4) ............................................................................................. 22
§ 21083(a)(5)(A) ................................................................................... 18, 19
§ 21083(a)(5)(A)(iii) .................................................................................. 19
§ 21085 ................................................................................................. 17, 19
§ 21111 ................................................................................................. 17, 18

California Elections Code
§ 2166 ........................................................................................................ 11
§ 2166.5 ..................................................................................................... 11
§ 2166.7 ..................................................................................................... 11
§ 2166.8 ..................................................................................................... 11
§ 2194(b)(1) ............................................................................... 1, 11, 15, 21
§ 2200-2214 ............................................................................................... 13
§ 2220-2227 ............................................................................................... 13
§ 2265(b) .................................................................................................... 25

ER-276

# TABLE OF AUTHORITIES
## (continued)

**Page**

California Government Code
§ 7924.000(b)................................................................................... 11
§ 7924.000(b)–(c)............................................................................. 15

E-Government Act, Pub. L. No. 107–347, § 208, 116 Stat. 2899 (2002)............... 24

Pub. L., No. 107–347, § 208(b)(1)(A)(ii)(II) ........................................... 24

**REGULATIONS**

California Code of Regulations, Tile 2
§ 19001(h)..........................................................................14, 16, 21
§ 19074(a)................................................................................ 25

**CONSTITUTIONAL PROVISIONS**

United States Constitution, First Amendment.............................................21, 22, 23

United States Constitution, Article I
§ 4, cl. 1 ................................................................................ 12

**COURT RULES**

Federal Rule of Civil Procedure
§ 12(b)(1)................................................................................5, 7
§ 12(b)(6)................................................................................. 5

**OTHER AUTHORITIES**

OMB Guidance, M-03-22 (Sep. 26, 2003), https://perma.cc/E6PW-YQTP............................................................................... 24

Brief for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 ...........................................................................14, 15

*Basis*, Merriam-Webster Dict., https://www.merriam-webster.com/dictionary/basis ...................................................... 8

*Purpose*, Merriam-Webster Dict., https://www.merriam-webster.com/dictionary/purpose........................................... 7

ER-277

**INTRODUCTION**

In this lawsuit, the U.S. Department of Justice ("DOJ") seeks an order directing the Secretary of State and the State of California (together, "California") to turn over a static, point-in-time copy of California's computerized voter registration list of its nearly 23 million registered voters. Compl. at 16, ¶ 5. It is demanding California do so "with all fields" of information associated with each individual voter's registration record. *Id.* California has not provided access to an entirely unredacted voter list because state law prohibits disclosure of "all fields"— driver's license numbers ("DLNs") and social security numbers ("SSNs"), among other information, "are confidential and shall not be disclosed to any person." Cal. Elec. Code § 2194(b)(1). California is not alone in this refusal. Seven other states and Orange County have been sued by DOJ for taking the same position.

California's refusal was only limited to information protected by state law. The Secretary invited DOJ to inspect the State's entire voter registration list (with appropriate redactions), explained in detail the actions the State takes to maintain the accuracy and currency of the State's voter rolls, and comprehensively answered specific questions posed to the Secretary about data submitted in a biennial federal survey on election administration. These responses are documented in the back-and-forth correspondence beginning in July.

California also asked DOJ sensible questions, such as why there was a need to collect vast amounts of personal information that was unrelated to its voter list maintenance obligations, and how DOJ was complying with other federal laws limiting collection of citizen information. These questions went unanswered. This lawsuit followed.

DOJ is not legally entitled to the sensitive voter information it was denied. Each of DOJ's three claims fall to a collection of defects, none of which can be cured. Beyond its flawed claims, DOJ has not alleged compliance with three federal laws protecting citizens' personal information: the Privacy Act, the E-Government

ER-278

Act, and the Driver's Privacy Protection Act ("DPPA").

In its first count, DOJ tries to invoke Title III of the Civil Rights Act of 1960 ("CRA"), a civil rights era tool that allows the Attorney General to make demands to inspect elections records to enforce voting rights laws. But DOJ fundamentally misunderstands this law's purpose and operation. To start, this Court lacks jurisdiction to compel the requested relief because it is not within the judicial district where the records are located or where the records demand was made. Nor has DOJ satisfied Title III's requirement that it provide a statement of the basis and the purpose for its records demand—indeed, DOJ could not do so, because it is not seeking records for a purpose consistent Title III's narrow scope. Finally, Title III does not preempt California's voter information protections. These laws serve as complementary aspects of the same statutory scheme.

In its second count, DOJ claims it is entitled to the protected voter information under the National Voter Registration Act's ("NVRA") public inspection provision. But California fully complied with this provision when the Secretary invited DOJ to inspect California's voter rolls—DOJ is not entitled to more. Nor does this provision preempt California's voter information protections. These protections can be read harmoniously with the NVRA's disclosure provision, and numerous courts have found that the NVRA permits redactions of highly sensitive voter information.

In its third count, DOJ claims its generic enforcement authority under the Help America Vote Act ("HAVA") empowers it to demand and receive the huge swaths of highly sensitive data requested. No legal authority supports that proposition.

Finally, the Complaint establishes that the DOJ is seeking data protected by the Privacy Act, the E-Government Act, and the DPPA, but it fails to allege its compliance with any of those laws. Each of these federal statutes preclude the DOJ from receiving the records it seeks, making it appropriate for the Court to put an end to the DOJ's improper claims now. The Court should therefore grant California's motion to dismiss the Complaint without leave to amend.

2

## FACTUAL BACKGROUND

Beginning in May of this year, DOJ's Civil Rights Division embarked on a project of requesting the full, unredacted copies of the voter registration rolls maintained from dozens of states across the country.[1] To date, DOJ has filed suit against eight states to compel disclosure of the full, unredacted data in electronic form.[2] California is among the dozens of states targeted by DOJ, and one of the eight to be sued so far.

In July, DOJ sent its first letter[3] to the Secretary demanding an electronic, unredacted, and point-in-time copy of California's statewide voter registration list, which is maintained in a computerized database as required by HAVA. Compl. ¶ 34; Brudigam Decl. Ex. 1. DOJ also asked the Secretary to provide a description of the steps she takes to ensure voter list maintenance is done in accordance with the NVRA and posed questions about California's submissions in response to the U.S. Election Assistance Commission's 2024 Election Administration and Voting Survey (EAVS). Brudigam Decl. Ex. 1. DOJ's stated authority for this initial demand was the NVRA's public inspection provision, 52 U.S.C. § 20507(i).

The Secretary responded on July 22 explaining that she needed more than the 14 days provided by DOJ to respond. Compl. ¶ 35; Brudigam Decl. Ex. 2. A week

---

[1] DOJ letters demanding all statewide voter registration data from 30 states have been collected into Exhibit 17 to the Declaration of Malcolm Brudigam ("Brudigam Decl."). This is not an exhaustive collection. DOJ letters are properly subject to judicial notice, as set out in the Request for Judicial Notice ("RJN") at 3–4, filed herewith. Matters subject to judicial notice may be considered by the Court on a motion to dismiss without converting the motion to one for summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

[2] *United States v. Bellows*, 1:25-cv-00468 (D.Me.) (filed Sep. 16, 2025); *United States v. Oregon*, 6:25-cv-01666 (D.Or.) (filed Sep. 16, 2025); *United States v. Simon*, 0:25-cv-03761 (D. Minn.) (filed Sep. 25, 2025); *United States v. Benson*, 1:25-cv-01148 (W.D. Mich.) (filed Sep. 25, 2025); *United States v. Pennsylvania*, 2:25-cv-01481 (W.D. Penn.) (filed Sep. 25, 2025); *United States v. Bd. Of Elecs.*, 1:25-cv-01338 (N.D.N.Y.) (filed Sep. 25, 2025); *United States v. Scanlan*, 1:25-cv-00371 (D.N.H.) (filed Sep. 25, 2025); *see* RJN at 4–5.

[3] All letters exchanged between the DOJ and California are attached as Exhibits 1–8 to the Brudigam Decl. Because these letters are all referenced in the Complaint and form the basis of the DOJ's claims, *see* Compl. ¶¶ 34–38, 43–44, they are incorporated by reference into the Complaint and properly considered on a motion to dismiss. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

ER-280

later, DOJ sent a second letter demanding immediate responses to some questions, a copy of the statewide voter registration list by August 8, and the remainder of the information by August 29. Compl. ¶ 36; Brudigam Decl. Ex. 3.

On August 8, the Secretary identified documents responsive to DOJ's inquiries and offered to make a copy of California's voter registration list available for inspection at the Secretary's office in Sacramento. Compl. ¶ 37; Brudigam Decl. Ex. 4. The letter noted that, in accordance with California and federal law, certain sensitive information would be redacted, including voters' DLNs and SSNs. Brudigam Decl. Ex. 4.

On August 13, DOJ rejected the Secretary's invitation to inspect the voter registration list. Compl. ¶¶ 38–42; Brudigam Decl. Ex. 5. DOJ reiterated its demand for an unredacted electronic copy of the voter registration list and invoked new legal grounds for its demand—HAVA and Title III of the CRA. Brudigam Decl. Ex. 5. DOJ claimed that the data sought was necessary to "determine whether California's list maintenance program complies with the NVRA." *Id.* The August 13 letter also demanded "a copy of all original and completed voter registration applications submitted to the State of California" from the past two years. *Id.*

On August 21, the Secretary responded to DOJ again inviting it to inspect the California voter registration list at her office. Compl. ¶ 43; Brudigam Decl. Ex. 6. The Secretary explained that Title III of the CRA and HAVA did not apply to DOJ's request and asked DOJ whether its efforts to build a system of records of California voters complied with the Privacy Act. Brudigam Decl. Ex. 6. The Secretary also pointed out that DOJ's efforts to obtain similar data from all 50 states undercut its claim that such data was necessary for an investigation of *California's* NVRA compliance. *Id.*

On August 29, the Secretary sent DOJ a list of election officials responsible for conducting voter registration list maintenance, as requested in its July 10 letter. Compl. ¶ 44; Brudigam Decl. Ex. 7.

4

ER-281

On September 12, the Secretary sent her final letter providing comprehensive responses to every question posed in DOJ's July 10 letter. Compl. ¶ 44; Brudigam Decl. Ex. 8. The Secretary declined to provide copies of every original and completed voter registration application dating back two years, explaining that DOJ failed to cite any applicable legal authority to justify the sweeping request. *Id.* The Secretary again raised questions about DOJ's compliance with federal laws that appeared implicated by its vast collection of voter information. *Id.*

DOJ never responded to the Secretary's August 21, August 29, and September 12 letters, and never coordinated an inspection of California's voter registration list. Instead, on September 25, DOJ sued the Secretary and five other States.

## LEGAL STANDARD

"A complaint may be dismissed for failure to state a claim only when it fails to state a cognizable legal theory or fails to allege sufficient factual support for its legal theories." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016); Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for lack of subject matter jurisdiction if "the allegations contained in a complaint are insufficient on their face to invoke [the court's] jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); Fed. R. Civ. P. 12(b)(1).

## ARGUMENT

### I.    DOJ HAS FAILED TO ASSERT COGNIZABLE LEGAL CLAIMS

DOJ asserts three claims against California: (1) violation of Title III of the CRA; (2) violation of the NVRA; and (3) violation of HAVA. Each claim suffers from multiple fatal flaws that cannot be cured by amendment.

#### A.    DOJ's CRA Claim Fails on Both Jurisdictional and Substantive Grounds

##### 1.    Title III of the CRA

Title III was "designed to secure a more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala.

5

ER-282

1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961). In furtherance of this purpose, Title III imposes document retention requirements on elections officials: "[e]very officer of election," or designated custodian, "shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election" for federal office, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." 52 U.S.C. § 20701; *id.* § 20706.

If certain conditions are met, DOJ may inspect these records. *Id.* § 20703. As relevant here, the Attorney General must present "a statement of the basis and the purpose therefor." *Id.* Title III also includes an enforcement mechanism to compel production of these records. The district court located where the written demand is made, or where the records are located, has "jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705.

### 2. This court lacks jurisdiction to compel relief

DOJ's difficulties in invoking Title III start at the beginning: DOJ has not sued in the correct court. Jurisdiction lies in only the federal judicial district where the written demand was made, or the relevant records are located, 52 U.S.C. § 20705, and this specific jurisdictional statute must control over the Complaint's general jurisdictional citations, otherwise Section 20705's requirement is rendered a nullity. *United States v. Brumbaugh*, 139 F.4th 1077, 1085 (9th Cir. 2025) ("[T]he specific governs the general . . . especially where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solution.")

Here, DOJ sued California in the Central District of California, but DOJ's demand was made to the Secretary at her Sacramento address, and her response stated that the records demanded are in her Sacramento office. Compl. ¶ 37; Brudigam Decl. Exs. 5–6. Thus, this Court lacks jurisdiction under Title III to compel the production of election records. 52 U.S.C. § 20705. This Court should dismiss DOJ's Title III claim without leave to amend. Fed. R. Civ. P. 12(b)(1).

ER-283

### 3.   DOJ's demand for records fails to satisfy an essential statutory requirement

Even if the Court takes jurisdiction to compel relief under Title III, DOJ failed to provide "a statement of the basis *and* the purpose therefor," as the law requires. 52 U.S.C. § 20703 (emphasis added); *Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 990 (9th Cir. 2020) ("[W]hen 'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'"). DOJ has long treated "purpose" and "basis" separately. *See Kennedy v. Lynd*, 306 F.2d 222, 231 n.6 (5th Cir. 1962) (showing a demand by the Attorney General where it stated a basis *and* a purpose); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) (same), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

As an initial matter, DOJ offers no statement of the purpose and the basis for its demand for unredacted copies of all original and completed voter registration applications from December 1, 2023 through July 1, 2025. *See* Compl. ¶¶ 38, 47–48; Brudigam Decl. Exs. 5; 8 at 7–8.

As for its demand for California's entire voter registration list, DOJ alleges that it made a proper demand in its August 13 letter to the Secretary, where it wrote that the "statement of the basis and the purpose" of its demand was "to assist in our determination of whether California's list maintenance program complies with the NVRA." Compl. ¶¶ 38, 47–48; Brudigam Decl. Ex. 5. DOJ's statement amounts, at best, only to a statement of its purpose. *Purpose*, Merriam-Webster Dict., https://www.merriam-webster.com/dictionary/purpose (defining "purpose" as "something set up as an object or end to be attained: intention"). In contrast, a "basis" is "something on which something else is established or based." *Basis*, Merriam-Webster Dict., https://www.merriam-webster.com/dictionary/basis. DOJ's request fails to provide any statement of its grounds for suspecting that California was violating the NVRA or to explain how the requested records are relevant to its

7

ER-284

inquiry. Allowing DOJ to obtain records without such a showing would ignore the canon against surplusage and vitiate Congress's choice in establishing this requirement. *In re Saldana*, 122 F.4th 333, 342–43 (9th Cir. 2024).

### 4. DOJ cannot invoke Title III to investigate issues unrelated to civil rights

DOJ's demand for records also fails to satisfy Title III's requirements because the stated purpose falls outside the scope of the CRA. The CRA's text and history limit Title III to investigations of civil rights violations, namely, efforts to prevent *eligible* voters from voting or registering to vote for illegal reasons like racial discrimination. As shown below, for the "statement of the basis and the purpose" of a Title III demand to be valid, it must relate to a civil rights investigation.

Title III's text provides that the "statement of the basis and the purpose" "shall" be included in a records demand, indicating it is an explicit requirement and precondition. *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command. . . . 'Shall' means 'must.'"). But some statements of basis and purpose—say, bases or purposes unrelated to voting at all—could not suffice, because that would "sap the interpreted provision of all practical significance." *Pac. Coast Fed'n of Fishermen's Assocs., Inc. v. Nickels*, 150 F.4th 1260, 1271, 1273 (9th Cir. 2025). Indeed, "[i]t is a 'familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.'" *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201–02 (1979) (concluding that the "prohibition against racial discrimination in . . . Title VII must therefore be read against the background of [its] legislative history . . . and the historical context from which the Act arose"); *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.*, 470 F.3d 827, 846 (9th Cir. 2006) (applying *Weber*).

The Court must read that text alongside Title III's context and history. *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 941 (9th Cir. 2017). The overwhelming

evidence shows that Title III of the CRA was enacted to facilitate investigation into civil rights violations related to discrimination in voting. A valid "statement of the basis and purpose," then, is one that relates to such an investigation.

Both congressional reports and President Eisenhower's signing statement indicate that the CRA focused on the "key constitutional right of every American, the right to vote without discrimination on account of race or color." Brudigam Decl. Ex. 9 at 1; Ex. 10 at 2 (under "Summary"); Ex. 11 at 1–3; *see also* RJN at 2–3. Title III was enacted to further that overarching goal of the CRA. The year before the CRA's enactment, the President's recommendations to Congress emphasized the "serious obstacle" that insufficient access to voter registration records posed to safeguarding the right to vote under the Civil Rights Act of 1957. Brudigam Decl. Ex. 12 at 2. Once enacted, the President's signing statement recognized that Title III "requires the retention of voting records, [which] will be of invaluable aid in the successful enforcement of existing voting rights statutes." *Id.* Ex. 9 at 1–2.

In fact, all contemporaneous records related to the CRA's enactment strongly indicate that Title III was enacted to build upon the Civil Rights Act of 1957. As a House committee report explained, "Title III is a necessary supplement to part IV of the Civil Rights Act of 1957," and "would implement Federal enforcement" of this prohibition. *Id.* Ex. 11 at 26; *see also* Ex. 15 at Part IV. And the congressional record repeatedly shows that Title III was meant to facilitate the enforcement of the voting rights protections codified in the Civil Rights Act of 1957. *Id.* Ex. 13 at 3683, 3692; Ex. 14 at 5193, 5209; *see also Rogers*, 187 F. Supp. at 853 (finding that the CRA's legislative history "leaves no doubt but that [Title III] is designed to secure a more effective protection of the right to vote"); RJN at 2–3.

Courts construing Title III shortly after it was enacted confirm that its aim was to facilitate protection of the right to vote through the Civil Rights Act of 1957 and the CRA itself. *Lynd*, 306 F.2d at 228 (explaining that the Attorney General "is entitled to inspect and copy all of the voter papers and records as defined" "in

9

ER-286

fulfillment of the duties imposed upon him by the Civil Rights Act of 1957 and 1960”). Valid statements of basis and purpose from the time of enactment were “based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting within your jurisdiction.” *Id.* at 231 n.6; *In re Coleman*, 208 F. Supp. at 199–200. Repeatedly addressing the issue, the Fifth Circuit “laid down the rule that the government is entitled to have an order of the trial court authorizing it to inspect the voting records” based on DOJ’s “reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county.” *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).

No valid civil rights purpose is alleged in DOJ’s Complaint. DOJ’s alleged purpose concerns assessing compliance with the voter registration list maintenance provisions of the NVRA, which requires each state “conduct a general program that makes a reasonable effort to remove the names of” voters who are ineligible due to death or a change in residence. 52 U.S.C. § 20507(a)(4); Compl. ¶ 53. But the mere failure to purge voter registration lists of these ineligible voters for these reasons does not automatically fall within Title III’s scope. *See Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962) (noting that statistical evidence in a Title III proceeding indicating a failure to remove voters who moved away or died was “a matter which does not bear any particular importance to the present inquiry”). DOJ must articulate a purpose and basis that relates to an investigation into civil rights, specifically, discrimination in voting.

Here, DOJ has failed to allege *any* basis for its demand, let alone one stating a reason to believe that discrimination in voting is occurring in California. And DOJ’s alleged purpose is not valid either because DOJ has not articulated how its assessment of California’s compliance with 52 U.S.C. § 20507(a)(4) relates to an investigation into civil rights, and more specifically, discrimination in voting.

ER-287

Nothing in DOJ's Complaint or letters to the Secretary suggests that any of these kinds of allegations could be made.

### 5. DOJ is only entitled to in-person, redacted inspection of records covered by Title III

Even if the Court takes jurisdiction and concludes that Title III authorizes DOJ's demand, and that DOJ can satisfy the statement of the basis and the purpose requirement, DOJ may only inspect a redacted version of California's voter registration list at the Secretary's office in Sacramento.

DOJ is not entitled to inspect an unredacted version of California's voter registration list, which includes voters' "state driver's license number, and the last four digits of their Social Security number." Compl. ¶ 47. California, like most states, prohibits disclosure of sensitive information contained in voter registration records, including SSNs, DLNs, and contact information of confidential voters.[4] Cal. Elec. Code § 2194(b)(1); Cal. Gov't Code § 7924.000(b). DOJ, claiming that such unredacted disclosures are "authorized by 52 U.S.C. § 20703," maintains that these state laws are preempted by the CRA. Compl. ¶ 42; *id.* at 16, ¶ 4. Because both statutory schemes can operate harmoniously, the CRA does not preempt the state laws protecting voter's sensitive information.

The Elections Clause gives States the power to regulate the time, place, or manner of federal congressional elections, and it simultaneously gives Congress the power to "make or alter such [r]egulations." U.S. Const., art I, sec. 4, cl. 1; *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1413–14 (9th Cir. 1995). This scheme gives Congress preemptive power over certain state election law, which is analyzed according to preemption principles specific to the Elections Clause. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9, 13–15 (2013) (*ITCA*). Although

---

[4] Confidential voters include victims of domestic violence, sexual assault, or stalking, public safety officers, election workers, among others, who face life-threatening circumstances to obtain temporary confidential status on voter registration lists. *See* Cal. Elec. Code §§ 2166, 2166.5, 2166.7, 2166.8.

11

ER-288

there is no presumption against preemption for federal laws enacted by Congress under its Elections Clause power, *id.* at 13–15, courts must be attentive to the scope and limits of express requirements set out in federal statute. Congress's authority over federal elections supersedes state law only "so far as it is exercised, and no farther." *Id*. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). If the federal and state provisions can "operate harmoniously in a single procedural scheme," then the state statute is not preempted. *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom*. *ITCA*, 570 U.S. 1 (2013).

Here, Title III does not preempt California's narrow confidentiality protections of voter's sensitive information for several reasons. Title III requires, in response to a proper demand, that the recordkeeper make available "all records . . . relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §§ 20701, 20703. To start, Title III's text does not prohibit the redaction of sensitive voter information. *Cf. Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (finding that "the appropriate redaction of uniquely or highly sensitive personal information in the Voter File" was permissible where the NVRA did not prohibit such redactions). Moreover, Title III's purpose is to enable civil rights investigations into discrimination in voting, but there is no articulated connection between the sensitive voter information DOJ demands and an allegation of or investigation into discrimination in voting. *Compare* Brudigam Decl. Ex. 5 at 2 *with id.* Ex. 15, Part IV. State law thus operates harmoniously with Title III. *See Gonzalez*, 677 F.3d at 394.

Finally, DOJ's demand that it be sent an electronic version of California's statewide voter registration database is contrary to Title III's unambiguous text. Compl. at 16, ¶ 5; Brudigam Decl. Ex. 5. A valid demand would require only that the records "be made available . . . *at the principal office of such custodian*." 52 U.S.C. § 20703 (emphasis added).

12

ER-289

**B.    DOJ Has Not Asserted a Cognizable Claim Under the NVRA**

DOJ has failed to assert a cognizable NVRA claim because the Secretary satisfied all her obligations under the NVRA when she gave DOJ an opportunity to inspect a redacted version of California's voter registration list. As with Title III, California's laws protecting sensitive voter information are not preempted by the NVRA: withholding such information does not frustrate the NVRA's purpose, and both laws can be read as complementary parts of the same statutory scheme.

The NVRA "erect[s] a complex superstructure of federal regulation atop state voter-registration systems." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). As relevant here, it requires States "to 'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible 'by reason of' death or change in residence." *Id.* (quoting 52 U.S.C. § 20507(a)(4)). With help from county elections officials, the Secretary follows a detailed process in state law for ensuring these ineligible voters are removed from voter rolls. Cal. Elec. Code §§ 2200–2214, 2220–2227; Brudigam Decl. Ex. 8.

**1.    The Secretary has complied with the NVRA**

The NVRA requires each State to maintain for at least two years and "make available for *public* inspection"—i.e., to anyone who asks—"all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1) (emphasis added). Here, the Secretary offered DOJ an opportunity to inspect a redacted version of California's voter registration list. Compl. ¶ 37; Brudigam Decl. Exs. 4, 6. This satisfies her obligations under Section 20507(i). And there is no requirement that California provide an electronic version of the records—the NVRA only requires "inspection." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1333 (11th Cir. 2024) ("'[P]ublic inspection' as used in the . . . [NVRA] does not include electronic disclosure").

13

ER-290

Moreover, courts have consistently recognized limitations on disclosing highly sensitive personal information of voters, even after reading the "all records concerning" language broadly. *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266-67 (4th Cir. 2021) ("*N.C. State*"); *Bellows*, 92 F.4th at 47–49, 56; *Greater Birmingham*, 105 F.4th at 1331–32. For example, courts have permitted redactions of SSNs and birthdates. *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 733 (S.D. Miss. 2014). And DOJ itself has previously maintained that the NVRA does not prohibit States from redacting "uniquely sensitive information," such as SSNs, before disclosing records. *Brief for the United States as Amicus Curiae*, *Pub. Int. Legal Found., Inc. v. Bellows* ("*DOJ Amicus Brief*"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28.

At bottom, DOJ sued California because it wants the state's entire unredacted voter registration list in electronic form, using the NVRA as a fig leaf.[5] But neither electronic production nor disclosure of sensitive voter information are required under the NVRA. The latter is explicitly prohibited under California law.

**2.    The NVRA does not preempt California law**

DOJ alleges that California's laws protecting voter's sensitive information are preempted by the NVRA. Compl. ¶ 42; *id.* at 16, ¶ 4. First, as demonstrated immediately above, the NVRA does not compel production of such sensitive information. Even if it did, California's voter information protections do not frustrate the NVRA's purpose and can operate harmoniously with the NVRA's public disclosure requirements.

Under California law, "the California driver's license number, the California identification card number, the social security number, and any other unique identifier used by the State of California for purposes of voter identification. . . , are

---

[5] The "voter registration information" that can be inspected includes birthdates, voter participation history, registration method, registration status, and a host of other information. Cal. Code Regs. tit. 2, § 19001(h).

14

confidential and shall not be disclosed to any person." Cal. Elec. Code § 2194(b)(1); Cal. Gov't Code § 7924.000(b)–(c). There is no conflict with the NVRA's requirements because California law and the NVRA can be construed as part of a "single procedural scheme," with California's voter information protections functioning as an implementing detail. *See Gonzalez*, 677 F.3d at 394. And because courts have concluded that redacting sensitive voter information in response is permitted under the NVRA, a state law requiring the same kind of redactions would not be preempted. *See Bellows*, 92 F.4th at 56; *N.C. State*, 996 F.3d at 264, 266–67. Not only can state and federal law operate together, but California's protections are a logical limitation on *public* inspection. Otherwise, anyone could request and receive access to all the sensitive information of nearly 23 million Californians—an absurd result. *Yim v. City of Seattle*, 63 F.4th 783, 792 (9th Cir. 2023) ("[Courts] are not required to interpret a statute in a formalistic manner when such an interpretation would produce a result contrary to the statute's purpose or lead to unreasonable results.").

The NVRA and California's voter information protections can also be read in concert because the latter does not obstruct the purposes of the former. *Bellows*, 92 F.4th at 52. As discussed above, DOJ and federal courts have explained that Section 20507(i) does not compel the production of unredacted SSNs and DLNs. *DOJ Amicus Brief*, 2023 WL 4882397 at *28 (state law limits on voter information are not preempted when they affect uses that "would not further the NVRA's purposes," including "bans on disseminating personal data."). Thus, there is no conflict between state and federal purposes here. *See Atlas Data Priv. Corp. v. We Inform, LLC*, 2025 WL 2444153, at *2–3 (D.N.J. Aug. 25, 2025) (finding state law limiting disclosure of personal information not preempted by the NVRA).

DOJ's attempts to generate a conflict in the face of these authorities fail. DOJ alleges that the information it is seeking "is necessary for the Attorney General to determine if California is" complying with its obligations under Section

15

ER-292

20507(a)(4). Compl. ¶ 53. However, DOJ fails to allege *why* SSNs and DLNs, and other protected voter information, are necessary to assess whether California is conducting a general program that makes a reasonable effort to remove ineligible voters by reason of death or change in residence. This failure is especially glaring when DOJ has been offered access to inspect large amounts of unredacted voter information, including names, dates of birth, addresses, and other information. Cal. Code Regs. tit. 2, § 19001(h). It also ignores the detailed explanation and citations to state law setting forth the robust list-maintenance program in California. *Compare Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019) (examples of a reasonable effort under section 20507(a)(4)) *with* Brudigam Decl. Ex. 8.

Finally, the request is improper because the NVRA may permit investigation into *whether* a state has a reasonable list maintenance program—something California clearly conducts—but it does not allow a fishing expedition into line-by-line voter list accuracy, which DOJ appears to want here. That level of accuracy, in a voter registration list that is being updated daily, is not necessary to satisfy compliance under the NVRA. *Pub. Int. Legal Found., Inc. v. Benson*, 136 F.4th 613, 625–26, 628 (6th Cir. 2025) (rejecting the argument that the adequacy of a list maintenance program should be judged by statistical indicia).

Because the NVRA leaves room for state laws, like California's voter information protections, that do not obstruct the NVRA's purposes and can be read as part of the same statutory scheme, there is no preemption here.

**C.   DOJ Has Not Asserted a Cognizable Claim Under HAVA**

HAVA sought to upgrade voting systems by setting standards for voting machines and voter registration databases and by providing federal funding to the States for elections purposes. *See* 52 U.S.C. §§ 20901, 21081, 21083; *Crowley v. Nev. ex rel. Nev. Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012). Congress left much of the implementation of HAVA to the states. *See* 52 U.S.C. § 21085; *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1172 (11th Cir. 2008).

16

ER-293

California carefully complies with HAVA's list maintenance requirements and demonstrates this compliance through its documented policies and practices. In response to DOJ's inquiries, the Secretary set out its list maintenance compliance in detail in the letters sent to DOJ on August 8, August 21, and September 12. Brudigam Decl. Exs. 4, 6, 8. At no point—in its correspondence or Complaint—has DOJ taken issue with any of California's specific policies or practices, or alleged any actual or suspected violation of HAVA.

Instead, DOJ is requesting a static, and unredacted, copy of the state's voter registration list, allegedly to investigate and find some unknown HAVA list maintenance violation. Compl. ¶¶ 57–63. HAVA does not require such disclosure. And as mentioned above, state compliance is based on assessing whether a state is taking reasonable steps to remove ineligible voters "on a regular and ongoing basis," not on a static look at the entirety of a state's voter registration list on any single day. *Benson*, 136 F.4th at 627; *see also Bellitto*, 935 F.3d at 1202 ("Nothing in HAVA broadens the scope of the NVRA's list-maintenance obligations.").

### 1. HAVA has no disclosure provisions at all

Unlike the NVRA, HAVA has no disclosure provisions—and DOJ's Complaint and letters to California cite no case law or other authority for the proposition that the mere existence of DOJ's authority to enforce HAVA's "uniform and nondiscriminatory" requirements entitles it to unfettered access to state voter registration lists upon demand. 52 U.S.C. § 21111. Section 21111 authorizes the Attorney General to "bring a civil action against any State or jurisdiction . . . for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements." 52 U.S.C. § 21111. This statutory text includes no requirement to produce information about specific registered voters, and the statutory text must control. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). It is axiomatic that DOJ must cite statutory authority to demand documents. *Peters v. United*

17

ER-294

*States*, 853 F.2d 692, 696 (9th Cir. 1988) (authority of government agency to issue document request "created solely by statute"). And, of course, the specific disclosure requirement in the NVRA is not incorporated into HAVA. Thus, DOJ's allegation that California's failure to provide sufficient information—specifically its decision to not disclose an "unredacted voter registration list[]"—constitutes "a violation of HAVA," Compl. ¶ 62, fails to state a plausible legal claim.

### 2. DOJ fails to allege any other violation of HAVA

In the Complaint, DOJ asserts that "Defendants have failed to take the actions necessary for the State of California to comply with Section 303 of HAVA." Compl. ¶ 59. But DOJ fails to allege any facts supporting a specific violation of HAVA's list maintenance requirements. DOJ's assertion also fails to acknowledge the detailed information that California provided to DOJ in its response letters demonstrating its compliance list maintenance program. Brudigam Decl. Exs. 4, 6, 8. DOJ then, conflictingly, suggests that California's "failure to provide sufficient information in response" to DOJ's demand letters "prevent[s] the Attorney General from *evaluating* California's compliance with HAVA." Compl. ¶ 60 (emphasis added). DOJ's fundamental misunderstanding of HAVA does not end here.

DOJ alleges, for example, that California's refusal to provide an unredacted voter list with sensitive voter information included "prevents the Attorney General from determining California's compliance with the list maintenance requirements of HAVA," citing 52 U.S.C. § 21083(a)(5)(A). Compl. ¶ 61. But section 21083(a)(5)(A) is not a list maintenance requirement; it requires a voter registration application to include certain identifying information for the State to use in registration, such as a SSN or DLN. *Id.* § 21083(a)(5)(A)(i). California is plainly complying with this requirement; otherwise, there would be no dispute here over inspecting this sensitive information. Compliance is also apparent from publicly available state voter registration forms. Brudigam Decl. Ex. 16; RJN at 3.

18

ER-295

Section 21083(a)(5)(A) also explains that "*[t]he State* shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law." 52 U.S.C. § 21083(a)(5)(A)(iii) (emphasis added). The upshot is that there is no "compliance" for DOJ to assess; this is wholly the State's domain. *See also* 52 U.S.C. § 21085 ("The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State."). Nor has DOJ alleged facts plausibly suggesting that California is violating this requirement.

DOJ then alleges that California's "failure to provide unredacted voter registration lists to include non-citizen voter data constitutes a violation of HAVA," citing 52 U.S.C. § 21083(a)(2)(B)(ii)-(iii). Compl. ¶ 62. This allegation is also a nonstarter. Section 21083(a)(2)(B)(ii)-(iii) requires that a state's computerized list maintenance be conducted "in such a manner that ensures that" only voters who are not registered or who are not eligible to vote, and duplicated names, are removed from the list. California provided DOJ with detailed information about how it conducts list maintenance to ensure that these requirements of HAVA are met, and DOJ has not put forth any allegations to the contrary.

### 3. HAVA does not preempt California law

California law prohibits disclosing the requested voter information, as discussed above. Here, HAVA includes no disclosure requirement at all, much less one that directly conflicts with the state law prohibition on producing sensitive voter information. *Cf. Colón-Marrero v. Vélez*, 813 F.3d 1, 14 (1st Cir. 2016) (finding state statute preempted where it required voters be removed from voter rolls after not voting in *one* prior general election, but HAVA limited removal to voters who did not vote in *two* consecutive general elections).

This case thus tracks *American Civil Rights Union v. Philadelphia City Commissioners*, 872 F.3d 175 (3d Cir. 2017), in which the Third Circuit rejected a claim that HAVA required Philadelphia to purge voters incarcerated for a felony

19

ER-296

conviction from the rolls. In Pennsylvania, individuals convicted of a felony need not be removed from voter registration rolls under state law. *Id.* at 180 (citations omitted). The plaintiffs argued that the state law conflicted with HAVA, citing the list-maintenance requirement in 52 U.S.C. § 21083(a)(2)(A)(ii). The Third Circuit rejected this argument, finding that the felony conviction reporting requirements in HAVA did "not impose a duty on election officials to subsequently act on that information by purging those individuals from the voter rolls *in disregard of the law of their state*." *Am. Civil Rights Union*, 872 F.3d at 186 (emphasis added). Here, *no* statutory text in HAVA creates a requirement to produce a voter list, much less one containing the sensitive voter information California law explicitly prohibits producing. Thus, there can be no preemption here.

## II.    DOJ HAS NOT ALLEGED COMPLIANCE WITH FEDERAL PRIVACY LAWS

The Court may consider affirmative defenses at the motion to dismiss phase. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013). Specifically, if the Court sees "some obvious bar to securing relief on the face of the complaint," it can dismiss based on an affirmative defense. *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019) (quotation omitted). As demonstrated below, the Complaint's face reveals three "obvious bar[s]" to relief: failure to comply with the Privacy Act, the E-Government Act, and the DPPA.

### A.    DOJ's Hunt for Data Violates the Privacy Act

The Privacy Act bars DOJ's claim, and the Court can resolve this gaping Privacy Act issue now. "The Privacy Act exists to protect individuals from disclosure of government-collected information." *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025). The law accordingly erects "certain safeguards for an individual against an invasion of personal privacy." Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974). Among these safeguards, agencies are prohibited from collecting or maintaining records related to an individual's First Amendment activities (unless narrow exceptions apply), and they must follow specific procedures before they

20

ER-297

"maintain, collect, use, or disseminate" any group of records searchable by individual. 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f).

The Privacy Act applies to the detailed voter data requested by DOJ. A covered "record" includes "any item, collection, or grouping of information about an individual that is maintained by an agency." 5 U.S.C. § 552a(a)(4). The requested records pass the test, housing core personal information like addresses, party preference, voting participation history, and date of birth, Cal. Code Regs. tit. 2, § 19001(h), as well as sensitive personal identifying information protected as confidential under California law such as signatures, DLNs, and SSNs, Cal. Elec. Code § 2194(b)(1).[6] *See* Compl. ¶ 38, p. 16, ¶ 5 (requesting the statewide voter registration list "with all fields," including sensitive personal data). And DOJ's effort to seize those records through this suit, if allowed, will result in a covered collection of records. *See* 5 U.S.C. § 552a(a)(3) (defining "maintain" to include "maintain, collect, use, or disseminate").

The Privacy Act thus squarely governs DOJ's records request here. As explained below, it precludes collection of this data for two reasons.

First, the Privacy Act bars federal agencies from collecting or maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). DOJ's records request directly implicates that statutory bar: voter registration, party affiliation, and the choice to participate or not in an election are all forms of political expression protected by the First Amendment. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999) (choice of whether to register to vote "implicates political thought and expression");

---

[6]Indeed, federal courts have held that the Privacy Act covers records that may be requested under the NVRA's public inspection provisions. *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015 (D. Alaska 2023); *Hosemann*, 43 F. Supp. 3d at 735; *N.C. State*, 996 F.3d at 263–64, 268.

21

ER-298

*Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69, 75–76 (1990) (the expression of political beliefs and association through political affiliation is protected by the First Amendment). No exception applies. No statute authorizes DOJ to maintain Americans' full, unredacted voter registration records. DOJ has not received the express authorization of the millions of voters whose records it seeks. And a point-in-time snapshot of the voter file is not pertinent to or within the scope of DOJ's purported investigation of California's list maintenance program and practices under the NVRA and HAVA. *See* 52 U.S.C. § 20507(a)(4) (NVRA provision requiring states to "conduct a general program that makes a reasonable effort" to remove ineligible voters due to death or change in residence), cited in Compl. ¶¶ 13, 53; 52 U.S.C. § 21083(a)(2), (a)(4) (parallel provision in HAVA), cited in Compl. ¶¶ 26, 29, 62. The complete voter registration applications DOJ requested likewise sit far afield from a legitimate investigation into list-maintenance practices. If a record "has at best only speculative relevance to an unstated law enforcement purpose," this exception is not satisfied. *Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284, 1299 (9th Cir. 2019). Because no exception applies, the statutory bar on maintaining records on First Amendment activities prohibits DOJ from collecting the requested records.

Second, even if DOJ could somehow evade that First-Amendment-activity problem, heightened protections apply when an agency establishes or alters a "system of records," or "group of records under the control of any agency from which information is retrieved by the name of the individual" or other individual identifier. 52 U.S.C. § 552a(a)(5), (e). As relevant here, the Privacy Act requires US DOJ to publish a System of Records Notice or SORN in the Federal Register before "establish[ing] or revis[ing]" a "system of records." *Id.* § 552a(e)(4); *Brusseau v. Dep't of Homeland Sec.*, 2021 WL 3174248, at *5 (E.D. Va. July 27, 2021). DOJ seeks to knock down these guardrails. Its attempt to obtain full, unredacted voter records from scores of states is a textbook example of a "system

22

ER-299

of records." *See* 52 U.S.C. § 552a(a)(5). The Complaint identifies no SORN allowing it to collect this data, nor is California aware of any applicable SORN. This dooms DOJ's data-collection efforts under the Privacy Act—the Act's structure hinges on public notice and comment regarding the nature, scope, and routine uses of a system of records *before* the government bulk-collects Americans' data. 5 U.S.C. § 552a(e)(4)(D); *see Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 763 (D. Md. 2025), *appeal docketed*, No. 25-1411 (4th Cir. Apr. 18, 2025).[7]

And with a Privacy Act issue this blatant, the Court can and should fix the problem now. The Court may consider this Privacy Act issue on a Motion to Dismiss because the violations "are apparent on the face of the complaint." *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013). DOJ seeks Privacy-Act-protected information, *see* Compl. ¶ 38, p. 16, ¶ 5, but fails to include allegations explaining how this trawl for data would comply with that law. Nor can this deficiency be cured. DOJ is statutorily barred from collecting records, such as these, that describe individuals' protected First Amendment activity. *See* 5 U.S.C. § 552a(e)(7). And even if DOJ could collect such records, no SORN satisfies DOJ's rigorous procedural duties under the Act. *Id.* § 552a(e)(4). The Complaint's face thus illustrates the affirmative defense, allowing judicial resolution now.

**B.    DOJ's Data Demand Violates the E-Government Act**

For similar reasons, the Court should dismiss the Complaint for failure to comply with the E-Government Act, Pub. L. No. 107–347, § 208, 116 Stat. 2899 (2002). The E-Government Act requires federal agencies to conduct a "privacy impact assessment" (PIA) prior to "initiating a new collection of information" that

_____

[7]The Complaint's sole mention of the Privacy Act is the irrelevant observation that HAVA exempts "the 'last 4 digits of a social security number'" from section 7 of the Act. Compl. ¶ 41 (quoting 52 U.S.C. § 21083(c)). Section 7, an uncodified provision found at Pub. L. No. 93-579, 88 Stat. 1896 (1974), prohibits denying individuals "any right, benefit or privilege" due to their refusal to disclose a Social Security Number. *See Dittman v. California*, 191 F.3d 1020, 1026 (1999). This provision has no bearing on whether DOJ can lawfully collect the records it seeks.

"includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the information encompasses "10 or more persons." *Id.* § 208(b). The PIA and its procedural requirements must be completed "*before* the agency initiates a new collection of information." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017) (emphasis original).

The face of the Complaint reveals that DOJ is seeking information protected by the E-Government Act. Compl. ¶ 38, p. 16, ¶ 5. The names, addresses, and sensitive voter information contained in the data and applications sought by DOJ fall in the heartland of the personal information protected by the Act, triggering the PIA requirement. *See* Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II); OMB Guidance, M-03-22 (Sep. 26, 2003), https://perma.cc/E6PW-YQTP, Att. A § II(A)(b), *id.* § II(B)(a)(6). Yet the Complaint does not allege that DOJ completed a PIA applicable to this vast new trove of data on individual voters, requiring dismissal.

### C.   DOJ's Demand Violates the Driver's Privacy Protection Act

Finally, DOJ's demand also violates DPPA because California's statewide voter registration database pulls sensitive voter information directly from the California Department of Motor Vehicles ("DMV").

The DPPA prohibits disclosing "personal information" that is obtained by the DMV in connection with a "motor vehicle record." 18 U.S.C. §§ 2721(a), 2725(1), (3), & (4); *Reno v. Condon*, 528 U.S. 141, 143 (2000). This prohibition extends to authorized recipients, like the Secretary, who receives information from the DMV in carrying out her functions related to voter registration. 18 U.S.C. §§ 2721(b)(1), (c). In California, the DMV electronically provides to the Secretary certain information associated with each person who applies for a driver's license, including completed voter registration applications. Cal. Elec. Code § 2265(b); *see also* 52 U.S.C. § 20504. Notably, California's statewide voter registration system

also pulls DLNs directly from the DMV on a regular and ongoing basis. Cal. Code Regs. tit. 2, § 19074(a).

In its Complaint, DOJ alleges that its records demand is exempt from the DPPA because the requested disclosure here "is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as [DOJ] is now doing." Compl. ¶ 41 (citing 18 U.S.C. § 2721(b)(1)). This conclusory allegation is insufficient to plausibly allege the applicability of the DPPA's government use exception. The DPPA's inclusion of the phrase "[f]or use" dictates the critical inquiry—i.e., whether "the actual information disclosed . . . is *used* for the identified purpose." *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc). "When a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party." *Id.* (emphasis original)

Here, as discussed above, assessing compliance with 52 U.S.C. § 20507(a)(4), Compl. ¶ 53, turns on *whether* California conducts a general program that makes a reasonable effort to remove persons due to death or change in residence. *See supra* pp. 15–16. It is implausible that DLNs for millions of registered voters would be *used* for that purpose—and DOJ certainly has not alleged how it would use those DLNs. Thus, DOJ's unbounded request exceeds the scope of the DPPA's government-function exception.

## CONCLUSION

The Court should grant California's motion to dismiss.

Dated: November 7, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
SETH E. GOLDSTEIN
Supervising Deputy Attorneys General


 /s/ Malcolm A. Brudigam

MALCOLM A. BRUDIGAM
ROBERT WILLIAM SETRAKIAN
ANNE P. BELLOWS
LISA C. EHRLICH
MICHAEL S. COHEN
KEVIN L. QUADE
WILLIAM BELLAMY
Deputy Attorneys General
*Attorneys for Defendants Shirley Weber, in her official capacity as the California Secretary of State, and State of California*

SA2025305412

26

ER-303

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Secretary of State Shirley Weber and State of California, certifies that this brief is 25 pages, which:

__ complies with the word limit of L.R. 11-6.1.

_X_ complies with the page limit set by Section 6 under "Judge's Procedures" on Judge Carter's courtroom website, https://apps.cacd.uscourts.gov/Jps/honorable-david-o-carter.

Dated: November 7, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California

/s/ Malcolm A. Brudigam
MALCOLM A. BRUDIGAM
Deputy Attorney General
*Attorneys for Defendants Shirley Weber, in her official capacity as the California Secretary of State, and State of California*

27

ER-304

ROB BONTA
Attorney General of California
R. MATTHEW WISE
SETH E. GOLDSTEIN
Supervising Deputy Attorneys General
ROBERT WILLIAM SETRAKIAN (SBN 335045)
ANNE P. BELLOWS (SBN 293722)
LISA C. EHRLICH (SBN 270842)
MICHAEL S. COHEN (SBN 339846)
KEVIN L. QUADE (SBN 285197)
WILLIAM BELLAMY (SBN 347029)
MALCOLM A. BRUDIGAM (SBN 323707)
Deputy Attorneys General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7873
 Fax:  (916) 454-8171
 E-mail:  Malcolm.Brudigam@doj.ca.gov
*Attorneys for Defendants Shirley Weber, in her*
*official capacity as the California Secretary of*
*State, and the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the STATE OF CALIFORNIA,**<br><br>Defendants. | 2:25-cv-09149-DOC-ADS<br><br>**NOTICE OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date:        Monday, Dec. 8, 2025<br>Time:        8:30 a.m.<br>Courtroom:  10A<br>Judge:       Hon. David O. Carter<br>Trial Date:  None set.<br>Action Filed: Sept. 25, 2025 |

PLEASE TAKE NOTICE THAT at 8:30 a.m. on the 8th day of December, 2025 Defendants Shirley N. Weber, in her official capacity as the California Secretary of State, and the State of California will move to dismiss the Complaint for failure to state a claim. This motion will be based on the attached Memorandum

1

ER-305

of Points and Authorities, the Declaration of Malcolm Brudigam and all supporting exhibits, the Request for Judicial Notice, and any other evidence or argument that the Court deems proper.

Defendants move to dismiss on the grounds that the Complaint fails to state a claim under Title III of the Civil Rights Act of 1960, the National Voter Registration Act, and the Help America Vote Act. Defendants move to dismiss the Title III claim on the grounds that the court lacks jurisdiction to compel any relief. Defendants also move to dismiss on the grounds that the Complaint fails to plead compliance with several Federal privacy laws.

This motion is made following the conference of counsel pursuant to L.R. 7-3 that took place on October 31, 2025. *See* Declaration of Malcolm A. Brudigam, ¶ 3. During that conference, counsel for Plaintiff stated that they oppose the motion.

Dated:  November 7, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General

/s/ Malcolm A. Brudigam
_____
MALCOLM A. BRUDIGAM
Deputy Attorney General
*Attorneys for Defendants Shirley Weber, in her official capacity as the California Secretary of State, and State of California*

SA2025305412

2

ER-306

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

MICHAEL E. GATES
Deputy Assistant Attorney General
Civil Rights Division

MAUREEN RIORDAN
Acting Chief, Voting Section
Civil Rights Division

BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division

U.S. Department of Justice
4 Constitution Square
150 M. Street NE
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: Brittany.Bennett@usdoj.gov

Attorneys for Plaintiff, UNITED STATES OF AMERICA

1

United States of America v. Shirley Weber in her Official Capacity as Secretary of
State of the State of California
COMPLAINT

ER-307

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NO: |
|---|---|
| Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | ACTION SEEKING STATEWIDE RELIEF |
| SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the STATE OF CALIFORNIA, | 1. VIOLATION OF CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20701, *et seq.* |
| Defendant(s). | 2. VIOLATION OF SECTION 8(a)(4) and 8(i) OF THE NVRA, 52 U.S.C. § 20507(a)(4) |
| | 3. VIOLATION OF SECTION 303(a)(2)(B)(ii) of HAVA, 52 U.S.C. § 21083 |

## **COMPLAINT**

As President Trump said earlier this year, "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic." Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25,

2

United States of America v. Shirley Weber in her Official Capacity as Secretary of
State of the State of California
COMPLAINT

ER-308

2025). Indeed, "[t]he right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id*. Under our Constitution, States "must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id*. Without such safeguards, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). And "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id*.

Plaintiff, the United States of America, brings this action against Shirley Weber, in her official capacity as the Secretary of State of the State of California, and alleges as follows:

## I.   INTRODUCTION

To prevent fraudulent votes from being cast, federal law requires that states conduct routine list maintenance procedures of their statewide voter registration databases. Accurate voter registration lists prevent the opportunity for fraud in federal elections. The Civil Rights Division of the Department of Justice is tasked by Congress with ensuring that states conduct voter registration list maintenance to prevent the inclusion of ineligible voters on any state's voter registration list.

The United States brings this action to enforce provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.; the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*.; and Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq*.

## JURISDICTION AND VENUE

1.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201(a); 52 U.S.C. §§ 20510(a) and 21111; and 52 U.S.C. § 20705.

ER-309

2.     Venue is proper in this District pursuant to 28 U.S.C. §§ 84, 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District, and the Defendants are located in and conduct election administration activities in this District.

## II.     PARTIES

3.     Plaintiff, United States of America, through the Attorney General, has authority to enforce the NVRA, 52 U.S.C. § 20510(a), and Sections 21081 through 83, and 21083a of HAVA, 52 U.S.C § 21111. Both the NVRA and HAVA authorize the Attorney General to bring a civil action in an appropriate district court for such declaratory and injunctive relief as are necessary to carry out the relevant requirements under the statute. 52 U.S.C §§ 20510(a) and 21111.

4.     Pursuant to the CRA, 52 U.S.C. § 20705, the Attorney General may compel states to produce certain records and papers relating to the administration of federal elections.

5.     Defendant State of California is a state of the United States of America and is subject to the requirements of the NVRA, HAVA, and the CRA. 52 U.S.C. §§ 20502(4), 20503, 20701, and 21141.

6.     Defendant, Secretary of State Shirley Weber, is sued in her official capacity as chief state election official responsible for coordinating California's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; Cal. Gov't Code § 12172.5.

7.     Defendant, State of California, is a state of the United States of America and therefore is subject to the requirements of the NVRA, HAVA, and the CRA. 52 U.S.C. §§ 20502(4), 20503, 20701, and 21141.

8.     Secretary Weber is sued in her official capacity only.

## III.     STATUTORY BACKGROUND

### A. The Civil Rights Act of 1960

9.     Congress empowered the Attorney General to request records

4

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-310

pursuant to Title III of the CRA, codified at 52 U.S.C. § 20701 *et seq.*

10.   Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

11.   Section 303 of the CRA provides, in pertinent part, "Any record or paper required by Section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

**B. The National Voter Registration Act ("NVRA")**

12.   The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote in Federal elections "while "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1), (4).

13.   Section 8 of the NVRA establishes requirements for the administration of voter registration for elections for federal office in covered states, including California. Section 8(a)(4) requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. §20507(a)(4)(A)-(B).

14.   Subsections (b), (c), and (d) set forth procedures for the removal of ineligible voters from official lists of voters as part of a state's "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office[.]" *Id*. § 20507(b).

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-311

15. State voter list maintenance programs must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973, *et seq*.)[.]" 52 U.S.C. § 20507(b)(1); see also S. Rep. No. 103-6 at 31 (Feb. 25, 1993) ("The term 'uniform' is intended to mean that any purge program or activity must be applied to an entire jurisdiction."); accord H.R. Rep. No. 103-9 at 15 (Feb. 2, 1993) (same).

16. Section 8(d) of the NVRA provides that a "[s]tate shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence," unless the registrant:

A. confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

B. has failed to respond to a [Confirmation Notice] and has not voted or appeared to vote . . . in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice. 52 U.S.C. § 20507(d)(1).

17. Section 8(d)(2) sets forth specific requirements for the Confirmation Notice to be sent to registrants, and Section 8(d)(3) provides that a "voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with [subsection 8(d)]." *Id*. § 20507(d)(2)-(3).

18. Section 8 of the NVRA also provides an example of a voter list maintenance program that constitutes a reasonable effort to remove registrants who have become ineligible due to a change of residence. 52 U.S.C. § 20507(c)(1). Under this program, a state uses information from the United States Postal Service National Change of Address ("NCOA") program to identify registrants who may

6

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-312

have changed residence. 52 U.S.C. § 20507(c)(1)(A). Where it appears from the NCOA information that a registrant has moved to a new address in the same jurisdiction, the registration record is updated to show the new address, and the registrant is sent a notice of the change by forwardable mail that includes a postage-prepaid, pre-addressed return form by which the registrant may verify or correct the address information. 52 U.S.C. § 20507(c)(1)(B)(i). Where it appears from the NCOA information that a registrant has moved to a new address in a different jurisdiction, the procedure set out in Section 8(d)(2), described above, is used to confirm the address change. 52 U.S.C. § 20507(c)(1)(B)(ii).

19. Section 8(i) of the NVRA provides that:

"Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

20. Section 8(i)(2) further specifies:

"The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2).

21. Section 10 of the NVRA requires each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509.

**C. The Help America Vote Act ("HAVA")**

7

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-313

22. The purpose of HAVA "can be stated very simply—it is to improve our country's election system." H.R. Rep. 107-329(I) at 31 (2001). "Historically, elections in this country have been administered at the state and local level[,]" but Congress found that "the federal government can play a valuable [role] by assisting state and local government in modernizing their election systems." *Id.* at 31-32.

23. HAVA imposes "minimum requirements" for the conduct of federal elections, which "allow the states to develop their own laws and procedures to fulfill the requirements" to the extent that they are consistent with the standards set by HAVA. *Id.* at 35.

24. HAVA requires all states to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level," that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

25. The computerized list required by HAVA "shall be coordinated with other agency databases within the State." 52 U.S.C. § 21083(a)(1)(A)(iv).

26. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 provides that a state's "election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

27. HAVA mandates that a state may not process a voter-registration application without the applicant's driver's license number, where an applicant has a current and valid driver's license, or, for other applicants, the last four digits of

8

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-314

the applicant's Social Security number. *Id*. § 21083(a)(5)(A). For applicants who have neither a driver's license nor a social security number, a state must assign a unique identifying number for voter registration purposes. *Id*. § 21083(a)(5)(A)(ii). A state must then determine the validity of the information provided by the applicant. *Id.* § 21083(a)(5)(A)(iii).

28. HAVA applies to all fifty states, including California. 52 U.S.C. § 21141.

29. Section 303 of HAVA incorporates by reference certain provisions of the NVRA. See 52 U.S.C. § 21083(a)(4)(A). These provisions, unless explicitly noted otherwise, apply to all states covered under HAVA. *Id*.

30. HAVA vests the Attorney General of the United States with sole authority to "bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081-83, and 21083a of [HAVA]." 52 U.S.C. § 21111.

31. HAVA contains no private right of action. See 52 U.S.C. §§ 20901 to 21145.

## IV.   FACTUAL ALLEGATIONS

32. The U.S. Election Assistance Commission (EAC) was established by HAVA and "is an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the voting process." EAC website, "About the EAC," https://www.eac.gov/about. The EAC conducts a biennial Election Administration and Voting Survey ("EAVS"), "an analysis of state-by-state data that covers various topics related to the administration of federal elections[,]" including voter registration and list maintenance. *Id.*

33. The EAC's most recent report, "Election Administration and Voting

9

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-315

Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), explains that as part of the 2024 EAVS, states "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance[,]" such as the number of confirmation notices states sent "to verify continued eligibility from registered voters[,]" and the number of voter registration records that state removed from their voter lists. EAC, 2024 EAVS Report, https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf, at 7.

34. After reviewing California's responses to the 2024 EAVS Survey, on July 10, 2025, the Attorney General requested the following information regarding specific answers it provided in the EAVS survey:

A. The current electronic copy of California's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.

B. California reported 2,178,551 duplicate registrations (15.6 percent of the total registered voters). However, seven counties failed to provide data regarding duplicate registrations. Please provide a list of all duplicate registration records in Imperial, Los Angeles, Napa, Nevada, San Bernardino, Siskiyou, and Stanislaus counties.

C. No data was listed in the EAVS survey regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list including the date(s) of removal. If they were merged or linked with another record, please provide that information. Please explain California's process for determining duplicates and what happens to the duplicate registrations.

10

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California

COMPLAINT

ER-316

D. California reported 378,349 voters (11.9 percent) were removed because of death, which was well below the national average. Please provide a list of all registrations that were cancelled because of death. Please explain California's process for determining who is deceased and removing them from the voter roll and when that occurs.

E. California's Confirmation Notice data required by Sec. 8(d)(2) of the NVRA was missing in the EAVS survey for several counties in California. Please provide the data for each county in California. In the 2022 EAVS report California reported 4,984,314 inactive voters, while in 2024 California reported 2,883,995 inactive voters. Please explain the reason for the change in the number of inactive registrations for these years.

F. A list of all registrations, including date of birth, driver's license number, and last four digits of Social Security Number, that were cancelled due to non-citizenship of the registrant.

35. On July 22, 2025, Defendants responded to the Attorney General's July 10, 2025, letter asking for more time.

36. The United States responded to Defendants' July 22nd letter and advised that most of the requested information should be readily available. Nonetheless, the United States agreed to give Defendants until August 29, 2025, to respond to all other requests that may not have been readily accessible.

37. On August 8, 2025, Defendants sent a letter to the United States expressing concerns about privacy protections of the voter registration list and other requested information. Defendants further refused to cooperate by stating "DOJ may inspect a copy of our redacted voter registration database during regular business hours by making an appointment with my office. Public inspection satisfies our legal obligations under the NVRA and ensures that this office complies with legal protections for voter registration data under California law."

11

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California

COMPLAINT

ER-317

Defendants ended this letter with an obtuse "Please do not hesitate to contact my office regarding when you plan to visit Sacramento to review the voter registration information."

38. In an August 13, 2025, letter, the Attorney General made a demand for the current electronic copy of California's computerized statewide voter registration list ("SVRL") with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their Social Security number as authorized by the CRA. 52 U.S.C. § 20703. The United States also requested original and completed voter registration applications.

39. The United States explained in the August 13th letter that:

"Section 303 of the CRA provides, in pertinent part, 'Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative….' 52 U.S.C. § 20703."

40. The United States then explained in the letter that pursuant to Section 304 of the CRA:

"Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury."

41. The United States also advised Defendants that "HAVA specifies that

12
United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-318

the 'last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974'" (5 U.S.C. § 522(a) note); 52 U.S.C. § 21083(c)).  In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing."

42.    To further address the concerns of Defendants, the United States also responded that responsive information such as California's voter registration list and original and completed voter registration applications may be sent by encrypted email or via the Department's secure file-sharing system even though California privacy laws are preempted by applicable federal law.

43.    On August 21, 2025, Defendants responded and refused to provide the requested information.

44.    On August 29, 2025, and September 12, 2025, Defendants provided minimal responses to the inquiries regarding the EAVs responses but continued to refuse to fully comply with Plaintiff's requests for information and records as described in its initial letter of July 10, 2025.

45.    The United States has now been forced to bring the instant action to seek legal remedy for Defendants' refusal to comply with lawful requests pursuant to federal law.

## V.    CAUSES OF ACTION
### COUNT ONE- CIVIL RIGHTS ACT OF 1960

46.    The United States restates and incorporates the preceding paragraphs as if fully restated herein.

47.    On August 13, 2025, the Attorney General made a demand for the current electronic copy of California's SVRL with all fields, including each registrant's full name, date of birth, residential address, their state driver's license

13

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-319

number, and the last four digits of their Social Security number as authorized by 52 U.S.C. § 20703. The United States also made a demand for original and completed voter registration applications. *Id*.

48. On September 12, 2025, Defendants refused to provide the requested records in violation of the CRA. 52 U.S.C. §§ 20701-20706.

49. Unless and until ordered to do so by this Court, Defendants' refusal to provide these records as requested constitutes a continuing violation of federal law.

## COUNT TWO- VIOLATION OF THE NVRA

50. The United States restates and incorporates the preceding paragraphs as if fully restated herein.

51. The Attorney General has enforcement authority to ensure compliance with the requirements of the NVRA. 52 U.S.C. § 20510(a).

52. The United States's July 10 and August 13 letters requested the information that California is required to disclose pursuant to 52 U.S.C. 20507(i).

53. Defendants have failed to provide sufficient responses to the United States's specific inquiries regarding its maintenance procedures, despite the Attorney General's enforcement authority of these requirements under both the NVRA and HAVA. This information is necessary for the Attorney General to determine if California is conducting "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" as required by 52 U.S.C. § 20507(a)(4).

54. The NVRA requires Defendant's to provide "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

55. The requested SVRL and registration application data are records

14

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California

COMPLAINT

ER-320

regarding California's list maintenance program and are required to be disclosed to the United States.

56.     Unless and until ordered to do so by this Court, Defendants' refusal to provide these records prevents the Attorney General from determining Defendants' compliance with the list maintenance requirements of the NVRA and represents an ongoing violation of law.

### COUNT THREE- VIOLATION OF HAVA

57.     Plaintiff realleges the preceding paragraphs as if fully stated herein.

58.     Pursuant to HAVA, Defendants are responsible for removing voters who are "not eligible to vote." 52 U.S.C. § 21083(a)(2)(B)(ii)-(iii).

59.     Defendants have failed to take the actions necessary for the State of California to comply with Section 303 of HAVA.

60.     Defendants' failure to provide sufficient information in response to requests made by the Justice Department's Civil Rights Division in its July 10 and August 13 demand letters prevent the Attorney General from evaluating California's compliance with HAVA, pursuant to the Attorney General's statutory enforcement authority under 52 U.S.C. § 21111.

61.     Defendants' refusal to provide to the United States the current electronic copy of California's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number or the last four digits of their Social Security number prevents the Attorney General from determining California's compliance with the list maintenance requirements of HAVA. 52 U.S.C. § 21083(a)(5)(A).

62.     Defendants' failure to provide unredacted voter registration lists to include non-citizen voter data constitutes a violation of HAVA. 52 U.S.C. § 21083(a)(2)(B)(ii)-(iii).

63.     Unless and until ordered to do so by this Court, Defendants' refusal to

15

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-321

provide these records prevents the Attorney General from making a determination of Defendants' compliance with the list maintenance requirements of HAVA and represents an ongoing violation of law.

### VI.    PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that this Court:

1. Declare that Defendants' refusal to provide registration records and California's electronic statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their Social Security number, upon a demand by the Attorney General violates Title III of the CRA. 52 U.S.C. § 20703;

2. Declare that Defendants have failed to make available and provide to the United States "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," in violation of the NVRA. 52 U.S.C. § 20507(i)(1);

3. Declare that the Defendants' refusal to provide the requested records concerning the voter registration and list maintenance records prevents the Attorney General from enforcing HAVA's list maintenance requirements;

4. Declare that any state law that prohibits Defendants from providing the requested statewide voter registration list is preempted by federal law;

5. Order Defendants to provide to the United States the current electronic copy of California's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number and original and completed voter registration applications as required by the CRA, NVRA, and HAVA;

16

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California
COMPLAINT

ER-322

and

6.  Order such additional relief as the interests of justice may require.

DATED: September 25, 2025                    Respectfully submitted,

                                             HARMEET K. DHILLON
                                             Assistant Attorney General
                                             Civil Rights Division


                                             */s/  Michael E. Gates*
                                             MICHAEL E. GATES
                                             Deputy Assistant Attorney General
                                             MAUREEN RIORDAN
                                             Acting Chief, Voting Section
                                             BRITTANY E. BENNETT
                                             Trial Attorney, Voting Section
                                             Civil Rights Division
                                             U.S. Department of Justice
                                             4 Constitution Square
                                             150 M Street NE, Room 8.141
                                             Washington, D.C. 20002
                                             Telephone: (202) 704-5430
                                             Email: brittany.bennett@usdoj.gov

17
United States of America v. Shirley Weber in her Official Capacity as Secretary of
State of the State of California
COMPLAINT

ER-323

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

18

United States of America v. Shirley Weber in her Official Capacity as Secretary of State of the State of California

COMPLAINT

ER-324

Case 2:25-cv-09149   Document 1-1   Filed 09/25/25   Page 1 of 4   Page ID #:19

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

UNITED STATES OF AMERICA

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

SHIRLEY WEBER, in her official capacity as Secretary of State for the State of California, and the State of California.

**(b) County of Residence of First Listed Plaintiff** _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

See attachment.

**Attorneys** (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify) _____

☐ 6. Multidistrict Litigation - Transfer

☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Federal enforcement of Section 303(a) of HAVA, Section 8 of NVRA, and Civil Rights Act of 1960 with respect to voter list maintenance in California. 52 U.S.C

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 835 Patent - Abbreviated New Drug Application |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | **SOCIAL SECURITY** |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 861 HIA (1395ff) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 862 Black Lung (923) |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 485 Telephone Consumer Protection Act | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☒ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 895 Freedom of Info. Act | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 896 Arbitration | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: _____

CV-71 (06/24)   CIVIL COVER SHEET   Page 1 of 3

ER-325

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:**  Your answers to the questions below will determine the division of the Court to which this case will be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No <br><br> If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B:  Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☒ Yes  ☐ No | | ☒ NO.  Continue to Question B.2. |
| If "no," skip to Question C.  If "yes," answer Question B.1, at right. | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.) <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☒ NO.  Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C:  Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO.  Continue to Question C.2. |
| If "no," skip to Question D.  If "yes," answer Question C.1, at right. | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.) <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO.  Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D:  Location of plaintiffs and defendants? | **A.** Orange County | **B.** Riverside or San Bernardino County | **C.** Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| **D.1.  Is there at least one answer in Column A?** | **D.2.  Is there at least one answer in Column B?** |
|---|---|
| ☐ Yes  ☒ No <br><br> If "yes," your case will initially be assigned to the <br> SOUTHERN DIVISION. <br><br> Enter "Southern" in response to Question E,  below, and continue from there. <br><br> If "no," go to question D2 to the right. ➡ | ☐ Yes  ☒ No <br><br> If "yes," your case will initially be assigned to the <br> EASTERN DIVISION. <br><br> Enter "Eastern" in response to Question E,  below. <br><br> If "no," your case will be assigned to the WESTERN DIVISION. <br><br> Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | WESTERN |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes  ☒ No |

ER-326

Case 2:25-cv-09149   Document 1-1   Filed 09/25/25   Page 3 of 4   Page ID #:21

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**?

☐ NO   ☒ YES

If yes, list case number(s):   United States v. Page, Case No. 8:25-cv-01370-DOC-ADS

**If yes, you must file a Notice of Related Cases. See Local Rule 83-1.3.**

**Civil cases** are related when they (check all that apply):

☒ A. Arise from the same or a closely related transaction, happening, or event;

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. STATEWIDE OR NATIONWIDE RELIEF**: Does this case seek to bar or mandate enforcement of a state or federal law and seek declaratory or injunctive relief on a statewide or nationwide basis?   ☐ NO   ☐ YES

**If yes, see Local Rule 83-11 for additional requirements.**   ✕

---

**XI. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** *Brittany E. Bennett*   DATE: 9/25/2025

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

ER-327

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| Plaintiff, | |
| | CASE NO: |
| v. | |
| SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the STATE OF CALIFORNIA, | |
| Defendant(s). | |

**Attachment to Civil Cover Sheet**
(Attorney Names, Addresses, and Phone Numbers)

I.(c)

Counsel for Plaintiffs:

MICHAEL E. GATES
MAUREEN RIORDAN
BRITTANY E. BENNETT
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Fax: (202) 307-3961
Email: Brittany.Bennett@usdoj.gov

1

ER-328

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NO: 2:25-cv-09149-DOC-ADS |
|---|---|
| Plaintiff, | NOTICE OF APPEAL |
| v. | |
| SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the STATE OF CALIFORNIA, | |
| Defendant(s). | |

## **NOTICE OF APPEAL**

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, appeals to the United States Court of Appeals for the Ninth Circuit from this Court's Order Granting Defendant's Motion to Dismiss and Intervenors' Motions to Dismiss (Doc. 128) entered in this action on January 15, 2026.

1

*United States of America v. Shirley Weber, et al.*
Notice of Appeal

ER-329

DATED: February 25, 2026                    Respectfully submitted,

                                            HARMEET K. DHILLON
                                            Assistant Attorney General
                                            Civil Rights Division


                                            /s/   Eric Neff
                                            ERIC V. NEFF
                                            Acting Chief, Voting Section
                                            Civil Rights Division
                                            U.S. Department of Justice
                                            4 Constitution Square
                                            150 M Street NE, 8th Floor
                                            Washington, D.C. 20002
                                            Telephone: (202) 704-5430
                                            Email: Eric.Neff@usdoj.gov

2

*United States of America v. Shirley Weber, et al.*
Notice of Appeal

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Eric V. Neff*
Eric V. Neff
Acting Chief, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, 8th Floor
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: eric.neff@usdoj.gov

3

*United States of America v. Shirley Weber, et al.*
Notice of Appeal

ER-331