No. 26-1232

Oral Argument Scheduled for Tuesday, May 19, 2026
9:00 A.M., Courtroom 1, Pasadena, California

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellant,*

v.

SHIRLEY WEBER, in her official capacity as Secretary of State of the
State of California and the State of California,
*Defendants-Appellees*,

NAACP, NAACP California-Hawaii State Conference, the League of
Women Voters of California, and Services, Immigrant Rights and
Education Network
*Defendants-Intervenors-Appellees*

On Appeal from the United States District Court
for the Central District of California
No. 2:25-cv-09149
Hon. David O. Carter

BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS AND LOCAL
ELECTION OFFICIALS IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE

Jonathan Miller
Kyra Sikora
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
Telephone: (510) 214-6960
jon@publicrightsproject.org

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................. 1

SUMMARY OF ARGUMENT ................................................. 2

ARGUMENT ........................................................................ 3

I.   Courts Must Evaluate the Basis and Purpose of a
     Demand for Election Records Under the CRA .................. 3

     A.   A recent surge in records requests has burdened
          the offices of local election officials ............................ 4

     B.   Courts must evaluate the CRA's required
          statement of the basis and purpose ............................ 9

II.  DOJ Has Not Provided a Legitimate Purpose and
     Basis For Its Requests for Election Records Under
     the CRA ........................................................................ 11

     A.   California's list maintenance procedures satisfy
          the requirements of the NVRA ................................. 12

          1.   Congress passed the NVRA to increase voter
               registration while maintaining accurate
               voter rolls ......................................................... 13

          2.   California's list maintenance program
               removes voters who have moved or died in
               compliance with the NVRA's requirements ...... 16

          3.   California's program is reasonable .................... 22

     B.   The EAVS data does not provide an adequate
          basis for DOJ's demand ............................................ 24

CONCLUSION ................................................................... 32

ADDITIONAL COUNSEL .................................................... 33

APPENDIX A – List of *Amicus Curiae* ............................... 34

i

# TABLE OF AUTHORITIES

CASES

*A. Philip Randolph Inst. v. Husted,*
838 F.3d 699 (6th Cir. 2016), *rev'd on other*
grounds, 584 U.S. 756 (2018) .......................................... 16

*Bellitto v. Snipes,*
935 F.3d 1192 (11th Cir. 2019) ....................................... 14

*City of San Jose v. Super. Ct.,*
88 Cal. Rptr. 2d 552 (Cal. Ct. App. 1999) ......................... 8

*Comm. to Support the Recall of Gascon v. Logan,*
312 Cal. Rptr. 3d 160 (Cal. Ct. App. 2023 ......................... 8

*Husted v. A. Philip Randolph Inst.,* 584 U.S. 756
(2018) ............................................................... 13, 14, 16

*Pub. Int. Legal Found. v. Benson,*
136 F.4th 613, 625 (6th Cir. 2025), *cert. denied,* No.
25-437, 2026 WL 568298 (U.S. Mar. 2, 2026) ........... 13, 23

*United States v. Amore,*
No. 1:25-cv-00639 (D.R.I. Apr. 17, 2026) ......................... 10

*United States v. Benson,*
No. 1:25-cv-1148, 2026 WL 362789 (W. D. Mich. Feb
10, 2026) ................................................................. 10, 11

*United States v. Galvin,*
Civ. No. 25-13816-LTS, 2026 WL 972129 (D. Mass.
Apr. 9, 2026) .............................................................. 10

*United States v. Oregon,*
No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5,
2026) ................................................................ 9, 10, 11

*United States v. Powell,*
379 U.S. 48 (1964) ....................................................... 10

STATUTES

52 U.S.C. § 20501 ............................................................................... 1

52 U.S.C. § 20507 ............................................................................. 18

52 U.S.C. § 20507(a) ......................................................................... 14

52 U.S.C. § 20507(a)(4) ............................................................... 14, 22

52 U.S.C. § 20507(b) ......................................................................... 15

52 U.S.C. § 20507(b)–(d) .................................................................. 14

52 U.S.C. § 20507(c)(1) ..................................................................... 15

52 U.S.C. § 20507(c)(2) ............................................................... 15, 31

52 U.S.C. § 20507(d) ......................................................................... 30

52 U.S.C. § 20507(d)(1) ............................................................... 14, 15

52 U.S.C. § 20703 ........................................................................... 2, 9

52 U.S.C. § 20705 ........................................................................... 4, 9

52 U.S.C. § 20922 ............................................................................. 24

Cal. Code Regs. tit. 2, § 19060 ......................................................... 16

Cal. Code Regs. tit. 2, §§ 19060–19098 ............................................. 1

Cal. Code Regs. tit. 2, § 19060(c) ................................................ 16, 17

Cal. Code Regs. tit. 2, § 19078(a) ..................................................... 17

Cal. Code Regs. tit. 2, § 19078(b) ..................................................... 17

Cal. Code Regs. tit. 2, § 19078(c) ..................................................... 17

Cal. Code Regs. tit. 2, § 19083(a)–(b) ............................................... 19

Cal. Elec. Code § 320 .......................................................................... 1

iii

Cal. Elec. Code § 2194(b)(1) ..................................................... 7

Cal. Elec. Code § 2201(a)(5) ................................................... 21

Cal. Elec. Code § 2201(c) ....................................................... 21

Cal. Elec. Code § 2201(c)(1) ................................................... 21

Cal. Elec. Code § 2201(c)(2)(C) .............................................. 21

Cal. Elec. Code § 2205 ..................................................... 20, 21

Cal. Elec. Code § 2206 ........................................................... 21

Cal. Elec. Code § 2220 ........................................................... 18

Cal. Elec. Code §§ 2200–2214 ................................................. 1

Cal. Elec. Code §§ 2220–2227 ................................................. 1

Cal. Elec. Code § 2224(a) ................................................. 18, 19

Cal. Elec. Code § 2224(c) ....................................................... 19

Cal. Elec. Code § 2225 ........................................................... 18

Cal. Elec. Code § 2225(a)(1) ................................................... 17

Cal. Elec. Code § 2225(a)(2) ................................................... 18

Cal. Elec. Code § 2226(a)(1) ................................................... 18

Cal. Elec. Code § 2226(a)(2) ................................................... 18

Cal. Elec. Code § 2226(b) ....................................................... 19

Cal. Elec. Code § 2227 ........................................................... 20

Cal. Elec. Code § 2402 ........................................................... 16

Cal. Gov't Code § 7921.000 ...................................................... 4

Cal. Gov't Code § 7924.000 ...................................................... 4

iv

Cal. Gov't Code § 7924.000(a)–(d) ........................................... 7

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 4, cl. 1 .................................................. 13

OTHER AUTHORITIES

Cal. Sec'y of State, Elections Div., *Vote by Mail -
November 3, 2020, General Election* ............................... 30

Charles Stewart III, *Is the EAVS a Reliable Guide to
Voter List Maintenance?* (Aug. 25, 2018) ........................ 26

Jack Williams, MIT Election Data + Sci. Lab, *The
Election Administration and Voting Survey*,
Elections Performance Index (Aug. 16, 2021) ................. 26

Jane C. Timm, *Amateur fraud hunters bury election
officials in public records requests*, NBC News
(Mar. 26, 2026) ..................................................................... 7

Karen L. Shanton, Cong. Rsch. Serv., *The Election
Administration and Voting Survey (EAVS):
Overview and 2024 Findings* (July 8, 2025) .................... 25

Kyle Yoder & Alice Tan, CEIR Focus Brief: Election
Officials & the Misuse of Public Records Requests
(2024) ..................................................................................... 6

MIT Election Data + Sci. Lab, *About*,
https://perma.cc/4DFW-Z5ZH. ........................................ 26

Paul Gronke & Paul Manson, Findings From the 2023
LEO Survey (2023) .............................................................. 5

Paul Gronke et al., Findings from the 2024 Elections &
Voting Information Center Local Election Official
Survey (2025) ....................................................................... 5

Sept. 12, 2025 Letter from Shirley N. Weber to
Harmeet K. Dhillon, *United States v. Weber*, No.

2:25-cv-09149 (C.D. Cal. Dec 1, 2025), Dkt. No. 87-10. ................................................................. 28, 29, 30

Shirley N. Weber, Cal. Sec'y of State, *California NVRA Manual - Chapter 4: Voter Registration Applications and Voter List Maintenance* (Mar. 2025) ............................................................. 20

U.S. Election Assistance Comm'n, *2024 Election Administration and Voting Survey (EAVS): Guide to Using the Data Collection Templates* (Nov. 5, 2024) ............................................................. 28

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025) .......................... 25, 27

U.S. Election Assistance Commission, Best Practices: Public Records Requests (2023) ......................................... 5

## STATEMENT OF INTEREST

The *amici* listed in Appendix A offer this amicus brief in support of Appellee Defendant California Secretary of State Shirley Weber ("Appellee") and affirmance.[1]

*Amici* are local election officials and local governments representing jurisdictions in California and across the country. Many are duty-bound under federal law to promote the exercise of the right to vote. 52 U.S.C. § 20501. Many of the *amici*—including California Registrars of Voters—administer local, state, and federal elections in their respective jurisdictions. *See* Cal. Elec. Code § 320. Local election officials in California also maintain the voter registration records for their respective jurisdictions under the supervisory control of the Secretary of State (the "Secretary"). *See* Cal. Elec. Code §§ 2200–2214; Cal. Elec. Code §§ 2220–2227; Cal. Code Regs. tit. 2, §§ 19060–19098. Drawing from their

---

[1] *Amici curiae* submit this brief under Federal Rule of Appellate Procedure 29(a) and Circuit Rule 29-1. Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici* or their counsel has contributed money toward the preparation or submission of this brief. All parties have consented to the filing of this brief.

vast experience, *amici* write to highlight the lack of a legitimate basis by the Department of Justice ("DOJ") to demand sensitive voter information.

## SUMMARY OF ARGUMENT

The Civil Rights Act of 1960 ("CRA") requires DOJ to state the basis and purpose of any request for election records. 52 U.S.C. § 20703. That requirement is meaningful and demands more than a superficial statement from DOJ. Courts must inquire into the basis and purpose of DOJ's request for records in exercising their authority to compel production of those records.

DOJ's initial demand to the Secretary requested a list of the election officials responsible for implementing California's voter registration list maintenance and a description of the steps taken to ensure that the state's list maintenance program complied with the NVRA. 2-ER-267–69. In its August 13, 2025 letter to the Secretary, DOJ stated that its demand was made "to assist in our determination of whether California's list maintenance program complies with the NVRA." 2-ER-264. Then, during oral arguments on December 4, 2025,

2

DOJ stated that the purpose behind its requests to the State of California was "voter roll maintenance enforcement and compliance." 2-ER-117.

DOJ has never provided a clear statement of the actual basis and purpose of its request. California's list maintenance procedures go far beyond what is required by federal law, and the data cited by DOJ does not suggest otherwise. That data, which comes from standardized national surveys, provides incomplete information about California's list maintenance activities. DOJ cannot use it as a basis to support a demand sensitive voter information from California election officials.[2]

## ARGUMENT

### I. Courts Must Evaluate the Basis and Purpose of a Demand for Election Records Under the CRA.

Local election officials have first-hand experience dealing with requests for voter information. While *amici* work hard to respond to lawful information requests, they have seen the cost exacted by overbroad and invasive requests that diverted staff from their primary responsibilities. Requests can cross the line from burdensome to unlawful

---

[2] Although this brief addresses the appeal in *Weber*, which was not consolidated with the appeal of *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026), the arguments *amici* assert here are also applicable to the *Oregon* case.

when requesters demand sensitive information about members of the public. In such cases, courts act as a backstop to protect the privacy rights of individuals. Courts should continue to function in that role to ensure that voters' sensitive information is not released unless it is truly necessary. The CRA provides courts with that authority, allowing them to inquire into the underlying reasons that DOJ is seeking election records before compelling their production. *See* 52 U.S.C. § 20705 (granting federal courts jurisdiction to compel production of records by "appropriate process").

A. **A recent surge in records requests has burdened the offices of local election officials.**

Local election officials have historically provided voter information to the public through requests for records. State records laws, including California's Public Records Act ("PRA"), allow the public to access many government records, including certain voter information. Cal. Gov't Code § 7921.000 (declaring that access to information is a fundamental and necessary right), § 7924.000 (specifying information that must be kept confidential when releasing voter registration records). Local election officials take their responsibility to ensure election transparency seriously and understand the importance of transparency in ensuring

4

public confidence in the electoral process. A recent surge in public records requests, however, has unduly burdened the offices of local election officials and threatens to impede their ability to conduct elections.

*Amici* and other local election officials around the country have seen the number of records requests expand exponentially in recent years.[3] National surveys of local election officials demonstrate that the vast majority of officials surveyed have begun spending increased time on records requests.[4] Not only has the volume of such requests increased, but the requests themselves have become more burdensome.[5] Thus,

---

[3] *See* U.S. Election Assistance Commission, Best Practices: Public Records Requests, at 1 (2023), https://perma.cc/A346-P8JU.

[4] "LEOs are notably impacted by a rapid increase in public records requests and citizen inquiries." Paul Gronke & Paul Manson, Findings From the 2023 LEO Survey, at 2 (2023), https://perma.cc/6XLB-SC4G. Particularly in larger jurisdictions, almost all local election officials surveyed reported an increase in public records requests. *Id.* at 13. LEO surveys have been conducted by the Elections & Voting Information Center (EVIC), a non-partisan academic research center focused on election administration, since 2018.

[5] In its 2024 survey, EVIC included a new question regarding record requests. Paul Gronke et al., Findings from the 2024 Elections & Voting Information Center Local Election Official Survey, at 20 (2025), https://perma.cc/9TNQ-BE7M. In response, 72 percent of election officials surveyed reported that a smaller subset of requests disproportionately consume their time. *Id.* Over 60 percent reported that records requests are unduly burdensome and impede the ability of local election officials to perform their duties. *Id.*

public records requests are having a significant negative impact on the ability of local election officials to perform their duties, including the vital work of administering elections.

*Amici* have seen this first-hand. In recent years, local election officials have begun receiving record requests that are different in nature from those they have traditionally received. Those requests may seek a very broad range of records or cover a long period of time.[6] Many of the requests appear to be grounded in misinformation about election administration that has proliferated recently.[7] Such requests result in significant work for local election officials. One California local election official reported that she saw a threefold increase in public records requests and engaging directly with voters in the past five years.[8] The

---

[6] Kyle Yoder & Alice Tan, CEIR Focus Brief: Election Officials & the Misuse of Public Records Requests, at 2 (2024), https://perma.cc/3XVG-3AJN. The Center for Election Innovation and Research (CEIR) is a nonprofit that works with election officials to build confidence in elections. As part of that work, CEIR has researched the recent increase in public records requests and its effect on election administration.

[7] *Id.*

[8] As reported by the Contra Costa County Clerk-Recorder and Registrar of Voters.

increased staff time required to respond to public records requests has forced local election officials to shift staff responsibilities.[9]

Local election officials are accustomed to receiving requests for public voter registration information and have processes in place to ensure that their responses include permissible information while excluding or redacting individual voter information that should not be disclosed. California prohibits disclosure of sensitive information contained in voter registration records, including social security numbers, driver's license numbers, and the contact information of confidential voters. Cal. Elec. Code § 2194(b)(1); Cal. Gov't Code § 7924.000(a)–(d). Though local election officials in California routinely provide certain voter information to members of the public in response to public records requests, they have processes in place to ensure that certain sensitive information is excluded.

Some of the records requests are not only burdensome but are also unlawful. In those instances, local election officials may have to rely on courts to determine the duty of local election officials to respond. Courts

---

[9] Jane C. Timm, *Amateur fraud hunters bury election officials in public records requests*, NBC News (Mar. 26, 2026), https://perma.cc/CKZ9-SBN5.

act as a backstop against unlawful requests and perform an important function in protecting individuals from the release of their sensitive information. For example, California courts have routinely upheld the decisions of public officials to withhold certain sensitive information when responding to PRA requests in order to protect the privacy of individuals. *See Comm. to Support the Recall of Gascon v. Logan*, 312 Cal. Rptr. 3d 160, 177–79 (Cal. Ct. App. 2023) (holding that, to protect voter privacy, a third-party group could not use electronic voter lists outside of the Registrar of Voter's examination room); *City of San Jose v. Super. Ct.*, 88 Cal. Rptr. 2d 552, 561–565 (Cal. Ct. App. 1999) (holding that individuals who complained about airport noise have a strong privacy interest in their names, addresses, and telephone numbers under the PRA that is outweighed by the public interest in having information regarding their identities revealed).

*Amici* offer their experience in managing burdensome and overbroad requests for voter information to provide context regarding the court's authority to review a request for records under the CRA. Local election officials rely on courts to act as a backstop to enforce legal prohibitions against disclosing sensitive information about individuals in

response to records requests from the public. Courts should perform that same function for requests for records under the CRA.

## B. Courts must evaluate the CRA's required statement of the basis and purpose.

The CRA allows the Attorney General to demand certain election-related records and papers from state election officials. 52 U.S.C. § 20703. When making such a demand, the Attorney General must provide "a statement of the basis and the purpose therefor." *Id.* If a recipient does not comply with a demand from the Attorney General, federal courts "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The term "appropriate process" in the statute granting jurisdiction provides the district court with the authority to inquire into the basis and purpose for the demand.

DOJ has filed federal lawsuits against thirty states and the District of Columbia seeking to compel election officials to provide sensitive voter data. Although most of those lawsuits are still working their way through the trial courts, three other district courts have reached decisions on the merits of DOJ's claim. *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-cv-

9

1148, 2026 WL 362789 (W. D. Mich. Feb 10, 2026); *United States v. Amore*, No. 1:25-cv-00639 (D.R.I. Apr. 17, 2026).[10]

The only other district court in this circuit that considered the issue has soundly rejected DOJ's assertion that courts are precluded from examining the stated basis and purpose of a demand under the CRA. *Oregon*, 2026 WL 318402, at *7–8. The court started with the language of the statute, which provides that a district court has jurisdiction "by appropriate process to compel the production of" records and papers demanded by the Attorney General. *Id.* at *8. Because the term "appropriate process" is not defined, the court looked to a statute that provided courts with jurisdiction to compel "by appropriate process" the production of records demanded by the IRS. *Id.* In *United States v. Powell*, 379 U.S. 48, 58 (1964), the Supreme Court concluded that the Federal Rules of Civil Procedure applied to actions under the IRS statute and that courts could "inquire into the underlying reasons" for record demands. *Id.* Relying on that precedent, the district court concluded that

---

[10] One court did not reach the question of the adequacy of the basis and purpose, finding that the DOJ had not asserted a basis at all. *United States v. Galvin*, Civ. No. 25-13816-LTS, 2026 WL 972129, at *4 (D. Mass. Apr. 9, 2026).

10

it had the authority to evaluate whether DOJ's demand under the CRA stated an adequate basis and purpose, and thus whether it constituted a valid demand. *Oregon*, 2026 WL 318402, at *7–8. That district court reached the correct conclusion, supported by applicable Supreme Court precedent.[11]

## II. DOJ Has Not Provided a Legitimate Purpose and Basis For Its Requests for Election Records Under the CRA.

DOJ's first letter failed to state any basis or purpose for its demand for unredacted copies of all original and completed voter registration applications from December 1, 2023 to July 1, 2025. *See* 2-ER-267–69. DOJ then claimed that it later explained that the basis for its demand for California's entire voter registration list was that it would "assist in [its] determination of whether California's list maintenance program complie[d] with the NVRA." 2-ER-264. In its Opening Brief, DOJ contends that the basis for its demand is "numerous discrepancies and

---

[11] In *Benson*, the district court reached the correct conclusion that Appellants failed to state a claim under the CRA. However, with minimal analysis, the district court determined that the CRA does not allow a court "to evaluate the substance of the DOJ's purported basis and purpose." 2026 WL 362789, at *8. That finding is not supported by the statutory text of the CRA or Supreme Court precedent interpreting similar statutes.

11

anomalies in California's responses to the U.S. Election Assistance Commission's (EAC) 2024 report." Opening Br. at 21. That basis is insufficient in numerous ways.

*Amici* have extensive experience with state list maintenance practices. They take their responsibilities to maintain accurate, up-to-date voter registration records seriously. They follow the requirements of federal and state law, which require local election officials to balance list maintenance responsibilities with prohibitions on removing voters from the rolls without first providing notice. The "discrepancies and anomalies" raised by DOJ are taken out of reports from the Election Assistance Commission's Election Administration and Voting Survey (EAVS) and do not provide an accurate picture of California's compliance with the list maintenance requirements of the National Voter Registration Act (NVRA). EAVS data can be used to identify national trends, but cherry-picked data from a few categories is not a reliable or sufficient basis to suspect that California is violating the NVRA.

### A. California's list maintenance procedures satisfy the requirements of the NVRA.

The NVRA imposes an obligation on states to maintain accurate voter registration lists while also ensuring that voters are provided with

12

sufficient notice before removal. The statute does not mandate specific procedures for states to meet those obligations; it merely requires states to utilize programs that make a reasonable effort to remove ineligible voters. States need not have a perfect program, but merely one that makes a rational and sensible attempt to remove ineligible voters. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, No. 25-437, 2026 WL 568298 (U.S. Mar. 2, 2026). California's list maintenance program far exceeds that mandate.

### 1. Congress passed the NVRA to increase voter registration while maintaining accurate voter rolls.

The Constitution's Election Clause empowers the states to regulate and administer elections but also allows Congress to preempt state laws governing elections. U.S. Const. art. I, § 4, cl. 1. For most of the nation's history, states retained the sole authority to determine how to maintain their voter registration rolls. *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). In 1993, however, Congress passed the NVRA, which created a limited role for the federal government related to voter registration systems. "The Act has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Id.* The statute thus balances "competing interests" in

13

"easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019).

The NVRA requires states to ensure that all eligible applicants are registered to vote and that voters are not removed from the voter rolls except under the following specified circumstances: (1) the voter has requested removal; (2) the voter has been convicted of a crime or is mentally incapacitated, if provided by state law; (3) the voter has died; or (4) the voter has moved outside the election jurisdiction. 52 U.S.C. § 20507(a). The statute further requires states to "conduct a general program that makes a *reasonable effort* to remove" voters who no longer belong on the rolls because they have died or moved. *Id.* § 20507(a)(4) (emphasis added).

The NVRA imposes procedural requirements on states to ensure that eligible voters are not removed from voter rolls without sufficient process. *Id.* § 20507(b)–(d). Before the enactment of the NVRA, some states removed registrants without first providing notice. *Husted*, 584 U.S. at 762. The NVRA changed that by requiring prior notice before removing a voter from the rolls. 52 U.S.C. § 20507(d)(1). Under the

14

statute, a state may only remove a voter from the rolls on change-of-address grounds if the voter confirms in writing they have moved, or the voter has failed to respond to a confirmation notice sent by the election official and has failed to vote in the two federal elections following the notice. *Id.* The NVRA further prohibits states from using a program intended to "systematically" remove voters from the rolls in the 90 days leading up to a primary or general federal election, with very few exceptions. *Id.* § 20507(c)(2).

Under the NVRA, any program to remove voters from the rolls must be non-discriminatory and must not remove a voter solely due to their failure to vote. *Id.* § 20507(b). The NVRA does not require any specific program to remove ineligible voters, but it does spell out a procedure that states *may* use to identify and remove voters who have moved that would comply with the NVRA. *Id.* § 20507(c)(1). The relevant provision of the NVRA, often referred to as the safe harbor provision, makes clear that states may satisfy the statute's list maintenance process by establishing a program under which election officials send confirmation notices to voters who appear to have moved based on the information contained in the National Change of Address (NCOA) database maintained by the

15

United States Postal Service (USPS). *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 703 n.2 (6th Cir. 2016) ("Because that subsection describes the NCOA Process as one way in which states 'may' comply with their obligation under the NVRA to identify and remove voters who are no longer eligible due to a change of residence, the NCOA Process is sometimes referred to in this litigation as the 'Safe–Harbor Process.' " (citation omitted)), *rev'd on other grounds*, 584 U.S. 756 (2018). The safe harbor provision does not require states to utilize the outlined procedure. *Husted*, 584 U.S. at 777. States may instead establish their own procedures to comply with the NVRA, which California has done.

### 2. California's list maintenance program removes voters who have moved or died in compliance with the NVRA's requirements.

As the state's top election official, the Secretary is responsible for ensuring the state's compliance with the NVRA. Cal. Elec. Code § 2402; Cal. Code Regs. tit. 2, § 19060. As part of that responsibility, the Election Law and regulations require the Secretary to develop and supervise the establishment of a statewide voter registration system and maintain such a system. Cal. Code Regs. tit. 2, § 19060(c). County election officials are required to synchronize the county's voter registration records in the

16

county election management system with the statewide voter registration system. *Id.* Together, state and local election officials in California complete a number of processes designed to keep their lists up to date while preserving eligible voters' status as registered voters.

California regulations require the Secretary to conduct monthly voter registration list maintenance using USPS's NCOA database to identify address changes for registered voters. *Id.* § 19078(a). When records show a change of address, the statewide voter registration system will automatically transmit a NCOA Potential Address Change Message to the county elections official in the county from or within which a voter has moved. *Id.* § 19078(b). Then, within five business days of receipt of such a message, the county elections official is required to process the message and send a forwardable notice, including a postage-paid and preaddressed return form, to enable the voter to verify or correct address information. *Id.* § 19078(c); Cal. Elec. Code § 2225(a)(1). When postal service change-of-address data received from a nonforwardable mailing indicates that a voter has moved without a forwarding address or that a voter has moved out of state, the county elections official must also send

17

a forwardable notice to the voter pursuant to 52 U.S.C. § 20507. Cal. Elec. Code § 2225(a)(2).

Local election officials are required to immediately update the voter's registration record based on change of address information received pursuant to Cal. Elec. Code § 2225,[12] the county's preelection residency confirmation process, *see* Cal. Elec. Code § 2220, or directly from the voter, Cal. Elec. Code § 2226(a)(1). If the mailings to the voter are undeliverable, or if NCOA, Operation Mail, a returned mailing, or postal service change-of-address data received from a nonforwardable mailing indicates that the voter has moved or left without a forwarding address, or moved out of state, the county elections official is required to update the address to inactive. Cal. Elec. Code § 2226(a)(2).

In addition, county election officials are allowed to send alternate residency postcards to voters who have not voted in an election within the preceding four years and who have not updated their address, name, or party preference. Cal. Elec. Code § 2224(a). Those postcards request

---

[12] Cal. Elec. Code § 2225 establishes that, based on change-of-address data received from USPS or its licensees, the county elections official must send a forwardable notice, including a postage-paid and preaddressed return form, to enable the voter to verify or correct their address information.

18

that the voter confirm their residency with the county. *Id.* Election officials are also empowered under California law to conduct alternative residency confirmation procedures, and must notify all voters of the procedure in the county via a county voter information guide or in a separate mailing. *Id.* § 2224(c). If a voter's address is inactive based on the voter's failure to confirm their address pursuant to Cal. Elec. Code § 2224, the county election official must send a forwardable address verification mailing. *See id.* § 2224(a). If the voter does not respond to the mailing and does not vote during the next two federal November elections, the voter's registration is cancelled. *Id.* § 2226(b).

County clerks, including *amici*, take an active role in ensuring that there is synchronization between the county's voter registration data and the voter registration data in the statewide voter registration system. In fact, California regulations require the county election officials to check for synchronization between the two voter registration systems every 30 days and resolve any differences they find. Cal. Code Regs. tit. 2, § 19083(a)–(b). In addition, California law empowers county election officials to contract with consumer credit reporting agencies or their

19

licensees to obtain change-of-address data for list maintenance purposes. Cal. Elec. Code § 2227.

County election officials also receive other types of residency information that triggers their obligation to engage in voter list maintenance procedures. Clerks may receive a notice of change-of-address directly from the voter, such as a letter or change of address form. Upon receipt of that information, the clerks will update the voter's information immediately in the voter's registration record if the voter still lives within the county. If the voter's address is in another county within California, the county elections official must immediately alert the county elections official associated with the new residence address via the statewide voter registration system.[13]

California also exceeds the list maintenance requirements for deceased persons. Under California law, the local registrar of births and deaths must notify the county elections official no later than the 15th day of each month of all deceased people aged 16 years or older. Cal. Elec. Code § 2205. The county election official is required to cancel the affidavit

---

[13] Shirley N. Weber, Cal. Sec'y of State, *California NVRA Manual - Chapter 4: Voter Registration Applications and Voter List Maintenance* (Mar. 2025), https://perma.cc/5GHA-WCEK.

of registration of those deceased voters. *Id.* However, the Secretary takes the process even further. California law requires the Secretary of State to facilitate the availability of death statistics from the State Department of Health Services so that the Secretary or county election officials can use that data to cancel the affidavit of registration of deceased people. *Id.* § 2206. This belt-and-suspenders approach ensures that deceased individuals are removed from the registration rolls if there is any data missing from other sources. When county clerks receive notice that a voter is deceased, they send a letter to the voter notifying them of an impending cancellation of their record. *Id.* § 2201(a)(5), (c)(1). If the clerks are notified that the information is wrong, the voter stays active. *See id.* § 2201(c)(2)(C) (instructing the voter to contact the clerk and advise that the record cancellation was made in error).  If there is no response, or if they receive confirmation from the voter's family that the voter is deceased, the voter's record will be cancelled after 15 days from the date the notice was sent. *See id.* § 2201(a)(5), (c). This ensures that the state voter file can be updated with accurate information in the days leading up to an election.

21

The Secretary and local clerks employ multiple practices to ensure that the voter registration rolls are kept accurate and updated. They promptly remove the names of deceased individuals and begin the process to cancel voters upon receipt of information indicating that a voter may have moved. Some of the practices employed by election officials are mandated by the Election Law, but election officials often go beyond statutorily-mandated procedures to ensure accurate voter registration rolls.

### 3. California's program is reasonable.

California's list maintenance program employs the safeguards in the NVRA aimed at ensuring that voters are not removed without notice while also satisfying the statute's list maintenance requirements. California's program exceeds the requirements set forth in the NVRA's safe harbor provision and satisfies the statute's "reasonable effort" requirement.

The NVRA requires only that states conduct a program that makes a "reasonable effort" to remove voters who are ineligible because they have moved or are deceased. 52 U.S.C. § 20507(a)(4). Indeed, a sister circuit has recently concluded that Michigan's program for removing

22

deceased voters satisfies the "reasonable effort" standard. *Pub. Int. Legal Found.,* 136 F.4th at 625-29.[14] Because "reasonable effort" is not defined in the statute, the Sixth Circuit consulted dictionary definitions. *Id.* at 625. The Court concluded that "a fairly straightforward definition of 'reasonable effort' can be constructed: a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Id.* Thus, the Court explained, "a state must establish a program that makes a rational and sensible attempt to remove dead registrants; a state need not, however, go to 'extravagant or excessive' lengths in creating and maintaining such a program." *Id.*

California's list maintenance procedures constitute more than a "reasonable effort" to remove voters who have died or moved. Those procedures go beyond the "safe harbor" procedures outlined in the NVRA and employ additional methods to identify and remove individuals who have died or moved from the voter registration rolls.

---

[14] After the district court issued its opinion in the instant case, the Supreme Court denied the appellant's petition for writ of certiorari in *Public Interest Legal Foundation*, 136 F.4th 613. *Pub. Int. Legal Found. v. Benson*, No. 25-437, 2026 WL 568298 (U.S. Mar. 2, 2026).

### B. The EAVS data does not provide an adequate basis for DOJ's demand.

DOJ contends that it stated a basis for its demand when it "identified numerous discrepancies and anomalies in California's responses to the U.S. Election Assistance Commission's (EAC) 2024 report." Opening Br. at 21. Those "anomalies" were pulled from the EAVS data for the 2024 election. *Amici* write to contextualize the EAVS data and to demonstrate why cherry-picked datapoints from the survey are not a sufficient basis for demanding California's unredacted voter registration list.

The EAVS is a survey of state and local election officials conducted on a biennial basis by the U.S. Election Assistance Commission (EAC). The use of the EAVS dates back to the passage of the Help America Vote Act (HAVA), which created the EAC to serve "as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections[.]" 52 U.S.C. § 20922. The EAC uses data from the EAVS to fulfill that mandate.

The EAVS is divided into six sections covering voter registration, overseas and military voting, domestic absentee voting, election

24

administration, provisional ballots, and Election Day activities.[15] Each section includes standardized survey questions designed to gather data from states. State election officials use data from local officials and state-level databases to complete the survey questions. The chief election official of each state submits and certifies the response for each state. The EAC reports its findings to Congress and releases them to the public in the year following each election.

The EAVS data may be helpful in identifying general trends in voting. But it cannot be used effectively to make specific findings about individual jurisdictions. U.S. elections are conducted at the local level, and jurisdictions employ widely varying election practices, practices which also have changed over time.[16] Those differences are not easily translated to the standard response categories of the survey. While the

---

[15] *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report*, at 231–33 (June 2025), https://perma.cc/TMQ7-MSSD.

[16] *See* Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings*, at 2 (July 8, 2025), https://perma.cc/A746-9A35 ("[S]ome data may not be straightforwardly comparable across years, states, or localities. Changes in the EAVS survey instrument from one year to another and changes or differences in data collection practices or election laws, procedures, or definitions complicate comparisons.").

data is useful for gaining initial insights on voting patterns and procedures, it is not as detailed or comprehensive as the data maintained by states.[17] As one researcher aptly described it, the EAVS data is "close enough for social science, but not close enough for the court house."[18]

DOJ has cherry-picked certain EAVS data to call California's voter list maintenance procedures into question. With so many data points measured by the survey, DOJ will always be able to identify some areas where a state has higher or lower rates than the average. Indeed, with the number of states that DOJ has sued now up to 30, it is evident that DOJ has done just that.

---

[17] The MIT Election Lab aims to support advances in election science by collecting, analyzing, and sharing election data and findings. *See* MIT Election Data + Sci. Lab, *About*, https://perma.cc/4DFW-Z5ZH. It identifies itself as a "[p]ower user[]" of the EAVS data. Jack Williams, MIT Election Data + Sci. Lab, *The Election Administration and Voting Survey*, Elections Performance Index (Aug. 16, 2021), https://perma.cc/L3JG-LELE. The MIT Election Lab notes the need to strike a balance between "valuing what the survey can bring to the table with cautions about scrutinizing the data before using it." *Id.* It notes that the EAVS data may differ from administrative data maintained by the states "for many reasons that are justified." *Id.*

[18] Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?*, at 3 (Aug. 25, 2018), https://perma.cc/9MXY-DWK5.

DOJ has focused on specific categories within the EAVS to make it appear that California is not keeping up with other states in performing list maintenance. A focus on different categories of data within the EAVS, however, paints a different picture. In certain areas, California's activity in maintaining its voter registration exceeds that of its peers. As the EAC report recognized, California merged or linked 759,961 voter registration records, more than the next two best states combined.[19]

DOJ makes several claims about "anomalies" in the EAVS data, each of which does not constitute a true "anomaly," and does not provide a basis for acquiescing to DOJ's demand. *See* Opening Br. at 21-22. First, DOJ suggests that it is anomalous that seven of California's fifty-eight counties failed to provide data for the EAC report regarding duplicate registrations. *Id.* But DOJ mischaracterizes the counties' response to that survey question. The EAC stated in its guidance for completing the survey that, "[i]f your state or jurisdiction does not track data for an item, then you may select 'Data not available' as your response. There are instructions throughout the survey that provide helpful advice and

---

[19] *See* U.S. Election Assistance Comm'n, *supra* n.16 at 154–55 (noting that the next two highest states, Wisconsin and Ohio, reported 338,719 and 321,348 merged or linked records, respectively).

examples for when to use the 'Does not apply' and 'Data not available' responses."[20] As the California DOJ noted in its September 12, 2025 letter, six counties responded to the question by responding "Data not available," meaning that those counties did not track that information during the EAVS reporting period. Sept. 12, 2025 Letter from Shirley N. Weber to Harmeet K. Dhillon ("September 12 Letter") at 3-4, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Dec 1, 2025), Dkt. No. 87-10. The final county, Napa, responded to the question with data. *See id.* at 4. Therefore, DOJ is incorrect that seven California counties "failed to provide data." Instead, fifty-two California counties provided data, and six counties reported to the EAC that they did not track the number it sought during the reporting period. *See id.*

Second, DOJ also claims that it is anomalous that there was no data in the EAC regarding duplicate registrants who were removed from the California statewide voter registration database. Opening Br. at 22. That claim is equally unfounded. California does not have a list of duplicate registrants that were removed from the statewide voter registration

---

[20] U.S. Election Assistance Comm'n, *2024 Election Administration and Voting Survey (EAVS): Guide to Using the Data Collection Templates*, at 23 (Nov. 5, 2024), https://perma.cc/8CJQ-GEJC.

database because all duplicate registrants get merged with their duplicate. September 12 Letter at 4–5.

Third, DOJ asserts that it is anomalous that California reported that 11.9% of voters were removed from the voter rolls because of death, and that this number was well below the national average. Opening Br. at 22. But that is, in fact, the number, as determined by California's established process for removing deceased individuals from the voter rolls. September 12 Letter at 5. That process begins with the county's review of the voter record and the associated deceased record to compare the date of birth, name, and any other information to help verify that the records match. *Id.* If the county verifies a match, the county begins the pre-cancellation process. *Id.* That process requires county election officials to notify possibly deceased individuals 15 to 30 days before cancelling their registration. *Id.* If no response is received within 15 days of sending the pre-cancellation notice, the county must then respond to a message in the Election Management System after the 16th day of the pre-cancellation period to confirm the cancellation. *Id.*

Finally, DOJ asserts that it is anomalous that the number of inactive voters in California was more than 40% lower than reported two

29

years ago. Opening Br. at 22. But there are numerous explanations for that change in data. First, the data may actually reflect how well California's voter roll maintenance system is *working*. Here is the reason: Under the NVRA, election officials are prohibited from removing people from the voter rolls in certain instances without first providing notice and waiting for two federal election cycles to pass. *See* 52 U.S.C. § 20507(d). In 2020, all registered voters in California were sent a vote-by-mail ballot for the election.[21] As a result, election officials were able to identify which voters had changed their addresses, and which remained inactive. The drop in inactive voters coincides with the two-federal-election-cycle waiting period for list removals spelled out in the NVRA. Second, as the California DOJ noted in its September 12, 2025 letter, "the difference in inactive voters between the 2022 and 2024 EAVS may reflect an increase in removal of inactive voters pursuant to changes in state law to comply with the United States Supreme Court's *Husted* decision[,]" in which the Supreme Court clarified that cancellation is mandatory under federal law. September 12 Letter at 6–7.

---

[21] *See* Cal. Sec'y of State, Elections Div., *Vote by Mail - November 3, 2020, General Election*, https://perma.cc/W6Z2-MPP.

The data must also be viewed in the context of the NVRA's notice requirements. The NVRA's protections mean that the removal of a voter can take time. Even under the safe harbor provision, voters who have moved can remain on voter rolls for years if they fail to answer a confirmation notice. If a state conducts special federal elections, that must delay systematic removal processes due to the 90-day quiet period mandated by the NVRA. *See* 52 U.S.C. § 20507(c)(2). The processes for removal mandated by the NVRA may mean that data in a particular category gives the appearance of slow list maintenance, when in fact jurisdictions are simply adhering to their legal obligations.

The data DOJ cites simply does not provide a basis to believe that California's list maintenance procedures fail to comply with the NVRA. Under DOJ's reasoning, any report of data related to registrations or removals that differs from the national average would call a state's list maintenance procedures into question. This ignores the fact that our elections are administered at the state and local level, and there will always be differences between the states. The NVRA does not require that states do things identically, but merely that they utilize programs

31

that protect voters from being removed without notice while engaging in reasonable efforts to remove voters who are no longer eligible.

## CONCLUSION

The CRA requires DOJ to submit more than a superficial basis when it demands sensitive voter information. In exercising their authority to compel states to turn over election records, courts should first examine DOJ's purported basis and purpose to determine whether it is sufficient. DOJ has failed to assert a sufficient basis in this case. California conducts list maintenance procedures that satisfy the NVRA's requirements, and there is nothing in the data DOJ cites that demonstrates otherwise.

Respectfully submitted,

/s/ Jonathan B. Miller
Jonathan B. Miller

Jonathan Miller
Kyra Sikora
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
Telephone: (510) 214-6960
jon@publicrightsproject.org

Counsel for Amici Curiae

Dated: April 17, 2026

32

## ADDITIONAL COUNSEL

SUSAN K. BLITCH
County Counsel
188 W. Alisal Street, 3rd Floor
Salinas, CA 93901
*Attorney for the County of*
*Monterey, California*

JOHN D. NIBBELIN
County Counsel
400 County Center, 6th Floor
Redwood City, CA 94063
*Attorney for San Mateo*
*County, California*

DAVID CHIU
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett
Place
San Francisco, CA 94102
*Attorney for the City and*
*County of San Francisco,*
*California*

TONY LOPRESTI
County Counsel
70 W. Hedding Street East
Wing, 9th Floor
San José, CA 95110
*Counsel for the County of*
*Santa Clara, California*

APPENDIX A – List of *Amicus Curiae*

**Local Governments**

County of Monterey, California

City and County of San Francisco, California

County of San Mateo, California

County of Santa Clara, California

**Local Election Officials**

Bill Burgess
*Clerk, Marion County, Oregon*

Juan Pablo Cervantes
*Clerk, Recorder & Registrar of Voters, Humboldt County, California*

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Domonique Clemons
*Clerk & Register of Deeds, Genesee County, Michigan*

Cynthia Cornejo
*Interim Registrar of Voters, Alameda County, California*

Kristin Connelly
*Clerk-Recorder & Registrar of Voters, Contra Costa County, California*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Lynn Goya
*Clerk, Clark County, Nevada*

34

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Kirk McDonough
*Cranston Board of Canvassers Chairperson,*
*City of Cranston, Rhode Island*

Jesse Salinas
*Assessor, Clerk-Recorder & Registrar of Voters, Yolo County, California*

Dawn Marie Sass
*Clerk/Deputy Treasurer, City of Exeter, Wisconsin*

John Tuteur
*Assessor-Recorder-County Clerk/Registrar of Voters, Napa County,*
*California*

35

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  26-1232

I am the attorney or self-represented party.

This brief contains  6,498  words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

☒ is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

☐ it is a joint brief submitted by separately represented parties;

☐ a party or parties are filing a single brief in response to multiple briefs; or

☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature */s/ Jonathan Miller*                 Date April 17, 2026
*(use "s/*[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

36

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that they are governmental entities and individuals for whom no corporate disclosure is required pursuant to Federal Rule of Appellate Procedure 26.1.

37

## CERTIFICATE OF SERVICE

I, JONATHAN MILLER, hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2026.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jonathan B. Miller*
Jonathan B. Miller