No. 26-1232

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*

v.

SHIRLEY WEBER, *et al.*,

*Defendants-Appellees*

NAACP, NAACP CALIFORNIA-HAWAII STATE CONFERENCE, SIREN *et al.*,

*Intervenors-Appellees.*

On Appeal from the United States District for the Central District of California
No. 2:25-cv-09149-DOC
Hon. David O. Carter

**ANSWERING BRIEF OF INTERVENORS-APPELLEES NAACP, NAACP
CALIFORNIA-HAWAII STATE CONFERENCE, AND SIREN**

Abha Khanna
Tyler Bishop
Walker McKusick
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Ste. 2100
Seattle, WA 98101
Tel.: (206) 656-0177

Lalitha D. Madduri
Christopher D. Dodge
Jacob D. Shelly
Branden D. Lewiston
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, D.C. 20001
Tel.: (202) 968-4490
lmadduri@elias.law

*Attorneys for Intervenors-Appellees NAACP, NAACP CA-HI, and SIREN*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... iii

INTRODUCTION ...............................................................................................1

ISSUES PRESENTED.........................................................................................4

STATEMENT OF THE CASE.............................................................................4

I.      The Constitution and federal law commit voter registration practices to the States, subject to carefully circumscribed statutory obligations.............4

     A.     The Civil Rights Act of 1960 ...............................................5

     B.     The National Voter Registration Act ....................................8

     C.     The Help America Vote Act................................................10

II.     DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans. ...............................................................12

III.    DOJ sues California to compel disclosure of its protected voter data............15

IV.    The district court dismisses DOJ's complaint, concluding it lacks the sweeping authority claimed here. ...............................................................16

SUMMARY OF THE ARGUMENT .....................................................................18

STANDARD OF REVIEW ...............................................................................19

ARGUMENT ....................................................................................................20

I.     The district court correctly held that Title III demands are subject to the Federal Rules of Civil Procedure and judicial review. ............................20

II.    DOJ failed to state a claim under the CRA.................................................25

A. DOJ's claimed purpose of investigating California's list maintenance program is beyond the scope of Title III. ........................26

1. Congress enacted the NVRA and HAVA—not the CRA—to govern voter list maintenance by States. .................. 27

2. Congress enacted the CRA to facilitate investigations into the denial of the right to vote and violations of civil rights laws. ................................................................... 30

B. DOJ also lacks any basis for investigating California's list maintenance program. ........................................................35

C. Title III does not preempt California's voter privacy protections. ......38

III. Alternatively, California's statewide voter list is not a record or document within the scope of Title III. ..........................................41

A. Title III's text reaches only static records received from voters—not dynamic databases created by election officials. ............41

B. DOJ's broader reading of Title III conflicts with HAVA. ...................47

C. DOJ's remaining counterarguments fail to overcome the plain text of Title III. ....................................................48

IV. DOJ's failure to comply with the Privacy Act provides another independent basis for affirmance. ..............................................52

CONCLUSION ........................................................................57

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alabama ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960)............................................................ 6, 7, 32

*Alexander v. Sandoval*,
  532 U.S. 275 (2001)..................................................................................30

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013)................................................................................ 4, 41

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................20

*Biden v. Nebraska*,
  600 U.S. 477 (2023)........................................................................ 31, 33, 52

*Bond v. United States*,
  572 U.S. 844 (2014)..................................................................................35

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
  854 F.3d 683, 689–90 (D.C. Cir. 2017) ................................................ 21, 24

*CFPB v. Source for Pub. Data, L.P.*,
  903 F.3d 456, 458–60 (5th Cir. 2018)........................................................24

*Coleman v. Kennedy*,
  313 F.2d 867 (5th Cir. 1963).....................................................................34

*Crooks v. Harrelson*,
  282 U.S. 55 (1930)....................................................................................26

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010).....................................................................12

*Donaldson v. United States*,
  400 U.S. 517 (1971)............................................................................ 22, 23

*E.E.O.C. v. Karuk Tribe Hous. Auth.*,
  260 F.3d 1071 (9th Cir. 2001)...................................................................23

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)......................................................................48

*F.D.I.C. v. Garner*,
126 F.3d 1138 (9th Cir. 1997).....................................................38

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)........................................................ 28, 31, 34

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016)........................................................8

*Foster v. Love*,
522 U.S. 67 (1997)................................................................ 4, 6, 33

*Grand Canyon Univ. v. Cardona*,
121 F.4th 717 (9th Cir. 2024).....................................................45

*Hartmann v. Cal. Dep't of Corr. & Rehab.*,
707 F.3d 1114 (9th Cir. 2013) ....................................................20

*Honeycutt v. United States*,
581 U.S. 443 (2017).....................................................................43

*Huddleston v. United States*,
415 U.S. 814 (1974).....................................................................43

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018)........................................................ 9, 31, 41

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281 (1988).....................................................................31

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962)................................................ 41, 50

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)............................................. *passim*

*Knox v. Brnovich*,
907 F.3d 1167 (9th Cir. 2018).....................................................40

iv

*League of Women Voters v. DHS*,
No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ..............................53

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) ................................................................... 31, 33

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ........................................................................42

*Loc. 174, Int'l Bhd. of Teamsters v. United States*,
240 F.2d 387 (9th Cir. 1956) ................................................. 21, 23, 38

*LULAC v. Exec. Off. of the President*,
No. 1:25-cv-0946, 2026 WL 252420 (D.D.C. Jan. 30, 2026) ...................... 54, 55

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ...............................................................20

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ..........................................................................28

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) ..........................................................................51

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ...............................................................21

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ..........................................................................37

*Penn. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) ................................................................6

*Peters v. United States*,
853 F.2d 692 (9th Cir. 1988) ...............................................................24

*Prewett v. Weems*,
749 F.3d 454 (6th Cir. 2014) ...............................................................45

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ................................................................9

*Pub. Int. Legal Found. v. Boockvar*,
431 F. Supp. 3d 553 (M.D. Pa. 2019) ........................................................................9

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ........................................................................10

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) ........................................................................10

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........................................................................28

*Republican Nat'l Comm. v. Benson*,
754 F. Supp. 3d 773 (W.D. Mich. 2024) ........................................................................38

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ........................................................................10

*Rotkiske v. Klemm*,
589 U.S. 8 (2019) ........................................................................29

*Savarese v. U.S. Dep't of Health, Educ. & Welfare*,
479 F. Supp. 304 (N.D. Ga. 1979) ........................................................................57

*Schwier v. Cox*,
412 F.Supp.2d 1266 (N.D. Ga. 2005) ........................................................................55

*SEC v. Dresser Indus.*,
628 F.2d 1368 (D.C. Cir. 1980) ........................................................................25

*Smiley v. Holm*,
285 U.S. 355 (1932) ........................................................................33

*State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*,
580 U.S. 26 (2016) ........................................................................29

*Syed v. M-I, LLC*,
853 F.3d 492 (9th Cir. 2017) ........................................................................51

*TVA v. Hill*,
437 U.S. 153 (1978) ........................................................................53

*Union Pac. R.R. Co. v. United States*,
    865 F.3d 1045 (8th Cir. 2017) ................................................................43

*United States v. Amore*,
    No. 1:25-cv-639-MSM, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) .......... 1, 23, 59

*United States v. Benson*,
    No. 1:25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) .............. *passim*

*United States v. Est. of Romani*,
    523 U.S. 517 (1998) ................................................................ 29, 33

*United States v. Galvin*,
    No. 1:25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026) ................ 1, 14, 36

*United States v. Golden Valley Elec. Ass'n*,
    689 F.3d 1108 (9th Cir. 2012) ...................................................... 21, 36

*United States v. Mohrbacher*,
    182 F.3d 1041 (9th Cir. 1999) ........................................................43

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ................................................................ 21, 38

*United States v. Oregon*,
    No. 6:25-cv-0166, 2026 WL 318402 (D. Or. Feb. 5, 2026) ........................... 1, 36

*United States v. Powell*,
    379 U.S. 48 (1964) .................................................................. 18, 22

*United States v. Prasad*,
    18 F.4th 313 (9th Cir. 2021) .........................................................43

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) .........................................................12

*United States v. Union Oil Co. of Cal.*,
    343 F.2d 29 (9th Cir. 1965) .........................................................24

*Voter Reference Found., LLC v. Torrez*,
    160 F.4th 1068 (10th Cir. 2025) ............................................... 10, 29, 40

vii

*West Virginia v. EPA*,
  597 U.S. 697 (2022).................................................................... 3, 34, 52

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)..........................................................................34

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008).............................................................20

*Wis. Cent. Ltd v. United States*,
  585 U.S. 274 (2018)..........................................................................45

*Yates v. United States*,
  574 U.S. 528 (2015)..........................................................................46

## STATUTES

5 U.S.C. §552a ............................................................................ *passim*

10 U.S.C. §130c(d) ............................................................................44

26 U.S.C. §7604(a) ............................................................................22

30 U.S.C. §1732(b) ............................................................................44

44 U.S.C. §3572 ................................................................................44

52 U.S.C. §10101(a)(1)........................................................................7

52 U.S.C. §20501 ................................................................................8

52 U.S.C. §20504 ................................................................................8

52 U.S.C. §20505 ................................................................................8

52 U.S.C. §20507 ........................................................................ *passim*

52 U.S.C. §20510 ......................................................................... 10, 30

52 U.S.C. §20701 ........................................................................ *passim*

52 U.S.C. §20702 .......................................................................... 7, 47

52 U.S.C. §20703 ........................................................................ *passim*

52 U.S.C. §20705 ................................................................................22

52 U.S.C. §21083 ..................................................................11, 47, 48

52 U.S.C. §21085 ................................................................................12

52 U.S.C. §21111 ...............................................................................11

8 U.S.C. §1454(a) ..............................................................................44

Cal. Elec. Code §2119.........................................................................49

Cal. Elec. Code §2194......................................................................19, 39

Cal. Gov't Code §7924.000 ...............................................................19

Pub. L. No. 85-315, 71 Stat. 634 (1957)...........................................5, 32

Pub. L. No. 108-31, 107 Stat. 77 (1993).............................................8

## RULES

9th Cir. R. 28 ......................................................................................12

Fed. R. Civ. P. 1..................................................................................21

Fed. R. Civ. P. 81(a) ...........................................................................22

## REGULATIONS

11 C.F.R. §9428.7................................................................................13

## OTHER AUTHORITIES

106 Cong. Rec. 5086 (1960) ...............................................................33

AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795.........................15

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ..............................28, 48

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://perma.cc/JGH7-NQ7P ........................................... 15

Exec. Order No. 14399,
91 Fed. Reg. 17125 (Mar. 31, 2026) ............................................................ 15, 16

Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary,
86th Cong. 212 (1959) ................................................................. 6, 32, 49

H.R. Rep. No. 107-329 (2001) .......................................................... 12, 57

H.R. Rep. No. 86-956 (1959) ............................................................ 5, 6, 32

*Privacy Act of 1974: Systems of Records*,
68 Fed. Reg. 47610 (Aug. 11, 2003) ................................................................. 55

*Privacy Act of 1974: Systems of Records*,
90 Fed. Reg. 48948 (Oct. 31, 2025) ................................................................. 57

*Receive, Black's Law Dictionary* (12th ed. 2024) ..................................................... 42

Rep. of the U.S. Comm'n on Civil Rights (1959) .......................................... 5, 6, 49

Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to Homeland Security, sources say*, CBS News (Mar. 26, 2026), https://perma.cc/T62F-J3ZF ................................................................. 15

## INTRODUCTION

The U.S. Department of Justice (DOJ) has embarked upon an unprecedented nationwide campaign to collect the complete voter registration data of nearly every American. It has issued demands to more than 40 States, ordering them to turn over unredacted, non-public versions of their complete voter registration lists, notwithstanding state laws that protect sensitive information on those lists from disclosure. Most States have refused, recognizing that DOJ lacks the authority to compel such disclosure. As a result, DOJ has sued 30 States and the District of Columbia to force them to surrender these lists. To date, these suits have been uniformly rebuffed by courts across the country, including the district court below, which rightly held that none of the asserted grounds for DOJ's "unprecedented" demand provide a legal basis for such compelled disclosure. ER-2.[1]

DOJ insists it needs unredacted voter lists to ensure that the States are complying with the voter list maintenance procedures set forth in the National Voter Registration (NVRA) and Help America Vote Act (HAVA). But if that were the case, one would expect those laws to supply DOJ with the power to demand that information. They do not. HAVA contains no disclosure provision at all. And while

---

[1] *See also United States v. Oregon*, No. 6:25-cv-0166, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Galvin*, No. 1:25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 1:25-cv-639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026).

1

the NVRA allows DOJ to inspect "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" maintained by States, 52 U.S.C. §20507(i), appellate courts have *uniformly* held that States are permitted to redact sensitive personal information when producing records under §20507(i). Notably, DOJ brought claims under the NVRA and HAVA below, but now abandons them on appeal, effectively conceding that they do not afford DOJ the authority it seeks.

Instead, DOJ proceeds exclusively based on Title III of the Civil Rights Act of 1960 (CRA), which Congress enacted during the height of the Civil Rights Movement to aid DOJ in enforcing voting rights. But the CRA provides no foothold for DOJ's unprecedented demand here. To start, the CRA requires DOJ to provide a "statement of the basis and the purpose" for any demand for records made under its auspices. 52 U.S.C. §20703. Fundamental principles of statutory interpretation confirm that the CRA requires a *permissible* purpose—not *any* purpose, as DOJ claims. Specifically, the CRA's disclosure provision is limited to aiding DOJ's investigating and enforcement of *voting rights* laws—not list maintenance laws like the NVRA and HAVA, where Congress expressly afforded alternative disclosure and enforcement authority. To hold otherwise would grant DOJ previously "unheralded" power to demand unredacted voter rolls from States at any time, for any reason, without "clear congressional authorization" for such sweeping power. *West Virginia*

2

*v. EPA*, 597 U.S. 697, 722–23 (2022) (citation omitted). The sudden grant of extraordinary federal power would be troubling in any context, but particularly when it comes to voter registration—a domain where States enjoy primacy.

DOJ's attempt to shoehorn its demand into the confines of the CRA comes with other terminal defects. It has failed to state a "basis" for investigating California, and its *post hoc* efforts to construct such a basis fail. Furthermore, the plain language of the CRA extends only to records that "come into [the] possession" of election officials from voters and cannot be "altered"—under penalty of "imprisonment." It therefore cannot encompass computerized voter databases, which States themselves create and are *required* to continuously "alter" through updating and maintenance. Accepting DOJ's effort to stretch the CRA to reach such materials would result in a cascade of absurdities under other CRA provisions, while also creating unnecessary tensions with the NVRA and HAVA. Finally, in its haste to compile a nationwide voter list unauthorized by law, DOJ has flouted its obligations under the Privacy Act—an independent basis for affirmance.

With no answer for these deficiencies, DOJ's lodestar argument is that its CRA claim is immune from judicial review—a radical theory that must be rejected. Courts have a long-recognized duty to review the lawfulness of intrusive federal investigations and demands. The court below properly fulfilled that duty by dismissing for failure to state a claim. This Court should affirm.

## ISSUES PRESENTED

1.      Whether the district court correctly held that DOJ's claim under the CRA is subject to judicial review and Rule 12(b)(6).

2.      Whether the district court properly dismissed DOJ's CRA claim because DOJ failed to include a sufficient statement of basis and purpose, as well as on the separate ground that the CRA does not preempt California privacy law.

3.      Whether, in the alternative, this Court should affirm on the basis that computerized voter lists are beyond the scope of the CRA.

4.      Whether the district court correctly held that the relief DOJ seeks violates the Privacy Act as a matter of law.

## STATEMENT OF THE CASE

**I.      The Constitution and federal law commit voter registration practices to the States, subject to carefully circumscribed statutory obligations.**

The Constitution "invests the States with responsibility for the mechanics" of elections, subject only to decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). It is therefore States that are principally responsible for determining voter eligibility and maintaining lists of eligible voters—not the federal government. *See Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 17 (2013). Though Congress has acted to protect voting rights, it has exercised its authority to regulate in the field of voter registration

4

sparingly and, when doing so, has always reaffirmed the paramount role of the States in managing their own voter lists.

### A.    The Civil Rights Act of 1960

The only authority DOJ invokes on appeal to support its demand for California's statewide voter registration list is Title III of the Civil Rights Act of 1960, a law enacted to "provide a more effective protection of the right of all qualified citizens to vote." H.R. Rep. No. 86-956, at 7 (1959).

Title III's genesis traces to a report by the U.S. Commission on Civil Rights. *See* Rep. of the U.S. Comm'n on Civil Rights, at 87–94 (1959) ("Comm. Rpt."). In the Civil Rights Act of 1957, Congress created the Commission and charged it with "investigat[ing] allegations … that certain citizens of the United States are being deprived of their right to vote." Pub. L. No. 85-315, §104(a)-(b), 71 Stat. 634, 635 (1957). The Commission reviewed voting applications in Jim Crow jurisdictions to identify discriminatory registration practices. By comparing registration forms submitted by Black and White applicants, the Commission revealed that southern election officials often imposed tests on Black applicants—such as requiring them to "copy article 2 of the U.S. Constitution"—while exempting White applicants from "copy[ing] this same lengthy article." Comm. Rpt. at 87. Comparing applications also revealed that "many Negro applicants were denied registration because of inconsequential errors which they made, whereas many white applicants who

5

committed similar errors were permitted to register." *Id.* at 91. The Commission thus concluded that reviewing "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137.

However, the Commission often found its investigatory work thwarted by efforts to destroy or restrict access to "[r]ejected applications." *Id.* at 93. For instance, in response to the 1957 Act, Alabama enacted legislation requiring the "destruction of the questionnaires of unsuccessful applicants for registration." *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 212 (1959) ("*Hearings*") (statement of Attorney General Rogers);[2] *see also Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 n.4 (M.D. Ala. 1960) (recounting officials' efforts to "destroy[]" registration records). Under the 1957 Act, DOJ lacked any "power in civil proceedings to require the production" of registration records, rendering its ability to investigate denials of the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7. The Commission therefore recommended that Congress enact legislation requiring that election officials retain registration records and allow DOJ to inspect them. Comm. Rpt. at 137–38. "Congress responded by passing the Civil Rights Act of 1960." *Penn. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (Shwartz, J., dissenting).

---

[2] Available at: https://perma.cc/ET26-FKD9.

This history "leaves no doubt but that [Title III] [wa]s designed to secure a more effective protection of the right to vote." *Gallion*, 187 F. Supp. at 853. Title III's interlocking provisions collectively permit DOJ "to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). Title III thus "enable[s] the Attorney General to determine whether §1971 suits or similar actions should be instituted." *Id.* at 228. In turn, §1971—now codified at §10101— guarantees the right to vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. §10101(a)(1).

The core provision of Title III requires officials to "retain and preserve" the records most critical to a voting rights investigation. Specifically, §20701 provides:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. §20701. Title III criminalizes "willfully fail[ing]" to comply with the statute's command, *id.*, threatening "imprisonment" for "[a]ny person … who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved." *Id.* §20702.

7

Finally, Title III allows DOJ—after making an adequate demand—to inspect covered records:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]

*Id*. §20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

## B.     The National Voter Registration Act

Three decades after the enactment of the CRA, Congress passed the NVRA. *See* Pub. L. No. 108-31, 107 Stat. 77 (May 20, 1993). In contrast to the CRA, which was designed to bolster DOJ's ability to investigate voting rights violations, the NVRA built an administrative framework to regulate certain voter registration procedures. Congress enacted the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. §20501(b).

The NVRA requires States to ensure "simple means are available to register for federal elections and [that] these means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016). Among other things, the NVRA directs States to allow individuals to register to vote when they apply for a driver's license, 52 U.S.C. §20504, and to register by mail, *id.* §20505.

The NVRA also sets forth rules guarding against improper or rushed voter removals. *See id*. §20507. The NVRA also requires States to take steps to ensure their voter rolls are reasonably up to date—the first time federal law placed any affirmative "list maintenance" obligation on the States. *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). That modest record-keeping obligation reaffirms the principal role of States in managing registration lists, requiring only that they "conduct a general program" that "makes a reasonable effort" to remove names from the list that are ineligible because of either (1) "the death of the registrant" or (2) "a change in the residence of the registrant." 52 U.S.C. §20507(a)(4).

In the NVRA itself, Congress also created an inspection tool to facilitate "the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). Specifically, the NVRA requires States "make available for public inspection … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. §20507(i). This inspection provision grants both the Attorney General and members of the public a "broad grant of access" to state list maintenance records. *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561 (M.D. Pa. 2019)). However, appellate courts have uniformly held that it also permits States to redact

9

sensitive personal information before disclosure. *E.g.*, *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021).

*This* disclosure provision—expressly provided for in the NVRA itself—constitutes Congress's chosen method for facilitating pre-suit investigation of list maintenance practices, as DOJ has previously acknowledged. *See* Br. for the U.S. as Amicus Curiae at 1, *Pub. Int. Legal Found. v. Sec'y Commw. of Pa.*, No. 23-1590 (3d Cir. Nov. 6, 2023), Dkt. 40 ("The Attorney General is charged with enforcing the NVRA, including Section 8(i), and relies on Section 8(i) to aid its enforcement efforts. 52 U.S.C. 20510(a)."). DOJ's own complaint and initial correspondence further reflect that §20507(i) is the customary tool DOJ employs when assessing whether States are undertaking a proper "general program" of list maintenance. ER-320 ¶¶ 53–56; *see also* ER-267–68.

## C.    The Help America Vote Act

Four decades after the CRA, Congress enacted HAVA to "improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). HAVA requires States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. §21083(a)(1). The list must "contain[] the name and registration information

10

of every legally registered voter in the State," *id*., and "serve as the single system for storing and managing the official list of registered voters throughout the State," *id*. §21083(a)(1)(A)(i).

The list is dynamic by design. For instance, HAVA directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id*. § 21083(a)(1)(A)(vi). The State's chief election official must ensure "local election officials are able to enter [that] information." *Id*. §21083(a)(1)(A)(vii). Likewise, HAVA requires that the list "shall be coordinated with other agency databases within the State." *Id*. §21083(a)(1)(A)(iv). HAVA also imports the NVRA's safeguards against improper removals and its list maintenance requirement. *Id*. §21083(a)(2)(A).

Though HAVA gives DOJ authority to sue to address violations of the statute, *see id*. §21111, it does not grant DOJ access to State voter lists or otherwise empower DOJ to superintend or audit States' voter list maintenance practices. To the contrary, HAVA contains no inspection provision, and it reaffirms the preeminent role of States' in managing voter lists, instructing that each State's list be "defined, maintained, and administered at the State level," *id*. §21083(a)(1)(A), and committing "[t]he specific choices on the methods of complying with the requirements of [HAVA] … to the discretion of the State," *id*. §21085. The absence

11

of any disclosure provision in HAVA is a feature, not a bug—Congress viewed state authority over voter registration as central to preserving our democratic system:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. ***The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome***. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001) (emphasis added).

## II. DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans.

DOJ recently launched an unprecedented campaign to collect States' unredacted voter files, which include sensitive information about each registered voter.[3] DOJ has sent demands to at least 48 States. Most have refused to turn over their unredacted lists.[4] DOJ has now sued 30 States and the District of Columbia to compel disclosure.

---

[3] Intervenors-Appellees recount the relevant facts based on DOJ's Complaint and other matters properly subject to judicial notice; other statements are offered only for general context and background. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); 9th Cir. R. 28-2.8.

[4] *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Apr. 9, 2026), https://perma.cc/QME5-EDE3; *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (permitting judicial notice of public material when "neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein").

DOJ's legal theories have shifted over the course of these lawsuits. In the first eight—including this one—DOJ framed the matter largely in terms of the NVRA and HAVA. *E.g.*, ER-319–21. But in its more recent suits, DOJ has ditched its NVRA and HAVA claims—appearing to concede that these laws do not provide the scope of disclosure DOJ desires—and proceeded under the CRA alone. *E.g.*, Compl., *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. Dec. 11, 2025). Consistent with this approach, DOJ does not appeal dismissal of its NVRA and HAVA claims here.

DOJ has also recast its factual allegations. In its early complaints, DOJ alleged that its demands were prompted by "anomalies" identified in Election Administration & Voting Survey ("EAVS") reports.[5] Here, for instance, DOJ cited EAVS data to suggest California's rate of removing voters from its rolls was below the national average. ER-316–17. DOJ sued Maine days before it sued California, alleging it needed to investigate that State because its rate of removing voters was *above* the national average. *See* Ex. 3 ("July 24, 2025 Ltr."), *United States v. Bellows*, No. 1:25-cv-468 (D. Me. Sep. 16, 2025), ECF No. 5-4. In its more recent suits, however, DOJ has abandoned the pretext that its demands were prompted by individualized concerns with a given State's list maintenance program. *E.g.*, *Galvin*, 2026 WL 972129, at *3-6. In these cases, DOJ has argued the CRA demands require

_____

[5] EAVS is a biennial survey of state and local election officials administered by the U.S. Election Assistance Commission. *See* 11 C.F.R. §9428.7.

no factual basis *at all* and need only a "statutory basis," such as the bare invocation of "HAVA" or even just Title III itself. *See* Opp'n to Mot. Dismiss at 19, *United States v. Thomas*, No. 3:26-cv-00021-KAD (D. Conn. Mar. 13, 2026), ECF No. 76 (disputing the CRA requires DOJ to supply any "factual basis" for demand); *see also Amore*, 2026 WL 1040637, at *5 (rejecting DOJ's argument that "Title III essentially authorizes factually groundless 'fishing expeditions'").

DOJ has also struggled to keep its story straight on the purpose of its demands. It initially claimed that it required California's unredacted voter list to assess its compliance with list maintenance under the NVRA and HAVA. ER-319. But when moving to expedite this appeal, DOJ pointed instead to the specter of noncitizens on voter rolls—an issue it did not raise below. *See*, *e.g.*, Mot. to Expedite at 2, 7, 15. DOJ now omits concerns of noncitizen voting in its merits brief, *see* DOJ Br. 13-14, 22-26, and instead claims that it requires sensitive voter data to assess California's "compliance with its recordkeeping requirements under the NVRA." DOJ Br. 29.

DOJ's inconsistencies betray its true purpose—to empower itself as a supervisory authority that can dictate which names appear on a State's voter list. To that end, DOJ has pressured States into signing agreements obligating them to cancel the registrations of any voters requested by DOJ. *E.g.*, Ex. G at 5, *United States v. Griswold*, No. 25-cv-3967 (D. Colo. Feb. 10, 2026), ECF No. 37-8. The head of DOJ's Civil Rights Division has confirmed that DOJ's goal is to purge "hundreds of

14

thousands of people" from voter rolls.[6] Most recently, President Trump directed federal agencies to, in effect, create a national registry of voters permitted to cast ballots through the postal service. *See* Exec. Order No. 14399, §3(b)(iii)-(iv), 91 Fed. Reg. 17125, 17126 (Mar. 31, 2026). And DOJ and the Department of Homeland Security (DHS) are reportedly "close to finalizing an agreement that will allow the federal government to use sensitive voter registration data for immigration and criminal investigations."[7] Indeed, a DOJ attorney recently disclosed that DOJ was "dishonest" with state officials when stating how it intended to use their voter lists.[8]

## III.    DOJ sues California to compel disclosure of its protected voter data.

DOJ sent Secretary Weber a letter on July 10, 2025, demanding, among other things, California's "statewide voter registration list." ER-267. DOJ also demanded that the Secretary produce "*all fields*" from its voter registration database, *id.*, including "the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number." ER-265. This letter relied solely on the NVRA's inspection

---

[6] AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795.

[7] Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to Homeland Security, sources say*, CBS News (Mar. 26, 2026), https://perma.cc/T62F-J3ZF.

[8] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://perma.cc/JGH7-NQ7P.

provision to underpin its demand for California's voter list. DOJ did not invoke the CRA until a subsequent letter on August 13, 2025, in which it asserted the purpose of the request was to "assist in our determination of whether California's list maintenance program complies with the NVRA." ER-264.

Secretary Weber declined to produce an unredacted copy of California's voter registration list. She explained that "the NVRA does not give DOJ general supervisory power over the accuracy of each record in the voter file." ER-259. She further objected to producing records under Title III because DOJ had not provided any "basis for suspecting any shortcoming" in California' list maintenance program, and because assessing "compliance with the NVRA's list maintenance requirements does not require production of sensitive and confidential records of millions of Californians." *Id*. She nonetheless offered to permit inspection of California's voter list—excluding full dates of birth, social security numbers, and driver's license numbers, which are protected from disclosure under California law—at her office in Sacramento. ER-258–60.

Rather than respond to Secretary Weber, or take up her offer to review California's public voter list, DOJ sued.

## IV. The district court dismisses DOJ's complaint, concluding it lacks the sweeping authority claimed here.

DOJ raised claims under the NVRA, HAVA, and the CRA. ER-319–21. The district court determined that none of these statutes required production and

16

dismissed the complaint. ER-14–34. Following uniform precedent, the court held that the NVRA's inspection provision does not reach unredacted voter lists. ER-21–22. The court also held that HAVA does not entitle DOJ to California's voter list, for the obvious reason that it "does not contain any disclosure provisions." ER-25–28. DOJ does not contest the dismissal of those claims on appeal, arguing only that the court erred by dismissing its CRA claim.

As to that claim, the court rejected DOJ's position that CRA claims are exempt from judicial review and the Federal Rules. ER-14. On the merits, the court held Title III requires DOJ to state a *factual* basis for its demand but that DOJ failed to do so. ER-17. The court also held DOJ's purported purpose of ascertaining California's compliance with its list maintenance obligations under the NVRA and HAVA was beyond the CRA, ER-15–16, and that California's unredacted voter list was unnecessary to assess compliance with those statutes in any event, ER-16. The court also held that DOJ failed to comply with federal privacy laws, including the Privacy Act. ER-28–32. Finally, after concluding that DOJ's CRA claim must be dismissed under Rule 12(b)(6), the court expressed concerns about DOJ's candor, questioning its true purpose in demanding California's voter list. ER-17–20.[9]

---

[9] The court was clear that its ruling was *not* based on those concerns, but rather DOJ's failure to satisfy the statutory requirements of stating a sufficient "basis and purpose," among other independent grounds. ER-14–17, 20–32. Accordingly, DOJ's claim that the court erred by inquiring into DOJ's motives cannot be a basis for reversal. *Contra* DOJ Br. 30–31.

**SUMMARY OF THE ARGUMENT**

1.      DOJ's CRA claim is subject to both the Federal Rules of Civil Procedure and meaningful judicial review. The Supreme Court and this Court have long recognized that government document demands are subject to review for compliance with their authorizing statutes, and nothing in Title III displaces that principle. The Federal Rules also clearly apply because nothing in the CRA supplants them or provides alternative procedures to follow. Indeed, the Supreme Court has confirmed that a statute with *identical* jurisdictional language is subject to the Federal Rules. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964).

2.      The district court correctly dismissed DOJ's CRA claim on several grounds. *First*, DOJ's stated purpose—investigating California's compliance with list maintenance requirements—is not a permissible "purpose" under the CRA. Congress enacted the NVRA and HAVA—not the CRA—to govern list maintenance and supplied a specific inspection tool in the NVRA. DOJ may dislike the authority Congress granted, but it cannot simply replace the NVRA's inspection provision with authority from an unrelated statute. *Second*, DOJ failed to state any factual "basis" for its demand in a single written instrument as Title III requires, and its *post hoc* effort to construct a basis fails. *Third*, nothing in the CRA suggests Congress intended to preempt state privacy laws—like Cal. Elec. Code §2194(b)(1) and Cal.

Gov't Code §7924.000(b)–(c)—that forbid disclosure of sensitive personal information on voter lists.

3. Separately, the Court may affirm because Title III does not reach dynamic, computerized voter lists. The statute covers only static records—like voter applications—that "come into the possession" of election officials from voters and that cannot be "alter[ed]" in any way. Election officials who alter such records can be subject to criminal liability. Extending Title III to reach statewide databases would breach the CRA's text and place it in irreconcilable conflict with HAVA's command that election officials continuously update and alter those very records.

4. Finally, the Court may also affirm because DOJ failed to comply with the Privacy Act before seeking to collect, maintain, and match the sensitive personal information of millions of Californians. DOJ's existing authorizations do not contemplate collection on this scale, and its plan to run voter data through the SAVE system triggers the Act's computer-matching requirements, which DOJ ignored.

## STANDARD OF REVIEW

"A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed de novo." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008) (citation omitted). The Court may affirm on "any ground that is supported by the record, whether or not the district court relied on the same ground or reasoning ultimately adopted by this court." *Hartmann v. Cal. Dep't of*

19

*Corr. & Rehab.*, 707 F.3d 1114, 1121 (9th Cir. 2013). Dismissal under Rule 12(b)(6) is required "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). It is not enough for a complaint to contain "a formulaic recitation of the elements of a cause of action." *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## ARGUMENT

**I.      The district court correctly held that Title III demands are subject to the Federal Rules of Civil Procedure and judicial review.**

DOJ first contends that the district court erred by engaging in judicial review *at all*, arguing that "so long as the Attorney General has stated in writing the basis and purpose of the demand," there is nothing left for courts to do beyond rubber stamping the Title III demand without question. DOJ Br. 17. It further claims, without elaboration, that parties resisting such demands "may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure." *Id.* at 16.

DOJ fails to identify *any* authority sanctioning this radical view, which would grant it unchecked power to intrude upon state election administration. This Court has long repudiated the notion that a court may grant its "imprimatur of approval" to a government document demand "without further investigation." *Loc. 174, Int'l Bhd. of Teamsters v. United States*, 240 F.2d 387, 391 (9th Cir. 1956); *see also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (holding courts must quash

20

demands that "exceed the investigatory power" of a federal agency); *CFPB v. Accrediting Council for Indep. Colls. & Schs.* ("*Accrediting Council*"), 854 F.3d 683, 689–90 (D.C. Cir. 2017) (similar). Rather than serving as a "rubber stamp," *Loc. 174*, 240 F.2d at 391, courts asked to enforce such governmental demands must, at minimum, assess "(1) whether Congress has granted the authority to investigate; (2) whether procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation." *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012). The district court therefore correctly concluded the Rule 12(b)(6) framework applies, ER-14, permitting resisting parties to "test[] the legal sufficiency" of DOJ's claim, *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

That conclusion is well-grounded. The Federal Rules "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. This case is such an action. While Rule 81 sets out a narrow set of cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—none involves the CRA. *See id.* § 81(a).

The Supreme Court has also spurned DOJ's suggestion that the Federal Rules are diminished or inapplicable in actions seeking to enforce governmental demands. In *Powell*, the Court held that where a statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of

21

Civil Procedure apply." 379 U.S. at 58 n.18. The Court's conclusion was based on statutory text *identical* to the relevant language in Title III—a jurisdictional grant stating that courts "shall have jurisdiction by appropriate process to compel" compliance, *see* 52 U.S.C. §20705; 26 U.S.C. §7604(a)—which the Court found to neither displace the Federal Rules nor relieve courts of their duty to examine governmental demands. *See Powell*, 379 U.S. at 58 & n.18. *Powell* thus compels the same conclusion for Title III.

DOJ has no answer to *Powell*, citing instead to Supreme Court precedent confirming that the "Civil Rules, of course, … have an application" to suits meant to enforce governmental demands. *Donaldson v. United States*, 400 U.S. 517, 524 (1971) (cited at DOJ Br. 17). This marks a puzzling departure from DOJ's *Oregon* brief, where DOJ endeavors to distinguish *Powell* and argues the CRA "displaces the Federal Rules" entirely. *See* Br. for the U.S. as Appellant at 15, *United States v. Oregon*, No. 26-1231 (9th Cir. Mar. 18, 2026), Dkt. 26.[10]

Back in this appeal, DOJ concedes that the Federal Rules apply but—citing *Donaldson*—insists the Rules cannot interfere with the "summary" nature of the proceedings. DOJ Br. 17. But DOJ fails to cite any authority explaining how the ordinary application of the Federal Rules should be modified or diminished here.

---

[10] These inexplicably divergent arguments aside, DOJ's theories in *Oregon* fail for the reasons set forth by the Our Oregon Intervenors in that appeal.

Instead, DOJ vaguely alludes to a "special statutory proceeding" that, ironically, is not spelled out in Title III or any other statute. *Id.* at 15. *Donaldson* offers DOJ no aid—that decision *confirmed* that Rule 24(a)(2) of the Federal Rules continues to apply in a civil action to enforce a tax summons, even though it affirmed the Fifth Circuit's conclusion that a putative intervenor failed to satisfy Rule 24's substantive terms. *See Donaldson*, 400 U.S. at 540–41.

If anything, *Donaldson* provides *more* authority that district courts should treat actions like these as "just another lawsuit." *Loc. 174*, 240 F.2d at 391. And as this Court has repeatedly affirmed in a wide array of circumstances, such enforcement lawsuits still require meaningful judicial review. *E.g.*, *E.E.O.C. v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1082 (9th Cir. 2001) (EEOC administrative subpoena); *Peters v. United States*, 853 F.2d 692, 699 (9th Cir. 1988) (immigration-related subpoena); *United States v. Union Oil Co. of Cal.*, 343 F.2d 29, 31 (9th Cir. 1965) (antitrust CID); *see also CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458–60 (5th Cir. 2018) (reversing order to enforce consumer protection civil investigative demand after inquiry into the basis and purpose of demand); *Accrediting Council*, 854 F.3d at 689–91 (similar).

Beyond *Donaldson*, DOJ relies entirely on a Fifth Circuit case from 1962 in support of its contention that a court must hold its nose and sign off on any Title III demand without question. DOJ Br. 14–20 (citing *Lynd*, 306 F.2d at 225–26). But

23

DOJ strips *Lynd* of its context; the issues in dispute there bear no resemblance to those here. To start, there was no question in *Lynd* that DOJ had a sufficient basis for its demand and invoked Title III for a valid purpose. As the court explained, Title III's "clearest purpose[]" is to permit investigations "concerning infringement or denial of … voting rights," *Lynd*, 306 F.2d at 228, and DOJ's demand in that case was issued pursuant to that purpose, *see id.* at 229 & n.6 (noting "[t]he record establishe[d] without contradiction" that DOJ had "adequately stated the basis and the purpose" of its investigation based on evidence of racial discrimination "with respect to registration and voting"); *id.* at 228 (explaining the "purpose" of Title III "is to enable the Attorney General to determine whether §1971 [voting discrimination] suits or similar actions should be instituted"). In contrast, here, DOJ did not "adequately" invoke the CRA—it has no factual basis for its demand, and its purported purpose is to "ascertain" California's compliance with *the NVRA and HAVA*—an unprecedented theory divorced from the CRA's animating concerns. *Lynd* also recognized that courts must be "open for [] determination" if there is a "genuine dispute" about whether the statute encompasses a "particular paper or record." 306 F.2d at 226. There is certainly such a dispute here. *See infra* §III. In all events, DOJ's reading of *Lynd* cannot be reconciled with the later *Powell* decision.[11]

---

[11] *Lynd* also had no occasion to decide whether the CRA preempted a State's voter privacy laws or to discuss its interplay with the Privacy Act. *Infra* §§II.C, IV.

The Court should also reject DOJ's audacious request to "remand with instructions to order Secretary Weber to immediately produce the requested unredacted" voter list. DOJ Br. 52. While DOJ moved to compel production of the voter list below, *see* ER-348, the district court dismissed that motion as incompatible with the Federal Rules and did not address independent arguments raised against that motion, ER-351; *see also* ER-14. Even if this Court were to remand, the appropriate next steps would be for the matter to proceed to discovery, including as to whether DOJ's purpose in seeking California's voter list is pretextual and to ensure DOJ's compliance with the Privacy Act and similar laws. *See SEC v. Dresser Indus.*, 628 F.2d 1368, 1388 (D.C. Cir. 1980) (recognizing that "discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty"). As the district noted, serious doubts exist about DOJ's intended purposes, *supra* Statement §IV as well as its compliance with federal privacy laws, *infra* §IV.

## II.     DOJ failed to state a claim under the CRA.

The CRA requires that a demand made under its auspices be accompanied by a "statement of the basis *and* the purpose therefor." 52 U.S.C. §20703 (emphasis added); *see also Crooks v. Harrelson*, 282 U.S. 55, 58 (1930) (explaining that use of "and" requires "not one or the other, but both"). The district court rightly concluded that DOJ failed to provide a legally suitable purpose *or* basis. ER-15–17. It was also

25

correct that, even if DOJ *could* satisfy these prerequisites, nothing in the CRA preempts California's commonsense privacy laws that require protecting the sensitive personal information DOJ seeks. ER-23–28.

### A. DOJ's claimed purpose of investigating California's list maintenance program is beyond the scope of Title III.

DOJ's alleged purpose for its demand is to "assess the State's compliance with the statewide [voter list] maintenance provisions of the [NVRA]." ER-263; *see also* DOJ Br. 22 (similar). But investigating California's compliance with its list maintenance obligations under the NVRA (or HAVA) is not a permissible purpose for *the CRA's* inspection provision, which Congress enacted to aid DOJ in the enforcement of civil rights laws—specifically the Civil Rights Act of 1957. *See* ER-16. DOJ misreads the CRA as granting capacious federal power to demand state voter rolls at any time and for any reason. And it ignores that Congress spoke *expressly* to how DOJ can enforce federal list maintenance requirements, *e.g.*, 52 U.S.C §§20510, 21111, including through a *different* inspection tool Congress made available to DOJ specifically for that purpose in the NVRA itself, *see id*. §20507(i). DOJ's argument therefore violates basic tenets of statutory construction and textualism. Worse still, it does so in service of a sweeping federal claim over state voter rolls that Congress never authorized, and which offends principles of federalism.

26

**1. Congress enacted the NVRA and HAVA—not the CRA—to govern voter list maintenance by States.**

A core problem with DOJ's invocation of the CRA as a tool for disclosure of voter list maintenance records is that Congress has spoken to that issue—but in a different statute. The NVRA grants DOJ the right to inspect "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. §20507(i)(1). DOJ is well aware of this inspection tool because it originally invoked it as the primary basis for its demand. ER-267. Indeed, DOJ's initial letter to Secretary Weber demanding California's voter list relied *solely* on the NVRA's inspection provision. ER-268. But it has since abandoned that claim on appeal, DOJ Br. 2–3, conceding that the district court was right that the NVRA does not mandate the disclosure of the sensitive voter information DOJ seeks, ER-21 (collecting authority).

Dissatisfied with the reach of the inspection tool Congress provided, DOJ argues that an unrelated statute—the CRA—provides it more far-ranging authority. DOJ Br. 12–37. But DOJ cannot supplant the inspection tool Congress *did* provide for federal list maintenance supervision—§20507(i)—with the one DOJ *wishes* Congress provided. Doing so would violate the "well established canon of statutory interpretation … that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). Allowing DOJ to invoke another

27

statute's disclosure tool because it finds the NVRA unsatisfactory would result in "the superfluity of a specific provision that is swallowed by the general one." *Id*. In such cases it is "[t]he terms of the specific authorization [that] must be complied with." *Id*.; *see also* Scalia & Garner, *Reading Law* 164 (explaining the general provision is "suspended" as "to cases covered by the specific provision").

DOJ does not appear to dispute this principle, noting that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." DOJ Br. 25 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). But the "more specific[]" statute here is the NVRA disclosure provision DOJ previously invoked (but then abandoned), which Congress created for purposes of facilitating inspection state list maintenance activities. The "specific policy embodied in [the] later federal statute"—that is, the NVRA—"should control" over the unrelated CRA. *United States v. Est. of Romani*, 523 U.S. 517, 530 (1998). And the specific policy Congress made in the NVRA was to require "broad and extensive public disclosure of relevant records," while still allowing "States … to redact appropriate personal information before providing [any] voter data." *Torrez*, 160 F.4th at 1083 n.14.

DOJ claims that the "lack of a comparable tool for records inspection by the Attorney General in the subsequently enacted NVRA and HAVA" means the CRA must supply a backstop for list maintenance enforcement. DOJ Br. 26

28

(acknowledging "neither" the NVRA or HAVA "provides its own equivalent to 52 U.S.C. 20703"). But DOJ's admission that the NVRA and HAVA "lack" the enforcement mechanism it wishes to use for list maintenance purposes is ultimately a concession that "Congress knew how to draft the kind of statutory language that [DOJ] seeks to read into" the NVRA and HAVA but opted not to. *State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 580 U.S. 26, 36 (2016); *see also Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.").

Lurking in the background of DOJ's theory is the misguided assumption that Congress surely *meant* to provide DOJ this inspection tool for list-maintenance purposes. *E.g.*, DOJ Br. 27 (arguing it is "implausible that Congress intended for the Attorney General to lack the ability to inspect complete records so pertinent to her enforcement authority under the NVRA and the HAVA"). But that assumption is wrong for several reasons. For one, Congress did not forget to provide DOJ enforcement tools in the NVRA and HAVA—it spoke expressly as to how both statutes are enforced. In addition to the NVRA's inspection provision, both statutes permit DOJ to file enforcement actions, *see* 52 U.S.C §§20510, 21111, entitling DOJ to the fruits of civil discovery—so long as it can plead a valid claim. That reflects Congress's judgment that DOJ must be able to make some preliminary showing—

29

enough to satisfy Rule 12(b)(6), at least—before it can seek records beyond what §20507(i) provides. This "express provision of one method of enforcing" the NVRA through pre-suit disclosure "suggests that Congress intended to preclude others." *Alexander v., Sandoval*, 532 U.S. 275, 290 (2001).

Further still, whereas the CRA purposefully sought to overcome fierce state resistance to voting rights, both the NVRA and HAVA take pains to emphasize state primacy over voter registration. *See supra* Statement §§I.B, I.C. Accordingly, the "lack of a comparable tool for records by the Attorney General" in the NVRA and HAVA is a *feature* of those laws. *Contra* DOJ Br. 26. Given the limited mandates those laws place on States, it is unremarkable Congress afforded more qualified pre-suit access to files like voter lists—indeed, before the NVRA, neither the Constitution nor federal law imposed *any* list maintenance obligation on the States. *See Husted*, 584 U.S. at 761. DOJ cannot reverse that deliberate balancing of federal-state authority by grafting text from one statute onto another.

> **2. Congress enacted the CRA to facilitate investigations into the denial of the right to vote and violations of civil rights laws.**

DOJ also offers a blinkered interpretation of the CRA that must be rejected. DOJ contends that because the CRA includes "no language limiting [it] to voting-rights violations," DOJ Br. 23, it can effectively be used for *any* purpose. But courts do not read isolated fragments of statutory text to find previously undiscovered wellsprings of federal power. *See Brown & Williamson*, 529 U.S. at 132 (explaining

"a reviewing court should not confine itself to examining a particular statutory provision in isolation"). "Textualists—like all those who use language to communicate—do not interpret words in a vacuum. Instead, we use context, including '[b]ackground legal conventions,' 'common sense,' and 'constitutional structure,' to ascertain a text's 'most natural meaning.'" *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 672 (2026) (Barrett, J., concurring) (alteration in original) (quoting *Biden v. Nebraska*, 600 U.S. 477, 509, 511–12, 515 (2023)). Rather, "[w]ords, like syllables, acquire meaning not in isolation but within their context." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 319 (1988) (Scalia, J., concurring).

The relevant statutory and historical context for the CRA is essentially undisputed. *See supra* Statement §I.A; *see also* DOJ Br. 3. Congress enacted the CRA to bolster enforcement of a closely related statute, the Civil Rights Act of 1957. *See* Pub. L. No. 85-315, 71 Stat. 634 (1957). Congress determined in 1960 that while "some progress" had been made towards the "elimination of discrimination because of race," there was a "need for additional legislation to implement the enforcement of civil rights." H.R. Rep. No. 86-956, at 3. Specifically, enforcement of the 1957 Act was stymied by "the refusal of some state and local authorit[ies] to permit" inspection of voter registration forms. *Id.* at 7. DOJ had "no existing power in civil proceedings to require the production of these records during any investigation" concerning "complaints of a denial to vote because of race." *Id*. Congress determined

31

that, without granting DOJ a "suitable provision for access to voting records during the course of an investigation," its ability to combat discrimination in voting was "rendered relatively ineffective." *Id.*

This history "leaves no doubt but that [Title III] [wa]s designed to secure a more effective protection of the right to vote." *Gallion*, 187 F. Supp. at 853. As DOJ's own preferred case acknowledges, Title III's "purpose is to enable the Attorney General to determine whether [§10101] suits or similar actions should be instituted." *Lynd*, 306 F.2d at 228. But it was also undisputed that "[i]t [wa]s not the purpose of title III to supervise State elections." *Hearings* at 700 (statement of Rep. William M. McCulloch, a principal drafter of Title III). Rather, the "purpose of Title III" is to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Id.*; *see also id.* at 600 (Attorney General Rogers explaining Title III is meant to facilitate investigations into "complaints that qualified persons have been denied the right to vote in violation of Federal law"); 106 Cong. Rec. 5086 (1960) (explaining Title III "requires the preservation of voting records and gives the Justice Department power to inspect them in enforcing the 1957 act" (Statement of Sen. Saltonstall)).

Buttressing this context are important "'[b]ackground legal conventions,' 'common sense,' and 'constitutional structure.'" *Learning Res.*, 146 S. Ct. at 672 (Barrett, J., concurring) (alteration in original) (quoting *Nebraska*, 600 U.S. at 509,

32

511–12, 515). The Constitution, in the first instance, "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69. The Elections Clause empowers States to "provide a complete code for congressional elections, not only as to times and places, but in relation to … registration." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). And both the NVRA and HAVA supply important "background legal conventions" reinforcing that voter registration remains principally a state matter. *See supra* Statement §§I.B, I.C. These foundational principles reinforce that Congress did not grant casually DOJ authority to demand inspection of unredacted state voter rolls on a whim.

The Court also "must be guided to a degree by common sense," which reinforces that Congress did not haphazardly grant DOJ a power of such "political magnitude" in a six-decade old civil rights law that no court has *ever* applied outside of voting rights investigations. *Brown & Williamson*, 529 U.S. at 133. In recent years, the Supreme Court has emphatically rejected the notion that Congress accidentally grants sweeping power to the Executive Branch through obscure or opaque statutory provisions. Rather, it demands "clear congressional authorization"—not "a merely plausible textual basis"—whenever an agency like DOJ claims previously "unheralded" power of such importance. *West Virginia*, 597 U.S. at 722–23. Congress, after all, "does not … hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

33

DOJ claims to have discovered just such an elephant, but fails to grapple with the context, history, statutory framework, and constitutional presumptions above. Nor does it advance any principled limitation on the permissible scope of Title III demands. Instead, it contends the CRA may be marshalled for the purpose of "investigating *possible* violations of a Federal statute." DOJ Br. 24 (quoting *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963)).[12] As the district court recognized, however, adopting DOJ's view would allow the government to wield Title III far "outside of the scope of what Congress intended [it] to be used for." ER-16. Indeed, based on the arguments DOJ raises in parallel cases, it believes Title III can be used for essentially *any* purpose, so long as the demand simply invokes a federal statute by name. *See supra* Statement §II. DOJ tries to pare that view back on appeal, by claiming Title III "at the very least" reaches "elections statutes." DOJ Br. 25. But DOJ's mode of statutory analysis provides no basis for this half-hearted effort at a limiting principle, which it adopts for convenience on appeal. And it stands in stark tension with DOJ's claims that the CRA "provides no meaningful standards"

---

[12] DOJ similarly supported its broad view in the district court by cherry-picking Senator Keating's statement that a demand can be "made for the purpose of investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (Statement of Sen. Keating)) (cited at ER-207). But DOJ omitted what Senator Keating said in the same colloquy—that Title III was intended "to add essential features to the laws already on the statute books toward ending discrimination in the voting privileges of our citizens." 106 Cong. Rec. at 7767.

34

for assessing the permissible scope of Title III demands, DOJ Br. 18, resulting in a "sweeping" power, *id.* at 12, that DOJ believes to be immunized from judicial review. This Court should decline to endorse such a "boundless reading" of the CRA, particularly given the "basic principles of federalism" at issue in the voter registration context. *Bond v. United States*, 572 U.S. 844, 858–59 (2014) ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" the "usual constitutional balance of federal and state powers." (citation omitted)).[13]

**B.      DOJ also lacks any basis for investigating California's list maintenance program.**

The district court correctly concluded that DOJ also failed to state a "basis" for its demand for California's voter list. 52 U.S.C. §20703. Title III's "basis" requirement means DOJ must state "specific, articulable facts" supporting its demand. ER-17; *see also Oregon*, 2026 WL 318402, at *8 (explaining that "basis" in Title III requires the "factual basis"); *Galvin*, 2026 WL 972129, at *3-6 (similar); *Amore*, 2026 WL 1040637, at *5 (similar); *accord Basis*, *Black's Law Dictionary*

---

[13] The district court did not, as DOJ baldly claims, hold that the CRA imposes racial discrimination as a precondition for invoking Title III—DOJ tellingly cannot cite anything to that effect. *See* DOJ Br. 22. Rather, the court held only that "voter roll maintenance" under the NVRA was outside the scope of "what the statute was intended to be used for." ER-16. This Court need not define the precise outer bounds of the CRA here; it is enough to say it does not reach list maintenance issues that Congress addressed in other statutes. *See id.* In any event, no party to this case has suggested that claims of racial discrimination are necessary for invoking Title III.

(4th ed. 1968) (including definitions for "basis" such as the "groundwork," "support," or "foundation" of something). By failing to state any such basis for its demand, DOJ flouted Title III's "procedural requirements." *Golden Valley Elec. Ass'n*, 689 F.3d at 1113.

DOJ did not invoke the CRA until its letter dated August 13, 2025. ER-263–65. And while the August 13 letter expressly stated that the "purpose" of the demand was "to assist in our determination of whether California's list maintenance program complies with the NVRA," ER-264, the letter says nothing at all about DOJ's "basis" for the demand. DOJ tries to excuse this failure by pointing to earlier correspondence mentioning purported "anomalies" in California's EAVS submissions, DOJ Br. 20, but that earlier letter did not invoke the CRA, ER-267–68, and so cannot constitute DOJ's "demand in writing" under Title III, 52 U.S.C. §20703.

Nor can DOJ's various correspondence simply be stitched together to form a "basis" for the demand. Congress was unequivocal: "*This demand*"—*i.e.*, the "written demand" required under the CRA—"shall contain *a* statement of the basis and the purpose therefor." 52 U.S.C. §20703 (emphases added). In *Niz-Chavez v. Garland*, the Supreme Court held that similar statutory instructions require the government to provide "'a' *single* document containing the required information, not a mishmash of pieces with some assembly required." 593 U.S. 155, 161 (2021) (emphasis added); *id*. at 163 ("Congress's decision to use the indefinite article 'a' …

36

suggests that the government must issue a single statutorily compliant document[.]"). The Court forbade treating such requirements as mere suggestions: "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Id.* at 172. DOJ's failure to provide all required information in a single written demand violates the plain terms of the CRA and suffices to affirm the dismissal.

Alternatively, even if DOJ could stitch its correspondence together into a single statement of basis, any such "basis" still fails. DOJ resists any review of its purported basis, again chiefly relying on *Lynd*, *see* DOJ Br. 14–20, but as the Supreme Court and this Court have held, a government document demand must be "reasonably relevant" to the matter under investigation, *Morton Salt Co.*, 338 U.S. at 652; *F.D.I.C. v. Garner*, 126 F.3d 1138, 1142 (9th Cir. 1997); *see also Loc. 174*, 240 F.2d at 392. Those decisions—not *Lynd*—bind this Court.

It is clear why DOJ hopes to avoid scrutiny: its purported basis is nonsensical pretext. Indeed, DOJ abandons its rationale for expediting this appeal—baseless fears of noncitizens on California's voter rolls—and claims only that California's EAVS responses show certain aspects of its list maintenance activities deviate from the national average. *See* DOJ Br. 22 (citing ER-268). But, as a statistical matter, *every* State features *some* deviation from the national average across the many categories of data tracked by EAVS. *See supra* Statement §II. That alone supplies no

37

inference that any State, including California, is failing to "conduct a *general program*" that "makes a *reasonable* effort" to remove voters from the rolls because of death or change of residence—all that federal list maintenance laws require of States. 52 U.S.C. §20507(a)(4) (emphases added); *cf. Republican Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773, 792 (W.D. Mich. 2024), *aff'd*, No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025).

Moreover, a mere snapshot of California's voter file would become outdated almost immediately and shed little light on whether the State is complying with its modest list-maintenance obligations. Any EAVS-related concerns that might reflect on California's list-maintenance efforts would be better investigated through records requests targeting California's *programs and procedures* relating to list maintenance—avoiding the concomitant invasion of the privacy rights of California voters. DOJ has, conspicuously, declined to request any such low-hanging fruit, even though Congress gave it a tool to do so in the NVRA. Instead, DOJ issued materially identical demands nationwide, seeking each State's unredacted voter list to purportedly investigate their list maintenance efforts—yet has somehow failed to seek *any other* list maintenance-related documents from these States.

## C. Title III does not preempt California's voter privacy protections.

Even apart from DOJ's noncompliance with the CRA, California law commands that sensitive voter information—including driver's license numbers and

38

partial social security numbers—remain "confidential and shall not be disclosed to any person." Cal. Elec. Code § 2194(b)(1). DOJ does not contest that California law prohibits disclosures of sensitive information in the unredacted voter file records it seeks. DOJ Br. 45–47 (quoting Cal. Elec. Code §2194(b)(1)). Accordingly, for DOJ to obtain California's *unredacted* voter file including such information, it must show that the CRA preempts California's voter privacy laws. It does not.

Title III does not require the disclosure of sensitive voter information. Certainly nothing in the statute's text specifically extends to such information. And the early case law confirms it was not meant to. As *Lynd*—the central case DOJ relies on—recognized, the CRA was intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d at 231; *see also Knox v. Brnovich*, 907 F.3d 1167, 1173–74 (9th Cir. 2018) ("The purpose of Congress is the ultimate touchstone in every preemption case."). And here, as the district court recognized, since driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. §21083(a)(5)(A)(i), Congress's purpose in enacting the CRA could not have possibly extended to requiring disclosure of such information, *see* ER-16.

DOJ also suggests that since neither the NVRA nor HAVA require the production of sensitive voter information, the CRA must. *See* DOJ Br. 27, 46–47.

39

But the caselaw cuts the other way. Courts have consistently held that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in [state voter files]." *PILF*, 92 F.4th at 56 (collecting cases); *see also Torrez*, 160 F.4th at 1082 & 1083 n.14 (similar). In other words, the *absence* of any clear language preempting widespread state privacy laws suggests Congress did not wish to displace them, consistent with the fact that Congress's Elections Clause power extends only "so far as it is exercised, and no farther," *ITCA*, 570 U.S. at 9. Just like the NVRA and HAVA, nothing in the CRA's text prohibits such redactions.

Finally, California's voter privacy law presents no obstacle to Congress's objectives for the CRA, which had nothing whatsoever to do with list maintenance— indeed, federal law did not purport to regulate state list maintenance practices until three decades after the CRA was enacted. As one early court applying Title III noted, a jurisdiction's "failure[] to purge voters who have moved away or have died … does not bear any particular importance" to a Title III inquiry. *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962). Congress did not regulate such matters until it enacted the NVRA. *See Husted*, 584 U.S. at 761. And California's voter privacy law poses no obstacle to Congress's actual purposes and objectives in enacting the CRA— facilitating investigations of the denial of the right to vote. That is likely why no court has ever held, in the CRA's 66-year history, that it preempts a comparable state

40

voter privacy law. Since Title III does not preempt California law, it cannot entitle DOJ to an unredacted copy of California's voter list.

### III. Alternatively, California's statewide voter list is not a record or document within the scope of Title III.

Alternatively, the Court can affirm because, as Intervenors argued below, "by its plain terms," Title III "does not require the production of California's voter registration list—or any internal records created by election officials." ER-247; *see also* ER-247–250. That is to say, statewide voter registration lists are not "records and papers" under the CRA. 52 U.S.C. §20701. Read naturally, Title III covers only static documents like voter application forms submitted by voters—not interactive, computerized databases maintained by election officials, like California's voter list. *See Benson*, 2026 WL 362789, at *9–10 (adopting this argument).

### A. Title III's text reaches only static records received from voters— not dynamic databases created by election officials.

By its plain text, Title III applies only to records that "come into [the] possession" of election officials relating to a voter's "application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. The phrase "come into [their] possession" "naturally refers to a process by which someone *acquires* an item from an external source." *Benson*, 2026 WL 362789, at *9. Since California's statewide voter list is a digital record created and

maintained by election officials, rather than a record that came into their possession from an external source, Title III does not reach such lists.

This follows from the "natural" and "ordinary" meaning of "come into possession." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Dictionaries link the phrase to receiving, obtaining, or acquiring something from another source. *See Receive, Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"). Federal courts—often relying on dictionaries published contemporaneously to the CRA—have equated "com[ing] into possession" of something with receiving, acquiring, or obtaining that thing. *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting Random House Dictionary of the English Language 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting Webster's New International Dictionary (3d ed., 1966, unabridged))); *United States v. Prasad*, 18 F.4th 313, 319 (9th Cir. 2021) ("The plain meaning of the term 'obtain' is 'to come into possession of'" (quoting *Obtain, Oxford English Dictionary* (2d ed. 1989)); *United States v. Mohrbacher*, 182 F.3d 1041, 1048 n.5 (9th Cir. 1999) (defining "receive" as "to come into possession of" or to take "into one's possession (something held out or offered by another)").

42

This reading of Title III is supported by the "obvious alternative" language Congress had at its disposal. *Union Pac. R.R. Co. v. United States*, 865 F.3d 1045, 1050 (8th Cir. 2017). Congress could have, for instance, written Title III to cover papers and records "in the possession" of election officials, or simply "all records" without qualification (as it did in the NVRA, *see* 52 U.S.C. §20507(i)), rather than those that "come into" possession of such officials. And it further aligns with common usage: a person "comes into possession" of an antique chair bequeathed by a relative, but not a chair they built themselves. *Cf.* DOJ Br. 34–35 (citing dictionary defining phrase as "acquire esp. as an inheritance").

DOJ's view that "come into possession" means to "acquir[e] information or property," *id.* at 35, is entirely consistent with this argument. "Acquiring" something is distinct from creating or generating it—a person may acquire a cake from the bakery, but it would grate on the ear to say they "acquired" a cake by baking it from scratch. The various statutes cited by DOJ are equally consistent with this argument. *See id.* at 35–36 & n.9. Each confirms that Congress deliberately uses the phrase "come into possession" when referring to things *received* by someone. For example, 8 U.S.C. §1454(a) draws a distinction between a person who "ha[s]" a record (it is "in" his possession) versus someone who "may come into possession of it" (he obtains it later). Similarly, 44 U.S.C. §3572 describes penalties for disclosing "information *supplied by individuals or organizations to an agency*" as well as

43

"individually identifiable information *acquired*" from elsewhere, *id.* §3572(a) (emphases added); *see also id.* §3572(f) (prescribing penalties when someone who "comes into possession of such information" improperly discloses it). The same is true for DOJ's other handpicked statutes. *See* 10 U.S.C. §130c(d) (using phrase "came into possession or under the control of the United States" in reference to information "received by an agency" from a foreign government); 30 U.S.C. §1732(b) (explaining States and Indian tribes are entitled oil and gas royalty information "as soon as practicable after it comes into the possession of the Secretary" from lessees). Title III sits comfortably among these laws, each of which regulates information an official *receives*, *obtains*, or *acquires* from another source.[14]

Comparing the CRA to the NVRA's inspection provision bolsters this understanding. The NVRA requires States to "make available for public inspection … all records concerning the *implementation* of programs and activities conducted for the purpose" of ensuring accurate voter lists. 52 U.S.C. §20507(i)(1) (emphasis added). Congress conspicuously omitted the "come into possession" construction and instead employed language tailored to reaching internal records. "Omitting a

---

[14] The fact that California's statewide voter registration list contains *information* originates with voters changes nothing. Whereas several statutes cited by DOJ refer to "information" that comes into possession of government officials, Title III refers exclusively to "records and papers" that come into the possession of election officials. 52 U.S.C. §20701. The State's computerized registration database, and any list generated by it, is not such a record or paper.

phrase from one statute that Congress has used in another statute with a similar purpose virtually commands the inference that the two have different meanings." *Grand Canyon Univ. v. Cardona*, 121 F.4th 717, 725 (9th Cir. 2024) (cleaned up) (quoting *Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014)). The NVRA's inspection provision makes clear Congress knows how to draft disclosure obligations that extend to documents created by election officials—but that it uses different language from Title III when it does so. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey differences in meaning.'" (citation omitted)).[15]

Additional textual indicators in the CRA reinforce the conclusion that Title III extends only to materials submitted to state election officials by voters. "[A]ccompanying words" are key context because "a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). Here, accompanying words specify that the CRA applies to records that come into officials' possession "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. That list "indicates the sorts of records

---

[15] The Privacy Act—which broadly covers all records "in the control of" government officials rather than records that had "come into" their possession"—also illustrates this point. 5 U.S.C. §552a(a)(5).

45

covered by the statute: namely, records that election officials *receive*, rather than *create*." *Benson*, 2026 WL 362789, at \*9.

And immediately after this list, Title III provides that the records contemplated by the statute "may be delivered to another officer of election" or "deposited" with another custodian. 52 U.S.C. §20701. California's voter list, by contrast, is accessible to and maintained by *all* state and local election officials, who must continuously update it on an expedited basis. *See id*. §21083(a)(1)(A)(v); *id*. §21083(a)(1)(A)(vi)); *id*. §21083(a)(1)(A)(vii). Whereas the CRA requires preservation of static documents that follow a chain of custody from one official to another, California's interactive voter database falls outside of its scope.

Similarly, the CRA requires retention only "for a period of twenty-two months" from the date of a covered election for those documents received "relating to any application, registration, payment of poll tax, or other act requisite to voting *in such election*." 52 U.S.C. §§20701–20702 (emphasis added). That temporal limitation makes sense when applied to documents like a registration form submitted by a voter, but it breaks down when applied to a statewide voter list stored in a computer database, which compiles voter information across many elections and is intended to be updated and maintained in perpetuity.

46

**B.** **DOJ's broader reading of Title III conflicts with HAVA.**

Confirming this textual analysis is the fact that DOJ's reading of Title III clashes with HAVA. Title III requires all records under its purview to be "retain[ed] and preserve[d]" for twenty-two months, 52 U.S.C. §20701, and it prohibits any willful "alter[ing]" of records subject to that "retain[] and preserve[]" requirement, *id.* §20702. Any person who willfully violates these requirements risks imprisonment. *Id.* §§20701, 20702. HAVA, in contrast, requires California's election officials to *continually* alter its voter list: It commands that the State create an "interactive computerized statewide voter registration list," 52 U.S.C. §21083(a)(1)(A); that "[a]ll voter registration information obtained by" election officials "shall be electronically entered into the computerized list on an expedited basis," *id.* §21083(a)(1)(A)(vi); that election officials must "perform list maintenance with respect to the computerized list on a regular basis," *id.* §21083(a)(2)(A); and that officials must "ensure that voter registration records in the State are accurate and are updated regularly," *id.* §21083(a)(4).

Holding that Title III reaches such computerized voter lists would place HAVA and the CRA into direct conflict, subjecting California's election officials to irreconcilable obligations—to continuously alter the State's centralized voter list under HAVA but risk imprisonment under Title III for doing so. This legal discord forecloses DOJ's read of Title III. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502

47

(2018) (explaining that courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another"); Scalia & Garner, *supra*, at 252 ("The body of the law should make sense," and "it is the responsibility of the courts, within the permissible meanings of the text, to make it so.").

Even if one looked past the CRA's ban on altering records, DOJ's read of Title III would require California's election officials to "retain and preserve" *every* iteration of the State's voter list whenever it changes. 52 U.S.C. §20701. That would be unworkable. The voter list changes each time anyone in the State registers to vote, when an existing registrant updates their information, and when the State removes someone from the list. As required by HAVA, those changes are not only made by the Secretary of State's office but also by numerous *local* officials dispersed throughout the State. 52 U.S.C. §21083(a)(1)(A)(v)–(vii); *see also, e.g.,* Cal. Elec. Code §2119 (requiring county clerks to register voters); *id*. §§2115, 2116, 2120 (requiring county clerks to update voter registration information). It is simply not plausible to conclude each of these election officials are required to save and retain the voter list—subject to the threat of criminal punishment—every time they change any field on the list for one of California's 23 million registered voters.

### C. DOJ's remaining counterarguments fail to overcome the plain text of Title III.

DOJ's counterarguments do not move the needle. *First*, it claims it was "plainly not the intention of Congress" to exclude voter lists from Title III, calling

the distinction "pedantic." DOJ Br. 32, 33 (quotation omitted). But DOJ is dead wrong about Congress's intent. As explained by one of Title III's architects, "[t]he purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, *the records upon which is based the decision of whether or not a person is a qualified elector*"—that is, voter applications. *Hearings* at 700 (statement of Rep. William M. McCulloch) (emphasis added). The Civil Rights Commission report that prompted enactment of Title III explains why Congress was preoccupied with application materials submitted by voters. *See supra* Statement §I.A. The Commission found, for instance, that its investigation had been thwarted by officials' efforts to destroy "[r]ejected applications" submitted by Black applicants, Comm. Rpt. at 93, and it determined that comparing such applications to applications submitted by White voters was "essential to any investigation of denials of the right to vote," *id*. at 137. That is why it recommended Congress enact legislation requiring such records to be preserved and subject to inspection. *Id*. at 138.

California's computerized voter list, by contrast, is not a "record[] upon which is based the decision of whether or not a person is a qualified elector," *Hearings* at 700; it is a digitized *compilation* of those decisions as to each and every voter, as assembled by election officials.

In fact, DOJ points to *nothing* to suggest Congress intended Title III to require the retention, preservation, and inspection of unredacted voter lists. DOJ's own

49

authority rejects that very notion. *See Lynd*, 306 F.2d at 231 (concluding CRA did not reach "confidential, private" information but rather only matters "open to legitimate reasonable inspect"); *Bruce*, 298 F.2d at 863 n.2 (concluding "failure[] to purge" voter lists "d[id] not bear" on a Title III inquiry). Far from "pedantic," reading Title III in this way "makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Benson*, 2026 WL 362789, at *9.

DOJ next argues that "the distinction between records 'coming into one's possession' and being 'in one's possession,' is a temporal one—not a distinction between obtaining records from an outside source and through self-generation." DOJ Br. 35–36 (cleaned up). This reasoning is difficult to follow. It is tautological to say that an election official's duty to "retain and preserve" a record is triggered only *after* they take possession of that record—such as when they take office, or when one official receives a record from another. An election official can, of course, only retain and preserve records *already* in their possession. DOJ's read must be rejected because it would render "come into … possession" meaningless and fail to "give effect, if possible, to every clause and word of a statute." *Syed v. M-I, LLC*, 853 F.3d 492, 501 (9th Cir. 2017) (citation omitted). "Courts are required to give effect to Congress' express inclusions and exclusions, not disregard them." *Nat'l Ass'n of*

50

*Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018). This surplusage problem is easily avoided by giving the phrase "come into possession" its natural and ordinary meaning: that it limits the scope of the CRA only to documents that election officials acquire from an external source.

DOJ's proffered interpretation also leads to absurdities. Under its theory, when an election official first creates a new record, it would not be subject to the CRA until it was transmitted to or came under the purview of a *different* election official—until that point, the created record had not yet "come into" anyone's "possession." That makes no sense, particularly for demands directed to a State's chief election official, who is *always* in possession of the State's centralized voter registration database. Further, if DOJ is correct that the CRA reaches internally-generated documents, then every email, letter, memo, handwritten note, draft, or any other record created by any election official across California would need to be "retain[ed] and preserv[ed]" and not "alter[ed]"—subject to the threat of criminal punishment—so long as it "relat[es] to" a voter's application, registration, or other voting prerequisite in a particular election. 52 U.S.C. §§20701–20703. That cannot be right—"nothing in the CRA's text implies an intent to require states to preserve every election-related record that they *create*." *Benson*, 2026 WL 362789, at \*10. Those absurd consequences, however, are avoided if "comes into possession" is given its natural reading of reaching only records submitted by a voter.

51

At bottom, even if DOJ's read of Title III were feasible as a matter of vocabulary and grammar—and it is not—the Court should not permit DOJ to "discover in a long-extant statute an unheralded power" merely because DOJ can cobble together "a colorable textual basis" for its claimed authority. *West Virginia*, 597 U.S. at 722, 724 (citation omitted). "Just as an instruction to 'pick up dessert' is not permission to buy a four-tier wedding cake, Congress's use of a subtle device is not authorization for agency action of enormous importance." *Nebraska*, 600 U.S. at 518 (Barrett, J., concurring) (cleaned up). If Congress actually intended for DOJ to have unchecked supervisory power over States' list maintenance practices— including the power to override widespread state privacy laws—it would have said so clearly. And it would most naturally have done so in one of the two statutes (the NVRA and HAVA) where federal law actually imposes list maintenance duties on the States. But Congress did no such thing.

## IV. DOJ's failure to comply with the Privacy Act provides another independent basis for affirmance.

The Court should also affirm the district court's holding that DOJ's requested relief, if granted, would violate the Privacy Act. ER-28–31; *accord TVA v. Hill*, 437 U.S. 153, 193 (1978) (federal courts cannot grant relief that would violate specific commands of Congress). Specifically, in its rush to sweep up the sensitive information of every California voter, DOJ ignored the Privacy Act's procedural

52

requirement and is thus prohibited from "collect[ing]," "maintain[ing]," or "us[ing]" the "record[s]" it demands. 5 U.S.C. §552a.

The Privacy Act "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). It does so by "adopt[ing] procedural safeguards when the records maintained by a federal agency, *i.e.*, a 'system of records,' are changed or used in a new way." *Id.* at *2 (quoting 5 U.S.C. §552a(a)(5), (e)).  When any agency seeks to "establish or revise any 'system of records,' it must 'publish in the Federal Register … a notice of the existence and character of the system of records,'" *id.* at *2 (quoting 5 U.S.C. §552a(e)(4)). Such a notice, a "SORN," must include a defined set of information about the records stored in the system—including a description of how the records will be stored and "use[d]," whose records are at issue, the purpose of maintaining the records, and assessments as to why the records are suitable for the new or revised use. 5 U.S.C. §552a(e). DOJ *must* comply with these requirements "*before*" it engages in activity covered by the Privacy Act. *LULAC v. Exec. Off. of the President*, No. 1:25-cv-0946, 2026 WL 252420, at *54-55 (D.D.C. Jan. 30, 2026) (emphasis added).

DOJ's counterarguments misunderstand how the Privacy Act works. It first asserts that the Act only applies to an agency's *disclosure* of private information, and that the Act therefore has no bearing on *collection* of private voter information from

53

a State. DOJ Br. 38–39. That is wrong. The Act imposes obligations on any agency that "maintains" a "system of records," 5 U.S.C. §552a(e), and these terms have clear statutory definitions. "Maintain" means "*maintain, collect*, use, or disseminate." *Id.* §552a(a)(3) (emphasis added). And "system of records" means "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* §552a(a)(5). California's voter list, which contains the names and other identifying information of all registered voters, qualifies as a "system of records" under the Act. *Schwier v. Cox*, 412 F.Supp.2d 1266, 1271–72 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). DOJ's demand for California's voter file shows it clearly intends to "collect," "use," and "maintain" such data, meaning §552a(e) obligations attach. *LULAC*, 2026 WL 252420, at *55.

DOJ next claims it satisfied the Privacy Act's requirements through a SORN identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records." DOJ Br. 39–40. DOJ claims this SORN authorizes collection of California's voter list because it "cites NVRA, HAVA, and the [CRA]." *Id.* DOJ is wrong again: that SORN does not mention these statutes. Regardless, the Privacy Act requires substantially more than "citing" an enforcement statute and, as the court below held, this SORN is insufficient. ER-30. It notifies the public that

DOJ may seek to "maintain" information about the "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). It is not plausible to understand this language as contemplating collection of information about *every registered vote in California*, never mind the nation, as DOJ claims. Similarly, the SORN describes the categories of records in this system to "consist of case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." *Id.* While this language may cover run-of-the-mill files maintained for specific investigations and litigation, it would be remarkable to conclude they extend to a statewide (or nationwide) voter registration list that has never before been compiled by DOJ. In short, the SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on [such] an unprecedented level." ER-30.

Finally, DOJ's demand conflicts with the Privacy Act's stricter requirements for collection of data that is intended to be "matched" against other records. Specifically, the Act prohibits using records in "computer matching programs," except under strict conditions. 5 U.S.C. §552a(o), (e)(12). "No" record "contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a computer matching program" absent written agreement between the agency and the other source(s) of any records "matched." *Id.* §552a(o)(1). This

agreement must identify "the purpose and legal authority for conducting the program," *Id.* §552a(o)(1)(A), and the matching program cannot commence at all without public notice, *id.* §552a(e)(12). These provisions *prohibit* linking or matching federal "records," including those obtained from states, absent *prior* "authoriz[ation] by law." 5 U.S.C. §552a(o)(1).

DOJ has confirmed it intends to share voter files with DHS so the lists can be run through the SAVE system. *See* ER-19.[16] Indeed, DHS belatedly issued a SORN acknowledging DOJ intends to feed state voter lists into SAVE so it can "verify" eligibility, which it admits constitutes "[c]omputer [m]atching" programs. 90 Fed. Reg. 48948–51 (Oct. 31, 2025). Yet DOJ has not satisfied any of the obligations for collection of data for use in computer matching programs described above—and lacks "legal authority" in any event, *see* 5 U.S.C. §552a(o)(1).

In short, DOJ's demand for California's voter file fails to comply with the Privacy Act, which Congress enacted to prevent the federal agencies from compiling excessive amounts of personal information. *See Savarese v. U.S. Dep't of Health, Educ. & Welfare*, 479 F. Supp. 304, 308 (N.D. Ga. 1979) (Congress enacted the Privacy Act to "control … the unbridled use of highly sophisticated and centralized

---

[16] DOJ recently admitted that state registration data will be shared with DHS to run through the SAVE program. *See* Clarification of Record, *United States v. Amore*, No. 1:25-cv-639 (D.R.I. Mar. 27, 2026), ECF No. 46.

information collecting technology."), *aff'd sub nom. Savarese v. Harris*, 620 F.2d 298 (5th Cir. 1980); *see also* ER-28. That DOJ now seeks to do so in a traditional state realm—one where Congress has sought to preserve "dispersal of responsibility" among the States, H.R. Rep. No. 107-329, at 31–32—reinforces the importance of such protections. This Court can therefore affirm dismissal on this ground.

## CONCLUSION

The decision below should be affirmed.

April 17, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri
Christopher D. Dodge
Jacob D. Shelly
Branden D. Lewiston
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Tel.: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
jshelly@elias.law
blewiston@elias.law

Abha Khanna
Tyler Bishop
Walker McKusick
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Ste. 2100
Seattle, WA 98101
Tel.: (206) 656-0177
akhanna@elias.law
tbishop@elias.law
wmckusick@elias.law

*Attorneys for Intervenors-Appellees*
*NAACP, NAACP California-Hawaii*
*State Conference, and SIREN*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Intervenors-Appellees NAACP, NAACP California-Hawaii State Conference, and SIREN state that the following case pending in this Court is related to this appeal because it raises closely related issues: *United States v. Oregon*, No. 26-1231 (9th Cir.).

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 26-1232

I am the attorney or self-represented party.

**This brief contains** 13,968 **words, including** 0 **words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( ● ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Lalitha D. Madduri   **Date** 4/17/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*