No. 26-1232

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

v.

SHIRLEY WEBER, et al.,
*Defendants-Appellees.*

NAACP; NAACP CALIFORNIA-HAWAII STATE CONFERENCE;
SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK;
LEAGUE OF WOMEN VOTERS OF CALIFORNIA,
*Defendants-Intervenors-Appellees*

ON APPEAL FROM THE ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA

## BRIEF OF APPELLEE LEAGUE OF WOMEN VOTERS OF CALIFORNIA

GRAYCE ZELPHIN (SBN 279112)
gzelphin@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

JULIA A. GOMEZ (SBN 316270)
jgomez@aclusocal.org
PETER ELIASBERG (SBN 89110)
peliasberg@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232

THERESA J. LEE (NY 5022769)
tlee@aclu.org
ARI SAVITZKY (NY 5060181)
asavitzky@aclu.org
SOPHIA LIN LAKIN (NY 5182076)
slakin@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

PATRICIA J. YAN (NY 5499173)
pyan@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800

*Counsel for Defendants-Intervenors-Appellees League of Women Voters of California*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. iii

TABLE OF AUTHORITIES .........................................................................v

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................. 4

STATEMENT OF THE ISSUES................................................................... 4

STATEMENT OF THE CASE ...................................................................... 4

    A.   Statutory Background: Title III of The Civil Rights
           Act of 1960................................................................................. 4

    B.   Factual Background..................................................................... 8

    C.   Procedural Background ............................................................ 14

SUMMARY OF ARGUMENT ................................................................... 14

STANDARD OF REVIEW......................................................................... 17

ARGUMENT ............................................................................................. 19

    I.   The Federal Rules of Civil Procedure Apply in this Federal
        Civil Action ............................................................................. 19

    II.  The District Court Correctly Held that the United States
        Failed to State a Claim under the Civil Rights Act of 1960 ....... 26

        A.   The CRA Does Not Entitle the United States to
             California's Unredacted Voter List Because It Does Not
             Reach Records Created by the State.............................. 26

        B.   The United States Failed to Comply with the CRA's
             Statutory Requirement for "A Statement of the Basis
             and the Purpose" for Sensitive Voter Data....................... 30

1. The United States Failed to State the Basis of its CRA Demand ............................................................ 32

2. The United States Failed to Allege a Viable Purpose for its CRA Claim ...................................... 36

    a. The Stated Purpose Does Not Comport with the Records Demanded ................................. 36

    b. The Stated Purpose is Contradicted by the United States' Own Public Statements .......... 39

III. The CRA Does Not Require Disclosure of Private, Sensitive Voter Information to the Federal Government ........................... 42

CONCLUSION ................................................................... 48

CERTIFICATE OF COMPLIANCE ..................................... 50

CERTIFICATE OF SERVICE ............................................. 51

iv

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Action Recycling Inc. v. United States,*
721 F.3d 1142 (9th Cir. 2013)............................................................22

*Ala. ex rel. Gallion v. Rogers,*
187 F. Supp. 848 (M.D. Ala. 1960) ....................................................30

*Alabama v. United States,*
304 F.2d 583 (5th Cir. 1962)................................................................6

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026) ...................................43

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)............................................................................17

*Chadha v. Immigr. & Naturalization Serv.,*
634 F.2d 408 (9th Cir. 1980)..............................................................23

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.,*
603 U.S. 799 (2024)............................................................................41

*Crystal v. United States,*
172 F.3d 1141 (9th Cir. 1999)............................................................22

*Dep't of Commerce v. New York,*
588 U.S. 752 (2019)............................................................................42

*Dinkens v. Att'y Gen. of U.S.,*
285 F.2d 430 (5th Cir. 1961)..............................................................31

*Donaldson v. United States,*
400 U.S. 517 (1971)............................................................................22

*Greidinger v. Davis,*
988 F.2d 1344 (4th Cir. 1993).............................................................43

*Gutierrez de Martinez v. Lamagno*,
515 U.S. 417 (1995)................................................................23

*Hazel-Atlas Glass Co. v. Hartford Empire Co.*,
322 U.S. 238 (1944)................................................................18

*Honeycutt v. United States*,
581 U.S. 443 (2017)................................................................27

*Hunter v. U.S. Dep't of Educ.*,
115 F.4th 955 (9th Cir. 2024) .............................................17

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ........................... 7, 30, 32

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
7 F.3d 357 (3d Cir. 1993) ....................................................18

*In re Saldana*,
122 F.4th 333 (9th Cir. 2024) .............................................29

*J.O.P. v. United States Dep't of Homeland Sec.*,
2025 WL 1431263 (4th Cir. May 19, 2025) .........................42

*Kaweah Delta Health Care Dist. v. Becerra*,
123 F.4th 939 (9th Cir. 2024) .............................................46

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)......................................... *passim*

*Maldonado v. Harris*,
370 F.3d 945 (9th Cir. 2004).............................................17

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
164 F.4th 710 (9th Cir. 2026) ...................................... 17, 39

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008)............................................17

*MGIC Indem. Corp. v. Weisman*,
803 F.2d 500 (9th Cir. 1986)..............................................18

vi

*N.H. Fire Ins. Co. v. Scanlon,*
362 U.S. 404 (1960) .................................................................. 21

*Niz-Chavez v. Garland,*
593 U.S. 155 (2021) .................................................................. 41

*Pac. Coast Fed'n of Fishermen's Associations, Inc. v. Nickels,*
150 F.4th 1260 (9th Cir. 2025) ............................................... 29

*Perkins Coie LLP v. DOJ,*
783 F. Supp. 3d 105 (D.D.C. 2025) ....................................... 42

*Peters v. United States,*
853 F.2d 692 (9th Cir. 1988) ................................................. 38

*Project Vote/Voting for Am., Inc. v. Long,*
682 F.3d 331 (4th Cir. 2012) .............................. 45, 46, 47, 48

*Pub. Int. Legal Found. v. Benson,*
136 F.4th 613 (6th Cir. 2025) ............................................... 38

*Pub. Int. Legal Found., Inc. v. Bellows,*
92 F.4th 36 (1st Cir. 2024) .................................................... 45

*Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections,*
996 F.3d 257 (4th Cir. 2021) ................................................. 45

*Sheetz v. Cnty. of El Dorado,*
601 U.S. 267 (2024) ................................................................ 47

*Sugarloaf Funding, LLC v. U.S. Dep't of Treasury,*
584 F.3d 340 (1st Cir. 2009) ................................................. 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
551 U.S. 308 (2007) ................................................................ 18

*United States Small Bus. Admin. v. Bensal,*
853 F.3d 992 (9th Cir. 2017) ................................................. 18

*United States v. Amore,*
No. 1:25-cv-00639, 2026 WL 1040637
(D.R.I. Apr. 17, 2026) .................................... 14, 33, 39, 40

vii

*United States v. Benson,*
  No. 1:25-CV-01148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026)......13

*United States v. Cartwright,*
  230 F. Supp 873 (M.D. Ala. 1964) ......................................................6

*United States v. Galvin,*
  No. 1:25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026) .......14, 33

*United States v. Golden Valley Elec. Ass'n,*
  689 F.3d 1108 (9th Cir. 2012)............................................................22

*United States v. Hernandez,*
  322 F.3d 592 (9th Cir. 2003)..............................................................47

*United States v. Mayton,*
  335 F.2d 153 (5th Cir. 1964)............................................................4, 5

*United States v. Oregon,*
  No. 6:25-CV-01666-MTK, 2026 WL 318402
  (D. Or. Feb. 5, 2026) ...........................................................5, 12, 13, 33

*United States v. Powell,*
  379 U.S. 48 (1964) .......................................................................20, 21

*United States v. Prasad,*
  18 F.4th 313 (9th Cir. 2021) .............................................................27

*United States v. Raffensperger,*
  No. 1:26-cv-00485, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026) ..........14

*United States v. Ritchie,*
  342 F.3d 903 (9th Cir. 2003)..............................................................17

*United States v. Weber,*
  No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ..........13

*Zadvydas v. Davis,*
  533 U.S. 678 (2001)..........................................................................47

viii

| **Statutes** | **Page(s)** |
|---|---|

5 U.S.C. § 552(b) ...................................................................... 45

5 U.S.C. § 552a(b) .................................................................... 45

8 U.S.C. § 1454 ........................................................................ 28

13 U.S.C. § 214 ........................................................................ 27

18 U.S.C. § 654 ........................................................................ 28

18 U.S.C. § 1703(a) .................................................................. 28

26 U.S.C. § 7604(a) .................................................................. 20

28 U.S.C. § 1291 ........................................................................ 4

28 U.S.C. § 1331 ........................................................................ 4

28 U.S.C. §1343 ......................................................................... 4

44 U.S.C. § 3501 ...................................................................... 45

50 U.S.C. § 217 ........................................................................ 28

52 U.S.C. § 20501 ...................................................................... 2

52 U.S.C. § 20507(a) ............................................................... 36

52 U.S.C. § 20507(c) ................................................................ 37

52 U.S.C. § 20507(d) ............................................................... 37

52 U.S.C. § 20507(i) ........................................................... *passim*

52 U.S.C. § 20701 .............................................................. *passim*

52 U.S.C. § 20703 .............................................................. *passim*

52 U.S.C. § 20705 ................................................... 6, 15, 19, 20

52 U.S.C. § 20901 ...................................................................... 2

ix

52 U.S.C. § 20922 ................................................................8

52 U.S.C. § 21083 ..............................................................37

52 U.S.C. § 21085 ..............................................................37

U.S. Const. art. 1 § 4, cl. 1.................................................1

**Rules**                                                     **Page(s)**

Fed. R. Civ. P. 1..............................................................22

Fed. R. Civ. P. 16(b)........................................................26

Fed. R. Civ. P. 81(a)........................................................22

**Other Authorities**                                      **Page(s)**

106 Cong. Rec. 5,326 (1960) .......................................... 5, 6, 30

106 Cong. Rec. 6,959 (1960) ..............................................20

*Basis*, Merriam-Webster ...................................................32

Election Assistance Comm'n, Election Administration and Voting
Survey 2024 Comprehensive Report (2025).............................. 9, 35, 37

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice
Department*, N.Y. Times Mag. (Nov. 16, 2025) ......................41

Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026).......... 13, 40

H.R. Rep. No. 86-956 (1959)....................................... 4, 28, 29

*Quick Profiles: California – Health Outcomes: Mortality*, NATIONAL
INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES .................35

Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over
states' voter roll data to Homeland Security, sources say*, CBS News
(Mar. 26, 2026)..............................................................40

The Federalist No. 60 (Hamilton)...........................................1

## <u>INTRODUCTION</u>

The United States, through the Civil Rights Division of its Department of Justice ("DOJ"), seeks California's unredacted voter file and the highly sensitive voter data contained therein. But no law compels California to produce this sensitive information. To the contrary, the United States' attempt to seize millions of citizens' sensitive voter data over California's objection is inconsistent with our constitutional design and is not supported by the voting rights laws on which its Complaint relies. For that reason, the United States' parallel fishing expeditions into states' voter data throughout the country have been resoundingly rejected. This Court should reach the same conclusion and affirm the district court's order below.

The Elections Clause of the United States Constitution entrusts states, not the federal executive, with responsibility for managing most aspects of federal elections unless Congress specifically legislates otherwise. *See* U.S. Const. art. 1 § 4, cl. 1. This was a conscious choice by the Framers to promote federalism, avoid concentrated power, and protect democracy from tyranny. *See* The Federalist No. 60 (Hamilton) (discussing how voters in various states would "overthrow their tyrants"

if the national government were to abuse its power under the Elections Clause). Even where Congress has passed laws regulating federal elections, including Title III of the Civil Rights Act of 1960 ("CRA" or "Title III"), 52 U.S.C. § 20701 *et seq.*, the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*, it has consistently and expressly left the details of election administration and maintenance of state voter registration lists to the states. The United States' demand for the sensitive personal data of millions of voters threatens to upend our electoral system's federalist design. It also threatens to compromise voters' privacy and chill voter participation. Because no federal law entitles the United States to the private data it seeks, the district court correctly dismissed the Complaint.

On appeal, the United States abandons its unmeritorious claims to the data under the NVRA or HAVA. It now asserts only that Title III of the CRA, a 1960s voting rights statute passed to remedy Black voter disenfranchisement in the Jim Crow South, entitles the federal government to seize the personal identifying information of millions of

2

California voters today, over the objection of their own state government. It does not.

This Court can affirm the dismissal of the United States' CRA claim on multiple grounds. First, California's unredacted voter registration list does not fall within the "records and papers" contemplated by the CRA's unique text. The CRA requires retention and production only of certain records, namely those that have "come into the possession" of state elections officials, like voter registration applications. 52 U.S.C. § 20701. But the voter registration list is a record *created by* California in the first place. Second, as the district court correctly concluded, the United States failed to provide a "statement of the basis and the purpose" in writing for its demand for California's state voter registration list, as required by law. 52 U.S.C. § 20703. DOJ stated neither a basis nor a valid purpose in its demand to California. And third, even if the United States could establish a CRA claim as to some state election records, the relief it seeks—forced disclosure of millions of Californians' sensitive protected data—would impermissibly burden Californians' constitutional right to vote and raise privacy concerns. This Court can affirm dismissal on any of these independent grounds.

3

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the United States stated a claim for relief under Title III of the Civil Rights Act of 1960.

2. Whether the sensitive personal information the United States seeks can be compelled by the Civil Rights Act of 1960.

## STATEMENT OF THE CASE

### A.    Statutory Background: Title III of The Civil Rights Act of 1960

Congress enacted Title III of the CRA to protect Black Americans' constitutional right to vote and stop former Confederate states from denying thousands of citizens the ability to register to vote. *See, e.g.*, H.R. Rep. No. 86-956 at 7 (1959). The CRA followed the Civil Rights Act of 1957, Congress's first attempt since Reconstruction to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). However, Congress "found it necessary to legislate again in 1960 with respect to this problem of

4

assuring full rights of suffrage to all Americans." *Id*. Title III sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law." *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *3 (D. Or. Feb. 5, 2026). The statute requires that state and local elections officials retain and preserve "all records and papers that come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. § 20703.

While Congress intended that the Attorney General investigate violations of constitutional rights, some, including Florida Congressman William Cramer, were also concerned about DOJ using the powers granted by Title III for "fishing expedition[s]." 106 Cong. Rec. 5,326 (1960). To address these concerns, Congress adopted Rep. Cramer's amendment to Title III, which added a requirement that the Attorney General's demand for records include "a statement of the basis and the

purpose therefor." 52 U.S.C. § 20703; *see also* 106 Cong. Rec. 5,326 (1960). And Congress expressly authorized judicial review over such statements of basis and purpose, by specifying that "[t]he United States district court for the district in which a demand is made pursuant to [Section 20703] of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

The federal government initially used Title III as intended, to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 585–86 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962) (registration records subject to the CRA showed that discriminatory registration practices led to less than 10% of Black citizens being registered to vote while nearly 100% of white citizens were registered); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (reviewing data from an investigation pursuant to Title III which revealed that voting registrars engaged in racially discriminatory practices resulting in 89% of white citizens being registered to vote but only 7.5% of Black citizens being registered). And in conducting those investigations, DOJ adhered

to the statutory requirement to set forth in writing "the basis and the purpose" for its records demand, 52 U.S.C. § 20703—that is, the factual basis for why DOJ suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

This robust use of Title III of the CRA was short lived. Only a few years later, Congress passed the Civil Rights Act of 1964, which outlawed racial segregation. Then, in 1965, Congress passed the Voting Rights Act, the "crown jewel of the civil rights movement," which established broad new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens. Because Congress enacted more effective voting rights laws, federal court assessment of Title III has largely been silent since 1965. Until the past year, all jurisprudence analyzing the CRA arose during the 1960s in former Confederate states and pertained to investigations into state and local officials unlawfully denying Black citizens their right to register to vote.

## B.    Factual Background

Half a century later, on July 10, 2025, DOJ sent a letter to California Secretary of State Shirley Weber requesting a current electronic copy of California's computerized statewide voter registration list, containing all fields, pursuant to Section 8(i) of the NVRA, 52 U.S.C. § 20507(i). 2-ER-267. The letter did not identify any potential violations of the NVRA or of any other federal statute. *See* 2-ER-267–68. It did not mention the CRA at all. *See id.*

The letter also asked six separate questions stemming from California's responses to the Election Administration and Voting Survey 2024 Comprehensive Report ("2024 EAVS Report"). 2-ER-268. The 2024 EAVS Report is a biennial report published by the U.S. Election Assistance Commission ("EAC"),[1] which broadly covers survey data about federal elections management from all 50 states and U.S. territories. It is an aggregation of public data submitted by the states

---

[1] The EAC was established by HAVA to be an independent federal agency charged with, among other functions, serving as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of federal elections. *See* 52 U.S.C. § 20922.

that provides an overview of America's decentralized electoral system.[2] The report makes clear that state voter registration practices and methods differ considerably, and—due to governing federal law—statewide voter registration lists inevitably include some voters who are no longer qualified to vote.[3]

On July 22, Secretary Weber responded, acknowledging receipt and noting that the State was working on a response. SER-66. On July 29, DOJ sent another letter, again demanding California's state voter list with all fields pursuant to Section 8(i)(1) of the NVRA, 52 U.S.C. § 20507(i)(1). SER-68–69. On August 8, Secretary Weber responded, noting that DOJ invoked the NVRA's records provision, which permits redaction of certain sensitive voter information. SER-71. Secretary Weber invited DOJ to inspect a copy of California's public voter registration list at her office in Sacramento, with appropriate redactions of Social Security numbers, driver's license numbers, and similar

---

[2] *See* Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report (2025) ("2024 EAVS Report").

[3] The 2024 EAVS Report, referencing requirements of the NVRA, states that voter "registration removal can take up to two federal general election cycles to complete for some registration records," and "it is inevitable that voter lists will contain some number of voter records for individuals who are no longer eligible to vote." *See id.* at 150.

protected personal identifying information. SER-72. Secretary Weber's letter also provided answers to two of DOJ's 2024 EAVS Report-related questions and indicated that answers to the other questions were forthcoming but required additional time. SER-72–73.

In yet another letter on August 13, 2025, DOJ raised, for the first time, Title III of the CRA and HAVA, and again demanded California's complete and unredacted voter list. 2-ER-263–64. In that letter, DOJ claimed: "[a]s required by Section 303 of the CRA, our letter dated July 10, 2025, provided you with 'a statement of the basis and the purpose therefore,' *id.*, namely, to assist in our determination of whether California's list maintenance program complies with the NVRA." 2-ER-264. DOJ demanded that California provide its electronic voter registration list and ensure "that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number" within seven days. *Id.* (emphasis in original).

On August 21, Secretary Weber responded, again offering DOJ the opportunity to inspect the state voter registration list with sensitive information redacted. 2-ER-258. She also requested that DOJ ensure

10

that its data request would comply with state and federal privacy laws. 2-ER-259–61. On August 29, Secretary Weber sent DOJ another letter answering a question posed by DOJ's initial July 10 letter and indicating that she anticipated providing responses to the rest of DOJ's 2024 EAVS Report-related questions by September 12, 2025. SER-76. And on September 12, Secretary Weber submitted detailed responses to each of the questions DOJ raised in its July 10, 2025 letter related to the 2024 EAVS Report. *See* SER-97–104.

On September 25, 2025, DOJ responded by filing this civil action against California and Secretary Weber, bringing claims pursuant to (1) Title III of the CRA, (2) the NVRA, and (3) HAVA. *See* 2-ER-307–28. The Complaint did not allege that DOJ set forth in writing any "statement of the basis and the purpose" for its CRA demand in any communications with Secretary Weber or her office. *See id.* Neither did the Complaint itself allege any factual basis or purpose for seeking California's complete statewide voter registration list under the CRA. *See id.* Instead, the Complaint merely alleges that the Attorney General "made a demand for the current electronic copy of California's SVRL with all fields, including each registrant's full name, date of birth, residential address, their state

11

driver's license number, and the last four digits of their Social Security number," 2-ER-319–20, and summarily concluded that "California's refusal to provide these records constitutes a continuing violation of federal law." 2-ER-320.

About the same time that the United States initiated this action, it also filed nearly identical complaints against Michigan, Minnesota, New Hampshire, New York, Pennsylvania, Maine, and Oregon.[4] The United States has since initiated federal civil actions, with complaints alleging a single count under the CRA, against 22 additional states and Washington, D.C., bringing the total to 31 lawsuits.[5] Each of these

---

[4] *See United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. filed Sept. 25, 2025); *United States v. NH Secretary of State*, No. 1:25-cv-00371 (D.N.H. filed Sept. 25, 2025); *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. filed Sept. 25, 2025); *United States v. Bd. of Elections of New York*, No. 1:25-cv-01338 (N.D.N.Y. filed Sept. 25, 2025); *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. filed Sept. 25, 2025); *United States v. Bellows*, No. 1:25-cv-00468 (D. Me filed Sept. 16, 2025); *United States v. Oregon*, No. 6:25-cv-01666 (D. Or. Sept. 16, 2025).

[5] *United States v. Fontes*, No. 2:26-cv-00066 (D. Ariz. filed Jan. 6, 2026); *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo. filed Dec. 11, 2025); *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. filed Jan. 6, 2026); *United States v. Evans*, No. 1:25-cv-04403 (D.D.C. filed Dec. 18, 2025); *United States v. Albence*, No. 1:25-cv-01453 (D. Del. filed Dec. 2, 2025); *United States v. Raffensperger*, No. 1:26-cv-00485 (N.D. Ga. filed Jan. 23, 2026); *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. filed Dec. 11, 2025); *United States v. McGrane*, No. 1:26-cv-00197 (D. Idaho filed Apr. 1, 2026); *United States v. Matthews*, No. 3:25-cv-03398 (C.D.

lawsuits seeks complete unredacted voter registration lists containing "all fields" from state elections officials. In conjunction with these lawsuits, the United States has publicly announced that it seeks to create its own voter database and use voter lists for immigration enforcement. 1-ER-18–19; *see also* Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026). District courts have dismissed the United States' complaints in all five states where a decision has been reached. 1-ER-2–34 (*United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026)); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-CV-01148, 2026 WL

---

Ill. filed Dec. 18, 2025); *United States v. Adams*, No. 3:26-cv-00019 (E.D. Ky. filed Feb. 26, 2026); *United States v. Bellows*, No. 1:25-cv-00468 (D. Me. filed Sept. 16, 2025); *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md. filed Dec. 1, 2025); *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. filed Dec. 11, 2025); *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev. filed Dec. 11, 2025); *United States v. Caldwell*, No. 3:26-cv-02025 (D.N.J. filed Feb. 26, 2026); *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M. filed Dec. 2, 2025); *United States v. Ziriax*, No. 5:26-cv-00361 (W.D. Okla. filed Feb. 26, 2026); *United States v. Amore*, No. 1:25-cv-00639 (D.R.I. filed Dec. 2, 2025); *United States v. Henderson*, No. 2:26-cv-00166 (D. Utah filed Feb. 26, 2026); *United States v. Hanzas*, No. 2:25-cv-00903 (D. Vt. filed Dec. 1, 2025); *United States v. Koski*, No. 3:26-cv-00042 (E.D. Va. filed Jan. 16, 2026); *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash. filed Dec. 2, 2025); *United States v. Warner*, No. 2:26-cv-00156 (S.D. W. Va. filed Feb. 26, 2026); *United States v. Wisconsin Elections Comm'n*, No. 3:25-cv-01036 (W.D. Wis. filed Dec. 18, 2025).

362789, at \*1 (W.D. Mich. Feb. 10, 2026); *United States v. Galvin*, No. 1:25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 1:25-cv-00639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *see also United States v. Raffensperger*, No. 1:26-cv-00485, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026) (dismissing complaint for lack of jurisdiction).

## C. Procedural Background

On January 15, 2026, the district court dismissed the United States' Complaint, holding that the pleadings failed to state a claim under the NVRA, HAVA, or CRA. 1-ER-2–34. The court applied Federal Rule 12(b)(6) and dismissed the United States' CRA claim because it failed to comply with the statutory requirements. More specifically, the district court held that the United States' Title III demand failed to provide "a statement of the basis and the purpose therefore." 1-ER-15–17.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's dismissal of the United States' Title III claim because no viable Title III claim has been made.

As an initial matter, the United States cannot evade its claim's legal deficiencies by arguing the federal civil action it initiated is actually a special statutory proceeding. Appellant's Opening Br. at 14–17. The

14

statute creates no special proceeding. *See* 52 U.S.C. § 20705. The United States' meritless assertion is inconsistent with the CRA's own text, the express requirements of the Federal Rules, binding Supreme Court precedent, and basic notions of judicial independence and the rule of law.

Applying Rule 12(b)(6) as required, there were several grounds on which dismissal was proper, and this Court can affirm on any of them.

First, Title III does not reach the records the United States seeks. Title III only relates to documents that "come into [the] possession" of election officials. 52 U.S.C. § 20701. So, the United States' Title III demand for records *created* by the State seeks materials outside of Title III's purview. 52 U.S.C. § 20701. While this was not the reason for dismissal at the district court, it is an additional or alternative basis on which this Court can affirm.

Second, the United States failed to plead that it made a viable Title III demand because it did not follow the statute's mandatory requirements. As the district court correctly held, the United States failed to provide a valid statement of "the basis and the purpose" for its demand for California's unredacted voter list. 52 U.S.C. § 20703. The pleadings show *no* statement of any basis, and the generalized purpose

15

offered by DOJ does not match the records demanded. Even if this purpose were otherwise valid, the United States' own public statements and other public records strongly suggest that it is pretextual, and thus it fails to comply with the statutory requirements of the CRA for that reason as well. The United States' failure to provide a basis and failure to provide a valid purpose are each fatal to its CRA claim.

Finally, the relief sought by the United States, a complete statewide voter registration list without redactions, cannot be granted without trammeling constitutional and privacy rights. As such, the relief sought cannot be granted. The federal seizure of the personal sensitive information of millions of Californians would unconstitutionally chill their right to vote. As courts have consistently held, redacting such information is appropriate and even required to ensure unnecessary disclosures do not burden citizens' fundamental right to vote or violate their privacy interests. Because the United States' Complaint seeks relief that cannot be granted, this Court can affirm the district court's dismissal on that ground as well.

16

## STANDARD OF REVIEW

The Ninth Circuit reviews de novo a district court's grant of a motion to dismiss. *Hunter v. U.S. Dep't of Educ.*, 115 F.4th 955, 962 (9th Cir. 2024). The Court "may affirm the district court's dismissal 'on any basis supported by the record, even if the district court relied on different grounds or reasoning.'" *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 723 (9th Cir. 2026) (quoting *Maldonado v. Harris*, 370 F.3d 945, 949 (9th Cir. 2004)).

Dismissal is proper when the allegations in the complaint fail to set forth facts that, if true, would entitle the plaintiff to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While well-pleaded factual allegations must be accepted as true and construed in the light most favorable to the plaintiff, *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), legal conclusions couched as factual allegations need not be accepted, *Iqbal*, 556 U.S. at 678.

In considering whether dismissal is proper, the pleadings include any documents incorporated by reference therein (such as the contents of the correspondence between DOJ and the State in this case). *See United*

17

*States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The Court may also consider documents that are judicially noticeable, like the United States' numerous public statements. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("courts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *United States Small Bus. Admin. v. Bensal*, 853 F.3d 992, 1003 n.3 (9th Cir. 2017) (holding it is "appropriate to take judicial notice of this information [that] was made publicly available by government entities"); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("On a motion to dismiss, [courts] may take judicial notice of matters of public record outside the pleadings"); *see also In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) (affirming dismissal based on undisputed documents outside of the pleadings); *cf. also Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 246 (1944) ("the agencies of public justice [need] be not so impotent that they must always be mute and helpless victims of deception and fraud"), *overruled on other grounds by Standard Oil of Cal. v. United States*, 429 U.S. 17, 18 (1976).

18

## ARGUMENT

### I. The Federal Rules of Civil Procedure Apply in this Federal Civil Action

As an initial matter, the Federal Rules of Civil Procedure govern this civil action. The text of Title III does not create any special exception from the Federal Rules. *See* 52 U.S.C. § 20705. The United States relies almost exclusively on a decades-old, non-binding, and plainly distinguishable case, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), to assert that a Title III demand is "a special statutory proceeding" and that the district court erred in applying the Federal Rules to its federal civil action. Appellant's Opening Br. at 14–17. This attempt to end-run the Federal Rules, including Rule 12, must be rejected. As the district court correctly concluded, statutory text, controlling Supreme Court precedent, and the Rules must be followed here. 1-ER-13.

Start with the text. Title III provides: "The United States District Court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Because the

statute does not specify any particularized process, the process that is "appropriate" is the Federal Rules of Civil Procedure.[6]

Binding precedent so holds. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court held that proceedings to enforce a federal records statute—one written in terms materially identical to the CRA, with the same "by appropriate process" language—are governed by the Federal Rules, *id.* at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("the United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is

---

[6] The legislative history of Title III, while unnecessary to interpret its plain meaning, is consistent with its text. In discussing the CRA on the Senate floor in 1960, Sen. Hruska explained: "[Section 305] is merely a restatement of court powers which now exist . . . . A formal court application, and any order which might flow from the court, would still remain unimpaired and without diminution." 106 Cong. Rec. 6,959. The CRA's "appropriate process" language was meant to confirm courts' unimpaired judicial oversight—not stymie it as DOJ suggests. 52 U.S.C. § 20705.

located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper" (emphasis added).[7]

The *Powell* Court could not have been any clearer: Because the records statute there provided that records requests would be judicially enforced "by appropriate process," and because no alternative process was specified, "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 57–58 & n.18; *accord N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407–08 (1960) (absent "express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law") (footnotes omitted). That holding squarely applies here. Where the federal government demands the production of documents, the demand may be contested on "any appropriate ground." *Powell*, 379 U.S. at 58. And in the years since *Powell*, the Supreme Court, this Court, and other courts of appeals have time and again reaffirmed, in numerous contexts, that it is a court's responsibility to independently

---

[7] Any effort by DOJ to contend that the holding of *Powell* as to the applicability of the Federal Rules in contingent on special features of the Internal Revenue Code must also fail. In *Powell*, the Supreme Court held that "the Federal Rules of Civil Procedure apply" *not* because of other provisions of the Internal Revenue Code, but "[b]ecause [the statute] contains no provision specifying the procedure to be followed in invoking the court's jurisdiction." *Powell*, 379 U.S. at 52, 58 n.18 (emphasis added).

21

determine—prior to compelling disclosure—whether a government agency has followed procedural requirements and whether the evidence sought is relevant and material to its investigation. *See, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528 (1971); *Action Recycling Inc. v. United States*, 721 F.3d 1142, 1144–45 (9th Cir. 2013); *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012); *Crystal v. United States*, 172 F.3d 1141, 1143–1144 (9th Cir. 1999); *see also Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009) (same).

And if more were needed, the Federal Rules themselves are explicit on this point. With limited exceptions inapplicable here, they "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include a claim under Title III. *See* Fed. R. Civ. P. 81(a)(5) (expressly providing that the Rules "apply to proceedings to compel testimony or the production of documents"). The United States filed a federal civil action. It cannot avoid the implications of its own decisions.

This conclusion—that the Federal Rules apply in a federal civil action involving the authority of the executive branch to impinge on the traditional role of the states and the individual rights of citizens—is consistent with both ordinary practice and the independent judicial function that the Federal Rules are designed to serve. Indeed, the "duty of the Judiciary . . . is to determine . . . whether the Executive branch has correctly applied the statute that establishes its authority." *Chadha v. Immigr. & Naturalization Serv.*, 634 F.2d 408, 430 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983)). Thus, judicial review of executive action "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 424 (1995). Here it most certainly was not.

The United States never backs up its contrary assertion that this federal civil action is actually a "special statutory proceeding" that exists outside of the Federal Rules. Appellant's Opening Br. at 15. It points to no statutory text that provides for any such "special" process—because none exists. Rather, the United States' assertion of a "special" process is based solely on the Fifth Circuit's opinion in *Lynd*, a half-century-old,

23

pre-*Powell*, non-binding case addressing wholly dissimilar circumstances.

*Lynd* must be understood in context, as a response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to protect the right to vote by facilitating discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. The Fifth Circuit painted a clear picture of this recalcitrance: By the time *Lynd* was decided, the county registrar defendants in that case had already spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Lynd*, 306 F.2d at 227. This was all despite the fact that "the factual foundation for" the basis and purpose of the Attorney General's Title III requests was utterly self-evident—massive racial disparities with respect to registration that evidenced Jim Crow regimes' discriminatory refusal to register Black

24

voters. *See id.* at 227–28 & n.6. Against that backdrop, the Fifth Circuit emphasized that, after months of litigation, a new round of plenary "judicial review or ascertainment" of *further* facts was not warranted under Title III; to the contrary, at that point the statutory goal of protecting the franchise could only be met with summary resolution. *See id.* at 226–228.

It is also important context that *Lynd* was decided before sensitive personal identifying information such as Social Security numbers or driver's license numbers was widely required as part of a person's voter registration record, and before any federal laws had been passed to protect and constrain access to personal information. *Lynd* and contemporaneous cases required production of *public* records; as the court explained in *Lynd*: "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." *Id.* at 231.

*Lynd* is thus inapposite twice over. And in any event, the United States goes far beyond *Lynd* here. It does not seek expedited summary judgment following months of litigation over a facially valid Title III

25

demand—something that the Federal Rules would certainly allow under appropriate circumstances, *see* Fed. R. Civ. P. 16(b), 56. It instead argues that the Rules simply do not apply, and states and citizens cannot challenge the facial validity of a demand before millions of voters' personal identifying information is seized by the federal government. Title III's text, binding cases like *Powell* and its progeny, the Rules themselves, and basic notions of due process and judicial independence all resoundingly defeat that assertion.

## II. The District Court Correctly Held that the United States Failed to State a Claim under the Civil Rights Act of 1960

### A. The CRA Does Not Entitle the United States to California's Unredacted Voter List Because It Does Not Reach Records Created by the State

The United States fails to state a claim because it seeks records that are not covered by Title III at all.

Section 301 of Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Section 303—the provision granting the Attorney General authority to request records—

26

in turn obligates officials to turn over "[a]ny record or paper required by [Section 301] to be retained and preserved," *id.* § 20703—that is, only those records that have "come into [their] possession," *id.* § 20701. While "all records and papers" is indeed sweeping language, Title III is distinct from other statutory records provisions in that it provides an immediate textual limitation to this broad language: only those records or papers that have "come into [the custodian's] possession" must be retained and provided in response to a valid Title III demand.

The state's voter roll falls outside the ambit of this text. Binding precedent consistently equates "coming into possession" of something with obtaining or receiving it. *See Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" as a matter of 1960s and contemporary usage) (internal quotation marks omitted); *United States v. Prasad*, 18 F.4th 313, 319 (9th Cir. 2021) (holding the plain meaning of "obtain" is "to come into possession of" or "to get or acquire") (internal quotation marks omitted). Indeed, Congress regularly uses the language "comes into possession" to refer to something that the subject obtains or acquires, rather than creates. *See, e.g.*, 13 U.S.C. § 214 (prohibiting census staff from disclosing

27

"any information . . . which comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of money or property that "comes into [one's] possession"); 18 U.S.C. § 1703(a) (prohibiting postal employees from delaying or destroying any mail that "come into [their] possession"); 50 U.S.C. § 217 (requiring all military members to report whenever abandoned property "comes into [their] possession"); *see also* 8 U.S.C. § 1454 (distinguishes between someone "hav[ing]" a certificate or "com[ing] into possession of it").

The phrase "come into . . . possession" in the CRA thus refers to records that elections officials obtain, rather than those they create. And because the voter file is a continuously updated document created by state officials, it is not a record that "come[s] into [their] possession," and thus falls outside of the reach of the CRA.

This reading is consistent with Title III's aims. The statute was part of an effort to force Southern registrars to accept the voter registration forms submitted by Black voters, rather than destroying them or otherwise rejecting valid registration forms. *See* SER-106–07; SER-110–11; SER-122–23; SER-168; SER-177–78; SER-181–83; *see also* Report of the United States Commission on Civil Rights at 93 (1959), *available at*

28

https://www.usccr.gov/files/historical/1959/59-001-U.pdf ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible"); H.R. Rep. 86-956 at 7 (1959) (describing the importance of viewing materials submitted by voters to elections officials as "an essential step in the process of enforcing and protecting the right to vote"). Title III is at its heart a retention provision that aims to prevent the destruction of materials submitted by would-be voters and to allow federal enforcers to uncover evidence that those would-be voters were being denied registration on the basis of race.

The United States' contrary reading is wrong. To read Title III as applying to *any* documents or records that an elections official possesses, including those it creates, would improperly read language out of the statute, replacing "all records and papers *which come into [their] possession*" with "all records and papers which *they possess*." Courts must "construe Congress's work so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant." *Pac. Coast Fed'n of Fishermen's Associations, Inc. v. Nickels*, 150 F.4th 1260, 1271 (9th Cir. 2025) (citation and quotation marks omitted); *In re*

*Saldana*, 122 F.4th 333, 342 (9th Cir. 2024) (citation and quotation marks omitted). By including the phrase "comes into [their] possession," Congress expressed its desire to require retention and disclosure only of records that the elections officials received or obtained from others, but not those that they created themselves.

This Court can affirm the district court's dismissal of the complaint on that basis alone.

**B.    The United States Failed to Comply with the CRA's Statutory Requirement for "A Statement of the Basis and the Purpose" for Sensitive Voter Data**

A Title III demand requires a written "statement of the basis and the purpose" for the records the Attorney General is seeking. 52 U.S.C. § 20703. Title III's "basis" and "purpose" requirements are critical safeguards created precisely to prevent the statute from becoming a vehicle for DOJ to conduct fishing expeditions into states' voter data. *See* 106 Cong. Rec. 5,326 (1960) (statutory language introduced to prevent "fishing expedition[s]"); *see also In re Coleman*, 208 F. Supp. at 201 (recognizing "exception[s]" to "[t]he right of free examination of official records" due to improper purpose); *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("Title III provides—*if properly applied*

30

and enforced—an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles") (emphasis added), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961).

As the district court correctly held, the United States did not meet this statutory requirement—it provided neither a basis nor a valid purpose for its demand for California's unredacted voter list—so the United States was not entitled to any relief under Title III of the CRA. 1-ER-17. On appeal, the United States again argues that its failure to meet this statutory requirement should be overlooked because: (1) the Court cannot review a "statement of the basis and the purpose," and (2) the United States' interest in investigating California's hypothesized non-compliance with its NVRA list maintenance requirements suffices as both its statement of basis and purpose. The first argument, addressed above in Section I, is meritless. This case is governed by the Federal Rules and the United States' actions are subject to judicial review. The second argument, addressed below, also fails.

"Basis" and "purpose" under Title III have consistently been treated as distinct concepts. In *Lynd*, for example, the Attorney General's stated

31

*basis* was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction." 306 F.2d at 229 n.6. The stated *purpose* was to investigate and establish a discriminatory "pattern or practice" in the jurisdiction's voting registration processes. *Id.* at 228 n.4. In the limited universe of Title III cases, courts consistently treated these concepts as distinct. *See, e.g.*, *id.*; *In re Coleman*, 208 F. Supp. at 199–200. The United States' failure to articulate *both* a sufficient basis and a sufficient purpose underlying its request for California's unredacted voter file invalidates its CRA claim. Dismissal was therefore proper.

### 1. The United States Failed to State the Basis of its CRA Demand

The "basis" for a CRA demand is a statement of why the United States believes there may be some relevant violation of law—the facts on which the demand is "based." *Lynd*, 306 F.2d at 229 n.6; *see also Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis [https://perma.cc/2CDG-7WU5] (last visited Apr. 16, 2026) ("something on which something else is established or based").

32

Here, the United States has consistently failed to provide any factual basis for its CRA demand. The Complaint does not allege that any factual basis for the demand was ever stated, *see* 2-ER-307–328, and the August 13 Letter, in which DOJ first invoked the CRA, is similarly silent as to why (or even if) the United States believes California's list maintenance procedures might violate the NVRA. *See* 2-ER-263–65. Neither document explains on what basis the United States might suspect a violation of the NVRA, or any federal law, in the first place. That omission is fatal. *See, e.g.*, *United States v. Galvin*, 2026 WL 972129 (D. Mass. Apr. 9, 2026) (dismissing because the United States failed to state a basis for its CRA demand against Massachusetts); *United States v. Oregon*, 2026 WL 318402, at \*9 (same); *United States v. Amore,* 2026 WL 1040637, at \*12 (same).

In its August 13 letter invoking the CRA, DOJ averred that it had already provided a Title III statement of basis and purpose (it hadn't), which it identified as: "to assist in our determination of whether California's list maintenance program complies with the NVRA." 2-ER-264. But determining whether California is complying with the NVRA is at most a "purpose" for the demand, not a factual "basis" for it. *See* 1-ER-

33

17. DOJ's statement in its August 13 letter collapsed the two distinct written requirements that are *both* mandated by Title III: "the basis *and* the purpose." 52 U.S.C. § 20703. The failure to state "the basis" for the demand in writing is in itself fatal to the United States' Complaint and grounds to affirm the district court. 1-ER-17.

To try to retroactively supply a "basis," the United States now points to the letters predating its CRA demand, quoting language from the July 10 letter, which did not mention the CRA. Appellant's Opening Br. at 22 (citing 2-ER-268). Even if the July 10 letter could theoretically serve as a valid Title III demand without ever invoking or even mentioning Title III, the July 10 letter's contents do not supply the required statement of the basis.

The July 10 letter requested California's voter registration list pursuant to NVRA's public disclosure provision, and "additionally" set forth various queries relating to the 2024 EAVS report, ER-267–68, queries that Secretary Weber provided responses for, SER-71–74, SER-97–104. The United States now characterizes the July 10 letter as identifying "discrepancies" based on the EAVS-reported data, Appellant's Opening Br. at 21–22, but that is not what the July 10 letter or the

34

pleadings say. The July 10 letter asks questions about California's EAVS responses, but it never frames these as discrepancies nor does it suggest any factual basis to think that California's list maintenance procedures might fail to comply with the NVRA. *See* 2-ER-267–68. In fact, neither the July 10 letter nor the Complaint alleges *any* evidence of *anything* inconsistent with reasonable list maintenance efforts in the EAVS data.[8] The United States provided no Title III basis for California's complete unredacted voter list, and this Court should therefore affirm dismissal.

---

[8] Indeed, the 2024 EAVS Report itself acknowledges that differences are to be expected between the states, and even within states. *See* 2024 EAVS Report at 2 ("Broad legal and procedural authority [over elections] rests with the states, territories, the District of Columbia, and local jurisdictions. As a result, wide variation exists in the policies and practices for conducting elections across and sometimes within states, and these policies and practices are constantly changing"). Any purported discrepancy or anomaly between states could be simply explained by differences that "are to be expected as between the states." *Id*. For example, the United States notes that "California's reported 11.9% of voters 'removed because of death' was 'well below the national average.'" Appellants' Opening Br. at 22. But mortality rates vary across states, and a lower rate of removal based on death could simply be explained by California's lower than average mortality rate. *See Quick Profiles: California – Health Outcomes: Mortality*, NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES, https://hdpulse.nimhd.nih.gov/data-portal/quick-profile/06/mortality (last visited Apr. 10, 2026) (listing, for "All Causes of Death," a rate of 687.6 in California as compared to the national U.S. rate of 805.6).

### 2. The United States Failed to Allege a Viable Purpose for its CRA Claim

#### a. *The Stated Purpose Does Not Comport with the Records Demanded*

The United States' asserted purpose is the same statement that it claims for its basis: "to assist in our determination of whether California's list maintenance program complies with the NVRA." 2-ER-264. The district court correctly found that this stated purpose failed to meet Title III's requirements.

The statutorily required "purpose" is an explanation of how the requested records would help determine if there is a violation. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6. So, to be a valid "purpose," the records sought must be intended to prove the suspected violation that the United States seeks to investigate. Here, the United States' requested records, a static snapshot of California's unredacted voter file, are neither necessary nor germane for determining whether California's list maintenance program complies with the NVRA.

The NVRA requires California to "conduct a general program that makes a reasonable effort" to remove ineligible voters from the official lists of eligible voters. 52 U.S.C. § 20507(a)(4)(A)–(B). Perfect or error-

36

free voter rolls are not the standard, nor are they feasible in practice. *See, e.g.*, 2024 EAVS Report at 150 (noting that it is "inevitable" that voter lists will contain some number of voter records for individuals who are no longer eligible to vote). In fact, the NVRA—the statute the United States purportedly seeks to enforce—explicitly *prohibits* removal of the names of some potentially ineligible registrants from the official list of eligible voters until steps are taken to provide notice and ensure they are not removed prematurely or unfairly. *See* 52 U.S.C. § 20507(d). Meanwhile, HAVA, the federal statute that requires the collection and use of personal identifying information and numerical identifiers in the state's voter roll database, expressly provides that "[t]he specific choices on the methods of complying with" such requirements "shall be left to the discretion of the State." *Id.* § 21085. Accordingly, the State's *procedures* for voter list maintenance and how they are carried out (which California has provided), SER-71–74, SER-97–104, are what establish its compliance with the NVRA, *see* 52 U.S.C. §§ 20507(a)(4), (c)(1), 21083(a)(2)(A), 21085. A snapshot of the unredacted voter file (much less individuals' sensitive personal data contained therein) does not.

37

Here, California offered to provide the United States with almost all the information and records it sought, including any information it might need to understand California's voter list maintenance procedures. SER-71–74; 2-ER-257–58. The United States' insistence on also obtaining the highly sensitive personal identifiers of millions of Californians—like driver's license and partial Social Security numbers—is not relevant for its stated purpose of NVRA compliance. *See Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988) (noting that federal agencies' requests must be "no broader than necessary to achieve its purpose" and cannot be so broad as to constitute a "fishing expedition"). The United States may *wish* it could supplant the State's primary role in voter list maintenance by using the unredacted voter file data to go line-by-line to identify purported errors in California's voter list at a single point in time, but even if it undertook that unlawful and unauthorized course of action, any purported findings from reviewing only a static snapshot of the voter registration list would not amount to California failing to comply with the "reasonable effort" required by the NVRA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–26 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is

38

rational and sensible" and rejecting any "quantifiable, objective standard" in this context). The August 13 letter's general reference to NVRA compliance is not enough to plausibly plead that the DOJ stated "the purpose" of its CRA demand. *See United States v. Amore,* 2026 WL 1040637, at \*13–14 (holding that even if DOJ were to cure its pleadings and add a factual basis, investigating NVRA compliance is not a valid Title III purpose); *see also Malheur,* 164 F.4th at 721 (affirming district court's dismissal because plaintiff failed to make a plausible claim).

### b. *The Stated Purpose is Contradicted by the United States' Own Public Statements*

Moreover, even if the United States' stated purpose was facially valid, the district court correctly concluded that it did not need to accept a contrived statement of purpose where the United States directly contradicted its purpose in public representations. 1-ER-17–20. The United States has filed nearly identical lawsuits in 30 states and the District of Columbia—each demanding the complete unredacted voter roll with all sensitive and personally-identifiable information. *See supra* n.5. Over the course of those proceedings, the United States has admitted in open court that it will use and share the gathered information with

39

agencies such as the Department of Homeland Security, thus potentially facilitating immigration investigations. Mar. 26, 2026 Hr'g Tr. at 50:21–23 65:1–66:18, *United States v. Amore*, No. 25-cv-639 (D.R.I. filed Dec. 2, 2025).[9] This is plainly a purpose outside the purported purpose provided in DOJ's written CRA demand to California and pleaded in the Complaint in this case. The Administration also has not been coy about its desire for a national voter registration list,[10] and it recently issued an executive order requiring the creation of one.[11] Yet the United States has repeatedly invoked only voter list maintenance as its stated purpose in the context of filing what are basically cut-and-paste lawsuits.[12]

---

[9] *See also* Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to Homeland Security, sources say*, CBS News (Mar. 26, 2026), https://www.cbsnews.com/news/justice-dept-finalizing-deal-voter-roll-data-homeland-security/.

[10] *See* 1-ER-19 (noting reports that the federal government is attempting to "amass the personal information of millions of Americans in a centralized database").

[11] Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026).

[12] One article from late 2025, around the time this action was filed, extensively quoted a former lawyer from DOJ's Civil Rights Division, describing DOJ's aims in this case and others like it with respect to the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data . . . . I had never before told an opposing party, Hey, I

The statute requires more. Critically, the CRA mandates that DOJ provide in writing a statement of "*the* basis and *the* purpose" of a records request. 52 U.S.C. § 20703 (emphasis added). By twice using the definite article, the statute requires not just a conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021) (noting that the inclusion of a definite article with a singular noun implies that each noun is "a discrete thing"); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).

The Court need not ignore public information demonstrating that the United States failed to provide a statement of the actual purpose underlying its demand. This case does not exist in a vacuum. The district court was correct in refusing to "ignore the disconnect between the decision made and the explanation given," and this Court is similarly not "required to exhibit a naiveté from which ordinary citizens are free." *Dep't*

---

want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Mag. (Nov. 16, 2025), https://perma.cc/L39A-S5VZ.

41

*of Commerce v. New York*, 588 U.S. 752, 756 (2019); *see also J.O.P. v. United States Dep't of Homeland Sec.*, 2025 WL 1431263, at \*10 (4th Cir. May 19, 2025) (Gregory, J. concurring) ("As is becoming far too common, we are confronted again with the efforts of the executive branch to set aside the rule of law in pursuit of its goals."); *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("the government's explanation simply is not credible"). The United States urges this court to exhibit that naiveté simply because *Department of Commerce* was an Administrative Procedure Act suit and this is not. Appellant's Opening Br. at 29–30. But that distinction misses the point. Here, the question of pretext goes directly to whether the requirements of Title III were met—whether the United States stated *the* purpose for its demand, as required by the statute. The pleadings and public record compel the conclusion that it did not. As such, the CRA claim was correctly dismissed for that reason as well.

### III. The CRA Does Not Require Disclosure of Private, Sensitive Voter Information to the Federal Government

Even if the United States had provided a valid basis and purpose to support its demands for records covered by Title III—which it did not—

any sensitive personal voter information would be subject to redaction. Constitutional and privacy concerns are paramount here and prohibit disclosure of the sensitive information that the United States seeks. This is because requiring voters to consent to the disclosure of their uniquely sensitive information, like driver's license numbers and other unique identifier numbers, as a prerequisite to voting creates an unnecessary burden on their fundamental right to vote. *See Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (holding that making disclosure of sensitive data "a condition of [the] right to vote, . . . creates an intolerable burden on that right"). Many voters would be discouraged from registering and exercising their right to vote if the sensitive information they submitted for registration could be seized by the federal executive without an opportunity to object. This risk of chilling voters' rights is particularly acute where, as here, the United States has itself admitted to sharing sensitive personal information with outside activist groups and storing such data on unsecured, non-government servers that did not conform with agency security protocols. *See* Notice, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, Dkt. 197, at 5–6 (D. Md. Jan. 16, 2026).

In *Lynd*, the very case on which the United States repeatedly relies, the Fifth Circuit noted that "of great importance" to its reasoning was that it was "not discussing confidential, private papers and effects" but "rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection . . . ." 306 F.2d at 231. In this case, the United States does not seek only public records, as were at issue in *Lynd*. California has already agreed to allow access to *all* public records requested by the United States and has simply declined to provide the "confidential, private" personal identifying information of California voters that would not "ordinarily [] be open to legitimate reasonable inspection," *id.*; *see* SER-71–74.

Indeed, around the time Title III was enacted and *Lynd* was decided, the records subject to disclosure to the Attorney General were not required to contain Social Security numbers or other sensitive identifying data, voter data could not be electronically transferred, compounded, or shared, and the Attorney General was not yet subject to federal privacy laws such as the Privacy Act of 1974. The current reality is that the vulnerability of electronic data, particularly sensitive personal identifiers, cannot be overlooked or compromised without a very

44

compelling reason, which federal law now consistently recognizes. *See, e.g.*, 5 U.S.C. § 552(b)(6) (exempting private records from FOIA disclosure); 5 U.S.C. § 552a(b) (establishing protections for personal information held by the federal government); 44 U.S.C. § 3501 note (purpose of law is to "ensure sufficient protections for the privacy of personal information . . .").

Congress later enacted the NVRA, which includes a records provision, allowing for disclosure of records specifically related to list maintenance. *See* 52 U.S.C. § 20507(i)(1). And as repeatedly recognized in that context, redactions of sensitive personal data of voters are permitted and may even be affirmatively required to protect the fundamental right to vote and voter privacy. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012); *Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); 2-ER-175–77.

Title III must be interpreted consistently with the later filed NVRA. For one, it would be anomalous to allow the earlier-enacted and more general provisions of the CRA to supplant the later-enacted NVRA

45

records provision, which specifically covers list-maintenance-related records, and which have been interpreted to allow and require redaction. *See, e.g.*, *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 951 (9th Cir. 2024) (recognizing the "well-established canon of statutory construction [that] specific statutory provisions control general ones," particularly where, as here, "the two provisions are interrelated and closely positioned"). Moreover, like Title III, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703,; 52 U.S.C. § 20507(i)(1). But courts have held that redaction is required to the extent the disclosure of such sensitive material would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Project Vote*, 682 F.3d at 339 (internal quotation marks and citation omitted). The Fourth Circuit in *Project Vote*, even while granting access to a state's voter registration applications for inspection and photocopying, ensured the redaction of information "uniquely sensitive and vulnerable to abuse." *Id.* In coming to this conclusion, the court emphasized that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering

46

to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339. This reasoning is consistent with the general principle that courts must interpret federal statutes in a manner that avoids unnecessarily raising "constitutional questions." *United States v. Hernandez*, 322 F.3d 592, 594–95 (9th Cir. 2003) (citing *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)).

The same privacy and constitutional concerns that warranted redactions in response to records requests under the NVRA apply equally to requests for the same records under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act . . . it must follow the same constitutional rules."). Indeed, the limited case law considering records requests under the CRA expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, thereby recognizing that courts can, and must, protect sensitive voter information from disclosure where privacy and constitutional concerns arise. Thus, even if the United States had properly pleaded its entitlement to California's statewide voter registration list under Title III—and for numerous reasons, it failed to do

so—voters' sensitive personal information would still need to be redacted. No matter the statutory mechanism, conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Project Vote*, 682 F.3d at 339 (citation omitted).

## <u>CONCLUSION</u>

The decision below should be affirmed. The Court should also reject the United States' unsupported request that the mandate issue immediately or that the time for filing a petition for rehearing or rehearing *en banc* be shortened.

Dated: April 17, 2026        Respectfully submitted,

                     */s/ Grayce Zelphin*
                     GRAYCE ZELPHIN (SBN 279112)
gzelphin@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

JULIA A. GOMEZ (SBN 316270)
jgomez@aclusocal.org
PETER ELIASBERG (SBN 89110)
peliasberg@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

48

1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232

THERESA J. LEE (NY 5022769)
tlee@aclu.org
ARI SAVITZKY (NY 5060181)
asavitzky@aclu.org
SOPHIA LIN LAKIN (NY 5182076)
slakin@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

PATRICIA J. YAN (NY 5499173)
pyan@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800

*Counsel for Defendants-Intervenors-Appellees League of Women Voters of California*

49

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify this motion complies with the length limits set forth in Fed. R. App. P. 27(d)(2) and Ninth Circuit Rule 27-1(1)(d), because this motion contains 10,042 words excluding the items exempted by Fed. R. App. P. 32(f). The motion's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  April 17, 2026          */s/ Grayce Zelphin*
Grayce Zelphin

*Counsel for Defendants-Intervenors-Appellees League of Women Voters of California*

50

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I electronically filed the foregoing brief by using the appellate ACMS system.

I certify that the participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated:  April 17, 2026    _    _/s/ Grayce Zelphin_____
Grayce Zelphin

*Counsel for Defendants-Intervenors-Appellees League of Women Voters of California*

51