No. 26-1232

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

SHIRLEY WEBER, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF THE STATE OF CALIFORNIA AND THE STATE OF CALIFORNIA,
*Defendants-Appellees*,

NAACP, NAACP CALIFORNIA-HAWAII STATE CONFERENCE, THE LEAGUE OF WOMEN VOTERS OF CALIFORNIA, AND SERVICES, IMMIGRATION RIGHTS AND EDUCATION NETWORK,
*Defendants-Intervenors-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:25-cv-09149 (Carter, J.)

## BRIEF OF *AMICI CURIAE* COMMON CAUSE, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, AND NATIONAL URBAN LEAGUE IN SUPPORT OF DEFENDANTS-APPELLANTS AND AFFIRMANCE

Robert Weiner
Gillian Cassell-Stiga
Catherine Meza
LAWYERS' COMMITTEE FOR CIVIL
 RIGHTS UNDER LAW
1500 K Street NW, Ninth Floor
Washington, DC 20005
gcassell-stiga@lawyerscommittee.org

Omar H. Noureldin
Maryam Jazini Dorcheh
COMMON CAUSE
805 15th Street NW, Suite 800
Washington, DC 20005
onoureldin@commoncause.org

Lanny A. Breuer
Thomas Perrin Cooke
 *Counsel of Record*
Samuel T. Ackerman
Joshua M. Schenk
Maya M. Sharp
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
pcooke@cov.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

INTEREST OF *AMICI CURIAE* ........................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 3

BACKGROUND ................................................................................................. 3

ARGUMENT ...................................................................................................... 6

I.      The Decision Below Is Correct. .................................................................... 6

II.     The Compelled Disclosure of Voter Data Contravenes the Purpose of HAVA and the Structure of Federal Election Law. ....................................... 8

     A.     The Department's Demand Upends the Central Role of States and Congress in Regulating Elections.................................................. 8

     B.     The Demand Is Incongruous with the Text and Purpose of HAVA................................................................................................. 11

III.    The Demand Will Chill Voter Participation and Expose Americans to an Array of Unnecessary Risks. .................................................................. 15

     A.     Compelled Disclosure of Sensitive Voter Information Chills Civic Information. ...................................................................... 15

     B.     The Chilling Effect Is Heightened When the Asserted Enforcement Purpose Appears Pretextual.......................................... 20

     C.     The Demand for Voter Data Will Further Erode Constitutional Principles and Democratic Norms. .................................................. 23

          1.     Contemporary and Historical Experience Prove that Citizen-Data Centralization Enables Democratic Backsliding.......................................................................... 23

          2.     Artificial Intelligence Amplifies the Risks Associated with Federal Voter Data Aggregation.................................... 27

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1..................................................................8, 9

**Cases**

*ACLU v. Phila. City Comm'rs*,
  872 F.3d 175 (3d. Cir. 2017) .......................................................7

*Bellitto v. Snipes*,
  935 F.3d 1192 (11th Cir. 2019) ...................................................7

*Buckley v. Am. Constitutional L. Founds., Inc.*,
  525 U.S. 182 (1999)....................................................................16

*Bush v. Gore*,
  531 U.S. 98 (2000).......................................................................12

*Bush v. Palm Beach Cnty. Canvassing Bd.*,
  531 U.S. 70 (2000)..................................................................11, 12

*Clingman v. Beaver*,
  544 U.S. 581 (2005)......................................................................11

*Common Cause Ga. v. Kemp*,
  347 F. Supp. 3d 1270 (N.D. Ga. 2018).......................................18

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)................................................................20, 23

*Foster v. Love*,
  522 U.S. 67 (1997).........................................................................9

*Greidinger v. Davis*,
  988 F.2d 1344 (4th Cir. 1993) ..............................................15, 16

*Harper v. Va. State Bd. of Elections*,
  383 U.S. 663 (1966)......................................................................15

*Husted v. A. Philip Randolph Inst.*,
    584 U.S. 756 (2018)............................................................................17

*League of United Latin Am. Citizens v. Exec. Off. of President*,
    808 F. Supp. 3d 29 (D.D.C. 2025).................................................9, 10

*Libertarian Party of Va. v. Alcorn*,
    826 F.3d 708 (4th Cir. 2016) ...........................................................10

*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986)............................................................................9

Order on Mot. to Compel & Mots. to Dismiss, *United States v. Galvin*,
    No. 25-cv-13816 (D. Mass. Apr. 9, 2026), Dkt. No. 92........................8

*Palm Beach Cnty. Canvassing Bd. v. Harris*,
    772 So. 2d 1220 (Fla. 2000) ............................................................12

*Project Vote, Inc. v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016).............................................16

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)..............................................................................23

*Roudebush v. Hartke*,
    405 U.S. 15 (1972)..............................................................................9

*Tashjian v. Republican Party of Conn.*,
    479 U.S. 208 (1986)..........................................................................11

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995)............................................................................9

*United States v. Amore*,
    2026 WL 1040637 (D.R.I. Apr. 17, 2026) ........................................8

*United States v. Benson*,
    2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ..............................7, 8

*United States v. Oregon*,
    2026 WL 318402 (D. Or. Feb. 5, 2026) .............................................7

iii

*Yick Wo v. Hopkins*,
 118 U.S. 356 (1886)......................................................................................15

**Statutes**

52 U.S.C.
 § 20507(a)(1) ...........................................................................................3
 § 20507(a)(3) ...........................................................................................3
 § 20507(a)(4) ...........................................................................................3
 § 21083(a)(1)(A)................................................................................3, 7, 13
 § 21083(a)(4) ...........................................................................................7
 § 21083(a)(4)(A) ...................................................................................4, 13
 § 21083(a)(4)(B) ...................................................................................4, 13

**Legislative Materials**

H.R. Rep. No. 86-956 (1959)..........................................................................6

H.R. Rep. No. 107-329 (2001)..................................................................13, 14

S. Rep. No. 93-981 (1974) ............................................................................26

S. Rep. No. 94-755 (1976) ............................................................................26

**Executive Orders**

Exec. Order No. 14,243, *Stopping Waste, Fraud, and Abuse by
 Eliminating Information Silos*, 90 Fed. Reg. 13,681 (Mar. 25,
 2025) ...............................................................................................19, 29

Exec. Order No. 14,399, *Ensuring Citizenship Verification and
 Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31,
 2026) ...........................................................................................18, 19, 21

**Other Authorities**

Alice Clapman & Andrew Garber, *A New Antidemocracy Tool*,
 Brennan Ctr. for Just. (Sep. 5, 2023) ...................................................28

Almog Simchon, Matthew Edwards, & Stephan Lewandowsky, *The
 Persuasive Effects of Political Microtargeting in the Age of
 Generative Artificial Intelligence*, 3 PNAS Nexus 1 (2024).............................27

Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024) ...................................................................17

Blair Shiff & Stephanie Johnson, *Racist Text Messages Sent Out Following Presidential Election*, WCNC (Nov. 7, 2024) ..................................28

Daniel Thilo Schroeder et al., *How Malicious AI Swarms can Threaten Democracy*, 397 Sci. 354 (2026)..........................................................28

Def.'s Notice of Corrections to Record, *AFSCME v. SSA*, No. 25-cv-00696 (D. Md. Jan. 16, 2026), Dkt. No. 197 .......................................22

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025) .......................22

Human Rights Watch, *Trapped in a Web: The Exploitation of Personal Data in Hungary's 2022 Elections* (Dec. 1, 2022) ............................24

Jacob Ritondo, *Black Students Receive Racist Text Messages After Trump's Win, Part of Apparent Nationwide Trend*, Crimson White (Nov. 6, 2024) .....................................................................................28

Jane Timm, *Conservative Voter Fraud Hunters Pitch New Programs to State Officials*, NBC News (Mar. 18, 2026)....................................28

János Kornai, *Hungary's U-Turn: Retreating from Democracy*, 26 J. Democracy 34 (2015) ...................................................................24

Kat Lonsdorf & A Martínez, *ICE Has Spun a Massive Surveillance Web. We Talked to People Caught in It*, NPR (Mar. 4, 2026) ..........................29

*The Massachusetts Convention: Convention Debates* (Jan. 16, 1788), *reprinted in* 6 *Ratification of the Constitution by the States: Massachusetts* (J. Kaminski et al. eds., 2000).....................................10

Mekela Panditharatne, *Preparing to Fight AI-Backed Voter Suppression*, Brennan Ctr. for Just. (Apr. 16, 2024) .........................................27

Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026) ........................................17

Nancy Bermeo, *On Democratic Backsliding*, 27 J. Democracy 5 (2016)................................................................................................23

v

Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News (Mar. 26, 2026) .................................................................................22

Sophia Cai, Ben Johansen & Irie Sentner, *Trump's War on Nonprofits*, Politico (Apr. 18, 2025) ...................................................................19

Steven Levitsky & Lucan A. Way, *Competitive Authoritarianism: Hybrid Regimes After the Cold War* (2010) .......................................24

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are civil rights and democracy organizations with longstanding commitments to protecting the right to vote, ensuring equal access to the electoral process, and safeguarding voters from unlawful intimidation, discrimination, and disenfranchisement.

Common Cause is a nonpartisan, grassroots organization dedicated to fair elections, due process, and ensuring that government at all levels is more democratic and responsive to the interests of the people. Founded by John Gardner in 1970 as a "citizens' lobby," Common Cause has over 1.5 million members nationwide and local organizations in 23 states. Common Cause has assisted with voter registration, encouraged voting, and advocated for policies at the federal, state, and local levels that would make participation in our democracy more accessible and convenient. Common Cause has long advocated in support of the privacy and voting rights interests of its members across California.

The Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization formed in 1963 at the request of President John F. Kennedy to enlist the private bar in the fight for civil rights. It has worked for decades to

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, undersigned counsel certifies that (i) no party or party's counsel authored this brief in whole or in part, (ii) no one other than *amici* or their counsel has contributed money toward the preparation or submission of this brief, and (iii) all parties have consented to the filing of this brief.

enforce federal voting rights protections, combat voter intimidation and suppression, and ensure fair and equal access to the democratic process. The Lawyers' Committee regularly represents voters and civic organizations harmed by unlawful election practices and has a substantial interest in preventing misuse of sensitive voter information.

The National Urban League is a historic civil rights organization founded in 1910 and dedicated to eliminating racial and economic inequities and advancing equal opportunity in education, employment, housing, and civic life. The organization has long advocated for policies that promote full and fair participation in elections and protect communities of color from practices that burden the exercise of the franchise. The organization has a strong interest in this case because federal demands for unredacted voter-registration data risk chilling voter participation and disproportionately harming the communities the organization serves.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's order denying the U.S. Department of Justice's ("DOJ" or the "Department") attempt to compel the disclosure of California's statewide voter registration list should be affirmed because the Department lacks statutory authority to request—much less demand—the information it seeks. *Amici* submit this brief to address the real-world consequences of the Department's effort to subvert federal law to create a national voter registry. Both clear doctrine and policy rationales to prevent the erosion of democratic norms support affirmance of the decision below.

## BACKGROUND

California maintains a computerized statewide voter registration list as required by the Help America Vote Act ("HAVA"), 52 U.S.C. § 21083(a)(1)(A). *See* 1-ER-24. California's list-maintenance obligations arise under both the National Voter Registration Act ("NVRA") and HAVA. These statutes are designed to foster states' effective management of—and bolster voter participation in—federal elections. NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters[,]" 52 U.S.C. § 20507(a)(1), (3), (4), while imposing safeguards that prevent improper removals. *See* 1-ER-20–21. HAVA likewise requires states to maintain accurate voter registration records, make "a reasonable effort" to remove ineligible registrants, and implement "[s]afeguards to ensure that eligible voters are

3

not removed in error." 52 U.S.C. § 21083(a)(4)(A)–(B).

On July 10, 2025, the Department issued a demand to California Secretary of State Shirley Weber for state election-related information, purportedly to determine whether California is complying with its obligations under the NVRA and HAVA. 2-ER-320 (Compl. ¶ 53). The Department sought, among other things, a "current electronic copy of California's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number and original and completed voter registration applications[.]" 2-ER-322 (Prayer for Relief ¶ 5). California was not alone—throughout the last year, the Department has demanded voter registration data from nearly every state and the District of Columbia. *See* 1-ER-8–9.

California offered to make the state voter list available to the Department for inspection at the Secretary of State's office in Sacramento. 1-ER-6–7. Like many other states that received similar demands, California noted that it would redact "sensitive information like voters' driver's license numbers and social security numbers." 1-ER-7. That information is protected from disclosure under state and federal law. *Id*. On September 12, 2025, "the Secretary sent a letter with comprehensive responses to the [Department's] remaining questions" but "did not provide an unredacted copy of every original and completed voter registration

4

application dating back two years[.]" 1-ER-8.

In lieu of responding, on September 25, 2025, the Department brought a lawsuit against California alleging violations of the Civil Rights Act of 1960 ("CRA"), the NVRA, and HAVA for failure "to provide to the United States the current electronic copy of California's computerized statewide voter registration list, with all fields," 2-ER-320–321 (Compl. ¶¶ 49, 56, 61), and sought an order to enjoin California to provide the same, 2-ER-322 (Prayer for Relief ¶ 5). California moved to dismiss on November 7, 2025. *See* 1-ER-10.

The district court dismissed the complaint on January 15, 2026. 1-ER-3. The court explained that:

> [i]n passing Title III of the [CRA], the NVRA, and HAVA, Congress' intent was clear—ensuring that all Americans, regardless of race, are able to vote without fear or distress.
>
> The DOJ cannot go beyond the boundaries provided by Congress and use these legislative tools in a manner that wholly disregards the separation of powers .... Should Congress want to enable the Executive to centralize the private information of all Americans within the Executive Branch, Congress will have to clearly say so.

1-ER-5. This appeal followed.

5

## ARGUMENT

**I.     The Decision Below Is Correct.**

The district court correctly dismissed the complaint because no provision of the CRA, HAVA, or NVRA authorizes the Department to compel California to produce an unredacted statewide voter registration database. California has already offered to provide its voter list for inspection excluding only the most sensitive identifiers. 1-ER-7–8. There is no legal or statutory basis for the Department to demand more.

The CRA was enacted to deter the destruction or concealment of records that may be evidence of voter intimidation or discrimination. *See* H.R. Rep. No. 86-956, at 7 (1959) ("The purpose of title III [of the CRA] is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race."). "Title III [of the CRA] was not passed as a tool for NVRA compliance." 1-ER-16. DOJ accordingly may not rely on a statute designed to "protect[] the voting rights of all Americans" to support their "extraordinary request for the personally identifying information of millions of Californians." 1-ER-4.

Likewise, HAVA includes no provision authorizing the Department to compel the disclosure of any information from state voting officials, much less sensitive personal information included in state voter registration databases. HAVA requires states to maintain statewide voter registration lists and implement safeguards against

6

the erroneous removal of voters from such lists. 52 U.S.C. § 21083(a)(1)(A), (a)(4). Though violations of HAVA's state list-maintenance obligations may be enforced through civil litigation, the statute includes no disclosure provision that would empower the Department to require states to provide copies of their voter registration lists.

The same is true of the NVRA. In enacting the NVRA, Congress sought to balance "easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). With these dual goals in mind, Congress was wary of "the devastating impact purging efforts previously had on the electorate.". *ACLU v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d. Cir. 2017). Accordingly, the NVRA provides for access to "records about the *process* that a state uses to maintain their voter list," it does not authorize the Department to demand access to the underlying list itself. *United States v. Benson*, 2026 WL 362789, at *4-5 (W.D. Mich. Feb. 10, 2026)

Unsurprisingly, district courts throughout the country have uniformly rejected the Department's attempts to rely on the CRA, HAVA, and the NVRA to compel disclosure of unredacted voter lists. *See, e.g.*, *United States v. Oregon*, 2026 WL 318402, at *2 (D. Or. Feb. 5, 2026) (issuing dismissal given that the CRA, HAVA, and NVRA "create specific and narrow roles for the federal government in the states'

7

regulation of elections and cannot give Plaintiff what it seeks."), *appeal docketed*, No. 26-1261 (9th Cir. Mar. 3, 2026); *Benson*, 2026 WL 362789, at *1 (dismissing DOJ's demand for an unredacted statewide voter file because none of the statutes invoked authorize the disclosure of voter registration lists); Order on Mot. to Compel & Mots. to Dismiss, *United States v. Galvin*, No. 25-cv-13816 (D. Mass. Apr. 9, 2026), Dkt. No. 92 (similar); *United States v. Amore*, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) (similar). Given the design and plain language of these statutes, this court should affirm that the Department lacks authority to demand access to California's unredacted statewide voter registration database.

## II. The Compelled Disclosure of Voter Data Contravenes the Purpose of HAVA and the Structure of Federal Election Law.

### A. The Department's Demand Upends the Central Role of States and Congress in Regulating Elections.

The Department's effort to compel disclosure of California's unredacted voter list likewise represents a direct assault on the decentralized structure of American election administration. Indeed, the Department's effort to exert federal dominion over voter data and the electoral process poses the precise threat to voter participation and the democratic process the Framers feared when designing our constitutional system.

The Elections Clause of the Constitution establishes the general constitutional framework for the regulation of federal elections. U.S. Const. art. I, § 4, cl. 1. It

states: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of chusing [*sic*] Senators." *Id.* Under that authority, States are empowered to regulate, among other things, voter registration, recounts, *Roudebush v. Hartke*, 405 U.S. 15 (1972), and the form and content of ballots, *see Munro v. Socialist Workers Party*, 479 U.S. 189 (1986).

Though placing responsibility for the regulation of elections primarily with the states, the Elections Clause "grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33 (1995)). Thus, the Constitution assigns broad authority over federal election administration to the states, subject only to regulations prescribed by Congress. *See* U.S. Const. art. I, § 4, cl. 1; *see also Foster*, 522 U.S. at 69. And, importantly, "the Constitution assigns no direct role to the President in either domain" of election administration. *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 42 (D.D.C. 2025).

This constitutional design is no mistake. These provisions are the product of the Framers' extensive debate concerning the roles that the state and federal governments would play in regulating elections. *See, e.g.*, The Federalist No. 59

9

(Alexander Hamilton) (arguing for federal control over congressional elections); The Anti-Federalist No. 7 (Cato) (arguing for state control over congressional elections). Recognizing the impossibility of a single regulation "which would have been always applicable to every probable change in the situation of the country," the Framers resolved "that a discretionary power over elections ought to exist somewhere." The Federalist No. 59 (A. Hamilton). The Framers "submitted the regulation of elections for the federal government, in the first instance," to the states, where such regulation would "be both more convenient and more satisfactory." Federalist No. 59. But they "reserved to [Congress] a right to interpose" regulations of its own where the need arose. *Id.* This diffusion of power would "preserve and restore to the people their equal and sacred rights of election" against "the influence of ambitious or popular characters, or in times of popular commotion, and when faction and party spirit run high." *The Massachusetts Convention: Convention Debates* (Jan. 16, 1788), *reprinted in* 6 *Ratification of the Constitution by the States: Massachusetts* 1217–18 (J. Kaminski et al. eds., 2000).

The Framers adopted this decentralized structure for good reason. "[L]ocal administration . . . allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716 (4th Cir. 2016). Even Alexander Hamilton, who urged greater federal control over congressional elections, acknowledged that

10

allowing "local administrations" to regulate elections "in the first instance" may, "in ordinary cases," be "more convenient and more satisfactory." The Federalist No. 59.

The Supreme Court has repeatedly affirmed this tenet of our constitutional order, *see, e.g.*, *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (noting States' "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' which power is matched by state control over the election process for state offices" (citation omitted) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986))); *see also Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam) (noting state legislatures' broad power over the appointment of presidential electors), and made clear that the text and history of the Constitution reflect the Framers' desire for states to exercise primary authority over election administration, subject only to necessary regulation adopted by Congress. The district court was correct to reject the Department's attempt to aggrandize federal executive power in contravention of Constitutional design.

**B.    The Demand Is Incongruous with the Text and Purpose of HAVA.**

In exercising its authority to regulate federal election, Congress has repeatedly sought to retain the primacy of state administration but with minimum federal election standards and, when necessary, federal enforcement to protect individual voting rights.

11

The commitment to state primacy in election administration was evident in Congress's enactment of HAVA following the 2000 Presidential election. That election hinged on the results in Florida, where "several . . . county canvassing boards determined that the manual recounts conducted indicated an error in the vote tabulation." *Palm Beach Cnty. Canvassing Bd. v. Harris*, 772 So. 2d 1220, 1225 (Fla. 2000), *rev'd sub nom. Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70 (2000). Those outcome-determinative errors demonstrated "that punchcard balloting machines can produce an unfortunate number of ballots which are not punched in a clean, complete way by the voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000). Mindful of this unfortunate reality, the Supreme Court predicted that the outcome of the 2000 election would lead "legislative bodies nationwide [to] examine ways to improve the mechanisms and machinery for voting." *Id*. at 104.

The Court was right. Following the Florida recount turmoil, Congress enacted HAVA to address faults in state election administration by, *inter alia*, setting forth minimum election administration standards and providing states with voluntary election assistance. In so doing, Congress took pains to ensure that primary election administration authority rested with the states.

As relevant here, HAVA's minimum standards require states to develop, "a single, uniform, official, centralized, interactive computerized statewide voter registration list" with the "name and registration information of every legally

12

registered voter in the State," 52 U.S.C. § 21083(a)(1)(A); "to ensure that voter registration records in the State are accurate and are updated regularly[;]" to establish "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters," *id.* § 21083(a)(4)(B); and to "make[] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," *id.* § 21083(a)(4)(A). HAVA thus places the primary responsibility for its implementation with states and does not empower the federal government to establish a federal voter list or otherwise inspect the lists maintained by the states.

Even the provisions of HAVA that specifically respond to the issues with the ballots in the 2000 Presidential election in Florida illustrate that HAVA does not countenance federal usurpation of state election administration. To address the issue of partially perforated ballots, HAVA established a "punch card replacement program." H.R. Rep. No. 107-329, pt. 1, at 32 (2001). Summarizing that provision, the legislative drafters explained, "[l]arge portions of the American public have lost confidence in [punch card voting systems]. For systems that use a blank punch card, a failure to properly align the card behind the ballot can result in the casting of a vote for a candidate the voter did not mean to select." *Id*. Even still, Congress refused to upset the balance of federal and state authority over election administration by mandating that states adopt particular ballot systems. Rather, Congress made funding available to states seeking to replace their punch card systems. *Id*. In so

13

doing, Congress recognized that "[s]ome jurisdictions may choose not to replace their punch card systems," but for states that seek "to modernize their [election] systems," it would provide federal resources to support those state-led efforts. *Id.*

The legislative drafters of HAVA were well aware of the constitutional structure and historic legislative tradition that places primary election administration authority with the states. Echoing the Framers, Congress explained that HAVA maintains "[t]he dispersal of responsibility for election administration," which "has made it impossible for a single centrally controlled authority to thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 32 (2001). As Congress recognized, "[t]his leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country." *Id.* The drafters of HAVA thus reaffirmed as a principal ill precisely that which the Department pursues in this action—centralized federal control of election administration.

HAVA does not allow the Department to obtain unredacted statewide lists, much less compile them into a national voter file. Such centralization efforts are anathema to the warnings of HAVA's drafters that a "singly centrally controlled [election] authority" may be able to "control the outcome" of elections, and eviscerate the guarantee of free and fair elections. H.R. Rep. No. 107-329, pt. 1, at 32 (2001).

14

**III.    The Demand Will Chill Voter Participation and Expose Americans to an Array of Unnecessary Risks.**

    **A.    Compelled Disclosure of Sensitive Voter Information Chills Civic Information.**

The compelled disclosure and aggregation of unredacted statewide voter-registration databases—including addresses, dates of birth, driver's license numbers, and Social Security numbers—creates a substantial risk that eligible Americans will be deterred from registering to vote or remaining active on the rolls.

The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (citation modified).

As courts have repeatedly recognized, the disclosure of personal identifiers forces citizens to choose between exercising the franchise and exposing themselves to risk of misuse or harassment. *See* 1-ER-5 ("The DOJ's request . . . stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used."). For example, in *Greidinger v. Davis*, the Fourth Circuit held that a state requirement to disclose

15

Social Security numbers as a condition of voter registration imposed an unconstitutional burden on the franchise, emphasizing that the risk of identity theft and personal harm was neither speculative nor remote. 988 F.2d 1344, 1354–55 (4th Cir. 1993). Similarly, in *Buckley v. American Constitutional Law Foundations, Inc.*, the Supreme Court struck down a Colorado law that required individuals who circulate ballot initiative-petitions to wear name badges as posing an impermissible burden on First Amendment-protected civic activities. 525 U.S. 182 (1999).

The threat posed by unauthorized use of sensitive voter information is further heightened when that data is in the hands of the federal executive branch. *See* 1-ER-33. And the data the Department seeks here is *particularly* sensitive. *See, e.g.*, *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016) (prohibiting "[d]isclosure of sensitive information such as Social Security numbers" because "an individual could be deterred from registering if his confidential information were subject to public disclosure"). When the federal government demands sensitive, identity-linked voter information—particularly in an environment where voters may reasonably anticipate misuse—eligible voters must choose between participation in democratic life and potential exposure to government scrutiny or investigation. Far from an idle concern, the chilling effect inherent in federal aggregation of voter data is particularly apparent in the current moment.

*First*, voters may reasonably fear that aggregated voter registration data will be used to support targeted prosecution, including prosecution based on unfounded accusations of illegal voting. Voter fraud in American elections is vanishingly rare. *See, e.g.*, Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024), https://perma.cc/VA8M-LVUZ. Nonetheless, leaders across the current administration continue to falsely assert otherwise. *See, e.g.*, Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026), https://perma.cc/4MZB-UYQL (describing President Trump's "often repeated—and equally often debunked—claims of widespread election fraud"). These public signals shape how reasonable voters assess the risks associated with participation in the electoral process. Once voter data is centralized within federal systems, individual-level identifiers can be cross-referenced with other databases to generate investigative leads detached from individualized suspicion. Under these circumstances, voters may reasonably conclude that participation itself increases exposure to prosecutorial scrutiny.

*Second*, voters may fear that centralized voter data will facilitate the removal of lawful voters from the rolls. Voter-purge efforts routinely produce false positives, disproportionately affecting eligible voters and imposing substantial burdens on re-registration and participation. *See, e.g.*, *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 765–69 (2018) (recognizing concerns that list maintenance processes

17

triggered by inactivity may result in improper removal of eligible movers); *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1294–96 (N.D. Ga. 2018) (finding that deficiencies in voter registration data systems created a substantial risk that eligible voters would be erroneously flagged or disenfranchised and forced to vote provisionally or re-register). The prospect of such errors, combined with limited avenues for timely redress, discourages electoral participation. Fundamentally, erroneous removals undermine public trust and confidence in the integrity of elections themselves, weakening the legitimacy of electoral outcomes and democratic governance more broadly.

*Third*, given the current administration's aggressive immigration agenda, voters who have recently attained citizenship are particularly vulnerable to threats discouraging voter participation. For naturalized citizens, voter registration data— when cross-referenced with immigration or naturalization records—may be perceived as a gateway to immigration enforcement where no lawful basis exists. The risk of misclassification or investigatory spillover is neither hypothetical nor remote in this context. *See* Citizenship EO §§ 1–3 (directing federal agencies to compile lists of confirmed citizens and calling for heightened investigation and enforcement efforts related to voter eligibility). For these voters, participating in elections may be viewed as increasing exposure to immigration consequences unrelated to voting eligibility.

18

*Fourth*, voters may fear that federal possession of voter data will facilitate data sharing across the federal government to target individuals associated with certain ideologies. The March 20, 2025 Executive Order directing federal agencies to eliminate "information silos" and ensure designated officials receive "full and prompt access" to unclassified agency records and state program data reinforces those fears. *See* Exec. Order No. 14,243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13,681 (Mar. 25, 2025) ("Eliminating Information Silos EO"). Similarly, Executive Branch directives to broaden investigation and prosecution efforts related to voter eligibility heighten the likelihood that, contrary to the Department's representations, the data the Department seeks will be used to enforce election-related crimes. *See* Exec. Order No. 14,399, §§ 1–3, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125, 17,125–27 (Mar. 31, 2026) ("Citizenship EO"). And these efforts coincide with increased scrutiny of nonprofit organizations engaged in civil rights, immigration, and criminal justice advocacy, including visits, funding freezes, and threatened audits. *See* Sophia Cai, Ben Johansen & Irie Sentner, *Trump's War on Nonprofits*, Politico (Apr. 18, 2025), https://perma.cc/5LYA-NZJA. In this environment, voters may reasonably fear that centralized possession of identity-linked data lowers the barriers to ideological targeting by both public and private actors.

19

Nor are these concerns alleviated by the Department's contention that the information at issue consists only of "marginal" identifiers, such as driver's license numbers or the last four digits of Social Security numbers. Such information functions as a persistent identity anchor that enables cross-referencing across government databases and enforcement regimes. Taken together, these conditions predictably result in self-suppression. By centralizing identity-linked voter information within federal systems subject to shifting enforcement missions, the government alters the conditions of democratic participation, deterring engagement in ways courts have repeatedly recognized as constitutionally cognizable. For this additional reason, the Court should affirm the decision below.

**B.** **The Chilling Effect Is Heightened When the Asserted Enforcement Purpose Appears Pretextual.**

Where, as here, the federal government advances plainly pretextual bases for collecting election data, voters have particular reason to distrust the Department's data collection efforts. As discussed *supra*, the scope of the data that the Department demands is wholly disconnected from ensuring compliance with HAVA, NVRA, and CRA. The Department's actions and stated enforcement priorities reflect a focus on law enforcement and immigration policy objectives, and further illustrate that the Department's effort will serve only to chill voter participation and undermine the democratic process. *See Dep't of Com. v. New York*, 588 U.S. 752, 782–84 (2019) (rejecting a pretextual agency justification where the challenged action bore directly

on political representation and public participation in the census).

Recent events make plain that—without any legal authority—the current federal administration is attempting to compile a national voter database to compel states to purge voters over unfounded citizenship concerns. On March 31, 2026, President Trump issued Executive Order 14,399. *See* Citizenship EO §§ 1–3. That Order directs federal agencies to aggregate, verify, and deploy voter registration and citizenship data across the executive branch for eligibility screening and enforcement purposes, including coordination among the Department, the U.S. Department of Homeland Security ("DHS"), the Social Security Administration ("SSA"), and the U.S. Postal Service ("USPS")—functions wholly unconnected with supervising state list maintenance procedures under the NVRA or HAVA. It also contemplates the use of voter registration data to control the distribution of mail-in and absentee ballots by directing USPS to condition ballot transmission on federal eligibility determinations derived from state and federal voter related datasets. *Id.* § 3. Finally, it authorizes the use of voter registration data to prioritize investigation and prosecution of alleged election related offenses and to facilitate immigration related enforcement coordination. *Id.* §§ 1, 2. These efforts are made possible by the collation of a national voter file—a goal that may be advanced through pretextual nationwide demands for state voter files.

Other recent reporting underscores the degree to which voters may reasonably

21

doubt the Department's purported bases for seeking sensitive voter information. For example, in September 2025, the New York Times has reported that the Department "is compiling the largest set of national voter roll data it has ever collected, buttressing an effort by President Trump and his supporters to try to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally[.]" Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://perma.cc/PYJ8-CN3V. More recently, major outlets reported that the Department and DHS were close to finalizing an agreement "that will allow the federal government to use sensitive voter registration data for immigration and criminal investigations." Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News (Mar. 26, 2026), https://perma.cc/484K-KH6F. Finally, in a recent lawsuit concerning access to highly sensitive personal data, the Department was forced to file a "notice of corrections to the record" revealing that, in March 2025, a political advocacy group requested assistance from the SSA in analyzing state voter rolls acquired by the advocacy group. With the stated aim of finding evidence of voter fraud to overturn election results in targeted states, the advocacy group entered into a "Voter Data Agreement" with the SSA. *See* Def.'s Notice of Corrections to Record 5, *AFSCME v. SSA*, No. 25-cv-00696 (D. Md. Jan. 16, 2026), Dkt. No. 197.

A voter may reasonably conclude from these recent public reports that the Department's demand for voter file data is motivated by a desire to facilitate its law enforcement and other policy priorities disconnected from compliance with HAVA, NVRA, and CRA. Federal investigative authority may not be used as a pretext for objectives Congress did not authorize. *See Dep't of Com.*, 588 U.S. at 780–85 (2019). That is especially the case where the pretext results in widespread public knowledge that the Department will deploy the data for undisclosed immigration and law enforcement efforts. Election-related rules must be assessed in light of their real-world effects on voter confidence and participation. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). The real-world effects of the Department's pretextual data collection efforts are clear: they will chill voting, civic participation, and confidence in the political process writ large.

### C. The Demand for Voter Data Will Further Erode Constitutional Principles and Democratic Norms.

#### 1. Contemporary and Historical Experience Prove that Citizen-Data Centralization Enables Democratic Backsliding.

Democratic erosion most often proceeds through incremental executive aggrandizement rather than abrupt institutional collapse. *See* Nancy Bermeo, *On Democratic Backsliding*, 27 J. Democracy 5, 10–11 (2016) (describing executive aggrandizement as a principal pathway of democratic decline). Contemporary regimes frequently retain formal elections while quietly skewing the conditions

under which participation occurs. *See* Steven Levitsky & Lucan A. Way, *Competitive Authoritarianism: Hybrid Regimes After the Cold War* 7–10 (2010). Looking to international and historical example, the Court should also consider how the unlawful federal demand for voter data will enable democratic backsliding.

Hungary is illustrative. From 2010 until its electoral defeat in 2026, the ruling party, Fidesz, under the leadership of Prime Minister Viktor Orbán, centralized power and weakened institutional checks while maintaining free—but unfair—elections. *See* János Kornai, *Hungary's U-Turn: Retreating from Democracy*, 26 J. Democracy 34, 34–48 (2015) (describing the democratic backsliding in Hungary since 2010). In the 2022 national elections, Fidesz relied on personal data originally collected by the state for public-service administration—such as health, tax, and social benefit systems—to conduct targeted political messaging and mobilization. *See* Human Rights Watch, *Trapped in a Web: The Exploitation of Personal Data in Hungary's 2022 Elections* 1–4 (Dec. 1, 2022), https://perma.cc/F5VQ-MGFQ. For example, the Hungarian government launched a website for citizens to register for the COVID-19 vaccine in 2020. *Id.* at 47. Individuals who registered were automatically enrolled in official email communications that initially concerned vaccination logistics. *Id.* But in 2022, those emails began to include political messages ranging from promoting tax cuts to support for an anti-LGBT referendum. *Id.* at 48. Access to this data allowed Fidesz to blur the line between itself and official

government bodies during the campaign. Dislodging such regimes requires extraordinary opposition mobilization, including, in Hungary's case, over a decade of sustained coordination among all opposition groups and a supermajoritarian victory.

American history also illustrates the risks posed by centralized information collection. Expanded federal control over personal political information—especially when justified by indeterminate enforcement objectives—has coincided with the erosion of constitutional norms. As just one example, acting pursuant to then-existing statutory authority for population measurement, the U.S. Census Bureau disclosed detailed residential information regarding persons of Japanese ancestry to the U.S. Army during WWII. This data ultimately facilitated the mass removal and internment of over 110,000 individuals, almost all of whom were American citizens. This episode demonstrates how centralized administrative datasets can be repurposed to devastating effect.

Recent American history offers similar examples of the misuse of government-held personal data in the context of domestic intelligence and law enforcement efforts. From the 1950s through the early 1970s, the Federal Bureau of Investigation's COINTELPRO program relied extensively on personal information maintained within federal systems to infiltrate lawful political organizations, including civil rights groups. Although justified at the outset as necessary to protect

25

public safety and national security, congressional investigations later revealed that the information was systematically redeployed to suppress constitutionally protected political expression and association. *See* Final Report of the Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, S. Rep. No. 94-755, bk. III (1976) (Church Committee). Much the same, the Watergate scandal demonstrates the vulnerability of centralized personal data to political misuse. Senior officials in the Nixon administration exploited confidential taxpayer information and other sensitive records held by federal agencies to identify individuals perceived as political opponents and subject those individuals to audits or investigative scrutiny. *See* Final Report of the Sen. Select Comm. on Presidential Campaign Activities, S. Rep. No. 93-981 (1974).

Together, these historical examples underscore how even lawfully collected records could be exploited for unlawful political ends. In each instance, personal data initially collected for permissible purposes was later redeployed in ways that undermined civil liberties and democratic participation. Modern voter databases magnify these risks. Unlike the localized, manual systems of earlier eras, contemporary voter files are comprehensive, digitized, and easily transferable. The risk of misuse is even more apparent in the disparity between the Department's stated purpose for its data requests and public indications that voter-registration data may be deployed for immigration and law enforcement purposes. That disparity

26

heightens, rather than diminishes, the relevance of this unfortunate historical experience.

### 2. Artificial Intelligence Amplifies the Risks Associated with Federal Voter Data Aggregation.

Advanced AI models can dramatically increase the precision and credibility of targeted persuasion efforts. With the additional inputs of centralized voter data at the federal level, the risk and costs of federal misuse to the fairness of elections skyrocket.

AI-driven systems enable highly personalized intimidation at scale, allowing campaigns or other actors to tailor messaging to individuals' specific vulnerabilities with minimal human involvement. Scholars have warned that generative AI can function as a "manipulation machine," automatically generating individualized political content optimized for influence. *See* Almog Simchon, Matthew Edwards, & Stephan Lewandowsky, *The Persuasive Effects of Political Microtargeting in the Age of Generative Artificial Intelligence*, 3 PNAS Nexus 1, 1–4 (2024). These same tools are increasingly capable of enabling targeted voter suppression tactics—such as individualized deterrence messaging and false eligibility warnings—directed at specific voters or communities at scale. *See* Mekela Panditharatne, *Preparing to Fight AI-Backed Voter Suppression*, Brennan Ctr. for Just. (Apr. 16, 2024), https://perma.cc/C2AD-H7SN. Similarly, coordinated AI agents and large language models enable sophisticated disinformation campaigns that mimic human behavior,

fabricate social consensus, and overwhelm democratic processes. *See* Daniel Thilo Schroeder et al., *How Malicious AI Swarms can Threaten Democracy*, 397 Sci. 354, 354–57 (2026). The existence of a centralized, unredacted voter-data repository would substantially accelerate and enhance these capabilities.

In an era of intense political polarization, microtargeting with voter data also poses acute risks to personal safety and electoral participation when deployed by bad-faith actors. Election-denial groups have already deployed tools such as EagleAI to generate mass fraudulent voter complaints, overwhelming local election officials and intimidating voters. *See* Alice Clapman & Andrew Garber, *A New Antidemocracy Tool*, Brennan Ctr. for Just. (Sep. 5, 2023). The same developers have continued to build and promote voter roll auditing tools, actively pitching these programs to state and local election officials in advance of upcoming elections. *See* Jane Timm, *Conservative Voter Fraud Hunters Pitch New Programs to State Officials*, NBC News (Mar. 18, 2026), https://perma.cc/TQK9-T3PM. Similar tactics were deployed during the 2024 election cycle to direct racist and intimidating text messages at voters of color nationwide, including messages telling recipients they had been "selected" to report to a plantation to "pick cotton." *See* Jacob Ritondo, *Black Students Receive Racist Text Messages After Trump's Win, Part of Apparent Nationwide Trend*, Crimson White (Nov. 6, 2024), https://perma.cc/4XEN-NW3Z; Blair Shiff & Stephanie Johnson, *Racist Text*

*Messages Sent Out Following Presidential Election*, WCNC (Nov. 7, 2024), https://perma.cc/9TV9-7VLE. Those incidents underscore how access to identity-linked data can facilitate personalized voter intimidation at scale— particularly against historically disenfranchised voters of color—amplify the risks of voter suppression, divert election officials from core functions, and undermine public confidence in the electoral system writ large.

The federal government's broader efforts to fuse data across agencies compound those concerns. *See* Eliminating Information Silos EO (promoting interagency data sharing). The government already uses AI-enabled tools for large-scale surveillance and targeting in contexts involving protests, immigration enforcement, and journalism. *See* Kat Lonsdorf & A Martínez, *ICE Has Spun a Massive Surveillance Web. We Talked to People Caught in It*, NPR (Mar. 4, 2026), https://perma.cc/Q9DV-PT67. Adding comprehensive voter data to this fused data environment—particularly when combined with biometrics and commercially purchased bulk data—would create the technical capacity to identify, track, and target political opposition. AI makes surveillance automatic, continuous, and scalable in ways that were previously impossible. The Department's demand risks spillover effects that may damage democratic institutions from the ballot box and beyond—and leaves all future governments with an intolerable temptation to use the data for purposes that erode the rule of law.

## CONCLUSION

The Department's demand is contrary to law. No federal law authorizes it, it flies in the face of long-recognized constitutional and legislative principles, threatens widespread voter intimidation, and lays the groundwork for an intolerable erosion of democratic norms. The Court should therefore affirm the district court's decision granting Defendants' Motion to Dismiss.

Respectfully submitted,

Dated: April 24, 2026

*/s/ Thomas Perrin Cooke*

Robert Weiner
Gillian Cassell-Stiga
Catherine Meza
LAWYERS' COMMITTEE FOR CIVIL
  RIGHTS UNDER LAW
1500 K Street NW
Ninth Floor
Washington, DC 20005
gcassell-stiga@lawyerscommittee.org

Omar H. Noureldin
Maryam Jazini Dorcheh
COMMON CAUSE
805 15th Street NW, Suite 800
Washington, DC 20005
onoureldin@commoncause.org

Lanny A. Breuer
Thomas Perrin Cooke
  *Counsel of Record*
Samuel T. Ackerman
Joshua M. Schenk
Maya M. Sharp
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
pcooke@cov.com

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1232

I am the attorney or self-represented party.

**This brief contains 6,418 words,** including ____0____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Thomas Perrin Cooke*      **Date** April 24, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*