No. 26-1232

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

SHIRLEY WEBER, *et al.*,

Defendants-Appellees

NAACP, *et al.*,

Intervenors-Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

BRIEF FOR THE UCLA VOTING RIGHTS PROJECT AS
AMICUS IN SUPPORT OF APPELLEES
AND SUPPORTING AFFIRMANCE

_____

UCLA VOTING RIGHTS PROJECT
CHAD W. DUNN
Legal Director
SONNI WAKNIN
CA Bar No. 335337
Senior Voting Rights Attorney
BERNADETTE REYES
CA Bar No. 299878
Senior Voting Rights Attorney
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………...…..3

INTEREST OF AMICUS CURIAE……………………………………………….4

   I.  INTRODUCTION AND SUMMARY OF ARGUMENT…………..…...5

   II. STANDARD OF REVIEW…………………………………………………7

   III.ARGUMENT ...........................................................................................7

        A. The United States Civil Rights' Commission Report and Recommendation provided the basis for Title III of the Civil Rights Act of 1960. ........................................................................................7

        B. The legislative history of the Civil Rights Act of 1960 and the legal precedent regarding Title III demonstrate that the purpose of the law is limited to investigations related to racial discrimination. ....................11

        C. DOJ's invocation of NVRA does not meet requirements of Title III for voter roll enforcement. ........................................................................14

            i.  DOJ's use of Title III as justification for its request is clearly pretextual...................................................................................15

           ii. DOJ's request does not meet the minimum standards outlined by courts. ....................................................................................15

   IV.   CONCLUSION ..................................................................................17

## TABLE OF AUTHORITIES

**Cases**                                                    **Pages**

*Alabama v. United States,*
304 F. 2d 582 (5th Cir. 1962) .................................................................14

*Chamber v. Herrera,*
78 F. 4th 1100 (9th Cir. 2023) ..................................................................7

*Dinkens v. Att'y Gen. of U. S.,*
285 F. 2d 430 (5th Cir. 1961) ……………………………………………..13

*Fayer v. Vaughn,*
649 F.3d 1061 (9th Cir. 2011) ..................................................................7

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960) ................................................................................10

*In re Coleman,*
208 F. Supp. 199 (S.D. Miss. 1962) .......................................................16

*Kennedy v. Bruce,*
298 F.2d 860 (5th Cir. 1962) ..................................................................17

*Kennedy v. Lynd,*
306 F.2d 222 (5th Cir. 1962) ........................................................... 13, 16

*Ranza v. Nike, Inc.,*
793 F. 3d 1050 (9th Cir. 2015) .................................................................7

*State of Ala. ex rel. Gallion v. Rogers,*
187 F. Supp. 848 (M.D. Ala. 1960).........................................................13

*United States v. Alabama,*
171 F. Supp. 720 (M.D. Ala.), *aff'd,* 267 F. 2d 808 (5th Cir. 1959), *vacated and remanded,* 362 U.S. 602 (1960). ..............................................................6

*United States v. Mayton,*
335 F. 2d 153 (5th Cir. 1964) ...................................................................5

**Statutes**

52 U.S.C. § 20702 ........................................................................................13
52 U.S.C. § 20703 ..........................................................................................6

**Other Authorities**

106 Cong. Rec. Vol. 106, Part 3 (1960) ............................................... 11, 12
106 Cong. Rec. Vol. 106, Part 4 (1960) ........................................... 11, 12, 13
United States Commission on Civil Rights, REPORT OF THE UNITED STATES
COMMISSION ON CIVIL RIGHTS (1959)… .............................. 5, 6, 8, 9, 10

**Interest of Amicus Curiae**

The UCLA Voting Rights Project (UCLA VRP) is an interdisciplinary academic research center housed in the University of California, Los Angeles, Luskin School of Public Affairs. The UCLA VRP's mission is to ensure that all voters have equitable access to the franchise. The UCLA VRP also provides hands-on clinical training to future lawyers, public policy officials, courtroom experts and social scientists while calling attention to the obstacles voters face in underserved towns, cities, and counties across the country.

The UCLA VRP conducts academic research on voting issues such as voting patterns, voter turnout, and language justice that can be directly translated into policy advocacy and policy implementation. The UCLA VRP works to educate voters about voting-related issues, including about efforts to suppress the Right to Vote. Amicus files this brief to assist the Court in understanding the complex history and reasoning behind the important statutes the Appellants ask this Court to interpret.[1]

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae, its members, or its counsel, contributed money to fund the preparation or submit this brief. All parties have consented to the filing of this brief.

## I. Introduction and Summary of Argument

Appellant, the Department of Justice (DOJ), seek sensitive voter data information. In doing so, they argue that Title III of the Civil Rights Act of 1960 imposes a "sweeping obligation on election officials" and provides the Attorney General with a "correspondingly comprehensive power" to demand unprecedented amounts of private, sensitive voter information. Opening Brief at 12-13. But Appellant lacks any actual understanding of the history, purpose, and scope of Title III. Instead, their reading would distort the statute to suit their purpose, one contrary to the intention of Title III.

The Civil Rights Act of 1960 followed the Civil Rights Act of 1957, which was Congress's first attempt to enforce the Fifteenth Amendment since Reconstruction. *See United States v. Mayton*, 335 F. 2d 153, 159 (5th Cir. 1964); *see also* United States Commission on Civil Rights, REPORT OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS IX (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf. Unfortunately, the Civil Rights Act of 1957 did little to provide actual suffrage for Black voters. As reported by the Commission on Civil Rights, "'[a] substantial numbers of citizens qualified to vote under [s]tate registration and election laws are being denied the right to register, and thus the right to vote by reason of their race or color.'" REPORT OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS at 141.

The explicit purpose of the Civil Rights Act of 1960 was to remedy a problem the Commission on Civil Rights identified: that efforts to investigate systematic disenfranchisement of Black Americans by local and state officials were thwarted by state policies requiring election officials to destroy voting applications and questionnaires.[2] "Test cases" brought by the United States Attorney General under the Civil Rights Act of 1957 (CRA of 1957) demonstrated a clear need to address the ways in which election registrars frustrated the ability of Black voters to register and cast ballots. *See United States v. Alabama*, 171 F. Supp. 720 (M.D. Ala.), *aff'd*, 267 F. 2d 808 (5th Cir. 1959), *vacated and remanded,* 362 U.S. 602 (1960).

Against this background, the clear purpose of Title III of the Civil Rights Act of 1960 was to grant the Attorney General the power to demand in writing that voting records be available for inspection and reproduction, thereby preventing *racial discrimination* in the voting process. *See REPORT OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS* at 136 (identifying the need for reliable data to determine the extent of racial discrimination in local voter registration practices); *see also* 52 U.S.C. § 20703 (empowering the Attorney General in response to this deficiency). DOJ's request in this case strays far from the purpose and mission of the 1960 Act. Title III does not give the Government the power to receive personal identifying information from California voters without even a suspicion of racial discrimination. Because

---

[2] *See REPORT OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS* at 86-97.

Title III of the 1960 Civil Rights Act is intended to be used to investigate racial discrimination and DOJ does not allege racial discrimination in connection with its demand for California's voter records, this Court should affirm the lower court's denial of DOJ's request.

## II.     Standard of Review

Motions to dismiss are reviewed by this Court de novo. *See Chamber v. Herrera*, 78 F. 4th 1100, 1103 (9th Cir. 2023). "'A motion to dismiss will only be granted if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face.'" *Fayer v. Vaughn*, 649 F. 3d 1061, 1064 (9th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This Court "may affirm…on any ground raised below and fairly supported by the record." *Ranza v. Nike, Inc.*, 793 F. 3d 1059, 1076 (9th Cir. 2015) (internal citation and quotation marks omitted).

## III.     Argument

### A. The United States Civil Rights' Commission Report and Recommendation provided the basis for Title III of the Civil Rights Act of 1960.

The complaints, hearings, and recommendations by the Commission on Civil Rights demonstrate that the purpose of Title III of the Civil Rights Act of 1960 was to address racial discrimination in voting, not provide the Attorney General with

unprecedented power to seize sensitive voter information and compile a first of its kind national federal database of registration records.

Testimony and complaints received from the Commission demonstrate that violations of the right to vote stemmed, in part, from the actions of local registrars. *See* REPORT OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS at 55–68. The Commission received complaint after complaint of vote denial in the form of local registrars flat out refusing to permit Black citizens from voting in Tennessee, *see id.* at 62–65, North Carolina, *see id.* at 65–66, Georgia, *see id.* at 66–67, and New York, *see id.* at 67–68. The most extensive complaints and examples came from Mississippi counties. For example, in Sunflower County, Black citizens described being turned away from registering to vote. *Id.* at 60. In Leflore County, a Black army veteran was turned away at the courthouse after attempting to register. *Id.* In Claiborne County, several Black voters had been registered until 1957, when they were suddenly removed from the voter rolls and unable to re-register. *Id.* A similar episode occurred in Jefferson Davis County: attempts to re-register to vote were unsuccessful. *Id.* at 61. In Forrest County, the county registrar flatly refused to register Black citizens to vote without providing any justification for the denial. *Id.* at 61. In another instance in Forrest County, a Black citizen had their voter registration denied 16 times by the registrar. *Id.* Additionally, a number of Black citizens were told by the registrar that he was unable to register voters, only to watch

that same election official register to vote two White women without delay moments later. *Id.* In Clarke County, a similarly recalcitrant registrar told Black citizens that they should "watch the papers and see how the mess in Little Rock and the mess in Washington worked out" before refusing to register any Black voters. *Id.* at 62. Complaints about being denied the ability to register to vote were also lodged by voters in Alabama. *Id.* at 69.

In response, the Commission attempted to investigate complaints, including arranging the inspection of voter registration records in Macon County, Alabama. *Id.* at 69-70. Upon arriving, however, the Commission's agents were denied access and told that they would not be permitted to inspect the records by order of Alabama Attorney General Patterson. *Id.* This began a trend, with Alabama Third Circuit Judge George Wallace ordering voter registration records in Barbour County sealed to prevent inspection by the Commission. *Id.* at 70. Wallace also impounded the records in Bullock County, and in both cases acted in response to state grand jury investigations into allegations of fraudulent voter registration. *Id.* at 71.

Additionally, the Commission heard testimony that Macon County had disbanded its Board of Registrars to avoid registering Black voters, before reconstituting the Board in secret. *Id.* at 75–76. Macon County also implemented a policy requiring new registrants to have an already-registered voter "vouch" for them, such that the registered White population could, and did, exercise what

9

amounted to a veto over any Black registration. *Id.* at 76. The testimony from Macon regarding the abusive practices of the County Board of Registrars was corroborated by thirty-three witnesses drawn from four counties. *See id.* at 78–80. The Commission also heard testimony concerning the gerrymandering of Tuskegee, Alabama, which sought to exclude as many Black citizens as possible from the City's political boundaries. *Id.* at 77; *see also Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (finding the gerrymander of Tuskegee unconstitutional).

As the direct result of this damning testimony and the Commission's own fruitless attempts to review election records, the Commission recommended that Congress "require that all State registration and voting records shall be public records and must be preserved for a period of 5 years, during which time they shall be subject to public inspection, providing only that all care be taken to preserve the secrecy of the ballot." *Id.* at 138. The Commission also recommended creating new causes action against registrars who refused to register qualified voters, expanding the Commission's power to enforce its own subpoenas without DOJ's assistance, and appointing a temporary federal registrar of voters. *Id.* at 138–42.

The Commission's recommendation was not intended to vest DOJ with authority to compel disclosure of voter registration information from any state at a whim; rather, the Commission's experience in Alabama indicates that the recommendation was a call for transparency in state and local maintenance of

10

registration records. Especially in light of the Commission's recommendation that publicly accessible registration information preserve the secrecy of the ballot, the highly sensitive nature of the material requested by DOJ in this case goes too afield of the concerns that motivated Congress to adopt Title III specifically and the Civil Rights Act of 1960 more broadly.

**B. The legislative history of the Civil Rights Act of 1960 and the legal precedent regarding Title III demonstrate that the purpose of the law is limited to investigations related to racial discrimination.**

The legislative history of the Civil Rights Act of 1960 and the legal precedent regarding Title III demonstrate that the purpose of the law is limited to investigations related to racial discrimination. During debate over the 1960 Act, Senator Javits highlighted that Title III was necessary to enforce voting rights, explaining that "[e]xperience has shown that local registration officials engage in every possible dilatory tactic to delay enforcement of voting rights suit. It is to meet this problem that the Federal voting referee and similar bills have been proposed." 106 Cong. Rec. Vol. 106, Part 3, p. 3693 (1960). Members of the House of Representatives invoked the need to protect and guarantee the right to vote, especially of Black citizens during the House debate on the Civil Rights Act of 1960. *See, e.g.,* 106 Cong. Rec. Vol. 106, Part 4, 5328, 5341, 5350 (1960). The House Committee referred to Title III as

11

"an essential step in the process of enforcing and protecting the right of qualified electors to vote." *Id.* at 4211.

Members of Congress repeatedly expressed concern that empowering the Attorney General with the ability to inspect voting records would create opportunities for "fishing expeditions." *See* 106 Cong. Rec. Vol. 106, Part 3, p. 2735, 4025 (1960) (Senator Ellender stating "[w]hat the State of Louisiana has objected to has been star-chamber hearings, and the wholesale examinations of voting records on a 'fishing expedition' basis."). In the Senate, Senator Ellender explicitly took issue with what he saw was the ability for "carte blanche authority to haul away and copy as many voting records as [the Commission on Civil Rights] may desire." *Id.* The concern regarding the Attorney General and Department of Justice engaging in "fishing expedition[s]" with unreasonable demands of voting records was shared by members of the House. Florida Congressman William Cramer expressed that Title III as initially proposed would "give[] to the Attorney General or thus the district attorneys…the unlimited power of discovery without existing court order or court proceedings…[the Attorney General] can go on the biggest 'fishing expedition' ever conceived in our jurisprudence—and without any court determination that a given complaint has merit." 106 Cong. Rec. Vol. 106, Part 4, p. 5326 (1960).

In response to concerns about the Attorney General seeking voter roll information without any legitimate purpose or merit, Congress adopted amendments

to Title III. Drafted by Congressman Cramer, these amendments added a requirement that the Attorney General's demand of records include "a statement of the basis and the purpose therefore" for voting record requests. *See* 52 U.S.C. § 20702; 106 Cong. Rec. Vol. 106, Part 4, p. 5326 (1960). In a speech, Congressman Cramer stated that the reason for the proposed amendment would be to "require any such request to be reasonable and not interfere with the ordinary process and duties of holding elections by the local registrar." 106 Cong. Rec. Vol. 106, Part 4, p. 5326 (1960). This demonstrates that while Congress sought to ensure that voting records were available for review and investigation, they wanted to limit investigations to the legitimate bases identified by the Commission—namely, preventing racial discrimination.

Furthermore, courts interpreting Title III have determined that the purpose of the law is to prevent racial discrimination in voting. Courts found that, "Title III provides—if properly applied and enforced—an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F. 2d 430 (5th Cir. 1961). In *Kennedy v. Lynd*, the Fifth Circuit found that "one of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all of the voter record

13

information within the time-reach of the statute relating to all persons as to ***whom there is a question concerning infringement or denial of their constitutional voting rights***." 306 F. 2d 222, 228 (5th Cir. 1962) (emphasis added). The Department of Justice used Title III as intended after passage: to investigate jurisdictions that denied voters the ability to register and vote on the basis of race. *See generally*, *Alabama v. United States*, 304 F. 2d 583, 585–86 (5th Cir. 1962). Nothing in the Department's demand even attempts to justify it within the purposes of the Act. The initial letter sent by the Department failed to even invoke the CRA of 1960 or Title III at all. *See* 2-ER-267-68. Regardless, even if the demand did originally invoke Title III, the lack of any allegation of racial discrimination would doom their expedition.

### C. DOJ's invocation of NVRA does not meet requirements of Title III for voter roll enforcement.

The Department of Justice requests did not meet the requirements of Title III for voter roll enforcement. As explained *supra*, Title III was designed as a means of investigating and protecting against infringement of the right to vote by jurisdictions based on race and color. And while Title III is not overly exacting in the standards for requests for records made under the law, DOJ's requests fail even under those standards.

14

### i. DOJ's use of Title III as justification for its request is clearly pretextual.

As an initial matter, even disregarding the specific terms of Title III, it is glaringly clear that DOJ's request was not made pursuant to the Act. A simple look at the initial request sent to the Secretary of State of California by DOJ bears no mention of Title III as the purpose for its sweeping request for voter data from the State. 2-ER-267. It was not until they received what they deemed an insufficient response from the Secretary that they invoked Title III. 2-ER-262-265. Even then, DOJ only invoked Title III to assert that they were entitled to the records, but at no point claimed they were pursuing an appropriate investigation into the denial of voting rights on the basis of race, as that law requires. *Id*.

DOJ's letters are insufficient. DOJ seeks to abuse the purpose of Title III and the CRA more broadly to suit their own unrelated requests. As will be discussed *infra*, the cases they cite to support their position simply do not actually do so. Rather these cases detail the clear distinction between requests made to actually investigate instances of racial discrimination in the exercise of the right to vote, and the baseless fishing expedition made here by DOJ.

### ii. DOJ's request does not meet the minimum standards outlined by courts.

DOJ's requests are completely unrelated to any concerns about discrimination. Rather, the concerns point to something quite the opposite: DOJ is concerned about *overinclusive* voter rolls—specifically those that had high numbers

of duplicate and deceased registrants. 2-ER-287-88. In their pleadings DOJ does not even try to assert that they are seeking this information to investigate racial discrimination in voting. Rather, DOJ's brief relies on readily distinguishable case law to assert the erroneous claim that Title III automatically entitles the Attorney General to any request for election data. And DOJ's opposition to the motion to dismiss argues that Title III does not require the demand to be related to racial discrimination. 2-ER-202-204.

DOJ ignores that the basis and purpose should be at least arguably related to the purpose of Title III and supported by some evidence of reasonable suspicion. Opening Br. at 17. For this Court to allow DOJ to ignore this minimum threshold would lead to absurd results, allowing the Attorney General to request records for almost any reason imaginable, especially those well outside the bounds of statute's actual purpose. As demonstrated *supra*, the legislative history of Title III is moored to racial discrimination in voting.

DOJ has understood this minimum threshold in the past. In *In re Coleman*, the letter sent to counties in Mississippi by the Attorney General stated clearly, "This demand is based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting within your jurisdiction." 208 F. Supp. 199, 199-200 (S.D. Miss. 1962). Another case cited by Defendants, *Kennedy v. Lynd*, makes

16

clear that although Title III is "investigative in nature…[i]ts purpose is to enable the Attorney General to determine whether § 1971 [racial discrimination] suits or similar actions should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." 306 F. 2d 222, 228 (5th Cir. 1962); *see also Kennedy v. Bruce*, 298 F. 2d 860, 863 (5th Cir. 1962) ("[W]e simply make the observation that in this day and age an effort to inspect the records of a county having such a disparity in the percentage of voters to eligible citizens as between the races should not be frustrated by the simple expedient of the Registrar's statement that there is nothing wrong.") These cases make clear that while the Attorney General need not provide vast amounts of information regarding the details or source of the investigation warranting the document request, they must, at a minimum, be related to an investigation of discrimination in voting.

## IV.  Conclusion

For the foregoing reasons, the Court should find that the purpose of Title III of the Civil Rights Act extends to actions by the Department of Justice to investigate constitutional deprivations of the Right to Vote on the basis of race and affirm the lower court's dismissal of Petitioner's suit.

17

Dated: April 24, 2026

Respectfully submitted,

UCLA Voting Rights Project

CHAD W. DUNN
Legal Director

*s/ Sonni Waknin*
SONNI WAKNIN
California Bar No. 335337
Senior Voting Rights Attorney
BERNADETTE REYES
California Bar No. 299878
Senior Voting Rights Attorney
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
sonni@uclavrp.org

*Counsel for Amicus Curiae*

18

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _26-1232_____

I am the attorney or self-represented party.

**This brief contains __3970_____ words,** including _0____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
    29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
    only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _s/ Sonni Waknin_____ **Date 4/24/2026_____**
*(use "s/[typed name]" to sign electronically-filed documents)*

19

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form15instructions.pdf](http://www.ca9.uscourts.gov/forms/form15instructions.pdf)

**9th Cir. Case Number(s)** | 26-1232

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

BRIEF FOR THE UCLA VOTING RIGHTS PROJECT AS AMICUS IN SUPPORT OF APPELLEESAND SUPPORTING AFFIRMANCE

**Signature** | s/Sonni Waknin | **Date** | 04/24/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* [forms@ca9.uscourts.gov](mailto:forms@ca9.uscourts.gov)

**Form 15** | *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf

**9th Cir. Case Number(s)** | 26-1232

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

UCLA Voting Rights Project

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

    a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
    ○ Yes    ◉ No

    If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

    b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
    ○ Yes    ◉ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                                   *1*                        *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?
   ○ Yes   ◉ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

◉ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** s/ Sonni Waknin   **Date** 4/24/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 34**   2   *New 12/01/24*