

CALIFORNIA
# DEPARTMENT OF JUSTICE

**Rob Bonta**
*Attorney General*

1300 I STREET, SUITE 125
SACRAMENTO, CA 95814

Public:  (916) 445-9555
Telephone:  (916) 210-6004
Facsimile:  (916) 324-8835
E-Mail:  Andra.Lim@doj.ca.gov

May 22, 2026

**VIA ACMS**

Molly Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

RE:    *United States v. Weber*, No. 26-1232
       Argument Held May 19, 2026
       <u>Fed. R. App. P. 28(j) Citation of Supplemental Authority</u>

Dear Ms. Dwyer,

In *United States v. Bellows*, No. 25-cv-00468 (D. Me. May 21, 2026), the

district court held that U.S. DOJ could not use Title III to obtain an unredacted

state voter list to enforce the NVRA's list-maintenance requirements or HAVA's

requirement to collect certain personal information.  The court explained that the

NVRA and HAVA have their own oversight mechanisms.  Op. 17.  Both statutes

authorize the Attorney General to sue for prospective relief.  52 U.S.C.

§§ 20510(a), 21111.[1]  The NVRA contains a records-disclosure provision, 52

---

[1] The statutes also include private enforcement provisions.  52 U.S.C. §§ 20510(b),
21112.

May 22, 2026
Page 2

U.S.C. § 20507(i)(1), but does not require disclosure of an unredacted voter list. *Compare Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 49, 56 (1st Cir. 2024) (NVRA requires disclosure of voter list but permits redaction), *with Pub. Int. Legal Found., Inc. v. Nago*, 2026 WL 1144703, *11 (9th Cir. 2026) (voter list not covered by disclosure provision at all).

The district court explained that it is "a commonplace of statutory construction that the specific governs the general, particularly where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." Op. 17-18. The court concluded that if U.S. DOJ "wants to enforce HAVA and the NVRA," it must use the "enforcement mechanisms that Congress provided in those statutes—which do not contemplate production of the unredacted computerized list." Op. 18; *see* Answering Br. 37-39 (same); *see also* 52 U.S.C. §§ 21083(a)(1)(A), 21085 (local election official, but not federal, access).

The district court emphasized that the NVRA and HAVA embody the broader federalism principle that *States* are "the primary regulators and administrators of [federal] elections." Op. 19. Congress retained a dispersal of power so it would be "impossible for a single centrally controlled authority to dictate how elections will be run" and thereby be able "to control the outcome."

May 22, 2026
Page 3

Answering Br. 7 (quoting H.R. Rep. No. 107-329).  If Title III gave "the United States a right to every state's [voter list]" to enforce the NVRA and HAVA, that "would take a sledgehammer to the balance Congress struck."  Op. 19-20.

                            Sincerely,

                            */s/ Andra Lim*

                            ANDRA LIM
                            Deputy Solicitor General

                For    ROB BONTA
                            Attorney General

cc:  All Counsel of Record (via ACMS)

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | No. 1:25-cv-00468-LEW |
| ) | |
| SHENNA BELLOWS, in her official ) | |
| capacity as Secretary of the State of ) | |
| Maine, and the STATE OF MAINE, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| LEAGUE OF WOMEN VOTERS ) | |
| OF MAINE, ) | |
| ) | |
| Defendant-Intervenors, ) | |
| ) | |
| JOHN SCHNECK and MARPHEEN ) | |
| CHANN, ) | |
| ) | |
| Defendant-Intervenors ) | |

**ORDER**

The United States filed this civil action to compel Defendants, the State of Maine and Secretary of State Shenna Bellows, to produce Maine's complete and unredacted computerized voter registration list.  The matter is before the Court on the Motions to Dismiss of Defendants (ECF No. 54), Defendant-Intervenors John Schneck and Marpheen Chann (ECF No. 61), and Defendant-Intervenor League of Women Voters of Maine (ECF No. 53).  Also before the Court is the United States' Motion for Order to Show Cause (ECF No. 5) why the requested records have not been produced.

Maine, along with many other states, historically have agreed to the Department of Justice's requests for access to their voter rolls.  *See*, *e.g.*, *United States v. Maine*, No. 1:06-cv-86, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007) (consent decree providing the United States "an electronic copy of voter information from the CVR").  Comity between coequal sovereigns is the hallmark of a thrumming republic, so it should not surprise the reader, though in these days it likely will, to learn that federal government curiosity in state voter rolls would ordinarily be worked out through cooperation and negotiation in observance of the delicate balance of sovereign authorities, thereby avoiding a clash between sovereigns. The question before me now is whether the Department of Justice can compel the type of access it once enjoyed through consent, in the face of a state's refusal.  For the reasons that follow, I conclude it cannot.  The Motions to Dismiss are GRANTED and the United States' Motion for Order to Show Cause is DENIED.

## BACKGROUND

On July 24, 2025, a Deputy Assistant Attorney General from the Civil Rights Division of the U.S. Department of Justice sent a letter to Maine's Secretary of State requesting, among other information, "[t]he current electronic copy of Maine's computerized statewide voter registration list [(SVRL)] . . . as required by Section 303(a) of the Help America Vote Act," including "all fields contained within the list," "[p]ursuant to Section 20507(i) of the [National Voter Registration Act]."  Compl. Ex. 1 ("July 24 Letter") at 1 (ECF No. 1-1); *see also* Compl. ¶ 31.  The Help America Vote Act requires states to "implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list" that "shall serve as the single system for storing and

2

managing the official list of registered voters throughout the State." 52 U.S.C. § 21083(a)(1)(A), (A)(i). To comply with this requirement, Maine created the "central voter registration system," which is the "single electronic information system and database for voter registration information maintained by the Secretary of State and used by all municipal jurisdictions." 21-A M.R.S. § 1(6-A). It includes each registered voter's full name, residential and mailing addresses, date of birth, most recent prior residential address, choice of political party, and election participation history. *See id.* §§ 152(1)-(2), 721. It also includes the voter's driver's license number, nondriver identification card number, or partial social security number, depending on which number the voter provided at registration. *Id.* § 152(1)-(2).

In addition to the demand for Maine's current computerized SVRL, the July 24 Letter also contained the following observations about Maine's responses to the Election Assistance Commission's election administration and voting survey:

- That Maine's voter registration rate in 2024 was 92.4 percent of the citizen voting age population;

- That Maine had 11,011 voters with duplicate registrations (or 3.5 percent), almost four times fewer than the national average (12.7 percent);

- That Maine had 101,771 voters (or 77.2 percent) removed for having moved outside the jurisdiction, more than twice the national average; and

- That data about Maine's confirmation notice mailings[1] was missing.

---

[1] The National Voter Registration Act outlines procedures for the identification of voters who may have changed residences, which include mailing notices to certain voters who (among other criteria) have not voted in the last two elections. *See* 52 U.S.C. § 20507(b)-(e).

*See* July 24 Letter at 2. In connection with these observations, the letter requested information about the actions Maine takes to ensure that ineligible voters are being removed and Maine's processes for sending out and tracking confirmation notices. *Id.*

On August 8, 2025, Secretary Bellows responded, refusing to provide the current computerized SVRL, contending that the request was "overbroad" and that the SVRL contains information protected as "highly sensitive" under Maine law.[2] *See* Compl. Ex. 2 ("Resp. to July 24 Letter") at 1, 3 (ECF No. 1-2); *see also* Compl. ¶ 36. That response also included the Secretary's answers to the July 24 Letter's questions about Maine's survey data, which the United States has alleged "did not provide sufficient details for the United States to evaluate compliance with [the Help America Vote Act] and the [National Voter Registration Act]." Compl. ¶ 37; *see also id.* ¶¶ 38-46.

On August 18, 2025, the Department of Justice sent another letter to the Secretary, renewing its "request for Maine's voter registration list . . . to assess the State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act" and reiterating that "the electronic copy of the [SVRL] must contain all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as

---

[2] Maine law designates the central voter registration system as confidential and exempt from Maine's public records laws. *See* 21-A M.R.S. § 196-A(1). It gives the Secretary discretion to "make available" to government actors "certain voter information for that entity's authorized use only," specifically, "the voter's name, year of birth, residence address, mailing address, electoral districts, voter status, date of registration or date of the voter record if applicable, voter record number and any special designations indicating uniformed service voters, overseas voters, or township voters." *Id.* § 196-A(1)(E). Defendants contend that this "authority does not extend to bulk disclosure of sensitive [personal identifying information] like full date of birth, social security number, and driver's license number." Defs. Mot. to Dismiss at 4.

4

required under the Help America Vote Act . . . to register individuals for federal elections." Compl. Ex. 3 ("August 18 Letter") at 1 (ECF No. 1-3); *see also* Compl. ¶¶ 47-50. The letter explained that the request was an exercise of the United States Attorney General's authority under the National Voter Registration Act, the Help America Vote Act, and Title III of the Civil Rights Act of 1960. August 18 Letter at 1-2. Of note, Title III requires states to make certain election records and papers[3] available to the United States Attorney General upon a written demand that includes "a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, which the Department of Justice asserted was contained in "our letter dated July 24, 2025 . . . namely, to assist in our determination of whether Maine's list maintenance program complies with the [National Voter Registration Act]."[4] August 18 Letter at 2.

The Secretary responded to the August 18 Letter on September 8, 2025, again refusing to provide the unredacted computerized SVRL. Compl. ¶ 51. A week later, the United States filed this lawsuit, alleging violations of the National Voter Registration Act, 52 U.S.C. § 20507(i) (Count I); the Help America Vote Act, *id*. § 21083 (Count II); and

---

[3] The "records and papers" terminology is specific to "records and papers which come into [the] possession [of state election officers] relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election." 52 U.S.C. § 20701.

[4] The August 18 Letter also demanded, in addition to the current computerized SVRL, "all original and completed voter registration applications submitted to the State of Maine from December 1, 2023, through July 1, 2025." August 18 Letter at 2. In response to this request, Secretary Bellows explained that, "under Maine law, original voter registration applications are maintained by registrars in each of Maine's roughly 480 municipalities." Ex. A to Defs. Mot. to Dismiss ("Resp. to August 18 Letter") at 3 (ECF No. 54-A) (citing 21-A M.R.S. § 172). Since August 18, the United States has shown no interest in these records, which, as far as I understand it, remain available to the United States should it wish to canvas Maine's town halls. This demand has gone completely unmentioned in both the Complaint and Motion for Order to Show Cause, which only seek to compel production of the current computerized SVRL.

Title III of the Civil Rights Act, *id*. § 20703 (Count III). The United States seeks an injunction ordering Defendants "to provide the United States the current electronic copy of Maine's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number as required by 52 U.S.C. § 20703." Compl. ¶ 65.D.

By now, nearly every state has received a request similar to the one at issue here. Many—including Maine—have declined, and as a result, the United States has initiated thirty lawsuits nearly identical to this one.[5]  Six have been dismissed on motions similar to the ones before me now. *See United States v. Fontes,* – F. Supp. 3d –, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore,* – F. Supp. 3d –, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, – F. Supp. 3d –, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Benson*, – F. Supp. 3d –, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Oregon*, – F. Supp. 3d –, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

## DISCUSSION

To avoid dismissal, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To determine whether a complaint "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), courts "separate the complaint's factual allegations (which must be taken

---

[5] *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*, U.S. Dep't of Justice Office of Public Affairs (Feb. 26, 2026), <https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-produce-voter-rolls> (last viewed May 21, 2026).

as true) from its conclusory legal allegations (which need not be credited)," *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012). The task is then to ascertain whether, "drawing all reasonable inferences in the pleader's favor," those "well-pled" factual allegations "plausibly narrate a claim for relief" under the law. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).[6]

To understand the United States' claim for relief, a summary of the statutory backdrop is necessary. That backdrop is comprised of the National Voter Registration Act (NVRA), the Help America Vote Act (HAVA), and Title III of the Civil Rights Act of 1960 (Title III).

The NVRA was enacted in 1993 "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1), and "to ensure that accurate and current voter registration rolls are maintained," *id.* § 20501(b)(4). In furtherance of those ends, the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the

---

[6] Defendants, Defendant-Intervenors, and various *amici curiae* have repeatedly and loudly cast aspersions on the Department of Justice's reasons for seeking so many states' SVRLs. The United States' representative at oral argument did his best to reassure all involved that requests like the one at issue here are routinely made by the Civil Rights Division and that states (including Maine) have complied in the past. At the hearing, the United States' attorney was emphatic that "this whole notion that somehow there's going to be a national database . . . created from" the voter registration data the Department of Justice has been attempting to compile "is not true," and that "there is no national database that's being created." Hr'g Tr. 51:3-7 (ECF No. 104). His efforts to assuage these concerns were almost immediately undermined by the issuance of an executive order directing the Department of Homeland Security to compile a "State Citizenship List" in order to "assist in verifying identity and Federal election voter eligibility." Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Apr. 3, 2026) ("Ensuring Citizenship Verification and Integrity in Federal Elections"). Fortunately for the United States, this matter is before me on motions to dismiss, and under the applicable standard, the only facts that I consider are those contained in the United States' Complaint and its attachments, which I take as true. *Morales-Cruz*, 676 F.3d at 224; *Schatz*, 669 F.3d at 55.

registrant; or (B) a change in the residence of the registrant[.]"  *Id*. § 20507(a)(4).  This program must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," *id*. § 20507(b)(1), and cannot "result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote" unless the state follows certain procedures, *id*. § 20507(b)(2).  The NVRA makes subject to public disclosure "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]"  *Id*. § 20507(i)(1).  And it empowers both private parties, *see id*. § 20510(b)(2), and the Attorney General, *id*. § 20510(a), to "bring a civil action in an appropriate district court for . . . declaratory or injunctive relief," *id*., in the event of a violation.

Following up on the NVRA, Congress passed the Help America Vote Act (HAVA), in 2002.  As the United States explains, "HAVA imposes 'minimum requirements' for the conduct of federal elections, which 'allow the states to develop their own laws and procedures to fulfill the requirements' to the extent that they are consistent with the standards set by HAVA."  Compl. ¶ 19 (quoting H.R. Rep. No. 107-329, pt. 1, at 35 (2001)).  Thus, HAVA provides that:

> [E]ach State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State[.]

52 U.S.C. § 21083(a)(1)(A).  The computerized SVRL "shall serve as the single system for storing and managing the official list of registered voters" in that state.

*Id.* § 21083(a)(1)(A)(i).   As explained above, the HAVA-mandated SVRL is what the United States seeks to compel Maine to produce.

HAVA also requires "[t]he appropriate State or local election official" to "perform list maintenance with respect to the computerized list on a regular basis." *Id.* § 21083(a)(2)(A)-(B).  Similarly, HAVA requires states "to ensure that voter registration records in the State are accurate and updated regularly" by implementing "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible" and "[s]afeguards to ensure that eligible voters are not removed in error." *Id.* § 21083(a)(4)(A)-(B).  HAVA also requires states to collect certain information from registrants through their applications, namely, the applicant's driver's license number or social security number, *see id.* § 21083(a)(5)(A)(i), which the state must take steps to verify, *see id.* § 21083(a)(5)(B).  Finally, HAVA empowers the Attorney General to bring "a civil action against any State or jurisdiction . . . for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083, and 21083a of this title."  *Id.* §§ 21111.

The United States' primary argument in support of its claim to Maine's SVRL invokes a different statute entirely: Title III of the Civil Rights Act of 1960.  Predating the NVRA and HAVA by several decades, Title III provides that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such

9

election," and makes the failure to do so punishable by up to one year of imprisonment. 52 U.S.C. § 20701. Title III also provides that "[a]ny record or paper" subject to that preservation requirement "shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]"[7] *Id*. § 20703. The Attorney General's written demand must "contain a statement of the basis and the purpose therefor." *Id*. Title III also affords to the U.S. District Court "jurisdiction by appropriate process to compel the production of such record or paper." *Id*. § 20705.

The United States contends that each of these statutes requires Maine to make its unredacted, current computerized SVRL available to the Department of Justice. And even more pointedly, the United States contends that Title III's delegation of jurisdiction on this Court to compel production by appropriate process creates "a special statutory proceeding" for the summary disposition of its claim to the requested records. *See* Pl. Resp. at 8 (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962)), 9-11. Finding support from a 60-year-old Fifth Circuit decision, the United States argues that in this "special statutory proceeding," there is "no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in

---

[7] The United States points to the terms "reproduction" and "copying" to argue that it is entitled to the complete, unredacted SVRL. Pl. Resp. at 12. Interestingly, the NVRA frames its disclosure requirement in very similar terms, requiring states to "make [records] available for public inspection and, where available, photocopying at reasonable cost." 52 U.S.C. § 20507(i)(1). As discussed further below, however, the First Circuit nonetheless concluded that "nothing in the text of the NVRA prohibits the redaction of uniquely or highly sensitive personal information" in records subject to disclosure. *Public Interest Legal Foundation v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

the written demand" or to challenge "the reasons why the Attorney General considers the records essential." *Id*. at 9-10 (quoting *Lynd*, 306 F.2d at 226); *see also* Pl. Mem. Order to Show Cause at 8-9 (ECF No. 5-1). For reasons that follow, I conclude that this case presents something other than a perfunctory matter of compelling compliance with a clear statutory directive. In fact, carefully considered, this case lacks the statutory grounding needed to state a claim upon which relief may be granted.

Title III provides that the Court has "jurisdiction by appropriate process to compel the production" of covered records. 52 U.S.C. § 20705. The Supreme Court, interpreting identical language in a different statute two years after the Fifth Circuit decided *Lynd*, held that because that statute "contains no provision specifying the procedure to follow in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). Analogizing the United States' demand under Title III to an administrative subpoena, as district courts have done in similar cases, *see*, *e.g.*, *Benson*, 2026 WL 362789, at *7, Defendants, as the "subject of the subpoena," are entitled to "an opportunity to challenge the subpoena before yielding the information," and the Department of Justice must "prove that . . . the subpoena is issued for a congressionally authorized purpose" and that "the information sought is . . . relevant to the authorized purpose."[8] *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3 (1st Cir. 1996).

---

[8] As far as I can tell, no district court has adopted the United States' view of *Lynd*'s "special statutory proceeding." *See Weber*, 816 F. Supp. 3d at 1182; *Oregon*, 2026 WL 1177244, at *8; *Benson*, 2026 WL 362789, at *7; *Amore*, 2026 WL 1040637, at *3-4; *Fontes*, 2026 WL 1177244, at *1 n.1. The United States has pointed to a show-cause order issued by the District of Connecticut in *United States v. Thomas*, No. 3:26-cv-21. *See* Pl. Notice re: Connecticut Order for Show-Cause Hearing (ECF No. 78). As Defendants and Defendant-Intervenors have observed, that order, which was issued *ex parte*, did little more than set a briefing schedule.

Turning to the substance of the United States's claim under Title III, I "start with the text of the statute itself." *See Teles de Menezes v. Rubio*, 156 F.4th 1, 12 (1st Cir. 2025) (internal citation omitted).  At first glance, the language of Title III appears to be quite sweeping, requiring state election officers to "retain and preserve . . . all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election," 52 U.S.C. § 20701, and then make any such "record or paper" available to the Attorney General "upon demand," *id*. § 20703.  Words and phrases like "all," "any," and "relating to" are certainly expansive. But "[w]ords in a statute are not islands," and "must be read in their context and with a view to their place in the overall statutory scheme." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).  While I have little trouble accepting that Maine's SVRL "relat[es] to . . . act[s] requisite to voting," I do not believe that it can be fairly described as a record or paper that "comes into [the] possession" of Maine's election officers, as that phrase is most naturally construed.  52 U.S.C. § 20701; *see also Benson*, 2026 WL 362789, at *9-10; *Fontes*, 2026 WL 1177244, at *3-7.

Title III requires states to preserve certain categories of evidence for a specified time following an election, to allow the Attorney General to investigate and litigate wrongdoing in the conduct of that election.[9]  *See* 52 U.S.C. § 20701.  To that end, Title III's production and preservation requirements are addressed to "records and papers" that "come into [the]

---

[9] The legislative history that the United States cites in its opposition to Defendants' and Defendant-Intervenors' motions to dismiss supports this understanding.  *See* Pl. Resp. at 8 n.2 (quoting H.R. Rep. 86-956 at 1944-45 (1960)).

possession" of the state election official. *Id*. It requires the preservation of those records and papers, *id*., criminalizes their destruction or alteration, *id*. § 20702, and grants the Attorney General access to them, *id*. § 20703. In other words, the Civil Rights Act "is not designed to facilitate the disclosure of voter information," but rather to require "the disclosure of *documents*"—specifically, documents that come into the state's possession in connection with its elections. *Benson*, 2026 WL 362789, at *10 (original emphasis). "The phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Id.* at *9 (collecting authority); *see also Receive, Black's Law Dictionary* (12th ed. 2024) ("to come into possession of or get from some outside source"). Title III's commands therefore pertain to records and papers that election officials receive from prospective voters to support the exercise of the suffrage by the prospective voters, not lists or other tools created by election officials for the purpose of preserving the information provided by voters and ensuring that persons appearing to vote are registered.[10] *See Benson*, 2026 WL 362789, at *9-10; *Fontes*, 2026 WL 1177244, at *3-7.

---

[10] The United States argues that state election officials "come into possession" of SVRLs "when they acquire them in the conduct of their official responsibilities, regardless of the information's source." Pl. Resp. to Notice of Supp. Auth. at 1 (ECF No. 111). Essentially, the United States argues that "come into [the election official's] possession" means "in the election official's possession." If that is the meaning Congress intended, however, this strikes me as an odd selection of words to convey it. "[C]ourts 'must give effect, if possible, to every clause and word of a statute,'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal citation omitted)—including, here, the words "come into." *See also Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 773 (2025). Coming into possession of something most naturally implies receipt from an external source. Congress could have required the retention and production of all election-related records and papers "in the possession of" the state election official but did not. The "natural implication" of the failure to adopt this "obvious alternative" is that Congress did not intend the alternative. *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014); *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477-78 (2017).

In my view, this resolves the matter: the United States cannot utilize Title III to compel production of Maine's SVRL because it is not a record that comes into the possession of state officials, but is instead the product of the labors of state officials. However, as a separate and independent reason for rejecting the United States' Title III claim, I am also persuaded that the United States' stated purpose for its request is insufficient.

Much of the parties' briefing in this matter, as well as the decisions of other district courts that have declined to compel production of other states' SVRLs, has focused on Title III's requirement that the Attorney General's written demand include a statement of the basis and the purpose for the demand. *See* 52 U.S.C. § 20703. A number of district courts have concluded, as Defendants and Defendant-Intervenors urge me to conclude here, that "the 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10; *see also Amore*, 2026 WL 1040637, at *6. Defendants and Defendant-Intervenors have made strong arguments that this is so, but stronger still, in my view, is the argument that whatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them.[11]

---

[11] Defendants and Defendant-Intervenors have also urged, and several other district courts have concluded, that the United States was required to, but did not, include in its written demand under Title III a factual basis for its request. *See*, *e.g.*, *Galvin*, 2026 WL 972129, at *3-6. The United States has requested that, in the event I am inclined to reach the same conclusion, it be permitted "to send Secretary Bellows a curing elaboration letter" setting out a factual basis. Pl. Resp. to Notice of Supp. Auth. at 2 (ECF No. 107). Because I decide the motions before me on other grounds, I do not chase this particular thread of the dispute to its conclusion.

Title III's requirement that the Attorney General provide a written "statement of the basis and the purpose" for its demand contemplates assessment of the sufficiency of the basis and the purpose asserted.  52 U.S.C. § 20703; *see also Oregon*, 2026 WL 318402, at *9 ("If any purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function").  The United States' stated purpose for requesting Maine's current unredacted SVRL is to ascertain whether Maine is complying with the list maintenance requirements imposed by the NVRA and HAVA.  *See* Compl. ¶ 49.  As the United States has explained in its filings, the intended review is apparently quite granular, including an assessment of "compliance with HAVA's requirement to provide the driver's license number, or the last four digits of the Social Security Number," which requires a "review [of] the SVRL to determine whether that information is being collected consistently." Pl. Resp. at 16.  The United States has also gestured towards a plan to review the SVRL "to identify duplicate registration records, registrants who have moved, and registrants who have died or otherwise are no longer eligible to vote in federal elections." *Id*. at 12-13.  I am not persuaded that the Civil Rights Act of 1960 can be leveraged for this purpose.

True, the text of Title III does not expressly limit the acceptable purposes for which the Attorney General can request documents under that statute.  But "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (internal citation omitted).  To determine whether the Attorney General's purpose is sufficient, I start not with Title III, but with the text and structure of

15

HAVA and the NVRA—the statutes that impose the obligation to create the computerized list of registered voters that the United States has brought this suit to obtain, and whose technical and list maintenance requirements the United States seeks to enforce. HAVA requires each state's chief election official to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list[.]" 52 U.S.C. § 21083(a)(1)(A). The list must contain "the name and registration information of every legally registered voter" and assign to each "a unique identifier." *Id*. HAVA clearly specifies and repeatedly reiterates that the list must be "defined, maintained, and administered at the State level"—not by the federal government. *Id*.; *see also id*. § 21083(a)(2) (directing "[t]he appropriate State or local election official" to "perform list maintenance with respect to the computerized list on a regular basis").[12] HAVA also expressly leaves "to the discretion of the States" "[t]he specific choices on the methods of complying with" its "requirements." *Id*. § 21085. The NVRA similarly directs its commands for "the administration of voter registration for elections for Federal office"—including those pertaining to voter list maintenance—to "each State." 52 U.S.C. §§ 20507(a), 20507(a)(4). Both statutes could not be clearer: each individual state, and not the U.S. Department of Justice, is the master of its voter list, entrusted with its administration and maintenance.

---

[12] *See also* 52 U.S.C. § 21083(a)(3) (directing "[t]he appropriate State or local election official" to "provide adequate technological security measures to prevent the unauthorized access to the computerized list"); *id*. § 21083(a)(4) (requiring "[t]he State election system" to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly"); *id*. § 21083(a)(5)(A)(iii) ("The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this paragraph, in accordance with State law").

HAVA, moreover, contains specific provisions that govern its enforcement, which do not independently afford the United States access to a state's current, unredacted SVRL. *See* 52 U.S.C. § 21111 (authorizing the Attorney General to "bring a civil action against any State . . . for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083, and 21083a of this title").   The NVRA contains a similar enforcement provision to that found in HAVA.  *See id*. § 20510(a) ("The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter.").   It also provides for the disclosure of "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," *id*. § 20507(i)(1), including Maine's computerized SVRL, *see Public Interest Legal Foundation v. Bellows*, 92 F.4th 36, 45-49 (1st Cir. 2024).

Together, the NVRA and HAVA create a comprehensive scheme for the creation and upkeep of states' computerized SVRLs, and for the enforcement of the list maintenance requirements imposed by those statutes.  That scheme gives the Attorney General the power to "bring a civil action" against a state that has violated those provisions, *see* 52 U.S.C. §§ 20510(a), 21111, but it does not contemplate the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions. That is why the United States leans so heavily on Title III of the Civil Rights Act, even though it was not drawn with any of our present concerns in mind.  Yet, "[i]t is a commonplace of statutory construction that the specific governs the general," particularly

where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal citations omitted); *see also United States v. Bormes*, 568 U.S. 6, 12-13 (2012) (reaffirming the principle that a "precisely drawn, detailed statute pre-empts more general remedies") (internal citation omitted).  When "a general authorization and a more limited, specific authorization exist side-by-side," the specific provision controls.  *RadLAX*, 566 U.S. at 645.  The United States' undertaking to obtain through the Civil Rights Act what it has all but conceded it cannot obtain under the specific statutes it is seeking to enforce is in direct contravention of these principles.  If the Department of Justice wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes— which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list.[13]

Finally, giving Title III the construction that the United States requests would also require me to turn a blind eye to traditional principles of federalism and how those

---

[13] The district court in *Benson* concluded differently on this point.  *See* 2026 WL 362789, at *8.  Because "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," the *Benson* Court reasoned that the several decades separating the passage of the Civil Rights Act from the passage of the NVRA and HAVA was not an important consideration.  *Id*.  Perhaps so, but "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (internal citation omitted).  I remain unconvinced by the proposition that Congress, in requiring states to create and maintain computerized lists of registered voters pursuant to particular specifications, would grant the federal government unrestricted access to those lists to investigate compliance with those specifications—beyond the mechanisms specifically provided for that purpose in those statutes themselves—without saying so explicitly.

principles have found expression in American elections—the backdrop against which Congress enacted the NVRA and HAVA. *See Learning Resources, Inc. v. Trump*, 607 U.S. – , 146 S.Ct. 628, 672 (2026) (Barrett, J., concurring) (emphasizing the importance of "background legal conventions and constitutional structure" in ascertaining "the most natural reading of a statute"). Under our Constitution, states are the primary regulators and administrators of elections for federal office, unless Congress passes legislation that preempts that framework. *See* U.S. Const. Art. I § 4, cl. 1; *Foster v. Love*, 522 U.S. 67, 69 (1997). And Congress's power to do even that is itself subject to limitations. *See, e.g., Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 16-17 (2013) ("[T]he Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."). The text of HAVA itself demonstrates sensitivity to this traditional division of labor and a delicate touch to matters bearing upon the relationship between the federal and state governments, recognizing that HAVA presented a new incursion into what had once been the states' exclusive domain. *See, e.g.*, 52 U.S.C. §§ 21084 (emphasizing that "nothing in this subchapter shall be construed to prevent a State from establishing election technology and administration requirements" in excess of those imposed by federal statute), 21085 ("The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State."). Construing the Civil Rights Act of 1960—enacted as strong medicine to address the stubborn ill of racial discrimination in voting booths across the Jim Crow South—to implicitly provide the United States a right to every state's SVRL on demand for purposes of conducting a comprehensive, line-by-line audit of the state's compliance with HAVA and the NVRA

19

would take a sledgehammer to the balance Congress struck when it required states to create and maintain computerized lists of registered voters in the first place. The implausibility of such a construction is only increased by the manner in which both the NVRA and HAVA repeatedly charge states—not the federal government—with the maintenance of their own voter rolls. *See id.* §§ 20507(a)-(g), 21083(a)(1)(A), 21083(a)(2), 21083(a)(3), 21083(a)(4).

To sum up, the United States has demanded Maine's SVRL under Title III of the Civil Rights Act for the purpose of monitoring compliance with the NVRA and HAVA. But the preservation and disclosure requirements of Title III are not that robust, applying only to records and papers that "come into [the election officer's] possession," 52 U.S.C. § 20701, and not the lists and tools created by the state to administer its elections. Furthermore, the NVRA and HAVA are more recent, more precise statutes with their own objectives and mechanisms for enforcement. If they do not authorize the disclosure that the United States here seeks to compel, Title III does not serve to make those statutes any more demanding. I turn to offer a few parting words on the United States' utilization of those statutes now.

The United States' championing of its claims under the NVRA and HAVA, in both its briefing and its presentation at the hearing on this matter, can only be described as half-hearted. And for good reason, since neither statute gives the United States the power to compel Maine to produce its current computerized SVRL "with all fields." Compl. ¶ 65.D. The First Circuit already determined what the United States is entitled to under the NVRA's public disclosure provision, *see* 52 U.S.C. § 20507(i)(1), in *Public Interest Legal*

*Foundation v. Bellows*, 92 F.4th 36 (1st Cir. 2024). While Maine's central voter registration system and reports generated from it fall within the scope of this disclosure provision, *see id.* at 45-50, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" from what the state must disclose, *id.* at 56. It does not, then, require production of the current computerized SVRL "with all fields," unredacted.[14] Compl. ¶ 65.D.

Unlike the NVRA, HAVA contains no disclosure provision at all. The United States points instead to its enforcement provision, *see* 52 U.S.C. § 21111, arguing that by virtue of its power to bring suit to enforce certain of HAVA's requirements, it is entitled to the records it seeks "through the ordinary investigative process" and under Rule 34 of the Federal Rules of Civil Procedure. Pl. Resp. at 16-17. But this is not an action to enforce HAVA's substantive requirements—the only violation of HAVA that the United States has actually alleged is Maine's failure to comply with its demand for the computerized SVRL.[15] *See* Hr'g Tr. 62:13-16 (ECF No. 104) ("But, again, just to clarify, both the NVRA and HAVA claims that we've brought are not substantive violations other than just simply we are entitled to the records."). The United States essentially claims "that it can file a

---

[14] Perhaps the United States could have argued that the Department of Justice is entitled to more under the NVRA than what a public requester (such as the Public Interest Legal Foundation) can obtain, as far as redactions of sensitive personal information go. But in the single paragraph offered in support of the NVRA claim, the United States does not make that case. *See* Pl. Resp. at 13-14.

[15] In its briefing, the United States gestures towards a similar argument with respect to its NVRA claim, which fails for the same reason. The United States asserts that it "has properly alleged in its Complaint that Defendants have failed to engage in reasonable list maintenance efforts" and is therefore entitled to "the voter registration list, which necessarily must be used to ensure the accuracy of the official list of eligible voters, and is some of the best evidence of a state's voter list maintenance efforts." Pl. Resp. at 15. If the United States' pleadings contain any allegation that Maine has not engaged in reasonable list maintenance efforts, in violation of the NVRA, it was not made apparent to me.

HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery." *Benson*, 2026 WL 362789, at *2. This assertion has "no basis in the Federal Rules of Civil Procedure," *id.*, nor in any other federal law of which I am aware. *See McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006) ("[P]laintiffs should not be permitted to conduct fishing expeditions in hopes of discovering claims they do not know they have."). Stated a bit more colloquially, the United States has filed a HAVA action in search of a HAVA violation, which is not the preferred order of things in the course of civil litigation.

At the hearing, the United States' attorney characterized the federal government's role in the voter-registration scheme created by HAVA and the NVRA as "one of trust but verify." Hr'g Tr. at 46:20 (ECF No. 104). But the text and structure of those statutes require a greater degree of trust than this Department of Justice would perhaps like to give—and only limited mechanisms for verification. As I see it, this was by design.

## CONCLUSION

For these reasons, the Motions to Dismiss (ECF Nos. 53, 54, and 61) are GRANTED, and the Motion for Order to Show Cause (ECF No. 5) is DENIED.

SO ORDERED.

Dated this 21st day of May, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge

22