

*CALIFORNIA*
**DEPARTMENT OF JUSTICE**

**Rob Bonta**
**Attorney General**

1300 I STREET, SUITE 125
SACRAMENTO, CA 95814

Public: (916) 445-9555
Telephone: (916) 210-6004
Facsimile: (916) 324-8835
E-Mail: Andra.Lim@doj.ca.gov

July 14, 2026

**VIA ACMS**
Molly Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

RE:     *United States v. Weber*, No. 26-1232
         Argument Held May 19, 2026
         <u>Fed. R. App. P. 28(j) Citation of Supplemental Authorities</u>

Dear Ms. Dwyer,

Two district courts recently held that U.S. DOJ was not entitled to state voter lists under Title III. *See United States v. Warner*, 2026 WL 2018877 (S.D. W.V. July 13, 2026); *United States v. Toulouse Oliver*, No. 1:25-cv-01193 (D. N.M. July 14, 2026). The courts determined that U.S. DOJ had not satisfied Title III's requirement that a records demand "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

First, the district courts ruled that "the 'basis' contemplated by Title III is a factual, not legal[,] basis." *Warner*, 2026 WL 2018877, at *5; *see Toulouse Oliver* at p. 19. U.S. DOJ's demand for California's voter list did not provide a factual

July 14, 2026
Page 2

basis for requesting millions of voters' highly sensitive information. Answering Br. 32-34.

Second, the district court in *Warner* ruled that U.S. DOJ's demand did not state a valid "purpose." The court reasoned that if "any purpose" would "suffice, then the requirement of stating the demand's purpose would serve no function." *Warner*, 2026 WL 2018877, at *6 (quoting *United States v. Oregon*, 2026 WL 318402, at *8 (Feb. 5, 2026)). The court "decline[d] to read Title III so broadly as to render an express statutory obligation void of any authoritative meaning." *Id.* Instead, based on Title III's history, the court determined that the "purpose" must "relate[] to an investigation into potential violations of an individual's right to vote." *Id.* at *7. U.S. DOJ's stated purposes of investigating compliance with the NVRA and HAVA did not "align with this." *Id.*

Both district courts noted that they joined numerous federal courts in dismissing U.S. DOJ's lawsuits. *Warner*, 2026 WL 2018877, at *1 n.1 (collecting cases); *Toulouse Oliver* at p. 7 (same); *see also United States v. Koski*, No. 3:26-cv-00042 (E.D. Va. July 14, 2026) (additional recent case similarly dismissing U.S. DOJ lawsuit). All told, federal courts have now rejected U.S. DOJ's efforts to obtain state voter lists in 15 States, and no court has ruled in the federal government's favor.

July 14, 2026
Page 3

Sincerely,

*/s/ Andra Lim*

ANDRA LIM
Deputy Solicitor General

For ROB BONTA
Attorney General

cc: All Counsel of Record (via ACMS)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

THE UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                      CIVIL ACTION NO.   2:26-cv-00156

KRIS WARNER,
*in his Official Capacity as*
*West Virginia Secretary of State,*

      Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is a Motion to Compel Federal Election Records filed by the United States ("Plaintiff").   (ECF No. 15.)   Also pending before the Court is a Motion to Dismiss filed by Defendant Kris Warner ("Defendant").   (ECF No. 24.)   For the following reasons, the Court **DENIES** Plaintiff's Motion to Compel Production, (ECF No. 15), and **GRANTS** Defendant's Motion to Dismiss, (ECF No. 24).

### I.   BACKGROUND

This action is one of the many lawsuits brought by the federal government against numerous states throughout our nation.[1]   It stems from repeated requests by the Attorney General

---

[1] Thus far, eleven federal district courts and one court of appeals have now dismissed Plaintiff's lawsuits on motions similar to the ones pending before this Court.   No court has ruled in favor of the United States to date.   *See United States v. Benson*, No. 26-1225, 2026 WL 1815425 (6th Cir. June 24, 2026); *United States v. Schmidt*, No. 2:25-cv-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. Scanlan*, No.25-cv-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Demarinis*, No. CV SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Wis. Elections Comm'n*, —— F. Supp. 3d ——, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, –—— F. Supp. 3d ——, 2026 WL 1430481 (D. Me. May 21, 2026); *United States*

1

of the United States for the West Virginia Secretary of State to turn over an unredacted copy of West Virginia's statewide voter registration list ("SVRL").  Like many other states, Defendant has steadfastly denied these requests.

It started on September 8, 2025, when Plaintiff sent a letter to Defendant seeking a copy of West Virginia's SVRL.  (ECF No. 1 at 5, ¶ 20.)  The information requested therein includes individuals' full name, date of birth, address, and driver's license or the last four digits of their social security number "as required under [the Help America Vote Act] to register individuals for federal elections."  (*Id*. at ¶ 22 (citing 52 U.S.C. § 21083(a)(5)(A)(i)).)  Plaintiff claims the letter indicated that the basis of the demand was the Civil Rights Act of 1960 ("CRA"), whereas the purpose of the request was to assess West Virginia's compliance with the maintenance provisions of the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA").  (ECF No. 39 at 8.)  On September 22, 2025, Defendant categorically denied this request.  (ECF No. 1 at 6.)

In response, on December 10, 2025, December 19, 2025, and January 13, 2026, the Attorney General sent follow-up emails renewing the request for a copy of West Virginia's SVRL.  (*Id*.)  Again, on February 11, 2026, Defendant sent a letter maintaining the position that he would not be adhering to the request in any degree.  (*See id*.)

Consequently, on February 26, 2026, Plaintiff initiated this lawsuit.  (*See id*. at 1.)  The Complaint asserts that, by withholding the requested information, Defendant is violating the CRA.

---

*v. Fontes*, ⸺ F. Supp. 3d ⸺, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, ⸺ F. Supp. 3d ⸺, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, ⸺ F. Supp. 3d ⸺ –, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *United States v. Oregon*, ⸺ F. Supp. 3d ⸺, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

(*Id*. at 6–8.)   Plaintiff asks the Court to (1) declare that Defendant's alleged wrongful concealment of information violates the CRA; and (2) subsequently order Defendant to relinquish West Virginia's SVRL and other federal election records demanded by the Attorney General to ascertain Defendant's compliance with HAVA and the NVRA.   (*Id*.)

Plaintiff then filed the pending Motion to Compel Federal Election Records on April 3, 2026.   (ECF No. 14.)   Defendant filed a response, (ECF No. 26), and Plaintiff replied, (ECF No. 49).   Defendant subsequently filed the pending Motion to Dismiss on April 29, 2026.   (ECF No. 24.)   Plaintiff filed a response, (ECF No. 39), and Defendant replied, (ECF No. 49).

As such, these motions are fully briefed and ripe for adjudication.

## II.    *LEGAL STANDARD*

As an initial matter, the parties dispute the appropriate standard for this case.   According to Plaintiff, it is entitled under Title III of the CRA to a "special statutory proceeding" on its Motion to Compel Production, under which the Court plays a "limited" role.   (ECF No. 15 at 5.)   Defendant argues that the Federal Rules of Civil Procedure ("FRCP") govern this case, and that Plaintiff is not entitled to any sort of alternative proceeding.   (ECF No. 26 at 9.)   The Court agrees with Defendant.

The Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, *except as otherwise provided by statute*, by local rule, or by court order in the proceedings."   Fed. R. Civ. P. 81(a)(5) (emphasis added).   Nothing in the text of Title III of the CRA establishes a special statutory proceeding.   *See* 52 U.S.C. § 20701 et seq.; *accord Weber*, 816 F. Supp. 3d at 1182; *Oregon*, 2026 WL 318402, at *8 (confirming "[t]here is no current or

3

binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III"). Rather, the CRA simply provides that a district court "shall have jurisdiction by *appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

The statute does not define what an "appropriate process" might entail. Plaintiff nevertheless relies primarily on *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962) to support its position that the "appropriate process" contemplated by statute requires a proceeding in which the Court's autonomy is "severely limited." (ECF No. 15 at 4.) That reliance is misplaced. Two years after *Lynd*, the Supreme Court interpreted identical language in a similar statute and held that because that statute "contains no provision specifying the procedure to follow in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). The Fourth Circuit has applied *Powell* to other demands for records in the context of federal agencies. *See, e.g., United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 165–66 (4th Cir. 1988); *E.E.O.C. v. Md. Cup Corp.*, 785 F.2d 471, 475–76 (4th Cir. 1986).

As such, the Court will evaluate Plaintiff's Motion to Compel under the same standard applicable to Defendant's Motion to Dismiss brought pursuant to Rule 12(b)(6). A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint. Fed. R. Civ. P. 12(b)(6). A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint

does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In applying this standard, a court must utilize a two-pronged approach. First, it must separate the legal conclusions in the complaint from the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.*

Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

## III.    DISCUSSION

Plaintiff justifies its demand to acquire West Virginia's SVRL by invoking the alleged pressing necessity to investigate the State's compliance with list maintenance provisions of the NVRA and HAVA. (*See* ECF No. 1 at 5.) Plaintiff asserts its authority to obtain these records for investigation under Title III of the CRA. (*Id.*) Conversely, Defendant argues, *inter alia*, that Plaintiff has failed to show its entitlement to West Virginia's SVRL under Title III of the CRA[2]

---

[2] The Court assumes without deciding, for purposes of its analysis, that an electronic SVRL is a record subject to the retention and demand provisions of Title III. 52 U.S.C. §§ 20701, 20703; *but see Demarinis,* 2026 WL 1780586, at *5 (concluding that "an SVRL is not a record or paper that a state must produce to the United States under the CRA.")

because (1) it failed to provide a factual basis for its demand, and (2) the stated purpose of the demand falls outside of Title III's scope.[3]  As discussed below, the Court agrees with Defendant.

### A.  Basis and Purpose

This case presents the question of whether the Attorney General of the United States is permitted, by law, to obtain West Virginia's SVRL.  To answer this, the Court's analysis must remain tethered to the text of Title III of the CRA.  *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 184 (2004) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous" (citations omitted)).  If a statute does not define a term, the Court gives the term its ordinary meaning.  *EPA v. Calumet Shreveport Refin., L.L.C.*, 605 U.S. 627, 638 (2025).  Under this first "cardinal canon" of construction, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54 (1992).

To that extent, Title III of the CRA sets out certain requirements regarding federal election records, and penalizes the theft, destruction, or alteration of those records.  *See* 52 U.S.C. §§ 20701, 20702.  Of relevance, the CRA mandates that "[a]ny record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative . . . be made available for inspection, reproduction, and copying." *Id*. § 20703 (emphasis added.)  The statute commands that the written demand "*shall* contain a statement of the *basis and the purpose therefor*."  *Id*. (emphasis added).

---

[3]  Defendant also argues that (1) the demand seeks information not covered by Title III; (2) if Plaintiff's requests were honored, three federal privacy laws would be violated in the process; and (3) West Virginia law prohibits the unredacted disclosure sought.  (ECF No. 25 at 6.)  Because the Court concludes that Plaintiff's Complaint failed to contain a statement of the basis and purpose for the demand as required by law, the Court does not need to reach Defendant's remaining arguments.

The central question then becomes how to construe the statute's distinct requirements of providing a description of the "basis" and "purpose" of the demand.

### 1.   Plaintiff's Demand Lacks a Sufficient Statement of its Basis

Plaintiff's demand fails to include a factual basis, as required by Title III.[4]   The letter begins with an overview of the Attorney General's authority to request and obtain West Virginia's SVRL under the NVRA, HAVA, and Title III of the CRA.   (ECF No. 14-2 at 1–3.) [5]   The letter then specifically references the CRA by stating: "Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of West Virginia's complete and current VRL. The purpose of this request is to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA."   (ECF No. 14-2 at 1–3.)

Clearly, this demand is devoid of any factual basis.   The demand includes no indication that West Virginia is suspected to be noncompliant with the list maintenance requirements of HAVA or the NVRA, nor does it point to any anomalies in West Virginia's voter registration data. Indeed, the letter contains the term "purpose" but does not use the word "basis," or provide any equivalent explanation supporting the necessity of the records request.   *See Galvin*, 2026 WL 972129, at *4 (taking into consideration the fact that neither the word "basis" nor any equivalent

---

[4] To determine whether the written demand provided a statutorily acceptable "basis," the Court is directed to the contents of the written demand.   *See Galvin*, 2026 WL 972129, at *9 (finding that the statute directs the Court to the Attorney General's written demand—rather than Plaintiff's subsequent court filings—to determine whether that demand contained a statement of the basis for the demand).

[5] In considering a motion to dismiss, the Court "should properly take judicial notice of its own records[.]"   *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir.1990); *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 Fed. App'x. 200 (4th Cir. 2016) (finding that courts can "'take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment.'").   The Complaint incorporates by reference the September 8, 2025, letter, (*see* ECF No. 1, ¶ 8), which was submitted as an exhibit to Plaintiff's Motion to Compel, (ECF No. 14-2 at 1–3).

term was included in the demand letter).   Plaintiff nevertheless offers several theories on how this demand did provide a factual basis, which all fail.

To start, Plaintiff claims the legally justifiable basis of its demand is the CRA itself.   (ECF No. 1, ¶ 21.)   Plaintiff insinuates that the term "basis" in Title III refers to the legal basis for the investigation, rather than a factual basis supporting its pursuit.   (*See* ECF No. 15 at 10.) Consequently, a permissible statement of the basis for the demand could just be a recitation of the statute itself.

The Court disagrees.   This circular interpretation contravenes practical principles of statutory analysis by disregarding the ordinary meaning of the language employed by Congress. *See Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)).   Title III does not define the term "basis," so it must be given its ordinary meaning.   *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995) (citation omitted).   A basis is "an underlying *fact* or condition."   *Basis*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added); *see also Basi*s, Merriam-Webster (2026), https://www.merriam-webster.com/dictionary/basis (last visited June 20, 2026) (providing that "basis" refers to "something on which *something else* is established or based") (emphasis added)).   Thus, at bottom, the statute requires a statement providing some factual support as to why the Attorney General demands production of the requested records.   *See Weber*, 816 F. Supp. 3d at 1184 (noting that the basis-and-purpose requirement precludes Plaintiff

from "embark[ing] on a fishing expedition of voter records in any state . . . without identifying a single issue with the state's policies beforehand").

Moreover, if Congress sought to direct the Attorney General to simply reference the statute itself in order to invoke its authority, "requiring the letter to contain a 'statement of the basis … therefor' would not be the obvious way to do so." *See Galvin*, 2026 WL 972129, at *5. In other statutes Congress provides express instructions for agencies to identify the legal authority underlying their actions. *See, e.g.*, 5 U.S.C. § 553(b)(2) (requiring notice of proposed rulemaking to include "reference to the *legal authority* under which the rule is proposed") (emphasis added)); 8 U.S.C. § 1229(a)(1)(B) (requiring notice to appear for removal proceedings to "specify[] . . . [t]he *legal authority* under which the proceedings are conducted") (emphasis added)). Thus, *if* Congress had intended to impose the requirement of a mere citation to statutory authority, it "knew exactly how to do so." *See SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 138 S. Ct. 1348, 200 L. Ed. 2d 695 (2018) (declining to confer a particular authority that Congress did not expressly provide because Congress "knew exactly how to do so" in other statutes).

Instead, the Court adopts the reasoning within the many decisions that have rejected Plaintiff's position and found that the "basis" contemplated by Title III is a factual, not legal basis. *See Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 2026 WL 318402, at *8–9; *Galvin*, 2026 WL 972129, at *4. This interpretation also aligns with the Attorney General's contemporaneous practice following Title III's enactment to include an express statement of facts to support the grounds of the demand. *Lynd*, 306 F.2d at 229 n.6 (observing compliance with the requirements of Title III when a written demand stated the records request was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been

9

made with respect to registration and voting within your jurisdiction[.]"); *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (same); *In re Coleman*, 208 F. Supp. at 199–200 (same).   To that extent, the letter did not contain a *factual* basis, as discussed above.

Alternatively, Plaintiff contends that the letter did provide a factual basis for the demand. (ECF No. 15 at 10.)   Specifically, Plaintiff claims that West Virginia's SVRL was needed "to provide the means" to assess compliance with the SVRL maintenance provisions of the NVRA and HAVA.   (*Id*.)   This alleged basis is likewise insufficient under Title III given that Plaintiff also maintains that the purpose of the request was to "ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA."   (*Id*.)   In other words, Plaintiff contends both the written demand's basis and purpose are completely identical.   The statutory text clearly forecloses this interpretation by conveying that "the basis" and "the purpose" are conceptually distinct.   *Galvin*, 2026 WL 972129, at *4.

The statute commands that the written demand "*shall* contain a statement of the *basis and the purpose therefor*."   § 20703 (emphasis added.)   "Shall" and "and" are important words in § 20703.   *See Benson*, 2026 WL 1815425, at *8.   "The use of the word 'shall' creates an obligation impervious to judicial discretion."   *Smith v. Spizzirri*, 601 U.S. 472, 476, 144 S.Ct. 1173, 218 L.Ed.2d 494 (2024) (citation omitted).   "And, in grammatical terms, is of course a conjunction … whose function is to connect specified terms."   *Pulsifer v. United States*, 601 U.S. 124, 133, 144 S.Ct. 718, 218 L.Ed.2d 77 (2024).   Thus, "[o]n its plain terms, this construction signals that 'basis' and 'purpose' are separate, non-overlapping requirements, each of which must independently be satisfied."   *Scanlan*, 2026 WL 1864054, at *6.   Accepting Plaintiff's interpretation would compound "the basis" requirement into "the purpose" and essentially read the

10

word "basis" out of the statute.  *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007) (cautioning "against reading a text in a way that makes part of it redundant"). Further, as discussed more fully below, Plaintiff's explanation—whether labeled as a basis or a purpose—fails.

Rather, only *after* this litigation began did Plaintiff attempt to provide factual justifications for its requests by citing how recent out of state enforcement efforts demonstrate the need for broader federal scrutiny.  (*See* ECF No. 39-1 at 3.)  Plaintiff points to instances in which North Carolina election officials admitted that the state was not maintaining records in compliance with HAVA.  (ECF No. 39 at 8.)  However, those assertions do not cure the factual deficiencies within the initial demand, nor does it identify any comparable concerns regarding West Virginia's list registration requirements.[6]

Accordingly, applying this textual framework to Plaintiff's letter, the Court finds that the demand fails to satisfy § 20703's basis requirement.

### 2. Plaintiff's Demand Lacks a Valid Purpose

Plaintiff's September 8 letter did contain an explicit statement of the purpose for its Title III demand: "to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA."  (ECF No. 14-2 at 2.)  Yet, Defendant argues that Plaintiff's stated purpose is insufficient because it is unrelated to the purpose of Title III, which is to protect against the infringement or denial of voting rights.  (ECF No. 25 at 12.)  Plaintiff responds that (1) Title III authorizes demands to investigate violations of any federal statute and does not require a nexus

---

[6] Plaintiff also provides consent decrees for instances in which it sought records in other states to assess compliance with HAVA and the Voting Rights Act.  (*See* ECF No. 39-1 at 3–5.)  However, these were voluntary agreements that did not test the legality of the requests generally.

11

between the demand and the purpose of the CRA, and (2) enforcing list maintenance compliance with HAVA and the NVRA is compatible with securing an individual's right to vote.  (*See* ECF No. 39 at 13–14.)

Whether Plaintiff's stated "purpose" can be as all-encompassing as it protests is ultimately a question of statutory interpretation.[7]  Congress required that a records request under Title III "shall" include a statement of "the" purpose underlying that demand.  *See* 52 U.S.C. § 20703. "The use of the word 'shall' creates an obligation impervious to judicial discretion." *Smith v. Spizzirri*, 601 U.S. 472, 476, 144 S.Ct. 1173, 218 L.Ed.2d 494 (2024) (citation omitted).  Thus, "[i]f any purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Oregon*, 2026 WL 318402, at *8.  The Court declines to read Title III so broadly as to render an express statutory obligation void of any authoritative meaning.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation modified)).

Because the "purpose" requirement cannot be satisfied by a blanket statement to a potential violation of any federal law, the Court must determine what Congress intended "purpose" in Title III to entail.  In doing so, the Court looks to Title III's text together with the legislative backdrop against which Congress enacted the statute.  *Cf. Turner v. Littleton-Lake Gaston Sch. Dist.*, 442 F.2d 584, 587 (4th Cir. 1971) ("In determining the purpose of legislation, it is appropriate to consider not only the effect of the legislation itself, but also the history and setting out of which the legislation arose."); *United States v. Hernandez*, 173 F.4th 94, 98 (4th Cir. 2026) ("Interpreting

---

[7] The ordinary understanding of "purpose" means "[a]n objective, goal, or end[.]"  *See Purpose*, BLACK'S LAW DICTIONARY (12th ed. 2024).

12

the plain language of a statute requires looking to both the 'specific context in which the language is used, and the broader context of the statute as a whole.'") (citation omitted)).

Title III of the CRA of 1960 was passed in the midst of the Jim Crow era, "to help end voting discrimination." *See Benson*, 2026 WL 1815425, at \*7; *see also* H. Rep. 86-956, at 7 (1959) ("The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race.") Congress enacted Title III of the CRA to strengthen enforcement of the Civil Rights Act of 1957 by requiring the maintenance and preservation of specific records to facilitate the investigation of allegations of discrimination in voter registration. *See* Pub. L. No. 85-315, 71 Stat. 634 (1957). Following its passage, Courts observed that Title III was "designed to secure a more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom*, *Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *Lynd*, 306 F.2d at 228 ("[O]ne of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all of the voter record information . . . relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights.")

Reading Title III in light of that historical context, the Court finds that "the 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at \*10. While Plaintiff argues that assessing compliance with HAVA and the NVRA does align with this purpose, Plaintiff's only apparent motivation to assess list maintenance compliance involves generalized nationwide concerns that voter registration records may contain too many names. (*See* ECF No. 39 at 8.) ("As a result of the Attorney General's enforcement action, North Carolina has reduced the number

13

of voter records missing an identification number under HAVA from 103,329 to 70,709.")   The potential failure on behalf of an unrelated state to purge voter records does not automatically fall within the bounds of Title III.   *See Bruce*, 298 F.2d at 863, n.2 (observing that evidence concerning a state's failure to remove voters who died or relocated was "a matter which does not bear any particular importance to the present [Title III] inquiry").   Rather, Plaintiff must state a "purpose" that relates to an investigation into potential violations of an individual's right to vote. It has not done so.

Nonetheless, even if investigating compliance with the NVRA or HAVA were valid purposes for seeking voter registration lists, Plaintiff does not provide any reasonable explanation for why obtaining highly sensitive voter data serves those purposes.   The NVRA and HAVA establish a comprehensive scheme governing the creation, maintenance, and enforcement of states' computerized SVRLs.   *See* 52 U.S.C. § 20501, § 21083(a)(1)(A).   The information Plaintiff is seeking pursuant to these statutes includes individuals' full name, date of birth, address, and driver's license or the last four digits of their social security number.   (ECF No. 1 at ¶ 22.) Although the NVRA and HAVA authorize the Attorney General to "bring a civil action" against a state that has violated those provisions, *see* 52 U.S.C. §§ 20510(a), 21111, neither statute contemplates "the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions."[8]   *Bellows*, 2026 WL 1430481, at *8.

---

[8] Despite basing the necessity of its investigation on ensuring compliance with the NVRA and HAVA, Plaintiff only brings this suit under Title III of the CRA.   If Plaintiff wanted to enforce HAVA or the NVRA, there are avenues for it to do so pursuant to those specific statutes.   *Bellows*, 2026 WL 1430481, at *8 ("If the Department of Justice wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes— which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list.")

14

To the contrary, Courts have recognized that states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA and that this information is not relevant to the removal of ineligible voters from voting rolls. *See Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010) ("[Social security numbers ("SSN")] are uniquely sensitive and vulnerable to abuse . . . . For that reason, a SSN disclosure requirement potentially undermines the voter registration goals of the NVRA."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 733 (S.D. Miss. 2014). Thus, while the NVRA authorizes investigations into states' policies regarding reasonable voter list maintenance, it does not green light the form of "intrusive digging DOJ is proposing" here. *Weber*, 816 F. Supp. 3d at 1188.

Likewise, states are not required under HAVA to disclose SVRLs. *Id*. at 1190 ("HAVA simply contains no such [disclosure] provision. This ends the inquiry. And the fact that the NVRA and CRA do include such provisions signals that the omission in HAVA was intentional." (citing to *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015)); *Oregon*, 2026 WL 318402, at *6 ("Congress knows how to include disclosure provisions, as it did so in both the NVRA and Title III. It did not do so here, and the Court will not play the role of Congress by adding one where it does not exist." (citing *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988))).

Thus, even if Plaintiff's stated purpose of assessing compliance with the NVRA and HAVA were sufficient, those statutes do not automatically entitle Plaintiff to the disclosure of the requested records. Regardless, because the demand letter did not include an adequate statement of its basis or purpose, as statutorily required, Plaintiff has failed to state a claim.[9] Therefore,

---

[9] Given the lack of an adequate basis or purpose, one is left to wonder what the real purpose was for the Justice Department to go to the trouble of filing civil actions like this one all around the nation. Troubling though this question is, it is not before the Court at this time.

Defendant's Motion to Dismiss under Rule 12(b)(6) is granted.   For the same reasons, Plaintiff's Motion to Compel is denied.

### IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion to Compel Production (ECF No. 15) and **GRANTS** Defendants' Motions to Dismiss (ECF No. 24.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        July 13, 2026

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of
New Mexico,

      Defendant,

and

NEW MEXICO ALLIANCE FOR RETIRED
AMERICANS,

      Intervenor-Defendant,

and

COMMON CAUSE, CLAUDIA MEDINA,
and JUSTIN ALLEN,

      Intervenor-Defendants.

Case No.: 1:25-cv-01193-JCH-JFR

### MEMORANDUM OPINION AND ORDER
### GRANTING DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on Defendant Maggie Toulouse Oliver's Motion to Dismiss

Pursuant to Federal Rule 12(b)(6) and Memorandum of Law in Support, Doc. 35; Intervenor-

Defendant New Mexico Alliance for Retired Americans' Motion to Dismiss, Doc. 32; and

Intervenor-Defendants Common Cause, Claudia Medina, and Justin Allen's Motion to Dismiss,

Doc. 34. Defendants filed these motions to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure in opposition to the United States Department of Justice, Civil Rights Division's

("DOJ") complaint, Doc. 1 ("Complaint"), and its Motion to Compel Production of Records Demanded Pursuant to 52 U.S.C. § 20705, Doc. 2 ("Motion to Compel).

Having carefully reviewed the parties' briefs and supplemental authorities, the applicable law, arguments at the April 21, 2026, motion hearing, and being otherwise fully informed, the Court concludes the DOJ has not satisfied the requirements of 52 U.S.C. § 20703 of Title III of the Civil Rights Act of 1960. Accordingly, the Court will **GRANT** each motion to dismiss, Docs. 32, 34, 35 (collectively "Motions to Dismiss"); **DENY AS MOOT** the DOJ's Motion to Compel, Doc. 2; and will **DISMISS** the DOJ's Complaint, Doc. 1, **WITH PREJUDICE** for the reasons explained below.

## FACTUAL BACKGROUND

I.      **New Mexico's Voting Registration List ("VRL")**

Since 2019, New Mexico's voter data has been electronically stored in a secure database known as the State Elections, Registration & Voting Integrity Systems ("SERVIS"). NMSA 1978, § 1-5-30 (2019) (establishing electronic voter registration management system). SERVIS stores voters' personally identifiable information ("PII") after voters voluntarily submit their completed voter registration applications. *Id.*; *see also* NMSA 1978, § 1-4-47 (2023) (outlining automatic voter registration processes). That PII includes, inter alia, the voter's name, gender, physical address, mailing address, phone number, current party affiliation, date of birth, date of registration, and voting history for all state and local elections. NMSA 1978, § 1-4-5.4(B) (2019) (describing content of voter registration forms); § 1-4-47(B); NMAC § 1.10.35.8(A)(4). Pursuant to data sharing restrictions created by state law, the Secretary of State "shall furnish voter data" after the requestor satisfies certain requirements. *See* NMSA 1978, § 1-4-5.5(A), (B) (2015).

2

As the Secretary of State, Toulouse Oliver is the chief election official of New Mexico. Doc. 1 at 3 ¶ 8. In that role, she is responsible for managing SERVIS and the information contained therein, as well as coordinating New Mexico's adherence to the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501-20511, and the Help America Vote Act ("HAVA"), 52 U.S.C. §§ 20901-21145. *See* § 1-5-30(A); NMSA 1978, § 1-5-3 (2005) (establishing voter record system regarding HAVA); *see also* 52 U.S.C. §§ 20509, 20701.

## II.   The DOJ's Demand Letter

On September 8, 2025, the DOJ sent Toulouse Oliver a letter requesting a copy of New Mexico's VRL.[1] Doc. 2-3 at 2. ("Demand Letter"); *see also* Doc. 1 at 5 ¶¶ 19-20. To fully comply with the demand, the DOJ specifically requested, "The electronic copy of the statewide VRL should contain *all fields*[.]" Doc. 2-3 at 2. Meaning, the DOJ expected Toulouse Oliver to turn over an electronic copy of New Mexico's VRL including each voter's "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number. . . ." *Id.* The DOJ asserted this request was made pursuant to its authority under the NVRA, HAVA, and Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. §§ 20701-20706.[2] *See* Doc. 2-3 at 2, 3; *see also* Doc. 1 at 3 ¶ 9 (citing the NVRA and HAVA). The

---

[1] This was apparently the second letter the DOJ sent Toulouse Oliver. *See* Doc. 35 at 18. The first was a letter dated August 14, 2025, and included the same demand for New Mexico's VRL. *Id.*; Doc. 107 at 8:3-4. It also stated the DOJ "had already 'received New Mexico's statewide voter registration list[.]'" Doc. 35 at 18. In her response, Toulouse Oliver purportedly noted she had not shared the VRL with the DOJ. *See id.* These letters were not provided to the Court.

[2] The DOJ's recitation of Section 20703 in the Demand Letter is incomplete. *See* Doc. 2-3 at 3. It conspicuously omits the ultimate sentence, stating, "This demand shall contain a statement of the basis and the purpose therefor." *Compare* Doc. 2-3 at 3 *with* 52 U.S.C. § 20703.

3

Demand Letter also provided, "The purpose of this request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA."[3] Doc. 2-3 at 3.

Toulouse Oliver responded two weeks later.[4] *See* Doc. 2-4. She stated she would "provide in-person or electronic access to a redacted voter file" and noted the DOJ "made no attempt to explain why [its] evaluation would require the inspection of unredacted private voter information that is otherwise protected by New Mexico law" and the Privacy Act of 1974, 5 U.S.C. § 552a.

---

[3] Defendants and amici curiae have thoroughly alerted the Court of the DOJ's potential ulterior motives in seeking voters' PII. *See* Doc. 32 at 5-6; Doc. 34 at 8, 8 n.7; Doc. 35 at 16-18; Doc. 89 at 10-14; Doc. 92 at 2-4. These are exemplified by the Executive Orders issued by the current Executive branch and agencies like the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") that have shared and reviewed protected voter data. *See, e.g.*, Exec. Order No. 14248, 90 Fed. Reg. 59 (Mar. 28, 2025) (titled "Preserving and Protecting the Integrity of American Elections" and directing DHS to "review each State's *publicly available* voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507 [of the CRA], alongside Federal immigration databases and State records requested, . . . for consistency with Federal requirements." (emphasis added)); Exec. Order No. 14399, 91 Fed. Reg. 59 (Apr. 3, 2026) (titled "Ensuring Citizenship Verification and Integrity in Federal Elections" and directing DHS to compile a "State Citizenship List" in order to "assist in verifying identity and Federal election voter eligibility"). Other districts have also noted these events. *See Weber*, 816 F. Supp. 3d at 1184 ("It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database."); *Schmidt*, 2026 WL 1850016, at *2 ("The quiet parts do not help. Public statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hope to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement.").

The Court has not considered these arguments, associated documents, or events while ruling on the Motions to Dismiss, however. *See* Fed. R. Civ. P. 12(d) (noting a court cannot consider "matters outside the pleadings"); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (outlining limited exceptions to considering documents outside the pleadings and those subject to judicial notice); *accord Bellows*, 2026 WL 1430481, at *3 n.6 ("Fortunately for the United States, this matter is before me on motions to dismiss, and under the applicable standard, the only facts that I consider are those contained in the United States' Complaint and its attachments, which I take as true.").

[4] The Complaint alleges this letter was sent a day prior on September 23, 2025. Doc. 1 at 7 ¶¶ 25, 26. Yet, the copy of the letter the DOJ filed is dated September 22, 2025. Doc. 2-4 at 2.

Doc. 2-4 at 2, 3. Toulouse Oliver also emphasized New Mexico's full compliance with the CRA, the NVRA, and HAVA. *Id.* at 2.

Two months later, the DOJ sued Toulouse Oliver on a single count under the CRA. *See* Doc. 1 at 7-8. The Complaint alleges the DOJ sent the Demand Letter "[b]ased on a review of the 2024 [Election Administration Voting Survey] Report[5] . . . seeking information regarding New Mexico's compliance with federal election law." *Id.* at 5 ¶ 18 (footnote added). The DOJ contemporaneously filed its Motion to Compel seeking production of the same documents and information. Doc. 2.

Soon thereafter, the Court granted Intervenor-Defendants Common Cause, Claudia Medina, and Justin Allen (collectively "Common Cause") and New Mexico Alliance for Retired Americans' ("NM Alliance") unopposed motions to intervene as defendants. Docs. 7, 9, 21, 25. The Court also granted three amici curiae leave to file their respective amicus briefs. *See* Docs. 87, 88, 91; *see also* Doc. 89 (amicus brief of Seventeen States and the District of Columbia[6]); Doc. 90 (amicus brief of Bipartisan Former State Secretaries of State Nationwide); Doc. 92 (amicus brief of the Democratic National Committee). Each Defendant then filed their respective motion to dismiss, arguing the CRA fails to provide a legal basis for the DOJ's suit. *See* Doc. 32 at 7-14; Doc. 34 at 9-15; Doc. 35 at 21-27.

---

[5] HAVA established the United States Election Assistance Commission ("EAC") in 2002. EAC, *About the EAC*, http://eac.gov/about (last visited July 8, 2026). It is "an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the election process." *Id.* The EAC conducts the biennial Election Administration Voting Survey ("EAVS") and produces a report. *See Election Administration and Voting Survey 2024 Comprehensive Report*, U.S. Election Assistance Comm'n (June 2025), https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf.

[6] The states include Maryland, Minnesota, Arizona, California, Colorado, Delaware, District of Columbia, Hawai'i, Illinois, Maine, Michigan, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.

The Court held a hearing on the parties' Motions to Dismiss on April 21, 2026. *See* Doc. 103 (Clerk's Minutes); Doc. 107 (Transcript). After hearing each party's argument,[7] the Court took the matter under advisement. Doc. 103 at 1.

### III.   Contemporaneous Demand Letters and Nationwide Litigation

The DOJ has made the same demand for statewide VRLs of forty-eight states and the District of Columbia ("D.C.").[8] After thirty states and D.C. did not comply with the DOJ's request, the DOJ sued each state to compel production of their VRLs.[9] To date, twelve of these cases have

---

[7] The DOJ offered a multitude of facts and legal contentions not in its briefing. This included substantiating "the basis" for the DOJ's demand by pointing to (1) congressional intent that "the DOJ be able to conduct an independent review of each state's list," Doc. 107 at 42:4-13 (referring to Doc. 2-3 at 2 n.1); (2) EAVS Report data about New Mexico's duplicate registrations and the percentage of removed-voters, *id.* at 44:17-24; and (3) a "facial violation" concerning New Mexico's HAVA identifiers. *Id.* at 45:4, 4-7. These new facts and arguments fall outside the content the Court considers when ruling on a motion to dismiss. *See Tellabs, Inc.*, 551 U.S. at 322.

[8] The status of each of these cases is evolving. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (July 8, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information (last viewed July 8, 2026); *see also Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*, U.S. Dep't of Just. Off. of Pub. Affs. (Feb. 26, 2026), https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-produce-voter-rolls (last viewed July 13, 2026).

[9] In fifteen of those cases, the DOJ asserts a single claim under the CRA that is nearly identical to the one filed here. *See, e.g.*, Complaint, *United States v. DeMarinis*, No. 1:25-cv-03934, ECF No. 1 at 7-8 (D. Md. Dec. 1, 2025); Complaint, *United States v. Copeland Hanzas*, No. 2:25-cv-00903, ECF No. 1 at 7-8 (D. Vt. Dec. 1, 2025); Complaint, *United States v. Albence*, No. 1:25-cv-01453, ECF No. 1 at 10-11 (D. Del. Dec. 2, 2025); Complaint, *United States v. Amore*, No. 1:25-CV-00639, ECF No. 1 at 7-8 (D. R.I. Dec. 2, 2025); Complaint, *United States v. Hobbs*, No. 3:25-cv-06078, ECF No. 1 at 7-8 (W.D. Wash. Dec. 2, 2025); Complaint, *United States v. Griswold*, No. 1:25-cv-03967, ECF No. 1 at 6-7 (D. Colo. Dec. 11, 2025); *United States v. Nago*, No. 1:25-cv-00522, ECF No. 1 at 8-9 (D. Haw. Dec. 11, 2025); Complaint, *United States v. Galvin*, No. 1:25-cv-13816, ECF No. 1 at 7-8 (D. Mass. Dec. 11, 2025); Complaint, *United States v. Aguilar*, No. 3:25-cv-00728, ECF No. 1 at 8 (D. Nev. Dec. 11, 2025); Complaint, *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036, ECF No. 1 at 8-9 (W.D. Wis. Dec. 18, 2026); Complaint, *United States v. Raffensperger*, No. 25-cv-00548, ECF No. 1 at 8-9 (M.D. Ga. Dec. 18, 2025) (subsequently dismissed without prejudice for lack of subject matter jurisdiction); Complaint, *United States v. Matthews*, No. 3:25-cv-03398, ECF No. 4 at 8-9 (C.D. Ill. Dec. 19, 2025); Errata Corrected Complaint, *United States v. D.C. Bd. of Elections*, No. 1:25-cv-04403, ECF No. 3-1 at

been dismissed. *See United States v. Weber*, 816 F. Supp. 3d 1168, 1196 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, 819 F. Supp. 3d 753, 770 (W.D. Mich. Feb. 10), *aff'd* No. 26-1225, 2026 WL 1815425, at *1, 8 (6th Cir. June 24, 2026); *United States v. Galvin*, Civil No. 25-13816, 2026 WL 972129, at *6 (D. Mass. Apr. 9, 2026), *appeal docketed* No. 26-1657 (1st Cir. June 9, 2026); *United States v. Amore*, C.A. No. 25-cv-00639, 2026 WL 1040637, at *6 (D.R.I. Apr. 17, 2026), *appeal docketed* No. 26-1665 (1st Cir. June 9, 2026); *United States v. Fontes*, No. CV-26-00066, 2026 WL 1177244, at *7 (D. Ariz. Apr. 28, 2026); *United States v. Bellows*, No. 1:25-cv-00468, 2026 WL 1430481, at *10 (D. Me. May 21, 2026); *United States v. Wis. Elections Comm'n*, 25-cv-1036, 2026 WL 1430354, at *5 (W.D. Wis. May 21, 2026); *United States v. DeMarinis*, Civil Case No. 25-cv-03934, 2026 WL 1780586, at *6 (D. Md. June 18, 2026), *appeal docketed* No. 26-1878 (4th Cir. July 13, 2026); *United States v. Schmidt*, No. 2:25-cv-01481, 2026 WL 1850016, at *1, 3 (W.D. Pa. June 27, 2026); *United States v. Scanlan*, Case No. 25-cv-371, 2026 WL 1864054, at *8, 10 (D.N.H. June 29, 2026), *appeal docketed* No. 26-1783 (1st Cir. July 7, 2026); *United States v. Bd. of Elections of the State of N.Y.*, 1:25-CV-1338, 2026 WL 1999921, at *1 (N.D.N.Y. July 10, 2026).

## LEGAL BACKGROUND

As outlined in the Elections Clause, the United States Constitution empowers all states to regulate and administer their elections: "The Times, Places and Manner of holding Elections for

---

7-8 (D.D.C. Dec. 19, 2025); Complaint, *United States v. Fontes*, No. 2:26-cv-00066, ECF No. at 7 (D. Ariz. Jan. 1, 2026); Complaint, *United States v. Thomas*, No. 3:26-cv-00021, ECF No. 1 at 7-8 (D. Conn. Jan. 6, 2026); Complaint, *United States v. Raffensperger*, No. 1:26-cv-00485, ECF No. 1 at 9 (N.D. Ga. Jan. 23, 2026).

Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations. . . .” U.S. Const. art. I, § 4, cl. 1. “The Framers recognized the difficulty of crafting election laws ‘applicable to every probable change in the situation of the country.’ So instead of constitutionalizing election law, they decided that a ‘discretionary power over elections’ needed to be lodged ‘somewhere.’” *Watson v. Republican Nat’l Comm.*, No. 24-1260, 2026 WL 1855462, at *12 (U.S. June 29, 2026) (quoting The Federalist No. 59, at 362 (C. Rossiter ed. 1961)). In many ways, that power was granted to the states to carry the mantel of ensuring elections run smoothly by regulating voter registration, determining voter eligibility, and maintaining voter rolls. *See Foster v. Love*, 522 U.S. 67, 69 (1997); *United States v. Benson*, No. 26-1225, 2026 WL 1815425, at *1 (6th Cir. June 24, 2026) (“States do most of the heavy lifting in overseeing federal elections.”).

States’ control over elections is not completely unfettered, however. *See Foster*, 522 U.S. at 69. The Elections Clause also “empowers Congress to pre-empt state regulations governing the ‘Times, Places and Manner’ of holding” elections. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). Pertinent here, Congress enacted three federal statutes—the CRA, 52 U.S.C. §§ 20701-20706, the NVRA, 52 U.S.C. §§ 20501-20511, and HAVA, 52 U.S.C. §§ 20901-21145—that created specific, narrow roles for the federal government in election regulation. To better understand the DOJ’s claim, the Court provides a short summary of each statute. The Court begins chronologically and turns first to the CRA, which predates the NVRA and HAVA by decades. While the DOJ did not file claims under the latter two statutes, both are still relevant to its suit.

8

I.       **Title III of the Civil Rights Act**

Passed in 1963, Congress enacted the CRA to combat racially biased voter suppression and disenfranchisement rampant during the Jim Crow era. Congress emphasized the statute's purpose was "to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race," and was meant to buttress the Attorney General "during any investigation it may conduct on complaints of a denial to vote." H.R. Rep. No. 86-956 at 7 (1959).[10] To effectuate this goal, Congress charges state election officials with "retain[ing] and preserv[ing], for a period of twenty-two months from the date of any general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701. The CRA also grants the Attorney General investigative authority:

> Any record or paper required by [S]ection 20701 . . . to be retained and preserved shall, upon demand in writing by the Attorney General . . . directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. § 20703.

Should a dispute result from such a demand, the "United States district court for the district in which a demand is made pursuant to [S]ection 20703 . . ., or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. The DOJ relies on these provisions to support its demand and claim.

---

[10] There are no claims of racially biased voter suppression in this case.

## II.    The National Voter Registration Act

Thirty years after the CRA was passed, in 1993, Congress enacted the NVRA "against a backdrop of lackluster voter registration and political participation." *Fish v. Kobach*, 840 F.3d 710, 720 (10th Cir. 2016). To address these issues, the NVRA "has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). *See* 52 U.S.C. § 20501(b)(1)-(4) (outlining the NVRA's four purposes). Further, the NVRA "aims at regulating uniform voting laws and procedures because 'discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.'" *Voter Ref. Found., LLC v. Torrez*, 160 F.4th 1068, 1079 (10th Cir. 2025) (quoting § 20501(a)(3)).

Amongst other requirements, the NVRA directs states to conduct a general program of voter list maintenance and to make certain records of their list-maintenance activities publicly available. *See* 52 U.S.C. §§ 20507(a), (i). Pursuant to certain boundaries, the NVRA also conserves the states' traditional authority for administering elections by giving states the flexibility and autonomy to design and operate a list-maintenance program within the statute's general parameters. § 20507(a)(4) (requiring "a reasonable effort to remove the names of ineligible voters"). If necessary, the Attorney General may pursue a civil enforcement action to investigate whether states are carrying out these statutory obligations. 52 U.S.C. § 20510(a).[11]

The Tenth Circuit recently interpreted the NVRA and whether it preempts pertinent New Mexico law controlling the publication of private voter data. *See Torrez*, 160 F.4th at 1072, 1081-

---

[11] No NVRA civil enforcement action has been filed here; and no documents have been demanded directed to records of list-maintenance activities.

84. Below, the district court ruled that the Voter Reference Foundation ("VRF")—an organization that obtained and published states' voter data on its public website—could continue to share each New Mexico "voter's name, birth year, registration address, registration date, party affiliation, registration status, precinct, and voting participation history." *Id.* at 1073, 1073-75. On appeal, the *Torrez* Court concluded, inter alia: (1) the NVRA preempts New Mexico privacy law restricting the use and sharing of voter data; and (2) the Secretary of State violated the NVRA's "enumerated purposes of public inspection and circulation of voter data" by "refusing to produce the requested voter data per" state law use-restrictions. *Id.* at 1083, 1088; *see id.* at 1081-84. The Tenth Circuit added an important caveat to these conclusions, however:

> To the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation . . . The State may limit such sensitive information, but as we underscore, restricting uses and/or publication altogether is prohibited by the NVRA.

*Id.* at 1083 n.14 (citing §1-4-5.5(B)).[12] In other words, under Tenth Circuit precedent, the NVRA does not provide for unfettered public disclosure of voters' PII. Because *Torrez* concerns the NVRA rather than the CRA, *Torrez* is not dispositive in deciding the Motions to Dismiss but its conclusion is informative.[13]

---

[12] Other federal courts have concluded similarly. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) (noting that information subject to redaction can include personal information of those subject to criminal investigations, amongst other exceptions); *Bellows*, 2026 WL at 1430481, *9 ("[N]either [the NVRA or HAVA] give[] the United States the power to compel Maine to produce its current computerized SVRL 'with all fields.'"); *cf. Bd. of Elections*, 2026 WL 1999921, at *11 ([T] the Government's NVRA claim fails for a much simpler reason: [52 U.S.C.] § 20507(i) does not require the disclosure of voter registration lists at all.").

[13] Defendants argue *Torrez* "dooms [the] DOJ's claim" for the unredacted VRL because Toulouse Oliver may redact voters' PII before providing it to a third party. Doc. 32 at 17; *see* Doc. 34 at 17; Doc. 35 at 26; 160 F.4th at 1083 n.14. However, as noted, *Torrez* does not address the CRA.

### III.    The Help America Vote Act

In 2002, Congress codified HAVA. *See* Pub. L. No. 107-252, 116 Stat. 1666 (2002). In an effort to improve voting systems and voter access, HAVA requires states adopt "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(A). Specifically, states must "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." § 21083(a)(1)(A). "[O]nly voters who are not registered or who are not eligible to vote are removed from the computerized list," as well as duplicate names. § 21083(a)(2)(B)(i), (iii). Thus, the SVRL serves as states' "single system for storing and managing the official list of registered voters." § 21083(a)(1)(A)(i). HAVA contains no disclosure requirements.

Within this statutory framework, the "specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." 52 U.S.C. § 21085. If the Attorney General believes these provisions are not being followed, then the Attorney General may "bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief." 52 U.S.C. § 21111.[14]

---

[14] No HAVA civil action has been brought here, nor has claim demanding the production of the State's VRL.

12

## LEGAL STANDARD

### I.    "Appropriate Process" or Special Statutory Proceeding

Section 20705 of the CRA grants federal district courts "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. The CRA does not define "appropriate process," however. To fill the gap, the DOJ asserts it is entitled to a "special statutory proceeding" after "filing an application for an order under Title III," because it "is not the commencement of an ordinary, traditional civil action" and instead is "merely a *pre-suit* investigation."[15] Doc. 51 at 9 (text only). Meaning, the Court's role in considering the merits of the DOJ's suit should be curtailed and the Federal Rules of Civil Procedure need not apply. *See id.*

---

[15] The DOJ's contentions about its motivations to sue are inapposite. In one regard, the Government posits New Mexico has committed a "facial violation" of the NVRA and HAVA, so it needed to bring an enforcement action. *See* Doc. 107 at 45:4; *see also id.* at 43:25-44:19 (explaining New Mexico's "abnormal" percentages and duplicate registrations documented in the EAVS report). At the same time, the DOJ frames the CRA as a "pre-suit investigative tool" that is part of its "trust but verify approach" concerning the State's VRL maintenance under the NVRA and HAVA. *Id.* at 34:20-21, 35:15, 40:24-25 (describing the suit as "an independent assessment consistent with this notion in the federal model of trust but verify"); *see also* Doc. 51 at 9 ("The CRA differs from ordinary civil actions because its 'chief purpose' is to facilitate *pre-suit* investigation."). The paradox of these contentions is obvious. Either the DOJ is suing to enforce New Mexico's statutory compliance or it is investigating a suspected violation of the NVRA and HAVA.

These arguments are not unique to this case. *See, e.g.*, *Bellows*, 2026 WL 1430481, at *9 ("Stated a bit more colloquially, the United States has filed a HAVA action in search of a HAVA violation, which is not the preferred order of things in the course of civil litigation."); *id.* at *10 ("[T]he United States' attorney characterized the federal government's role in the voter-registration scheme created by HAVA and the NVRA as 'one of trust but verify.' But the text and structure of those statutes require a greater degree of trust than this Department of Justice would perhaps like to give[.]" (text only)); *Benson*, 819 F. Supp. 3d at 759 ("There is simply no basis in the Federal Rules of Civil Procedure for the United States's suggestion that it can file a HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery."); *Galvin*, 2026 WL 972129, at *6 ("The only support the United States marshals for its proposed interpretation are its twin contentions that Title III was enacted as an investigatory tool to identify violations of federal election law, and that the Attorney General cannot be required to prove a violation before seeking evidence of the same. These arguments miss the point." (text only)).

at 10-12. Common Cause opposes and argues the Federal Rules of Civil Procedure govern as usual. Doc. 34 at 21-22.

Every other district court that addressed this argument has applied the Federal Rules of Civil Procedure. *See Bellows*, 2026 WL 1430481, at *5 n.8 ("[N]o district court has adopted the United States' view[.]"); *Weber*, 816 F. Supp. 3d at 1180-81; *Oregon*, 2026 WL 318402, at *8; *Benson*, 819 F. Supp. 3d at 758-59; *Amore*, 2026 WL 1040637, at *3; *Fontes*, 2026 WL 1177244, at *1-2; *DeMarinis*, 2026 WL 1780586, at *2; *Scanlan*, 2026 WL 1864054, at *1, *1 n.2; *Bd. of Elections*, 2026 WL 1999921, at *6 ("[T]he Court joins the many other district courts which have determined that a court's role in evaluating these Title III claims is not so limited."). And many relied on *United States v. Powell*, 379 U.S. 48 (1964), to do so.[16] *See Weber*, 816 F. Supp. 3d at 1182, 1182 n.15; *Oregon*, 2026 WL 318402, at *8; *Fontes*, 2026 WL 1177244, at *1; *Bellows*, 2026 WL 1430481, at *5; *DeMarinis*, 2026 WL 1780586, at *2; *Bd. of Elections*, 2026 WL 1999921, at *6. To date, no district court has sided with the DOJ.

Here, the Court concludes that the "appropriate process" is guided by the Federal Rules of Civil Procedure. Nothing about the DOJ's suit indicates those Rules should be displaced. By submitting a traditional civil complaint and motion to compel—rather than an administrative subpoena, for instance—the DOJ voluntarily invoked the jurisdiction of the federal courts and began the usual litigation process. As Rule 1(a) of the Federal Rules of Civil Procedure squarely states, "These rules govern the procedure in *all* civil actions and proceedings in the United States

---

[16] There, the United States Supreme Court considered three provisions of the Internal Revenue Code that granted courts the general power to enforce the Internal Revenue Service's summonses with "jurisdiction by appropriate process to compel." *See* 26 U.S.C. §§ 7402(b), 7604(a), (b); *Powell*, 379 U.S. at 52. Because these statutes were silent as to the "applicable procedures to be followed in invoking the court's jurisdiction," the Supreme Court concluded the Federal Rules of Civil Procedure applied to adjudications under the statutes. *Powell*, 378 U.S. at 58 n.18.

district courts[.]" (emphasis added). Thus, this suit falls squarely within the gambit of the ordinary, civil litigation processes.[17] Accordingly, the viability of the DOJ's single claim will be analyzed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.  Rule 12(b)(6) Motion to Dismiss Standards

The standards attendant to a Rule 12(b)(6) motion are well known. By bringing such a motion, Defendants assert that, even if the facts alleged by the DOJ are true, the Complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court also looks to Rule 8(a)(2) and how "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court will accept as true all factual allegations contained in the Complaint, *id.*, and it must construe the allegations in the light most favorable to the DOJ. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 558 (2007). Legal conclusions shrouded as factual allegations are not given the same presumption of truthfulness, however. *See Iqbal*, 556 U.S. at 678-79. When the allegations in a complaint cannot raise a plausible claim of "entitlement to relief," then the cause of action should be dismissed. *Twombly*, 550 U.S. at 558.

### DISCUSSION

The overarching issue in this case is simple: under the CRA, is the DOJ's written demand sufficient to compel production of New Mexico's complete and unredacted VRL? Defendants

---

[17] Were the Court to conclude otherwise, its analysis of the dispositive issue—whether the DOJ's written demand meets the requirements of Section 20703—would be the same. *See Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (noting that even in a summary proceeding, the court must decide as a matter of law whether the records can be properly demanded under Title III); *see also Wis. Elections Comm'n*, 2026 WL 1430354, at *2 ("The government disputes whether Rule 12(b)(6) applies in this case," but "analysis of the dispositive issue would be the same either way[.]"). Regardless, the DOJ provides no insight as to what constitutes "appropriate process" or whether a procedural exception would apply. *See, e.g.*, Fed. R. Civ. P. 1(a) (outlining that the federal rules apply "except as stated in Rule 81").

argue it is not because (1) the DOJ has failed to heed the requirements of Section 20703 of the CRA; (2) the DOJ's demand exceeds the scope of the CRA; and (3) the demand for unredacted voter information violates state and federal privacy law. *See generally* Docs. 32, 34, 35. Because Defendants' first argument resolves the Motions to Dismiss, the Court does not reach the remaining contentions.

The DOJ's authority to request election records under the CRA is a creature of statute. In this way, the Court looks to the plain language of Section 20703. *See Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation, as we always say, begins with the text."). When the language of a statute is clear and unambiguous—such as here—the Court need not read beyond the text. *See United States v. Husted*, 545 F.3d 1240, 1245 (10th Cir. 2008). "[A]fter all, there can be no greater statement of legislative intent than an unambiguous statute itself." *Id.*

Section 20703 provides that "[a]ny record or paper required[18] . . . to be retained and preserved" under Section 20701 "shall, upon demand in writing by the Attorney General . . . be made available for inspection, reproduction, and copying . . . This demand shall contain a statement of the basis and the purpose therefor." (footnote added).

Two Fifth Circuit cases—published soon after the CRA's codification—recognize Section 20703's requirements for crafting a successful demand. In *Kennedy v. Lynd*, the Fifth Circuit

---

[18] The Court need not decide whether New Mexico's VRL is a "record or paper" subject to the retention and demand provisions of Section 20701. While not raised here, the Court is aware this issue has been contested in multiple cases and was a reason for dismissal. *See DeMarinis*, 2026 WL 1780586, at *5 ("[T]his Court joins every court to have addressed this issue in concluding that an SVRL is not a record or paper that a state must produce to the United States under the CRA."); *Benson*, 2026 WL 1815425, at *6-7; *Fontes*, 2026 WL 1177244, at *5-7; *Bellows*, 2026 WL 1430481, at *7; *Wis. Elections Comm'n*, 2026 WL 1430354, at *4-5; *Scanlan*, 2026 WL 1864054, at *6; *Schmidt*, 2026 WL 1850016, at *2; *Bd. of Elections*, 2026 WL 1999921, at *8-11. No party argued the issue here.

16

concluded the Attorney General's following demand "adequately stated the basis and the purpose" for its record request:

> This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.
>
> The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.

306 F.2d at 229, 229 n.6 (text only). Thereafter, in *Kennedy v. Bruce*, the Fifth Circuit again upheld the Attorney General's properly stated demand:

> This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.
>
> The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.

298 F.2d 860, 861 (5th Cir. 1962) (text only).

These cases also show that the DOJ wrote statutorily compliant demand letters sixty years ago. Now, Defendants contend the DOJ's Demand Letter fails to do the same as it does not meet the requirements of Section 20703. *See* Doc. 32 at 9-13; Doc. 34 at 10-13; Doc. 35 at 22-24. The Court agrees—the DOJ's Demand Letter lacks key components of Section 20703.

Turning first to the "demand," the statutory text requires the Attorney General send a "demand in writing" with "the basis and the purpose" detailed therein. § 20703. Here, based on the CRA's plain language, the measure of the DOJ's written demand is the Demand Letter alone, Doc. 2-3. *See* Doc. 32 at 9-10 (NM Alliance arguing the Court may only consider the Demand Letter). Subsequent forms, court filings, or "a curing elaboration letter" cannot retrospectively supplement the DOJ's September 8, 2025, correspondence. Doc. 102 at 2; *see Galvin*, 2026 WL

17

972129, at *3 ("The statute therefore directs the Court to the Attorney General's written demand—rather than the United States' subsequent court filings—to determine whether that demand 'contain[ed] a statement of the basis' for the demand."); *Oregon*, 2026 WL 318402, at *9 ("[The DOJ]'s patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis' fails."); *cf. Benson*, 2026 WL 1815425, at *8 ("None of the three letters contains both a statement of the basis along with the purpose of the government's request[.]"). Concluding otherwise would be inapposite to the language of the CRA. "The statute says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 426 (2018).

Next, looking at the final sentence of Section 20703—"[t]his demand *shall* contain a statement of the basis *and* the purpose therefor,"—Congress "impose[d] a mandatory command" with the use of the word "shall." § 20703 (emphasis added); *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("'Shall' means 'must'"). Moreover, "the use of the conjunctive 'and,' in the phrase . . . clearly indicates that the [DOJ] cannot satisfy the statutory mandate by simply" supplying only "the basis" or only "the purpose." *Qwest Commc'ns Int'l Inc. v. FCC*, 398 F.3d 1222, 1236 (10th Cir. 2005). "'And,' in grammatical terms, is of course a conjunction—a word whose function is to connect specified items." *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (noting "and" means "along with or together with"). In this way, if the Attorney General's written demand only includes a statement of "the basis," but not "the purpose," or vice versa, it is statutorily insufficient. *See, e.g.*, *Benson*, 2026 WL at 1815425, *8 ("The government cannot pinpoint a Title III demand with a statement of the basis *and* purpose . . . The statutory text suggests that any demand must contain both."); *Scanlan*, 2026 WL 1864054, at *6 ("To read the statute as satisfied by a statement of either

18

basis or purpose alone would run afoul of the ordinary rules of statutory construction by rendering one half of the phrase superfluous.").

Further, by using the word "the" before "basis" and "purpose," Section 20703 requires the Attorney General outline both the discrete factual and the legal motivations underlying the request. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the "definite article 'the'" and indefinite article "a"); *Scanlan*, 2026 WL 1864054, at \*6 ("On its plain terms, this construction signals that 'basis' and 'purpose' are separate, non-overlapping requirements, each of which must independently be satisfied."). In other words, where "the basis" is founded in the facts of the investigation, "the purpose" is rooted in the DOJ's legal rationale. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Oregon*, 2026 WL 318402, at \*9 ("The Court understands 'basis' to mean a factual basis for investigating a violation of a federal statute."); *Galvin*, 2026 WL 972129, at \*4 (finding the DOJ's letter insufficient because it "contains nothing that could fairly be characterized as the factual basis for the demand"); *Amore*, 2026 WL 1040637, at \*11 ("To read 'basis' as meaning a legal basis would conflate that requirement with the required statement of the demand's 'purpose.'"); *Scanlan*, 2026 WL 1864054, at \*7 ("If 'the purpose' denotes the investigative objective of the demand, it follows that 'the basis' in this context is the evidentiary or factual predicate giving rise to the demand in the first place.").

Here, the DOJ's Demand Letter fails because it altogether lacks an identifiable "basis." Nowhere does the DOJ articulate any factual suggestion that New Mexico has violated the NVRA or HAVA, indicate the State has a pattern or practice of noncompliance with the same, nor does it explain how the unredacted PII is necessary to evaluate compliance with the NVRA and HAVA.

19

At most, the Demand Letter conveys the Attorney General's generalized question about New Mexico's VRL maintenance. Had the DOJ identified as the factual "basis" statistical anomalies within New Mexico's voter registration data or conduct associated with the State's VRL maintenance practices, then the outcome may have been different. Instead, the DOJ's Demand Letter is nearly identical to that in *Galvin* where "the Attorney General offered no basis—none— and the demand was therefore facially inadequate." 2026 WL at 972129, at *4. In the end, the Court, like Toulouse Oliver, is left to speculate as to "the basis" that led the DOJ to send its records request. This does not satisfy Section 20703.

Consequently, the DOJ has failed to state a claim under the CRA. Because the Demand Letter lacks "the basis" for the DOJ's records request, the Court need not determine whether the Government provided the sufficient "purpose." *See Scanlan*, 2026 WL 1864054, at *8 ("The absence of any basis is independently fatal to the United States' claim and provides an independent ground for dismissal of the CRA claim."). Hence, the Court will grant Defendants' Motions to Dismiss, Docs. 32, 34, 35; and deny the DOJ's Motion to Compel, Doc. 2.[19]

## CONCLUSION

The DOJ offered no "basis" whatsoever in its Demand Letter. Because of this, the DOJ has failed to provide "the basis and the purpose" mandated by Section 20703 of the CRA. Therefore, its Demand Letter is facially inadequate, and the Complaint fails to state a claim under Rule 12(b)(6). Doc. 1; *see Ashcroft*, 556 U.S. at 678. Accordingly, the Court does not reach Defendants'

---

[19] Ordinarily, the Court allows a plaintiff the opportunity to amend its complaint prior to dismissal. Although, for the reasons discussed above, the DOJ cannot remedy the shortcomings in its Demand Letter with an amendment or by sending "a curing amendment letter." Doc. 102 at 2. In this way, amendment would be futile. Accordingly, "dismissal with prejudice is appropriate." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

other arguments for dismissal. Ultimately, for all the reasons explained above, the Court hereby

orders the following:

1. Defendant Maggie Toulouse Oliver's Motion to Dismiss Pursuant to Federal Rule 12(b)(6) and Memorandum of Law in Support, Doc. 35, is **GRANTED**;

2. Intervenor-Defendant New Mexico Alliance for Retired Americans' Motion to Dismiss, Doc. 32, is **GRANTED**;

3. Intervenor-Defendants Common Cause, Claudia Medina, and Justin Allen's Motion to Dismiss, Doc. 34, is **GRANTED**;

4. The Department of Justice, Civil Rights Division's Motion to Compel Production of Records Demanded Pursuant to 52 U.S.C. § 20705, Doc. 2, is **DENIED AS MOOT**; and

5. Pursuant to Federal Rule of Civil Procedure 12(b)(6), this case is hereby **DISMISSED WITH PREJUDICE**.

The Court will separately enter a final judgment pursuant to Rule 58 of the Federal Rules

of Civil Procedure.

_____
SENIOR UNITED STATES DISTRICT JUDGE

21